Marshall-Edward: Mikels
A Private Living Sovereign Man
By Special Appearance Rogatory
Authorized Representative For
MARSHALL E. MIKELS ***-**-8951
**Mailing and Service Address**:207 Shasta Avenue
Mount Shasta, California [96067]
530-918-4162 / email biocorp@nctv.com
Residence **Address not for Service or mailing**:
115 15th Avenue, San Mateo, California [94402]

FILED
JAN - 4 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DMR

**United States District Court**
**NOTHERN DISTRICT CALIFORNIA**

MARSHALL E. MIKELS

Plaintiff

v.

JAN ESTEP, U.S. BANK NATIONAL ASSOCATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE AJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATE, SERIES 2007-3, CHAD FISHER, FISHER FINANCIAL GROUP, INC. dba, NATIONS CHOICE MORTGAGE, INC, an Arizona Corporation qualified to do business in California; R.K. ARNOLD MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. a Virginia Corporation ("MERS"); TIMOTHY O'BRIEN, SELECT PORTFOLIO SERVICING INC., a Utah Corporation qualified to do business in California; OLIVIA A. TODD, NATIONAL DEFAULT SERVICING CENTER INC., an Arizona Corporation qualified to do business in California ("NDSC"), WRIGHT FINLAY & ZAK, LLP, ROBIN PRIMA WRIGHT, T ROBERT FINLAY, JONATHAN M. ZAK, WILLIAM J. IDLEMAN, MADELEINE K. LEE, NICHOLE M. HOFFMAN, DAVID A. WOOD, RONALD M. ARLAS, DOES 1-100 et al

Defendant(s)

CV 12 0056
Case Number

**VERIFIED COMPLAINT FOR:**

1. FRAUD, AT THE INCEPTION PREDATORY LOAN ON A SENIOR
2. FRAUD, STATUTE OF FRAUDS VIOLATION
3. FRAUD, NO LOAN WAS MADE
4. MORTGAGE FRAUD, RECORDING FORGED AND FRAUDULENT TITLE
5. RECISSION AND DAMAGES, 15 U.S.C. §1635, §1640, 12 C.F.R. § 226, U.S.C. § 2601
6. CONSTITUTIONAL VIOLATIONS CONSPIRACY AGAINST RIGHTS 18 U.S.C § 241 and DEPRIVATION OF RIGHTS UNDER THE COLOR OF LAW §242 OBSTRUCTION OF JUSTICE, 18, U.S.C., Chapter 73. § 1503
7. INJUNCTION
8. ACCOUNTING
9. DECLARTORY RELIEF
10. CONSOLIDATION OF RELATED ACTIONS WITH REMOVED STATE COURT, UNLAWFUL DETAINER COMPLAINT Case Number CLJ203244

**DEMAND FOR JURY TRIAL**

## VERIFIED COMPLAINT

1. In any matter before this Court in the above referenced Case be informed of the following: The undersigned Declarant, Marshall-Edward: Mikels, does solemnly swear, declare and state as follows:

2. Declarant is competent to state the matters set forth herein.

3. Declarant has personal knowledge of the facts stated herein.

4. All the facts herein are true, correct and complete, admissible as evidence and if called upon as a witness, Declarant will testify to their veracity.

5. I, Marshall-Edward: Mikels am not a corporation or a public entity. No presumption can be used by this Court and/or attorneys to establish any jurisdiction, venue or impose a corporate identity onto Marshall-Edward: Mikels or the Plaintiff without full disclosure of the contract or trust agreement executed by all parties concerned and entered positively into this Court record and not consist of any extraneous agreement, license, certificate, contract or trust agreement not entered directly into evidence and this Court record. Without evidence of full prior disclosure of all elements detrimental to the parties no contract exists.

## ACCEPTANCE OF OATH AND EXTENSION OF SOVEREIGN IMMUNITY

### *U.S. Constitution 1789 Article VI - Debts, Supremacy, Oaths*

*"The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."*

6. I, Marshall-Edward: Mikels am a private living sovereign man an individualization of God and an immortal being with unalienable and inalienable Rights that I have been endowed with by the Creator. I hereby accept the Oaths of all Judges and Officials involved in this Case and extend my Sovereign immunity to them so that they can carryout their duties under the Constitution for the United States of America 1789 to protect my Rights and specifically my Right to a jury trial of common law in this Case.

7. I, Marshall-Edward: Mikels hereby state in and on this Court's record that any Judge, Clerk or other government official in connection with the above referenced Case or in any other matter to do with Marshall-Edward; Mikels or MARSHALL E. MIKELS are now under their Oath and that their Oath is made part of this record in this Case and all other matters and all proceedings in this Case or otherwise are to be conducted under their Oath obligation.

8. I, Marshall-Edward: Mikels am making a Special Appearance Rogatory in this Case as the Authorized Representative for MARSHALL E. MIKELS and the secured party creditor and will respond for MARSHALL E. MIKELS without relinquishing any Right; Private Sovereignty hereby exercised or assume any obligation for or any combination of the all CAP entity name.

**ALL RIGHTS RESERVED**

9. I am hereby exercising all my Rights endowed upon me by my Creator without reservation, which include but are not limited to the unalienable Sovereign Rights as referenced in the Bill of Rights and the United States Constitution of 1789, These Rights are bestowed by the creator and cannot be given up or affected by any agreement, they are absolute and come with existence itself and therefore must be recognized, respected and enforced by all. This Court will agree to respect all my private Sovereign Rights by this demand and confirm its agreement by any non-response on the Court record before any action, a non-response will constitute this Court's agreement by novation with respect to upholding their

Oaths of Office and the laws of the Constitution for the United States of America 1789 and all Laws and Rights stated therein.

10. The rights, jurisdiction and/or laws under the corporation charter or other instrument pertaining to the foreign corporation known as the UNITED STATES or UNITED STATES OF AMERICA that is a for profit corporation not formed by the people inhabiting the Continental United Sates of America and that is charted as a corporation in England or other country does not apply in this Case or any matter in connection herewith.

11. My Rights referenced herein include the Right as the Tribunal to appoint a judge to act as a Magistrate to aid the Jury in whatever needs necessary to conduct the proceedings to arrive at a fair and just verdict without hindrance, corruption by the banks, special interests or obstruction of any kind and for all involved in this matter to respect and recognize that the main function of government is the protection of the Peoples Rights.

12. My Rights include the Right to a jury trial in any civil matter and in this Case without obstruction by color of any law, rule or code and a jury trial is hereby demanded by me in this Case.

***Amendment 5 - Trial and Punishment, Compensation for Takings. Ratified 12/15/1791.***

*"No person shall ....................be deprived of life, liberty, or property, without due process of law;*

*5th Amendment and in the 14th Amendment.*

*Generally, due process guarantees the following (this list is not exhaustive):*

- *Right to a fair and public trial conducted in a competent manner*
- *Right to be present at the trial*
- *Right to an impartial jury*
- *Right to be heard in one's own defense*
- *Laws must be written so that a reasonable person can understand what is criminal*

*behavior*

- *Taxes may only be taken for public purposes*
- *Property may be taken by the government only for public purposes*
- *Owners of taken property must be fairly compensated*

*The "why" is* ***substantive due process****. Even if an unreasonable law is passed and signed into law legally (procedural due process),* ***substantive due process can make the law unconstitutional.*** *"*

13. My Rights include the protections of all land and property Rights afforded under any applicable Treaty of the United States for America, the Declaration of Independence, the Bill of Rights and United States Constitution of 1789, the Supreme Law of the Land and Common Law and cannot be superseded by the color of any law, civil, statutory, code, rule or regulation of any type.

14. My Rights include the Right to conduct all affairs within my jurisdiction as Sovereign living man under the protection of the Oaths taken by all judges and others in this Case in which they pledged to uphold and defend the Constitution of 1789 and the application of the laws therein and to protect the natural Rights of people that were given by the Creator and referenced in the Declaration of Independence, Bill of Rights an the Constitution of 1789. Without the express agreement of all parties to the establishment of any contravening jurisdiction in and on the Court record prior to any action all parties will agree to abide by the common laws of the Constitution and the jurisdiction and Rights of Sovereign man protected there under.

15. I have not entered into any contract with any attorney claiming to represent any of the Defendant(s) referenced above or in connection with the matters herein other than the Presentments and Defaults that the attorneys and individuals in connection with the above referenced matter are subject to arising from my Presentments that may be referenced herein or any previous filing in this or other Court. This Complaint or any other motion, filing or action will not reopen any matter subject to a previous default in

dishonor, agreement, obligation or liability arising out of Marshall-Edward: Mikels previous Presentments to U.S. Bank N.A. / U.S. BANK N.A. and all the other parties named associated with or in connection thereto. Any previous Default Judgment is final and considered evidence in any matter and not open to renegotiation, interpretation, jurisdiction or judgment by this or any other Court.

16. I have given no consent to any jurisdiction, venue, civil, statutory or other law referenced anywhere that can be used against me or my property or property rights. My Sovereign Rights and Common Law will apply to me. All civil, statutory, state or federal laws will apply to others referenced herein and in connection with the above referenced matter and is applicable to the parties with any connection to Plaintiff(s), U.S. Bank/BANK N.A. and others in the above matter and can be used against them in any action arising out of the matters referenced herein.

17. Any assumption of my consent to any agreement other than my previous Presentments and Defaults of the Parties in connection with U. S. Bank / BANK N.A. in connection with the above referenced matter, whether implied or in any other form is hereby declared null and void nunc pro tunc unless expressly agreed to by me in writing.

## FACTUAL BACKGROUND

### I
### A PREDATORY LOAN ON A SENIOR DESIGNED TO FAIL FROM THE BEGINING FOR PROFIT, THE MORTGAGE CONTRACT WAS VOID FROM THE ENCEPTION BASED ON FRAUD,

### II
### THE ALLEGED BORROWER WAS MADE AN UNINFORMED PARTY TO AN ILLEGAL AND UNLAWFUL INVESTMENT CONTRACT WITHOUT HIS KNOWLADGE OR AGREEMENT, AN UNINFORCEABLE CONTRACT WITHIN THE STATUTE OF FRAUDS

### III
### NO LOAN WAS MADE BY THE LENDER, NON-PERFORMANCE OF THE CONTRACT

**IV**
**DEFENDNAT(S) RECORDED A FORGED & BOGUS ASSIGNMENT OF DEED OF TRUST TO DEFENDNAT(S)**
**FRAUDULENT CHAIN OF TITLE,**
**AND FRAUDULENT NOTICE OF DEFAULT & TRUSTEE'S DEED,**

**V**
**VIOLATION OF FEDERAL LOAN RECISSION LAWS,**
**THE ALLEGED LENDER LOANED NO MONEY, THERE WAS NO LOAN,**
**PLAINTIFF ('S) UNLAWFUL DEBT COLLECTION AND INJUNCTION VIOLATIONS**

**VI**
**CONSTITUTIONAL VIOLATIONS**
**CONSPIRACY AGAINST RIGHTS 18 U.S.C § 241 and**
**DEPRIVATION OF RIGHTS UNDER THE COLOR OF LAW §242**
**OBSTRUCTION OF JUSTICE, 18, U.S.C., Chapter 73. § 1503**

## VENUE AND PARTIES

18, This Court is the proper venue because of the Diversity of the parties, the federal issues Constitutional issues and federal laws involved.

19. This action arises under 15 U.S.C. §, 12 C.F.R §, 15 U.S.C §2601, C.F.R. § 3500, 18 U.S.C. § 241 and § 242 and under California statutory and common law.

20. This Court has jurisdiction over Federal claims in this action based on 18 U.S.C. §§ 1331 and 1343 and 42 USC U.S.C. § 1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law. This Court also has supplemental jurisdiction over the pendant state law claims because the state law claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C § 1367.

21. The unlawful conduct, illegal practices, and acts complained of alleged in this complaint were all committed in the Northern District of California and the involved real property in located in the Northern

District of California. Therefore, venue properly lies in this District, pursuant to 12, U.S.C. § 2614 and 28 U.S.C.1391 (b).

**PLAINTIFF**

22. The PLAINTIFF, at all times mentioned herein the Plaintiff owns and occupies his primary home, real property and land located at 115 15th Avenue, San Mateo, California and is a sovereign citizen of the state of California a Republic located in the Continental United States of North America a Republic. Plaintiff incorporates paragraphs 1 through 21 herein as though set forth in full.

**DEFENDANT(S)**

22. The DEFENDANT(S) in this Case have head offices in states other than California and are incorporated in states other than California, Plaintiff will amend this Complaint to reflect the states of incorporation when ascertained.

23. DEFENDANT(S) U.S. Bank, National Association, 425 Walnut Street, Cincinnati, OH 45202-3923 as Trustee on behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates Series 2007-3, and Trustee and or Agent for Beneficiaries known or unknown; and are in connection with the original alleged lender: Fisher Financial Group, Inc., dba, Nations Choice Mortgage, an Arizona Corporation qualified to do business in California; 3393 East Baseline Road, #7-118, Gilbert, ARIZONA 85234, Mortgage Electronic Registration Systems, Inc., a Virginia Corporation ("MERS"); "MERS", P.O. Box 2026, Flint, MI 48501-2026, Select Portfolio Servicing Inc. ("SPS"), 3815 South West Temple, Salt Lake City, UT 84115 a Utah Corporation qualified to do business in California; National Default Servicing Center, Inc. 7720 N. 16th Street, Suite 300, Phoenix, Arizona 85020 an Arizona Corporation qualified to do business in California ("NDSC") referred to as DEFENDANT(S), Wright Finlay & Zak LLP,

4665 MacArthur Court, Suite 280, Newport Beach, CA 92660, Robin Prima Wright, T. Robert Finlay, Jonathan M. Zak, Willian J. Idleman, Madeleeine K. Lee, Nichole M. Hoffman, David A. Wood, Ronald M. Arlas, and Does 1 through 100 due to their association and involvement and other parties named or to be named.

24. The true names and capacities, whether individual, corporate or otherwise of Does 1 through 100, inclusive, are unknown to Plaintiff are presently unaware of which would give rise to a cause of action against said Doe defendants, and therefore sues said Defendants by such fictitious names and will seek leave of court to amend the complaint to show their true names and capacities when the same is ascertained. Plaintiff(s) will make all allegations necessary and proper to change said Defendants herein, all of whom are responsible in some manner for the events and happenings herein referred to, proximately causing damages to Plaintiff(s)

## BACKGROUND

### A PREDATORY LOAN ON A SENIOR DESIGNED TO FAIL FROM THE BEGINING FOR PROFIT

25. In early June of 2007, between the 4th and the 12th, Erick Brass, Senior Loan Officer at Fisher Financial, Inc., dba Nations Choice Mortgage ("Nations Choice") approached Plaintiff, Brass informed Plaintiff that "[i]f I were you I would pull every dollar possible out of your home and invest it in the stock market with some investments that will earn more than the interest payments you would be making and you're sure to make double or triple what your loan is costing you." Plaintiff did not investigate the statements on his own because Brass represented himself as very knowledgeable in the loan business and also in the investment world. Brass guaranteed Defendant that he knew what he was talking about, and that Plaintiff could rely on him for expert advice. The

property in question ("Property") is described in the Legal Description attached as **Exhibit A**, and incorporated here by reference.

26. Brass told Defendant that he had to move fast because interest rates would go up soon. Plaintiff was concerned that if he waited too long, interest rates would go up. He was not suspicious of Brass, because Brass sounded very professional and sure of himself. Brass also represented himself as a long time industry veteran who knew what he was talking about. Based on Brass' comments, Plaintiff was led to believe that he would be making a big mistake if he did not take advantage of the opportunity. Plaintiff did make some inquiries to Brass regarding the nature of the proposed loan. Specifically,

27. Plaintiff had some concerns regarding the adjustable rate note. This is because the interest rate on the loan would reset to a higher rate at the end of five years. He communicated these concerns to Brass. In response, Brass said "I wouldn't be concerned about any adjustment of the loan payment in five years because we rewrite these loans all the time, guaranteed, so don't be worried." Plaintiff was not suspicious of Brass because he had been in the business a long time with Nations Choice, and Brass represented that they could rewrite the loan to keep the payments low. Plaintiff did not further investigate Brass claims for the reasons given previously and also because Brass represented himself as able to rewrite the loan. Brass stated that he had been at Nations Choice since the company started, that he was in charge of rewriting loans and could guarantee a rewrite of the loan to keep the payments low. Plaintiff felt pressure to act fast before the rates change. Plaintiff believed that Nations Choice was interested in receiving regular loan payments from him. This is because Brass told Plaintiff that his credit score was high, and he should have no problem obtaining the loan and making the necessary payments required by the lender. Plaintiff believed Bass and did not investigate them because of the reasons stated previously. Furthermore, Plaintiff assumed that an

organization that extended a loan would naturally want to be paid back on the loan.

**I**

**FIRST CLAIM FOR RELIEF**

**FRAUD AT THE INCEPTION OF THE LOAN**

28. Plaintiff incorporates paragraphs 1 through 25 herein as though set forth in full

29. At all times herein the term loan means alleged loan. The truth is that Plaintiff was not able to make double or triple the cost of his loan in the stock market. The truth is that Defendant was not able to refinance Plaintiff's loan. The truth is that Nations Choice sold Plaintiff's alleged loan to investors in a securitized Loan Trust without Plaintiff's prior knowledge consent or agreement, the alleged loan and mortgage contract that was represented to plaintiff was not the loan and contract that transpired. Actually, the alleged lender Nations Choice Mortgage did not make a loan as the Note and Deed of Trust, the mortgage contract called for and stated.

30. Therefore, Plaintiff MARSHALL E. MIKELS is informed and believe and thereon alleges that Defendant(s) FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC.., in concert with the other Defendant(s) on or about 12, June 2007, defrauded Plaintiff as follows; Intentional or Negligent Misrepresentation, a) Defendant made representations of material fact as stated herein in paragraphs 23 through 25 but not limited thereto. b) These representations were in fact false c) When defendant made the representations, defendant knew they were false. The truth was that Mr. Mikels was not able to make double or triple the cost of his loan in the stock market. The truth is that Nations Choice was not able to refinance Mr. Mikels loan. The truth is that Nations Choice sold Mr. Mikels alleged loan to investors in a securitized Loan Trust. The expert analysis of the Loan Trust is contained in **summary Exhibit 1 and full 2**, the McDonnell Analysis, and incorporated here by reference. The investors in the Loan Trust did not intend to ever collect

payments from the putative loans, including Mr. Mikels transaction. With a default rate of approximately 44%, it is likely that the Loan Trust was put together not to develop a stream of payments, but to generate a profit for the defendants via failure of the trust.

31. **Promise Without Intent to Perform**. Plaintiff MARSHALL E. MIKELS has personal knowledge is informed and believe and thereon alleges Defendant's promise without any intention of performance was made with the intent to defraud and induce Plaintiff to rely upon it and to act as described in item Paragraph 33 to 34 but not limited thereto. At the time Plaintiff acted, Plaintiff was unaware of Defendant's intention not to perform the promise. Plaintiff acted in justifiable reliance upon the promise as stated herein. In justifiable reliance upon Defendant's conduct, Plaintiff was induced to act in as stated herein in paragraphs 37 but not limited thereto. Because of Plaintiff's reliance upon Defendant's conduct, Plaintiff has been damaged as stated in Paragraph 30 and 33 but not limited thereto.

32. As a direct and proximate result of the false, fraudulent and/or deceitful representation made by Defendant(s) and their agents, and the Plaintiffs' justifiable reliance on thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., and their agents have been and will be, unjustly enriched and the Plaintiffs have been damaged in an amount in excess of $1, 786,043

## II

## SECOND CLAIM FOR RELIEF

## AN ILLEGAL UNLAWFUL UNCONCSCIONABLE CONTRACT WITHIN THE STATUTE OF FRAUDS AND UNENFORCEABLE

33. Plaintiff incorporates paragraphs 1 through 30 herein as though set forth in full.

34. What actually transpired was that Defendant(s) made Plaintiff an uninformed party to an

investment contract without his knowledge, consent or agreement, which is an unconscionable contract that falls within the Statute of Frauds and which is unenforceable by law. The expert analysis of the Loan Trust is contained in **summary Exhibit 1 and full 2**, the McDonnell Analysis, and incorporated here by reference. Exhibit "6" "J" "The Securitization Flow Chart" shows all the various entities that worked together to form the investment contract between themselves, Plaintiff(s) and the unknown investors who were sold an interest in Plaintiff's home without Plaintiff's knowledge or consent. Plaintiff has personal knowledge is informed and believe and thereon alleges that all the parties involved in the "Securitization Flow Chart" basically duped the homeowner into putting up his good credit rating and property in a alleged loan doomed to fail from the beginning and then duped investors into buying an investment in Plaintiff's home, which very well may have been rated AAA, while knowing the loan was planned for failure and then profited from commissions, default insurance and the possibly the shorting of the collapsing market.

35. As a direct and proximate result of the false, fraudulent and/or deceitful representation made by Defendant(s) and their agents, and the Plaintiffs' justifiable reliance thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., all of the Defendant(s), the parties listed on Exhibit "6" "J" "The Securitization Flow Chart" and their agents have been and will be, unjustly enriched and the Plaintiffs have been damaged in an amount in excess of $1, 786,043 and other damages yet to be ascertained.

**III**

**<u>THIRD CLAIM FOR RELIEF FRAUD</u>**

**NO LOAN WAS MADE BY DEFENDANTS**
**DEFENDANT(S) HAVE NO STANDING TO MAKE A CLAIM**

36. Plaintiff incorporates paragraphs 1 through 33 herein as though set forth in full.

37. Plaintiff MARSHALL E. MIKELS has personal knowledge is informed and believes and thereon alleges that the alleged lender and none of the parties in the "Securitization Flow Chart" loaned any money to Plaintiff, therefore, **there was no loan made to Plaintiff**. Unless the unknown investors are identified as a claimant in a law suit with evidence that they loaned money to Plaintiff, under a contract that Plaintiff was a party to with full prior disclosure to Plaintiff and Plaintiff's agreement to and which agreement Plaintiff executed, no unpaid loan can be claimed by the investors. And, certainly no loan was made in any case by any of the Defendant(s). Therefore, the Defendant(s) cannot bring a law suit based on the non-payment of the Note and/or Deed of Trust because there was no contract performed by any Defendant(s) and no money loaned on those instruments and therefore Defendant(s) have no standing.

38. **a. The Defendant(s) did not receive a loan from Plaintiff(s) or from the alleged lender as proven by the evidence presented herein. Therefore, the Deed of Trust and alleged loan Note are void. See, Marie McDonnell's Declaration attached as Exhibit 1 and 2 and Exhibit "6" "J" the "Securitization Flow Chart"** which show that the alleged lender did not make the alleged loan, that any alleged funding came from (follow the Orange line and arrows) the "Mortgagee, Cede & Co. (DTCC) MORTGAGEE / CERTIFICATEHOLDERS PURCHASE MORTGAGE BACKED SECURITIES AS DEFINED IN CERTIFICATES" and then through Credit Suisse Securities (USA) LLC UNDERWRITER, and then through C. Credit Suisse First Boston Mortgage Securities Corp. DEPOSITOR, then through B. DLJ Mortgage Capital, Inc. SELLER / SPONSOR, then through **A.** Fisher Financial Group, Inc. d/b/a Nations Choice Mortgage ORIGINATOR.

39. **Therefore according to the public records presented in Marie McDonnell's Expert Witness Loan Analysis no loan was made by the alleged lender** Fisher Financial Group, Inc. d/b/a Nations

Choice Mortgage and based on this evidence of the securitization of the alleged mortgage contract **NO LOAN WAS MADE as represented to Mr. Mikels by the alleged lender and the written mortgage contract consisting of the Note and Deed of Trust, that is a fact supported by the evidence.**

40. **There was <u>no loan</u> made by the Plaintiff U.S. Bank N.A./U.S. BANK N.A**. although Marie McDonnell's Loan Analysis shows evidence that the alleged loan was securitized and public records show the entities referenced above in the chain of securitization implying that funding flowed from the purchasers of the securities through Cede & Co. (DTCC) **MORTGAGEE,** <u>there is no evidence in Plaintiff's filings of who allegedly funded any money</u>. No actual lender is named and the identities of any alleged lender remains unknown. Although the evidence does show that **<u>Plaintiff U.S. Bank N. A. did NOT make a loan</u>**.. Therefore, Defendant('s) **<u>lacks standing</u> because U.S. Bank N.A. did not loan any money and cannot represent unknown parties or represent that unknown parties loaned money without providing evidence.**

41. In addition, Marie McDonnell's Loan Analysis Exhibit "1" "M" and her Summary show that the Plaintiff(s) were **<u>not assigned any interest in the Deed of Trust or Note</u>** by the evidence of the bogus and fraudulent Assignment from the known Robo-Signer Bill Koch, that Plaintiff(s) and their agents recorded in the Records of the San Mateo County Recorder, which is conclusive evidence that the Plaintiff(s) have no interest in the Note or Deed of Trust and cannot represent to this Court that they are entitled to have an obligation to collect any money on behalf of the anonymous investors. Also, all of the documents recorded by NDSC or others referenced in Plaintiff('s) Declaration of Olivia A. Todd and the Declaration of Mindy C. Leetham, <u>**fail** and have absolutely no legal or lawful effect</u> on the transfer of Title, the authority to Notice or record Notice, the authority to Notice Substitution of Trustee, the authority to conduct a Trustee's Sale the authority to issue a Trustee's

Deed or any other paper because the phony Bogus and fraudulent assignment of interest to Defendant (s) U.S. Bank N.A. or the Trustee of the 2007-3 Trust was first in line, and did not and could not transfer any interest and therefore all documents that were recorded after the Bogus and fraudulent Assignment are worthless and have no authority to do anything or affect title in any way.

42. **See, Marie McDonnell's Declaration attached hereto as Exhibit "1" and "6""J"** which unveils evidence that the **Plaintiff(s) and their agents did not make a loan, did not perform on the represented mortgage contract, that the mortgage contract was conceived in fraud, that the undisclosed investment was within the Statute of Frauds and unenforceable.**

43. The investors in the Loan Trust did not intend to ever collect payments from the putative loans, including Plaintiffs' transaction. With a default rate of approximately 44%, it is likely that the Loan Trust was put together not to develop a stream of payments, but to generate a profit for the Defendants via failure of the trust.

44. In reliance on the statements of Brass, Plaintiff executed an Adjustable Rate Note ("Note") on July 11, 2007,. A copy of the Note is attached as **Exhibit B** and incorporated here by reference. The Note was in the amount of $1,350,000. The alleged lender was Fisher Financial Group. To secure payment of the principal sum and interest as provided in the Note and as part of the same transaction, Plaintiff, as trustor, executed (what in reality was a void contract from its inception based on fraud) and delivered to Defendant Mortgage Electronic Registration System ("MERS"), as alleged nominee for unnamed beneficiaries, a Deed of Trust ("Deed") dated July 11, 2007 by the terms of which Plaintiff, as trustor, conveyed to Ticor Title, as trustee, real property described in **Exhibit A**, which is incorporated here by reference.

45. On July 18, 2007, the Deed was recorded at the San Mateo County Assessor-County Clerk-Recorder's office. A copy of the Deed is attached as **Exhibit C** and incorporated here by reference.

After receiving the funds from the alleged loan (which evidence shows the money actually came from Plaintiff's Note with no loan made) and relying on the advice of Brass, Plaintiff invested the money in the stock market. Shortly thereafter the market declined, and Plaintiff attempted to protect his position by investing in precious metals because the stock market showed signs of a major decline coming soon.

46. As a result of signing the Note and investing the funds allegedly from Fisher Financial, Plaintiff lost $633,711 in the investment markets, and paid $162,331 commissions charged by various investment brokers and lost approximately $1,000,000.00 of equity in his home for which Defendant(s) are responsible. Since Plaintiff lost money in the investment markets, Plaintiff has personal knowledge is informed and believe and thereon alleges the Defendant(s) collectively in concert with other members of the industry collapsed the market causing the $1,000,000.00 loss of Plaintiff's home equity, he did not make any money in the way that Brass represented. As a result of losing the money, Plaintiff was unable to make his payments on the alleged Loan Note, which led to a foreclosure action on his home by the Defendant(s) who actually did not loan anything or have the authority or standing to foreclose.

47. On November 6, 2009, Defendant('s) Agent or Representative National Default Servicing Corporation ("NDSC"), caused to be recorded a Notice of Default against Defendant in regard to the subject property. A copy of the Notice of Default is attached as **Exhibit D** and incorporated by reference.

48. It is intentionally deceptively unclear in what capacity Defendant NDSC recorded the Notice of Default. In the body of the Notice, NDSC refers to itself as either "the original Trustee, the duly appointed substituted trustee, or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 7/13/2007..." The signature line of the Notice of Default claims that NDSC was acting on

behalf of Select Portfolio Servicing, FKA Fairbanks Capital Corporation as Beneficiary. On or about February 8, 2010, NDSC caused to be recorded a Notice of Trustee Sale. A copy of the Notice of Trustee Sale is attached as **Exhibit E**, and incorporated by reference. The sale was scheduled for March 3, 2010 at 1:00 p.m.

49. Furthermore, Plaintiff has personal knowledge is informed and believe and thereon alleges Defendants as whole took an unknown amount of profit on the origination, sale and servicing of the loan described in the Note. (See Exhibit 6, McDonnell Analysis) This amount can only be determined via an accounting.

50. Plaintiff asserts that the Note and Deed of Trust are void because of fraud in the inception of the contract and more recently learned after much research that NO loan was made. The contract he entered into by signing the Note, was not the one he anticipated. This is because Defendant anticipated, based on representations by Nations Choice, that his alleged lender would rewrite his alleged loan to keep the payments affordable. Furthermore, Defendant also anticipated that his alleged lender would have an interest in continuing to receive a stream of payments from him on the Note. As evidenced by the McDonnell Analysis, it is highly likely that the Loan Trust in which Defendant alleged loan was securitized was not designed to produce a stream of payments from borrowers. Rather it is certain that the Loan Trust was designed by defendants to fail. Plaintiff has personal knowledge is informed and believe and thereon alleges that the evidence from the alleged lender will show that the alleged mortgage was pledged to be securitized and sold as securities prior to the close of escrow in which case Defendant(s) premeditated the fraud. The actual evidence filed in the state court presently of the Note, Deed of Trust mortgage contract and the McDonnell report and Exhibit "6" "J" the "Securitization Flow Chart" show that in fact Plaintiff was made an uninformed third party to an investment contract, not a mortgage at all and a <u>violation of the statute</u>

of frauds and that Defendant's made no loan to Plaintiff.

51. As a direct and proximate result of the false, fraudulent and/or deceitful representation made by Defendant(s) and their agents, and the Plaintiffs' justifiable reliance on thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., all of the Defendant(s), the parties listed on Exhibit "6" "J" "The Securitization Flow Chart" and their agents have been and will be, unjustly enriched and the Plaintiffs have been damaged in an amount in excess of $1, 786,043 and other damages yet to be ascertained and decided by a jury .

**NATIONAL MASS FORECLOSURE FRAUDS COMMITTED BY THE MAJOR BANKS IS PROVEN TO BE FACT ON NATIONAL BROADCAST BY 60 MINUTES**

52. On Sunday night, April 3, 2011, CBS aired a national televised program familiar to all, "60 Minutes" on the subject of "Foreclosure Fraud" in which 10.29 million viewers sat and watched the story of how banks throughout the country have committed mass frauds and criminal violations on the American people by hiring $10 an hour workers with no experience to sign and forge other peoples names on title documents as phony vice presidents of numerous companies at the same time, so that the banks could foreclose on homes in which they did not own or have the title paperwork or a legal right to foreclose on, so they created the paperwork and forged the names to do it anyway. These people were told it was legal by their bosses and that they were expected to sign a high number of these phony documents per day, the man being interviewed said that he would sign up to 4,000 forged documents per day. All the banks that were involved were the major banks in this country including U.S. Bank the Plaintiff(s) in this Case CLJ 203244. This CBS program basically summed up what happened in this Case and revealed the fraudulent, illegal and criminal activities of the Plaintiff's in this Case and the fact that the Trustee's Deed that the Plaintiff's tout as their ownership right is

completely phony, fraudulent and criminal, they, the Plaintiff(s) know it, their Attorneys know it and there is no way this Court could not know it also after seeing this program and the evidence herein. The web site where the program can be seen is http://www.cbsnews.com/video/watch/?id=7361572n&tag=contentMain;cbsCarousel . So, with this background the following will prove what is obvious to the country and this Court.

## IV

## FORTH CLAIM FOR RELIEF MORTGAGE FRAUD

**PLAINTIFF (S) RECORDED A FORGED AND FRAUDULENT ASSIGNMENT OF INTEREST IN THE DEED OF TRUST AND NOTE TO DEFENDANT U. S. BANK N.A. AND ILLEGAL AND UNLAWFUL SUBSTITUTION OF TRUSTEE, NOTICE OF DEFAULT, NOTICE OF TRUSTEE'S SALE AND TRUSTEE'S DEED WITH THE SAN MATEO COUNTY RECORDER, THEREOFRE ANY CLAIM TO OWNERSHIP OR TITLE IS VOID AND WITHOUT EFFECT AND PLAINTIFF (S) HAVE NO STANDING TO BRING AN ACTION**

53. Plaintiff incorporates paragraphs 1 through 50 herein as though set forth in full.

54. Plaintiff hired Marie McDonnell a expert witness and loan forensic analyst (who did the Amicus Brief in the recent Massachusetts Supreme Court recent landmark Case" U.S. Bank v Ibanez" Case) to do a forensic loan analysis report on the alleged loan that Defendant(s) are claiming is the basis for their claim of ownership of the loan Note and Deed of Trust, right to foreclose, record a Trustee's Deed, claim to ownership of the referenced Plaintiff's property in this Case. The loan forensic analysis report revealed a bogus and forged assignment of interest in the Note and Deed of Trust to Defendant U.S. BANK N.A. and fraudulent documents in the chain of title and fake officers of the alleged holder of the Note without authority to transfer interest or title, or to foreclose or to record any legitimate notice or title document. Therefore, Plaintiff has personal knowledge is informed and

thereon alleges the Defendant(s) have no interest in the Note or Deed of Trust, cannot claim they made a loan, or transferred any money based on the Note, are not holders in due course, cannot claim that they represent any party who loaned money to Plaintiff, cannot claim they are collecting on behalf of anyone, cannot claim they had the authority the record the Notice of Default, the Notice of Trustee's Sale and record the Trustee's Deed because the first and most important instrument the assignment of any interest in the Note and Deed of Trust was phony, forged, fraudulent, illegal and unlawful and the Plaintiff (s) cannot claim title, ownership or the standing to bring any action to this or any other Court. Therefore, any claim by the Defendant(s) to ownership must be dismissed on that basis. Marie McDonnell's affidavit and Report summary that focuses on the above issues is attached hereto as **summary Exhibit 1**, and the full Report with her Affidavit is attached and incorporated herein as **Exhibit 2 with sub Exhibits A through M.** Marie McDonnell's report is supported by her Affidavit that was prepared for a TRO filed in the San Mateo County Superior Court in March 2010 and a recent Affidavit verifying her Report for this Case.

55. As a direct and proximate result of the false, fraudulent and/or deceitful representation made and actions done by Defendant(s) and their agents, and the Plaintiffs courts and authorities' justifiable reliance thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., TIMOTHY O'BRIEN, and SELECT PORTFOLIO SERVICING INC., a Utah Corporation qualified to do business in California; OLIVIA A. TODD, and NATIONAL DEFAULT SERVICING CENTER INC., an Arizona Corporation qualified to do business in California ("NDSC") all of the Defendant(s), the parties listed on Exhibit "6" "J" "The Securitization Flow Chart" and their agents to be ascertained as to their involvement, have been and will be, unjustly enriched and the Plaintiffs have been damaged in an amount in to be determined just and appropriate by a jury.

**THE FOLLOWING IS A SUMMARY OF MARIE MCDONNELL'S FINDINGS FORGED AND FRAUDULENT DOCUMENTS AND ASSIGNMENTS WITH NO AUTHORITY TO FORECLOSE**

56. Plaintiff incorporates paragraphs 1 through 47 herein as though set forth in full.

57. As referenced above, a forensic loan analysis was done on Plaintiff's alleged loan by Marie McDonnell an expert loan forensic expert witness who did the work on the recent landmark "U.S. Bank v Ibanez" case. This case is a solid landmark precedent, saying that if a bank doesn't own a mortgage, then it can't foreclose on a home (U.S. Bank is involved in Plaintiff's Case and is shown the illegal Trustee's Deed Defendant(s) recorded). if there was a break in the chain of title somewhere which meant that the bank didn't own the mortgage in question — then the borrower must get their deed, and their home back from the bank and this decision *is* retroactive. The loan analysis on Plaintiff's alleged loan revealed no assignment of interest to Defendant(s) a broken chain of title, missing, forged and fraudulent documents from the original lender Fisher Financial to Plaintiff U.S. Bank/BANK N.A. and that the parties who claimed to have the authority to foreclose did not have the authority as the evidence shows from the loan analysis as follows.

***Corporate Assignment of Deed of Trust***

*From Marie McDonnell, 2 28 2010 Truth In Lending Audit & Recovery Services, LLC*

*Copyright 2/28/2010*

*Page 16*

*"In the instant case, Bill Koch, an employee of SPS, executed and recorded a Corporate Assignment of Deed of Trust in the Official Records of San Mateo County on February 8, 2010, which purports to convey all right title and interest in the subject Note and Deed of Trust as of November 27, 2009 from Fisher Financial Group, Inc. d/b/a Nations Choice Mortgage to U.S. Bank National Association, as Trustee, on Behalf of the Holders of the*

*Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 ("ARMT 2007-3"). (See Exhibit F. – Corporate Assignment of Deed of Trust)"*

*"As established above, <u>this Assignment contradicts</u> the securitization pathway set forth in the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission which informs us that Fisher Financial was required to sell the Mikels mortgage obligation to DLJ Mortgage Capital, Inc. (the Seller/Sponsor); subsequently, DLJ was required to sell the Mikels mortgage obligation to Credit Suisse First Boston Mortgage Securities Corp. (the Depositor) on or about the Cut-Off Date December 1, 2007; finally, Credit Suisse was to convey the pooled assets, including the Mikels mortgage obligation, into the ARMT 2007-3 Trust Fund (the Issuing Entity) on or about December 26, 2007, the closing Date for the securitization. According to the endorsement on the Note, Fisher Financial divested its interest in the Mikels Loan on **July 11, 2007**; hence, <u>SPS's Corporate Assignment of Deed of Trust which purports to convey the Mikels' mortgage obligation directly into the ARMT 2007-3 Trust more than two years after the fact on **November 27, 2009 is controverted** by a preponderance of the evidence.</u>*

*To illustrate how the Mikels Note and Deed of Trust had to be conveyed into the ARMT 2007-3 Trust according to the securitization documents versus how SPS claims the transaction proceeded, I prepared a flow chart that compares the two. (See Exhibit M. - Bogus & Missing Assignments)*

See, Marie McDonnell's flow chart establishing proof of bogus, missing, forged and fraudulent documents incorporated herein and attached hereto as **Exhibit 1 in summary and 2 in full.**

***Substitution of Trustee***

*In considering whether to enjoin the Trustee's Sale scheduled to take place on Tuesday, March 2, 2010, the Court must determine whether this Substitution of Trustee is a valid document given the following facts:*

*1. Whereas SPS purports to substitute the Trustee of the Deed of Trust on behalf of ARMT 2007-3 as the Trust's servicing* ***agent, an officer of SPS did not execute the document.***

***2. Rather, the Substitution of Trustee was executed by Olivia A. Todd who is President of National Default Servicing Corporation. Accordingly, this document is self-serving as NDSC appointed itself as Successor Trustee without presenting any evidence that it was authorized by SPS or U.S. Bank as Trustee of the ARMT 2007-3 Trust to do so.***

***3. Finally, the Corporate Assignment of Deed of Trust from Fisher Financial to U.S. Bank as Trustee of the ARMT 2007-3 Trust*** ***<u>is a contrivance and is untruthful according to a preponderance of the evidence. Therefore, the Substitution of Trustee – which depends upon the Assignment – must also fail as well because no authority was conveyed to SPS, U.S. Bank or NDSC by virtue of the Assignment.</u>***

***<u>I believe that my Securitization & Foreclosure Analysis only scratches the surface of the financial fraud that belies Mr. Mikels' situation</u>****. Mr. Mikels' request for a Temporary Restraining Order is well founded in light of the facts addressed herein and in the interest of justice, the Court should grant his request.*

58. See, the loan analysis conclusions and the **<u>Exhibit ~ M. Bogus & Missing Assignments</u>**

incorporated herein and attached hereto as **Exhibits 1 in summary and 2 in full.**

59. **Marie McDonnell's conclusion based on the evidence and her expert testimony was that:**

1. **There is evidence - that U.S. Bank as trustee for the Trust 2007-3 was NOT the owner of the Note or holder in due course of the Note and has NO STANDING to foreclose or record any trustee's deed or appoint anyone one else to foreclose or record anything.**
2. **U.S. Bank was Not the holder of the Note in due course and is BARED FROM BRINGING ANY COURT ACTION.**
3. **SPS Inc. the loan servicer and National Default Servicing Corp. the foreclosure mill, have no authority to foreclose or record any trustee's deed because U.S. Bank as the Trustee for the Trust (because of the bogus illegal assignment) did not own or hold the note, was not the holder in due course and therefore had no authority to appoint.**
4. **There were forged and fraudulent chain of title documents recorded by SPS, NDSC, U.S. Bank, their Representatives and Agents.**
5. **The Agents of U.S. Bank, Select Portfolio Servicing, National Default Servicing, and the Agents they hired to do eviction work, the MRL Group, the law firms of Wright Finley & Zak, and most recently Pite & Duncan LLP do not have any authority to evict anyone or any standing to bring a court action.**
6. **The alleged loan was originated based on fraud and a predatory loan which is illegal under federal, state and common law and any claim to a loan obligation from any of the parties involved is void in law because of the fraud at the inception of the alleged loan. <u>No loan obligation exists</u> and none of the parties involved have standing to foreclose, record any trustee's deed, claim any interest, have no authority to make a claim that no tender was made, carry out any eviction action or file any complaint in any court.**

**7. All the parties involved are liable for the damages and monetary losses Plaintiff have suffered**

60. Note: This web site has the latest court cases and breaking news about the mass frauds, forgeries and illegal foreclosures by the major banks and their agents.

http://4closurefraud.org/author/4closurefraud/

61. As a direct and proximate result of the false, fraudulent and/or deceitful representation made and actions done by Defendant(s) and their agents, and the Plaintiffs courts and authorities' justifiable reliance thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., TIMOTHY O'BRIEN, and SELECT PORTFOLIO SERVICING INC., a Utah Corporation qualified to do business in California; OLIVIA A. TODD, and NATIONAL DEFAULT SERVICING CENTER INC., an Arizona Corporation qualified to do business in California ("NDSC") all of the Defendant(s), the parties listed on Exhibit "6" "J" "The Securitization Flow Chart" and their agents to be ascertained as to their involvement, have been and will be, unjustly enriched and the Plaintiffs and the public at large have been damaged in an amount in to be determined just and appropriate by a jury.

**FIFTH CLAIM FOR RELIEF RECISSION**

**THE LOAN NOTE AND DEED OF TRUST WAS CANCELLED BY FEDERAL LOAN RECISSION LAW ON MARCH 29, 2010**
**VIOLATIONS OF RECISSION, 15 U.S.C. §1635, §1640, 12 C.F.R. § 226,U.S.C. § 2601 AND OTHER FEDERAL LAWS**

62. Plaintiff incorporates paragraphs 1 through 59 herein as though set forth in full.

63. Marie McDonnell's Report provided proof to the Superior Court of San Mateo County of bogus, forged and fraudulent assignment that transferred no interest to Defendant(s) and transferred

no authority to foreclose and the court ignored it with a statement from the court's young law student intern that said "I don't think he will win" and denied Plaintiff's motion for a TRO to stop the fraud and illegal trustee's sale. Therefore, Defendant was forced to use the Federal loan recession laws as a remedy for justice outside of the San Mateo County Court to seek justice.

64. On March 29, 2010 Defendant served a NOTICE OF LOAN CANCELLATION AND AUTOMATIC VOIDING OF THE DEED OF TRUST on the Defendant(s) who had illegally and unlawfully claimed an interest in the above referenced property and on the others involved in the various frauds. The cancelled and voided Deed of Trust referenced herein was dated 7/13/2007 and recorded in San Mateo County as Document number 2007108403. The Notice of the Loan Rescission was served on all the parties involved by Notary Certificate of Service and Certified Mail, by licensed Process Service, Notary proof of delivery by fax and by a Court Reporter who recorded the delivery and entire Notice of Loan Cancellation and Automatic Voiding of the Deed of Trust with the Superior Court in San Mateo County.

65. The Federal loan rescission law that Plaintiff used is explained at length below for the Court's information and the **NOTICE OF LOAN CANCELLATION AND AUTOMATIC VOIDING OF THE DEED OF TRUST** dated March 29, 2010 is incorporated herein by this reference and attached hereto as **Exhibit 4.**

66. **The proof of delivery** of the NOTICE OF LOAN CANCELLATION AND AUTOMATIC VOIDING OF THE DEED OF TRUST dated March 29, 2010 by Fax with Affidavit of Delivery by Notary, Notary Certificate of Service by Certified Mail and the San Mateo County Court Reporter's Court Record is incorporated herein by this reference and attached hereto as **Exhibit 4-A**.

67. The Federal laws that apply are incorporated herein by this reference and attached hereto as **Exhibit 5.**

68. The federal law Defendant used to cancel the loan Note and automatically void the Deed of Trust is one of the most powerful remedies available to consumers to stop loan abuse. In fact, consumers began using this law recently to protect themselves from the nation-wide mass frauds and illegal foreclosures that the major banks and foreclosure-mill-attorneys were committing. The law is powerful and so effective at stopping the foreclosures that the banker's complained to the Federal Reserve Board of Governors to change the law, <u>although any change would not affect this Case because it was done on **March 29, 2010**</u>. To Defendant's knowledge no change was made because of the uproar that the Federal Reserve came under by the public and government officials, including Chairman Ben S. Bernanke the head of the Federal Reserve. Attached are letters to the Federal Reserve from Illinois and Ohio's Attorney General Richard Cordray and six Senators that make up the U.S. Senate, Committee on Banking, Housing and Urban Affairs attached hereto as **Exhibit 4-1 & 4-B.** Attorney General Richard Cordray letter reads in part:

*As the primary state law enforcement officials charged with protecting consumers from unfair and deceptive acts and practices in mortgage lending, we are writing in response to the Federal reserve's proposed amendments to Reg. Z, as set forth in the Notice of Proposed Rulemaking of September 24, 2010. This comment is submitted on behalf of the attorneys general of Ohio and Illinois.*

*These comments address only the proposed changes with respect to the extended right of rescission in 12 CFR, § 226.15 and §226.23. The proposed amendments to §226.15 and §226.23 would amend Reg. Z to condition the voiding of the creditor's security interest upon the consumer's tender of the amount demanded by the creditor. Proposed §226.15(d)(2) and §226.23(d)(2). This change would effectively nullify rescission as a tool for middle and low income homeowners fighting foreclosure and predatory lending, and would remove the*

*leverage of rescission as deterrence for unlawful creditor conduct. Accordingly, we respectfully request that the Federal Reserve withdraw its proposed rule amendments to 12 CFR §226.15 and §226.23*

69. And, U.S. Senate, Committee on Banking, Housing and Urban Affairs, Senators,: Sherrod Brown, Christopher Dodd, Jack Reed, Daniel Akaka, Jeff Merkley and Tim Johnson's letter to the Federal Reserve dated January 3, 2011 read in part:

*"We write toady as members of the Senate Committee on Banking, Housing, and Urban Affairs, to express our concerns regarding proposed changes to regulation Z implementing the truth in lending Act (TILA) that would erode important borrower protections that have been in place since TILA was enacted 42 years ago.*

*The extended right of rescission has been an important home-saving legal toll protecting borrowers against predatory loans. A borrower has traditionally had the right to resend a loan agreement that does not comply with TILA's disclosure requirements within three years of the agreement. The statute its implementing regulations have* ***long been interpreted to require a creditor to cancel its security interest after receiving notice from a homeowner****. See Williams v Homstake Mortgage Company., 968F,2d 1137, 1140, (11Cir. 1992; see also id, at 1141-42 (describing the rescission procedures under Regulation Z).*

*The board's proposed rule would reverse the traditional understanding of TILA's right of rescission (see 75 Fed. Reg. 58539, 58694 (2010). by requiring a homeowner to pay off the entire mortgage amount before a creditor is required to cancel its security interest in the home. Requiring a borrower to pay off the entire mortgage would render this important borrower right inaccessible to all but the wealthiest homeowners.*

*The Board has said that it "believes this adjustment would facilitate compliance with TILA"*

*(see,Id, at 58548; see also id, at 58629.)* ***__We disagree__***. *The existing order of events creates a balance between the consumer and the lender. The Board's proposal would tilt the balance in favor of creditors who have failed to comply with TILA's disclosure requirements.*

*We urge the Board to reconsider its proposed revisions to regulation Z."*

70. From: Dan L Walsh at: http://www.federalreserve.gov/SECRS/2011/January/20110110/R-1390/R-1390_122010_58063_516877700929_1.pdf with CC to Senator Franken, Senator Klobuchar and Congresswoman Michele Bachmann. Subject: Regulation Z - Truth in Lending Comments:

*"December 20, 2010 Chairman Ben S. Bernanke Federal Reserve Board 20th Street & Constitution Ave NW Washington, D.C. 20551 Subject: Proposed Rule R-1390; Regulation Z - Truth in Lending* ***__Chairman Bernanke, I oppose Proposed Rule R-1390__*** *which requires changes to the disclosure and finance charge calculation for credit life and debt protection products under federal Regulation Z."*

71. The above letters and statement by the Federal Reserve Chairman in strong opposition to the rule change to Regulation Z make the point that the **loan rescission law in effect now and at the time I used it is a powerful tool for the consumer to protect against predatory lending and that the law absolutely cancels the loan note and voids the deed of trust upon the consumers Notice of Loan Recession to the lender**.

72. To further explain the law and its effect in cancelling the loan and voiding the Deed of Trust, if there is any fraud or nondisclosures in the loan the Federal law provides that a consumer can cancel the loan and void the deed of trust anytime within three years of the loan signing or from the date of discovery of the non-disclosure. The Defendant alleged lender Fisher Financial dba Nations Choice Mortgage Inc., did not deliver the required notices and material disclosures to the Plaintiff, did not

deliver the required notice and material disclosures to the other parties who had an interest in the subject property, did not disclose the finance charge, the correct APR, the actual amount financed did not meet the disclosure requirement, there was no disclosure of an accurate payment schedule did not deliver a notice that met the requirement of a clear and concise disclosure notice. And, based on the fact that the alleged lender did not actually make a loan, none of the material disclosures requirements could be meet and where not met. Defendant's even capitulated in their admission of not meeting the material disclosure requirements and agreed that the Plaintiff did in fact have the loan rescission right extended to three (3) years after the consummation of the alleged loan and that Plaintiff was within his right to loan rescission and the voiding the Deed of Trust in his delivery of his Notice of Loan Recession to Defendant(s) on March 29, 2010. Therefore, the issue of a valid loan rescission is an undisputed fact. In addition Defendant's Default admissions include Defendant('s) release of all claims and bar to any claim in the subject property upon non-performance of the requirement of the TILA Loan Recession Law § 226.15 (d)(1) and (d)(2) Plaintiff refers to his tender of the Constructive Notice of Conditional Acceptance Upon proof of Claim dated May 7, 2010, #70091410000144719851, Notice of Fault in Dishonor (Opportunity to Cure) dated June 7, 2010 # 70091410000144719684 and Notice of Default in Dishonor dated June 21, 2010 # 70091410000144719783 Default Judgment and release of all claims by the Defendant(s).which is evidence in this Case and not subject to reopening of any issue by this Court that has been previously decided res judicata. The Federal loan recession law automatically canceled Defendant's alleged loan and deed of trust as an operation of Federal law and is not subject to discretion by a court or court order. Once the lender receives the Notice of Cancellation from the consumer the loan and deed of trust are automatically void, dead, gone and history. No foreclosure sale or recording of any trustee's deed can be done after the date of a loan rescission in this case march 29, 2010.

73. The law states a three step procedure once the Notice of Loan rescission is received by the lender, 1, the automatic voiding of the loan note and deed of trust as an operation of Federal law. 2, **the lender has twenty (20) days to return all the money that the borrower has paid to the lender, including loan and broker fees and record a notice of lien release (reconveyance) with the County Recorder**, and 3, **only after steps d) (1) and (d) (2) are performed is the borrower required to pay back what is owed to the lender based on an factual accounting**. If the lender has any objections or disputes, the lender can file a petition with the court within the twenty day period performance period to dispute steps 2 and 3 of the settlement procedure, although **step 1, the voiding of the loan note and deed of trust are not open to dispute, or discretion by the court, upon loan rescission the loan automatically becomes an unsecured loan**. If the lender does not perform their obligation to return the money paid by the borrower and record a lien release (reconveyance) or petition the court regarding to the settlement procedures within the 20 day period **the lender losses any claim thereafter**. The Doctrine of Unclean Hands bars a claim in court by any party who has not legally or lawfully performed or has unclean hands (not operated in good faith or illegally or unlawfully), therefore, the lender is barred by their non-performance of their obligation under the federal loan recession law and the Doctrine of Unclean Hands. The alleged lender Defendant(s) has no standing to bring a claim in court and is barred from making a claim to any interest in the above referenced property. The reason that the Defendant(s) did not make a claim or file an action for declatory relief was because the Defendant(s) did not own an interest in the Note or Deed of Trust, was not a holder in due course of the Note, did not loan any money, was not a party to any contract or had been assigned any interest in the Note or Deed of Trust. Therefore, Defendant(s) could not state a claim upon which relief could be granted.

**DEFENDANT(S) CONDUCT AN ILLEGAL AND UNLAWFUL TRUSTEE'S SALE AFTER**

**THE DELIVERY OF THE NOTICE OF LOAN RECISSION AND VOIDING OF THE DEED OF TRUST**

74. After Plaintiff's delivery of the Notice of Loan Recession on March 29, 2010, to the Defendant(s), which by law automatically voided the Deed of Trust, Defendant's ignored the Federal TILA Laws and scheduled several other trustee's sales in which Plaintiff was forced to deliver numerous certified mail Notices to all the Defendant(s) in an effort to stop further illegal activities of the Defendant(s) with no success, Defendant's continued on with a complete lack of respect for the law as though they were not subject to the it.

75. The following is one of several Stop Notices and demands Cease and Desist Notices Plaintiff delivered to Defendant(s). On May 29, 2010, Plaintiff delivered to Defendant(s) the following:

*"Notice to Agent is Notice to Principal; Notice to Principal is Notice to Agent, STOP NOTICE TO ALL CONCERNED, THEIR ASSIGNS, REPRESENTATIVES, AGENTS OR ATTORNEYS YOU DO NOT HAVE THE AUTHORITY TO PROCEED WITH A TRUSTEE'S SALE.THE DEED OF TRUST WAS AUTOMATICALLY VOIDED BY OPERATION OF FEDERAL LAW On March 29, 2010, you were served a NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST delivered by fax message and Certified Mail #s referenced herein; this NOTICE VOIDED the Deed of Trust by OPERATION OF LAW and is NOT subject to request, discretion or the authority of any of the Lender(s) or their Representatives, Agents, or Assigns referenced above and NOT subject to any attorney's, discretion or authority, including that of William Idleman Wright Finlay and Zak LLP, 4665 Mac Author Court, Suite 280, Newport Beach, CA 92660. The March 29, 2010 NOTICE VOIDS THE DEED OF TRUST AUTOMATICALLY BY OPERATION OF LAW and is incorporated herein by this reference as number two (2) of the Certified Copy San Mateo Court Reporter's*

*Transcript attached hereto as Exhibit "1".NOTICE OF CANCELATTION OF LOAN AND AUTOMATIC VOIDING OF THE DEED OF TRUST is hereby made by the undersigned to the above referenced Lender(s), Assign(s), Successor(s) Beneficiary(s), Trustee(s), Agent(s), Entities and any other Parties with interest, (herein after referred to as "Lender(s) as provided for in (Reg. Z §§ 226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15 U.S.C. § 1635(b).and other applicable law contained in the Federal Truth in Lending Act (TILA) including all other applicable law. NONE OF THE ABOVE PARTIES, OR THEIR ASSIGNS, REPRESENTATIVES, AGENTS OR ATTORNEYS HAS THE AUTHORITY TO PROCEED WITH A TRUSTEE'S SALE. ONCE THIS NOTICE HAS BEEN DELIVERED THE DEED OF TRUST IS VOID BY OPERATION OF FEDERAL LAW. Any concerned party* ***must, within*** *20 days from their receipt of the NOTICE OF LOAN CANCELATION AND AUTOMATIC VOIDING OF THE DEED OF TRUST dated and delivered on March 29, 2010, either send the above referenced Borrower (Marshall E. Mikels) back a satisfaction of mortgage and canceled note or file a petition for declaratory relief with a court of competent jurisdiction. If any Lender(s) or concerned party DID NOT file the petition and they DID NOT send back the satisfaction of the mortgage (or release and reconveyance in non-judicial states) then by operation of the law, the mortgage encumbrance is NULLIFIED."*

76. Defendant(s) completely ignored the above Notice and numerous other Stop Notices and Cease and Desist Demands that Plaintiff was forced to deliver to Defendant(s) in an effort to stop the continued threat of an illegal Trustee's Sale and on August 6, 2010 Defendant(s) conducted an illegal Trustee's Sale in spite of Plaintiff's protest and the obvious violations of federal law that Defendant(s) were committing, Defendant(s) did not care in the least.

77. After Defendant(s) conducted the illegal and unlawful Trustee's Sale on August 6, 2010, they

Recorded an illegal and unlawful Trustee's Deed in the Official Records of the San Mateo County Recorder on August 17, 2011 and thereafter began an intimidation campaign on Plaintiff in an attempt to force him from his home. Defendant(s) used a company run by John P. Lee of the MRL Group, in Fremont California, that specialized in taking possession of foreclosed homes. This company trespassed onto Plaintiff's property and put an unauthorized lock box on the front porch railing of Plaintiff's home and taped notices to vacate by certain deadline dates. And, at one point on or about December 23, 2010, someone jumped the back fence and committed a forced break-in and shattered a large plate glass sliding door at a back entrance to Plaintiff's home and Plaintiff was forced to call the police and report the break-in and to write numerous letters and Notices to fend off an aggressive attempt to take the property by intimidation, force and break-in by Defendant(s).

78. On January 21, 2011 Defendant(s) filed an illegal Unlawful Detainer Complaint, basically a fraud on the Superior Court of San Mateo County in an attempt to use the Court to carry out a theft. First Defendant(s) tried to get an order for posting the summons of the Unlawful Detainer Complaint in an effort to get a default by posting the summons of the accelerated proceeding in which the Plaintiff only had five days to answer the service once it was taped to his door. Defendant(s) failed by a denial of the judge and once again persisted and used an exparte application to get a judges order to post the summons in hopes of a quick default. Plaintiff's whole effort has been to use the Summary action of the Unlawful Detainer to gain possession in hopes that they could gain possession and create an uphill battle for Plaintiff to try and regain possession of his home, all done with fraud, deceit and in violations of numerous serious state and federal laws acting with impunity.

79. On September 21, 2011, Defendants filed a Motion for Summary Judgment in which a hearing date was set for September 28, 2011, giving Plaintiff four (4) court days before the hearing. Again, another attempt by the Defendant(s) to use an accelerated summary action to gain possession of

Plaintiff's home because the Defendant(s) knew they could not survive any discovery requirement as part of a trial.

80. Defendant(s) were well aware of the bogus and fraudulent assignment that had been recorded and that no interest in the Note or Deed of Trust had been transferred to Defendant U.S. BANK and when pressed to produce actual evidence of a Note held in due course by U.S. BANK, they couldn't produce it. And, the Defendant's could not produce the evidence that any of the Defendant(s) actually made a loan or were assigned the authority to collect on behalf of anyone else that made a loan. Defendant(s) were aware that this loan was a predatory loan from its inception based on fraud and that it was void from the beginning and therefore could not be legally executed by the Plaintiff and no tender requirement of Plaintiff could ever be claimed honestly or proven in court.

81. Defendant(s) also knew that there was no mortgage contract, that no loan was made on the terms and conditions of the Note and Deed of Trust mortgage contract, that the contract represented to Plaintiff was not the contract that transpired and that Plaintiff was made an uninformed party to an investment contract that fell within the Statute of Frauds and was illegal and unenforceable. And, in spite of all this knowledge of the frauds on so many levels the Defendant(s) without the slightest care for any victims, actively and aggressively joined in to fleece who knows how many people they could with no conscience whatsoever.

**PLAINTIFF REMOVED DEFENDANT U.S.BANK'S STATE COURT CASE, MOTION FOR SUMMARY JUDGMENT OF DEFENDANT'S UNLAWFUL DETAINER COMPLAINT TO THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF WHICH U.S. BANK IS THE PLAINTIFF IN THAT CASE**

82. On September 21, 2011, Plaintiff moved the Defendant's Motion for Summary Judgment to the Federal District Court, Northern District of California because the Defendant(s) was attempting to use the color of law to deprive Plaintiff of the Right to a jury trial. Defendant(s) used state civil codes

in the Motion papers and arguments that would limit the issues to be raised by Plaintiff to strictly landlord tenant issues and prevent plaintiff from raising any issue of the bogus and forged assignment of the Note to U.S. BANK or the other illegal title documents that had been recorded. Any evidence of Defendant's recording of bogus and fraudulent documents of title would be prevented form being aired, all under the guise of a summary proceeding that doesn't allow Plaintiff to raise fact that the alleged landlord is not the property. The Defendant(s) argument using state codes was that the Certified recorded foreclosure documents were self authenticating, true and not open to dispute because they had been recorded and all this was to be left up to a judges discretion in the same court that absolutely turned a blind eye to Marie McDonnell's report in Plaintiff's TRO hearing in March 2010, that proved that Defendant's recorded a bogus and fraudulent assignment that conveyed no title or interest to U.S. BANK. All this raised concerns about the competency and/or political influences at play on the court. Therefore, it was clear that the Defendants where using the color of law to deprive Plaintiff's Right to a jury trial. See, attached Defendant/plaintiff('s) UNLAWFUL DETAINER COMPLAINT attached hereto as **Exhibit 7.**

83. After Plaintiff had removed the Defendant's Motion for Summary Judgment to the Federal Court, the Defendant(s) immediately filed a Motion to remand it back to the State court citing argument that Defendant was the master of his complaint, that the Plaintiff could not use any affirmative defense to change the complaint, therefore the low dollar amount on Defendant's complaint that was purposely there to achieve the restriction to landlord tenant issues in state court forced the District Court to remand. Although the Court pointed out an option for Plaintiff to file a complaint in the District Court and consolidate the Defendant's Unlawful Detainer with it to bring it into the proper federal jurisdiction in that both cases involve of the same parties, issues and have federal issues, diversity and constitutional violations and this Court is the proper court for justice and remedies in both cases and

the following authority applies:

> The authority for removal of Defendant('s) U.S. Bank case is under U.S.C., Title 28, Part IV, Chapter 89, § 1441
>
> *"§ 1441. Actions removable generally*
>
> *(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded."*
>
> *" (c)* ***Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable*** *claims or causes of action, the entire case may be removed and the district court may determine all issues therein".*

TITLE 28, PART IV, CHAPTER 85, § 1331 Federal question

> *"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. "*

84. On November 7, the District Court granted Defendant's Motion to Remand back to state court and on December 6, 2011 Defendant's noticed a rescheduled hearing date of January 5, 2011 for the hearing of Defendant's U.S. BANK'S Motion for Summary Judgment.

85. Another troubling occurrence happened when the Defendant(s) went back to the state court to resume the Motion for Summary Judgment hearing, the court clerk required the Defendant(s) to obtain new Certified title documents from the County Recorder, which should be no problem for any attorney, however in this case William Idleman one of the attorneys for U.S. BANK wrote the Judge

scheduled to hear the MSJ and asked the Judge to overrule the court clerks requirement for new Certified title documents and allow the old previous Certified title documents to be used. I sent the Judge an objection letter explaining the fact that the earlier documents were illegal based on a bogus, forged and fraudulent assignment that was robo signed and that possibly the recorder might have some type of screening in place to spot robo signed documents now and that the court clerk's requirement was absolutely sound procedure in light of the mass recording frauds. However, the judge granted Idleman's request over my objection and the obvious is apparent and substantiates my previous experience with the San Mateo court, which is, I believe the banks have too much influence which has been and is in fact obstructing justice there and would prevent an unbiased hearing in any foreclosure matter. Therefore, I am compelled to file this Complaint in this District Court against the Defendant(s) and remove the Defendant's Motion for Summary Judgment and Unlawful Detainer to this Court for consolidation so that I can stop Defendant's efforts to use the color of law to obstruct justice, by conspiracy to deprive Plaintiff's Rights to a jury trail.

86. As a direct and proximate result of the false, fraudulent and/or deceitful representations made and malicious, vexing, cruel, illegal and unlawful actions done by Defendant(s) and their agents, and the Plaintiffs courts and authorities' justifiable reliance thereon, Chad Fisher and FISHER FINANCIAL GROUP INC and NATIONS CJOICE MORTGAGE INC., TIMOTHY O'BRIEN, and SELECT PORTFOLIO SERVICING INC., a Utah Corporation qualified to do business in California; OLIVIA A. TODD, and NATIONAL DEFAULT SERVICING CENTER INC., an Arizona Corporation qualified to do business in California ("NDSC") WRIGHT FINLAY & ZAK, LLP, ROBIN PRIMA WRIGHT, T ROBERT FINLAY, JONATHAN M. ZAK, WILLIAM J. IDLEMAN, MADELEINE K.LEE, NICHOLE M. HOFFMAN, DAVID A.WOOD, RONALD M. ARLAS, John P. Lee, MRL Group, DOES 1-100, all of the Defendant(s), the parties listed on

Exhibit "6" "J" "The Securitization Flow Chart" and their agents to be ascertained as to their involvement, have been and will be, unjustly enriched and the Plaintiffs and the public at large have been damaged in an amount that should be determined just and appropriate by a jury.

**VI**

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF RIGHTS PROTECTED BY THE U.S. CONSTITUTION CONSPIRACY AGAINST RIGHTS 18 U.S.C § 241 and DEPRIVATION OF RIGHTS UNDER THE COLOR OF LAW §242**

**DEFENDANT/PLAINTIFF ('S) MOTION FOR SUMMARY JUDGEMENT IS A VIOLATION OF THE RIGHT TO A JURY TRIAL BY USE OF THE COLOR OF LAW BY RESTRICTING ISSUES TO LANDLORD TENANT AND PROHIBITING ISSUES OF FRAUDULENT TITLE AND IT IS AN OBSTRUCTION OF JUSTICE**

87. Plaintiff incorporates paragraphs 1 through 75 herein as though set forth in full.

***Amendment 7 - Trial by Jury in Civil Cases. Ratified 12/15/1791.***

*"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."*

***Article III - The Judicial Branch***

***Section 2 - Trial by Jury, Original Jurisdiction, Jury Trials***

*"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and Consuls; to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States*

*shall be a Party; to Controversies between two or more States; between a State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.)* ***(This section in parentheses is modified by the 11th Amendment."***

88. I, am informed, believe and have personal knowledge that the Defendant(s) and the attorneys involved in this Case, by their REQUEST FOR JUDICIAL NOTICE in the federal court recently, and earlier in the state court with their filing of a Demurrer and with the Defendant('s) MOTION FOR SUMMARY JUDGEMENT of their UNLAWFUL DETAINER COMPLAINT wanted the court to establish their papers as facts, including the fraudulent assignment, foreclosure notices and trustee's deed that they have recorded and loan papers claiming perfected title to the subject real property so that they have a basis for an eviction action in their SUMMARY JUDGMENT MOTION of their UNLAWFUL DETAINER COMPLAINT.

89. However, the evidence filed by Plaintiff in this Case shows that Defendant(s) and their Agents committed civil and criminal fraud and falsified public records in an effort to claim false title to the property to carryout an unlawful trustee's sale and attempted unlawful eviction. And, thereafter, the use of state civil codes and the State Court to obstruct justice in an effort to hide the truth with the use of color of law to deny the Defendant('s) Right to due process and a jury trail, which is a violation of Federal Law as cited below:

**Title 18, U.S.C., Section 241**
**Conspiracy Against Rights**

*This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or*

*enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).*

*It further makes it unlawful for two or more persons to go in disguise on the highway or on the premises of another with the intent to prevent or hinder his/her free exercise or enjoyment of any rights so secured.*

**Title 18, U.S.C., Section 242**
**Deprivation of Rights Under Color of Law**

*"This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S.*

*This law further prohibits a person acting under color of law, statute, ordinance, regulation or custom to willfully subject or cause to be subjected any person to different punishments, pains, or penalties, than those prescribed for punishment of citizens on account of such person being an alien or by reason of his/her color or race.*

*Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties. This definition includes, in addition to law enforcement officials, individuals such as Mayors, Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who are bound*

*by laws, statutes ordinances, or customs."*

90. Plaintiff has visited the FBI's web site http://www.fbi.gov/about-us/investigate/civilrights/color_of_law on October 28, 2011 and can verify that it states the following *"Fabricating evidence against..........an individual also violates the color of law statute, taking away the person's rights of due process and unreasonable seizure. In the case of deprivation of property, the color of law statute would be violated by unlawfully obtaining or maintaining a person's property, which oversteps or misapplies the official's authority".*

91, Plaintiff can also verify that the Defendant('s) and the attorneys involved have used the civil law, the state court and the use of this summary proceeding in an attempt to prohibit the airing of their commission of title fraud and numerous other state and federal laws in an attempt to deny the Plaintiff('s) Right to a jury trial. And, based on the FBI's web site information referenced above and Plaintiff's understanding of the Constitution being the Supreme Law of the Land which protects the Right to a jury trial in this Case and that the Defendant(s) and the attorneys involved have attempted to use the *"color of law"* to unlawfully take the subject real property owned by Marshall-Edward. Mikels, located at 115 15th Avenue, San Mateo, California. The Defendant(s) do not own or have title to this property and that is a fact established by the evidence herein.

92. The Defendant(s) and others attempt to use unlawful, false and forged title documents to conduct an unlawful trustee's sale and eviction action under the color of law has been a constant effort and pattern that has been repeated over and over in this Case and now the Defendant(s) and the attorneys involved are attempting to use the state court and the same tactics again. The Defendant('s) REQUEST FOR JUDICIAL NOTICE and their MOTION FOR SUMMARY JUDGEMENT is another attempt to use the court and the color of law to obstruct justice and is an effort to legitimize false evidence and to use the court to unlawfully take property

93. **<u>The Plaintiff has filed in this Court proof of mortgage fraud that was committed by the Defendant('s), their Agents and the attorneys William J. Idleman, Ronald M. Arlas, Madeleine K. Lee and other attorneys maimed herein and yet to be named</u>** with the third party debt collection company Wright, Finlay & Zak. The proof is contained in the Plaintiff('s) initial filing of entitled Defendant's First Amended ANSWER to, in that case, Plaintiff('s) UNLAWFUL DETAINER COMPLAINT and other filings in this Case and recently in the Notice of Removal of the State Case CLJ203244 to the Federal Court Case No. C11-04687 (PJH) as follows:

94. Plaintiff Restates here for this Claim for Relief that **<u>a forensic loan audit was done by Marie McDonnell on February 28, 2010, which revealed that the assignment in the chain of title by Bill Koch (A PROVEN ROBO SIGNER) was a forged and fraudulent title assignment and the proof is filed in Defendant('s) First Amended Answer</u>** to Plaintiff(s) Unlawful Detainer Complaint and **in the Defendant('s) NOTICE OF REMOVAL** filed in the Case C11-04687 (PJH) on 09-21-2011 as Exhibit 6-M., and which is attached hereto as a **summary in Exhibit 1 and the full Loan Analysis as Exhibit 2**, to Marie McDonnell's Declaration for this Complaint, which shows the **<u>flowchart of missing, forged and fraudulent assignments that were recorded by the Defendant('s) in the Official Records of San Mateo County which fraudulently make up the Defendant('s) claim to title and which the subject UNLAWFUL DETAINER COMPLAINT AND MOTION FOR SUMMARY JUDGMENT IS BASED UPON. Page 15 and 16 of Exhibit 2 attached to Marie McDonnell's report details how the fraud was committed</u> and is incorporated herein by this reference and attached hereto in condensed Summary as Exhibit 1**

## THE ATTORNEYS AND DEFENDANT(S) HAD PRIOR KNOWLADGE OF THE FALSIFIED TITLE DOCUMENTS AND NO LOAN NOTE

95. The Defendant(s) and the above referenced attorneys and the third party debt collection

company Wright, Finlay & Zak were informed of the recorded false, forged and fraudulent title assignment in Plaintiff('s) MARSHALL MIKELS Complaint for Fraud and Accounting, case No. CIV 492452, and in the Ex Parte Application For Temporary Restraining Order filed on March 1, 2010 in the Superior Court of San Mateo County, California, against the Defendant(s), in which the above referenced loan audit by Marie McDonnell was attached to the Complaint and Ex Parte TRO Application as Exhibit B. **On April 1, 2010, the Defendant(s), third party debt collector Jonathan Zak, U.S. Bank N.A., MERS, SPS, Nations Choice Mortgage and NDSC filed a Demurrer and Request for Judicial Notice in the Plaintiff ('s) San Mateo Superior Court case No. CIV 492452 which is evidence that these Defendant(s) and the third party debt collector attorneys were informed of the recorded false, forged and fraudulent title assignments on or prior to April 1, 2010**. Attached hereto is the San Mateo Court web site Case filings as **Exhibit # 1-A**, the cover and signature pages of the Plaintiff('s) Complaint for fraud and accounting case CIV 492452, containing a verified account of the predatory loan fraud and other frauds committed by Plaintiff(s) in this Case as **Exhibit # 3-A**, the TRO Application Cover page as **Exhibit # 1**, Marie McDonnell's AFFIDAVIT IN SUPPORT OF PLAINTIFF MARSHALL MIKELS' MOTION FOR A TEMPORARY RESTRAINING ORDER as **Exhibit # 1**, the DEMURRER & REQUEST FOR JUDICAL NOTICE by the Defendant(s) U.S.BANK N.A., NATIONS CHOICE MORTGAGE, FISHER FINANCIAL, MERS, SPS, NATIONAL DEFAULT SERVICING INC. and the third party debt collector attorneys Wright, Finlay & Zak, as **Exhibit # F.**

## BANK INFLUENCE AND CORRUPTION

96. The above referenced Application for a TRO was denied by the State Court in San Mateo much to the surprise of Marie McDonnell and the attorney Tim Fong who were certain it would be granted because of the hard evidence and proof of the falsified recorded assignments. Plaintiff's attorney at

that time, Tim Fong, who filed the Complaint and TRO told Plaintiff that a law student working as assistant to the Judge hearing the TRO told him that she did not think the Plaintiff MARSHALL MIKELS would win and that was the reason given for the denial of the TRO. The attorney informed me that he believed the only one that read the papers was the law student and that the judge could not have read the papers and have arrived at that decision because of the proof of the falsified title. I have been informed that numerous other attorneys considered the San Mateo Court corrupt because of the decisions being made in favor of the banks in foreclosure cases. After seeing how the court operated in San Mateo first hand and hearing the story of corruption by the banks, I filed a REQUEST FOR DISMISSAL WITHOUT PREJUDICE because of the likelihood of the obstruction of justice by the Court in San Mateo County; the Request for Dismissal is attached hereto as **Exhibit 3**. The above referenced Exhibits 2 through 7 are incorporated herein by this reference for all purposes.

97. The attorneys and Plaintiff(s) in this Case and the other parties SPS, NDSC, MERS and others were informed and had prior knowledge of the falsified title documents and have actively worked together to set up the unlawful sale as co-conspirators and now are trying to run the fraud on this Court. The above referenced page 15, 16 and exhibit M of Marie McDonnell's report attached hereto as **Exhibit #1**, in part states:

***"Corporate Assignment of Deed of Trust***

*In the instant case, Bill Koch, an employee of SPS, executed and recorded a Corporate Assignment of Deed of Trust in the Official Records of San Mateo County on February 8, 2010, which purports to convey all right title and interest in the subject Note and Deed of Trust as of November 27, 2009 from Fisher Financial Group, Inc. d/b/a Nations Choice*

*Mortgage to U.S. Bank National Association, as Trustee, on Behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 ("ARMT 2007-3"). (See Exhibit F. – Corporate Assignment of Deed of Trust)* **(attached hereto as Exhibit 1**) ***As established above, this Assignment contradicts the securitization pathway set forth in the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission*** *which informs us that Fisher Financial was required to sell the Mikels mortgage obligation to DLJ Mortgage_Capital, Inc. (the Seller/Sponsor); subsequently, DLJ was required to sell the Mikels mortgage obligation to Credit Suisse First Boston Mortgage Securities Corp. (the Depositor) on or about the Cut-Off Date December 1, 2007; finally, Credit Suisse was to convey the pooled assets, including the Mikels_mortgage obligation, into the ARMT 2007-3 Trust Fund (the Issuing Entity) on or about December 26, 2007, the closing Date for the securitization. According to the endorsement on the Note, Fisher Financial divested its interest in the Mikels Loan on* ***July 11, 2007****; hence, SPS's Corporate Assignment of Deed of Trust which purports to convey_the Mikels' mortgage obligation directly into the ARMT 2007-3 Trust more than* ***two years after the fact on November 27, 2009 is controverted by a preponderance of the evidence****.*

***In considering whether to enjoin the Trustee's Sale scheduled to take place on Tuesday, March 2, 2010, the Court must determine whether this Substitution of Trustee is a valid document given the following facts:***

***1. Whereas SPS purports to substitute the Trustee of the Deed of Trust on behalf of ARMT 2007-3 as the Trust's servicing agent, an officer of SPS did not execute the document.***

*2. Rather, the Substitution of Trustee was executed by Olivia A. Todd who is President of National Default Servicing Corporation. Accordingly, this document is selfserving as NDSC appointed itself as Successor Trustee without presenting any evidence that it was authorized by SPS or U.S. Bank as Trustee of the ARMT 2007-3 Trust to do so.*

*3. Finally, the Corporate Assignment of Deed of Trust from Fisher Financial to U.S. Bank as Trustee of the ARMT 2007-3 Trust is a contrivance and is untruthful according to a preponderance of the evidence. Therefore, the Substitution of Trustee – which depends upon the Assignment – must also fail as well because no authority was conveyed to SPS, U.S. Bank or NDSC by virtue of the Assignment."*

**NO NOTE CONTAINED IN ANY OF THE COURT FILINGS BY THE DEFENDANT(S)**

98. **There is NO Loan Note contained in any of the Court Filings by the Defendant(s)** or the attorneys in this Case, only the "Adjustable Rate Rider", "Interest Only Addendum to Adjustable Rate Rider". **Defendant('s) Declaration of Mindy C. Leetham dated August 15, 2011 and attached to the Defendant('s) MOTION FOR SUMMARY JUDGMENT is false and misleading** in that it states that "Certified copies of the Deed of Trust and the Note....are attached as Exhibit #1, although, **NO NOTE is attached to Exhibit # 1 of her Declaration and is a complete fabrication and perjury. See the Declaration of Mindy C Leetham and EXHIBIT 1 ABSENT THE NOTE attached hereto as Exhibit G**. Therefore, the evidence of falsified and missing assignment from Marie McDonnell's findings and the fact that there is no Loan Note

contained in any of the Court Filings of Defendant(s) only leads to the fact that U.S. Bank N.A. as Trustee of the above referenced Trust, nor the Trust have the Loan Note or are owners of the Note and have no standing to make any claim in any court whatsoever.

99. **BASED ON THE HARD EVIDENCE ABOVE, DEFENDANT('S) HAVE NO STANDING IN THIS COURT TO REQUEST ANYTHING AND ARE BARRED BY UNCLEAN HANDS FROM OBTAINING ANY JUDICIAL NOTICE or granting of any order of judgment in Defendant('s)/Plaintiff('s) UNLAWFUL DETAINER COMPLAINT, MOTION FOR SUMMARY JUDGEMENT or ANYTHING ELSE.**

100. Note: Marie McDonnell is the expert witness who did the loan forensic analysis report for the landmark Massachusetts Supreme Court Cases U.S. BANK NATIONAL ASSOCIATION, trustee [FN1] vs. Antonio IBANEZ (and a consolidated case [FN2] ). For ABFC 2005-OPT 1 Trust, ABFC Asset Backed Certificates, Series 2005-OPT 1. [FN3]).No. SJC-10694.October 7, 2010. - January 7, 2011.

101. In the same situation as in this Case, the court affirmed that the banks did not have title to the mortgage when they published the required notices of the expected foreclosure sale or actually conducted the foreclosure sale. It is reported that this case will establish that many prior foreclosures were conducted improperly and unlawfully. **And, in the recent Bevilacqua v. Rodriguez Case:**

102. The Court held that owners cannot bring a court action to clear their titles under the "try title" procedure in the Massachusetts Land Court. The court found that the buyer never owned it in the first place. If you don't own a piece of property (say the Brooklyn Bridge), you cannot come into court and ask a judge to proclaim you the owner of that property, even if the true owner doesn't show up to defend himself. It's Property Law 101.

103. AND, **California Penal Code Section 532f (a),** it follows that any claim to ownership on that

basis is criminal mortgage fraud, California Penal Code Section 532f (a). *"A person commits mortgage fraud if, with the intent to defraud, the person does any of the following: (4) Files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission."*

104.. And, **18 U.S.C. § 1001**: *"Statements or entries generally whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully - (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."*

105. And, **18 U.S.C. § 1005:** ***"****Bank entries, reports and transactions, or other obligation, or mortgage, judgment or decree; or whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to injure or defraud.*

106. *And,* ***18 U.S.C. § 1021****: Whoever, being an officer or other person authorized by any law of the United States to record a conveyance of real property or any other instrument which by such law may be recorded, knowingly certifies falsely that such conveyance or instrument has or has not been recorded, shall be...."*

107. ADDED TO THIS, the fact that the attorneys, with full knowledge of the false and fraudulent title, filed the above referenced UNLAWFUL DETAINER COMPLAINT to try to gain unlawful possession of the Plaintiff('s) home, which is another criminal charge of theft under false pretense *California* **Penal Code section 484** defines *theft* to include larceny, embezzlement and *false pretenses*. And, when the Plaintiff(s) filed the Answer and First Amended Answer to the

Defendant(s) UDC, which contained the proof of the frauds and violations and requested a jury trial to prove it, the **Defendant(s) and the attorneys filed the above referenced MOTION FOR SUMMARY JUDGMENT in an effort to prevent any airing of the truth by lying to the court stating that the title was lawfully perfected and then attempted to use the summary expedited proceeding and the limiting of issues to landlord tenant ONLY to prevent any airing of the fraudulent title, that all of the perpetrators were fully aware of. This is obstruction of justice by the use of fraud on the Court and the use of the Court and color of law to quash any raising of fraudulent title**. This is a violation of Federal law,

**Title 18, United States Code, Chapter 73. § 1503 obstruction of justice**

statute which applies to any conduct that affects the *"due administration of justice."* As such, this type of obstruction is very broad. The statute prohibits any activity that *"corruptly ......or by communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice."*

AND, also among other laws violates state law CAL. § 422.6, Civil Code § 52.1 and federal law 42 USC 1983.

**COMMON LAW APPLIES TO PLAINTIFF CIVIL LAW APPLIES TO DEFENDANT (S)**

**UNDER COMMON LAW**
**THE PARTY HARMED MUST APPEAR TO STATE A CLAIM**
**IF NO PARTY APPEARS NO CLAIM CAN BE MADE**
**In anticipation of claims by Defendant(s)**
**AN ACTUAL LOSS MUST BE PROVEN**
**IF NO LOSS CAN BE PROVEN NO LAW IS VIOLATED**
**AND NO AWARD CAN BE MADE**

108. a. Marshall-Edward: Mikels is a private sovereign man and is the Authorized Representative and the secured party creditor of Defendant(s) and has the Right to a jury trial by a jury of peers

under the Constitution supreme law of the land common law and has demanded that this Right be protected and implemented under the flag of the Untied States of America without gold fringe and has not granted any authority or contract for a summary judgment hearing. With no objection on record or proof of claim or contract that would contravene Mr. Mikels claim, these Rights to a jury trial under common law must be respected and carried out. No one, an individual or our government acting under color of law, is allowed to take the fruits of our labor for domestic or foreign reasons, under Constitutional Law without due process of law, which has been held to be synonymous with the Common Law since Magna Carta of 1215. Common Law has become synonymous with our Constitutional Law and is protected under the 7th Amendment. Common law is the law of reason.

109. Under common law there must be someone who has been damaged, meaning that a living man or woman must appear in court as the party in interest and prove a loss or harm was done as the result of the Defendant('s) actions. In this Case no living man or woman has appeared to allege a loss. A third party attorney claiming to represent a corporate trustee claiming to represent unknown and unidentified parties is not a man or woman appearing who is alleging a loss or damage (if that were allowed anyone could bring an action without a real injured party or loss).

110. Therefore, Plaintiff('s) Complaint is defective because there is no one appearing to state a claim upon which relief can be granted. *Schneider v. Currey, 584 So.2d 86 (Fla. 2d DCA 1991) "A trial court, as well as this court, is also precluded from considering as fact unproven statements documented only by an attorney."* DiSarrio v. Mills, 711 So.2d 1355 (Fla. 2d DCA 1998) "Unsworn argument by counsel simply "is not evidence."

111. The right to Common Law is protected by the 7th Amendment which directs: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be other wise re-examined in any court of the

United States, than according to the rules of the common law."

Under the rules of the common law there must be an injured party, a victim. This known in legal terms as a corpus delicti, Latin for "the body of the crime," or the fact of a transgression. Article VI directs that all of our representatives must take an Oath to obey Constitutional law and that "the judges in every State shall be bound thereby, . . ."

112. The first rule in Constitutional law is that the Constitution cannot be violated. That means you can't make up some look-a-like CONSTITUTION with capitol letters and words with different hidden meanings comprising a CORPORATION for profit that is NOT formed knowingly by a fully informed populace which is for the people. To do so would be a fraud designed to fool the people into a form of hidden servitude. NO, that is not allowed under any Natural Law by The Devine Creator because it would be a violation of those unalienable and inalienable Rights of every man and woman in existence.

113. The second rule in Constitutional law is that the law must be clearly written and understood by all. No citizen is above the law and no law is above the citizen. None of our representatives, including the president, can violate Constitutional Law. We, the People and our representatives can change the law by an Article V Amendment. Until Constitutional Law is changed it must be obeyed by all citizens or we would have anarchy among the people and tyranny among our representatives.

114. Justice Antonin Scalia once asked: "How should we judge the Constitution? By your opinion? By my opinion? Or should we judge the Constitution by what it says?" The answer to his question is simple: we should judge the Constitution by what it says. Therefore, based on the above this Court cannot grant Plaintiff('s) Motion for Summary Judgment because there is no one before this Court that can prove they have been harmed and there is no one that has presented any evidence of a loss. And, Defendant(s) reserve their Right to Common Law the Supreme Law of the Land under the

American Flag without gold fringe by this Court's Agreement upon no opposition showing on the Court's Record prior to any hearing. Plaintiff(s) are subject to the Civil Laws, Codes, Statutes, Rules, Regulations and Ordinances under the CORPORATION OF THE UNITED STATES OF AMERICA.

**THE PLAINTIFF (S) ARE BARRED FROM BRINGING ANY ACTION BY THE DOCTRINE OF UNCLEAN HANDS**

115. Plaintiff (s) are barred from bringing any action in the above referenced Case because of all of the Plaintiff 's) above fraudulent, forgeries, including their Attorney (s) illegal, unlawful, civil and criminal violations of law and this Court must Dismiss their Unlawful Detainer Complaint with prejudice as a result.

**EIGTH CLAIM FOR RELIEF PLAINTIFF'S RIGHT TO RECEIVE ACCOUNTING DISCOVERY AND INTORAGATORIES**

**NO LOAN WAS MADE BY PLAINTIFF (S) PLAINTIFF'S ARE THE DEBTORS AND THE DEFENDANT IS THE CREDITOR**

116. No loan was made by Defendant(s) or the original alleged lender Fisher Financial Group, Inc., dba, Nations Choice Mortgage, an Arizona Corporation qualified to do business in California or any of the other parties involved who are collectively responsible to the question of a loan made or not..

117. Defendant(s) main argument is that Plaintiff has not made any tender so therefore Plaintiff is not entitled to any relief and therefore the Defendant(s) claim the right to foreclose and claim themselves the owner of the subject property. If in a loan was made to Plaintiff and the loan came from Defendant's or if they could prove they have an interest in the loan or an assignment to collect it and can produce someone who actually loaned the money as a witness, then if they can do any of the

above then it should not be a problem for them to do an Accounting and produce Discovery and Production of Documents and Interrogatories that prove where the money came from and who funded it or loaned it, therefore, Plaintiff has a Right and is entitled to demand Discovery and receive it from Defendant(s). Therefore, this is a Demand on Defendant(s) for Discovery and Production of Documents and Interrogatories per all applicable law and rules of Court to prove that Defendant(s) made a loan.

## DECLARATION OF AN EXPERT WITNESS ESTABLISHES THE FACT THAT NOT LOAN IS MADE

118. The Defendant has done extensive research of law, banking, the private Federal Reserve banking system, the nature of money or currency, how it is created, who creates it and the history of the bankruptcy of the private corporation known as the UNITED STATES from information readily available on the internet and has recently learned from all this that the Plaintiff (s) did not make any loan to the Defendant MARSHALL E. MIKELS or Marshall-Edward: Mikels the Authorized Representative. Quite the opposite, the Defendant loaned the Plaintiff (s) the $1,350,000.00 referred to herein.

119. The Federal laws referenced herein, an expert witness that worked for the Federal Reserve Bank as an attorney recognized to be an expert authority for approximately 20 years, the Federal Reserve's own publications and case law referenced and incorporated herein will prove this to be fact, the Defendant was and is the creditor who loaned $1,350,000.00 to the Plaintiff (s) who are the debtors in this Case. Thanks to the internet and the free flow of information and the efforts of countless people who over the years who have uncovered this giant fraud scheme pulled of on the people of this country by the most skillfully deceitful people in top positions of banking, government

and major corporations all dressed in suits and robes with titles to portray honesty but far from it as is being revealed every day now. This fraud cannot stand the light being exposed to it and is disintegrating with every passing day and this Answer and my experience is part of that light which will cause much needed change.

120. The evidence referenced and attached hereto and that will be presented to the jury at trial will show the facts that:

1. The Loan Note is the same as a check issued by the Defendant with his signature creating the money as the creditor, which is the law in the current banking system. The Plaintiff (s) deposited the Note and received money for themselves and gave no credit or any money from this deposit to Defendant. The original alleged lender Fisher Financial Group, Inc., dba, Nations Choice Mortgage and all the subsequent banks are responsible for any credit due the Defendant, therefore the Plaintiff's and the other parties are one and the same and collectively referred to as the Plaintiff (s).

2. The Plaintiff (s) deceived Defendant into believing that they loaned him their own money when in fact they did not loan any of their own money or their depositor's money and they stood nothing to lose if the alleged loan was not paid back.

3. The Plaintiff's basically loaned Defendant's own money back to him and required him, in addition, to pay the same amount of money to the Plaintiff (s) plus interest over the next thirty years plus some large loan fees.

4. If the Defendant failed to pay the Plaintiff (s) the same amount of money that the Plaintiff (s) withheld from Defendant (Defendant's Note check and loan to Plaintiff (s) which they deposited and kept) then Plaintiff's could take Defendant's home sell it and keep the money even though they never loaned Defendant anything and suffered no loss. These are the facts.

5. The Plaintiff's withheld this obviously important information in 1 through 4 above from

Defendant and went to great lengths to deceive the Defendant with volumes of loan documents created to give the illusion that a loan was being made by the Plaintiff (s) to Defendant, when in fact the opposite was the case. Had the Plaintiff (s) disclosed the truth to the Defendant, Defendant would have had the opportunity to seek better terms, since the Defendant was actually the lender he could have charged the Plaintiff (s) a reasonable interest rate on his loan to them and of course payback of the loan principal and some type of security like a deed of trust on the bank's property.

6. Because the Plaintiff (s) failed to disclose some very important terms of the loan agreement it was based on fraud and therefore void from the inception by law.

117. Defendant is attaching and incorporating herein an Affidavit by Walker F. Todd as **Exhibit 7**, which presents expert evidence that the bank does not loan any money. Walker F. Todd's Affidavit as an expert witness was filed into the public record as evidence in the BANK ONE, N.A. v HARSHAVADHAN DAVE et al Case No. 03-047448-CZ in the STATE OF MICHIGAN, CIRCUIT COURT FOR THE COUNTY OF OAKLAND and was executed and notarized on December 5, 2003 at Chagrin Falls. Ohio.

121. Walker F. Todd's professional background and qualifications as an expert witness are that for 20 years he worked as an attorney and legal officer for the legal departments of the Federal Reserve Banks of New York and Cleveland and worked with notes, bonds, banker acceptances, securities and other financial instruments among other things he became one of the recognized Federal Reserve System's experts on the legal history of central banking and among other things financial instruments that became or could become money and as explained more at length on page 2 of his Affidavit and attached hereto as **Exhibit 7.**

122. From page 3 of the Walker Affidavit:

*"When a bank accepts - - - promissory notes or any other similar instruments (hereinafter*

*"instruments") from customers and deposits or records the instruments as assets, it must record offsetting liabilities that match the assets that it accepted from the customers,* ***funds accepted from customers*** *" "In a fractional reserve banking system like the United States banking system, most of the funds advanced to borrowers (assets of the bank's)* ***are credited by the banks themselves*** *and are not merely transferred from one set of depositors to another set of borrowers."*

*"In classical economic theory, once economic exchange has moved beyond barter stage, there are* ***two types of money, money of exchange and money of account****."*

123. From page 4 of the Walker Affidavit:

*"Against this background, I conclude that the Note, despite some language about" lawful money" explained below, clearly contemplates both disbursements of funds and equivalent repayment or* ***settlement in money of account*** ***(that is, money of exchange would be welcome but is not required to repay or settle the Note.)****"*

*"The factual basis of this conclusion is the reference in the Disbursement Request and Authorization to repayment of $95,905.15 to Michigan National Bank from the* ***proceeds of the Note****."*

And: *"In what form of money* **or credit** *is the repayment obligation due?"*

124. And: *"legal tender, a related concept but one that is economically inferior to lawful money because it allows payment in instruments that cannot be redeemed for gold or silver on demand, has been the form of money exchange commonly used in the United States since 1933. Basically, legal tender is whatever the government says it is. This most common form of legal tender today is federal reserve notes, which by law cannot be redeemed for gold since 1934 or since 1964, for silver. See, 31 U.S.C. Sections 5103, 5118 (b) and 5119 (a)."*

125. And, from page 6 of the Walker Affidavit:

*"Legal tender under the uniform Commercial Code (U.C.C.) Section 1-201 (20) (Official Comment), is a concept that sometimes surfaces in cases of this nature. The referenced Official Comment note that the definition of money is not limited to legal tender under the U.C.C."* And; *"**The narrow view that money is limited to legal tender is rejected**"* And: *"In my opinion, the best sources of information on the origins and use of* **credit as money** *are in Alfred Marshall, MONEY CREDIT AND COMMERCE 249-251 (1929) and Charles P. Kindleberger, A FINANCIAL HISTORY OF WESTERN EUROPE 50-53 (1984)."* And: *"As commercial banks - - (private bankers) became established in Europe and North America - - - they commonly made loans to borrowers by extending there own credit to the borrowers or, at the borrowers' direction to third parties.* ***The typical form of such extensions of credit was the drafts or bills of exchange drawn upon themselves (claims on the credit of the drawees) instead of disbursements of bullion coin, or other forms of money. In transaction with third parties, these drafts and bills came to serve most of the ordinary functions of money"***

126. And from page 7 of the Walker Affidavit:

*"**Thus credit money** is not alien to the current official monetary system, is just rarely used as a device for the creation of federal Reserve credit , in turn in the form of either Federal reserve notes or banks' deposits at Federal Reserve Banks,* ***functions as money in the current monetary system.****"*

And from Page 8 of the walker Affidavit:

***ADVANCES OF BANK (CUSTOMER'S) CREDIT AS THE EQUIVALENT OF MONEY***

*Plaintiff apparently asserts that the defendants signed a promise to pay, such as note (s) or credit application (collectively the note), in exchange for the Plaintiff's advance of funds, credit or some type of money to or on behalf of defendant. However, the bookkeeping entries required by*

*application of GAAP*, (generally accepted accounting principals) *and the Federal Reserves own writings should trigger close scrutiny of Plaintiff's apparent assertions that it lent its funds, credit or money to or on behalf of Defendants, thereby causing them to owe the Plaintiff $400,000. According to the book keeping entries shown or otherwise shown to me and the application of GAAP , the Defendants allegedly were to tender some form of money ("lawful money of the Untied States of America" is the type of money explicitly called for in the note), securities of other capitol equivalent to money, funds credit or something else of value in exchange (money of exchange, loosely defined), collectively referred to herein as "money" to repay what the Plaintiff claims was the money lent to the Defendants.* ***It is not an unreasonable argument to state that the Plaintiff apparently changed the economic substance of the transaction from that contemplated in the credit application form, agreement, note(s), or other similar instrument(s) that the Defendant executed, thereby changing the cost and risks to the defendants. At most the Plaintiff extended it's own credit (money of account) but the defendants were required to repay in money (money of exchange, and lawful money at that), which creates at least the inference of inequality of obligations on the two side of the transaction (money, including lawful money, is to be exchanged for bank credit)***

127. And, on page 9 of the Walker Affidavit:

*"To understand what occurred between Plaintiff and Defendants concerning the alleged loan of money or, more accurately, credit, it is helpful to review a modern Federal Reserve description of a bank's lending process. See, David H. Friedman, MONEY AND BANKING (4th ed. 1984)(apparently already introduced into this case): "The commercial bank lending process is similar to that of a thrift in that the receipt of cash from depositors increases both its assets and its deposit liabilities, which enables it to make additional loans and investments. . . . When a*

*commercial* *bank makes a business loan, it accepts as an asset the borrower's debt obligation (the promise to repay) and creates a liability on its books in the form of a demand deposit in the amount of the loan."* *(Consumer loans are funded similarly.) Therefore, the bank's original bookkeeping entry should show an increase in the amount of the asset credited on the asset side of its books and a corresponding increase equal to the value of the asset on the liability side of its books. This would show that the bank* *received the customer's signed promise to repay* ***as an asset, thus monetizing the customer's signature*** *and creating on its books a liability in the form of a demand deposit or other demand liability of the bank. The bank then usually would hold this demand deposit in a transaction account on behalf of the customer.* ***Instead of the bank lending its money or other assets to the customer, as the customer reasonably might believe from the face of the Note, the bank created funds for the customer's transaction account without the customer's permission, authorization, or knowledge and delivered the credit on its own books representing those funds to the customer, meanwhile alleging that the bank lent the customer money.*** *If Plaintiff's response to this line of argument is to the effect that it acknowledges that it lent credit or issued credit instead of money, one might refer to Thomas P. Fitch, BARRON'S BUSINESS GUIDE DICTIONARY OF BANKING TERMS,* ***"Credit banking,"***

128. ***3. "Bookkeeping entry representing a deposit of funds into an account." But Plaintiff's loan agreement apparently avoids claiming that the bank actually lent the Defendants money.*** *They apparently state in the agreement that the Defendants are obligated to repay Plaintiff principal and interest for the "Valuable consideration (money) the bank gave the customer (borrower)." The loan agreement and Note apparently still delete any reference to the bank's receipt of actual cash value*

*from the Defendants and exchange of that receipt for actual cash value that the Plaintiff banker returned.* 74. *12. According to the Federal Reserve Bank of New York, money is anything that has value that banks and people accept as money; money does not have to be issued by the government. For example, David H. Friedman, I BET YOU THOUGHT. . . Federal Reserve Bank of New York (4th ed. 1984)(apparently already introduced into this case), explains that banks create new money by depositing IOUs, promissory notes, offset by bank liabilities called checking account balances. Page 5 says, **"Money doesn't have to be intrinsically valuable, be issued by government, or be in any special form.***

129. *The publication, Anne Marie L. Gonczy, MODERN MONEY MECHANICS 7-33, Federal Reserve Bank of Chicago (rev. ed. June 1992)(apparently already introduced into this case), contains standard bookkeeping entries demonstrating that money ordinarily is recorded as a bank asset, while a bank liability is evidence of money that a bank owes. The bookkeeping entries tend to prove that banks accept cash, checks, drafts, **and promissory notes/credit agreements (assets) as money** deposited to create credit or checkbook money that are bank liabilities, which shows that, **absent any right of setoff, banks owe money to persons who deposit money.. Cash (money of** exchange) is money, and credit or promissory notes (money of account) become money when banks deposit promissory notes with the intent of treating them like deposits of cash. See, 12 U.S.C. Section 1813 (l)(1) (definition of "deposit" under Federal Deposit Insurance Act). The Plaintiff acts in the capacity of a lending or banking institution, and the newly issued credit or money is similar or equivalent to a promissory note, which may be treated as a deposit of money when received by the lending bank.. Federal Reserve Bank of Dallas publication MONEY AND BANKING, page 11, explains that when banks grant loans, **they create new money. The new money is created because a new "loan becomes a deposit, just like a paycheck does."** MODERN MONEY MECHANICS, page 6, says, "What they*

*[banks] do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts."* *The next sentence on the same page explains that the banks' assets and liabilities increase by the amount of the loans. Plaintiff apparently accepted the Defendants' Note and credit application (money of account) in exchange for its own credit (also money of account) and deposited that credit into an account with the Defendants' names on the account, as well as apparently issuing its own credit for $95,905.16 to Michigan National Bank for the account of the Defendants.*

130. *One reasonably might argue that the Plaintiff* ***recorded the Note or credit application as a loan (money of account) from the Defendants to the Plaintiff and that the Plaintiff then became the borrower of an equivalent amount of money of account from the Defendants.*** *The Plaintiff in fact never lent any of its own pre-existing money, credit, or assets as consideration to purchase the Note or credit agreement from the Defendants.* *(Robertson Notes: I add that when the bank does the forgoing, then in that event, there is an utter failure of consideration for the "loan contract".)*

131. *When the Plaintiff deposited the Defendants' $400,000 of newly issued credit into an account, the Plaintiff created from $360,000 to $400,000 of new money (the nominal principal amount less up to ten percent or $40,000 of reserves that the Federal Reserve would require against a demand deposit of this size).* ***The Plaintiff received $400,000 of credit or money of account from the Defendants as an asset. GAAP ordinarily would require that the Plaintiff record a liability account, crediting the Defendants' deposit account, showing that the Plaintiff owes $400,000 of money to the Defendants, just as if the Defendants were to deposit cash or a payroll check into their account.*** *The following appears to be a disputed fact in this case about which I have insufficient information on which to form a conclusion:* ***I infer that it is alleged that Plaintiff refused to lend the Defendants Plaintiff's own money or assets and recorded a $400,000 loan from the***

***Defendants to the Plaintiff, which arguably was a $400,000 deposit of money of account by the Defendants, and then when the Plaintiff repaid the Defendants by paying its own credit (money of account) in the amount of $400,000 to third-party sellers of goods and services for the account of Defendants, the Defendants were repaid their loan to Plaintiff, and the transaction was complete.*** And,

132. ***The Plaintiff is trying to use the credit application form or the Note to persuade and deceive the Defendants into believing that the opposite occurred and that the Defendants were the borrower and not the lender***. *The following point is undisputed:* ***the Defendants' loan of their credit to Plaintiff when issued and paid from their deposit or credit account at Plaintiff, became money in the Federal Reserve System (subject to a reduction of up to ten percent for reserve requirements) as the newly issued credit was paid pursuant to written orders, including checks and wire transfers, to sellers of goods and services for the account of Defendants.***

*CONCLUSION*

**Based on the foregoing, Plaintiff is using the Defendant's Note for his own proposes.**

## CASE LAW THAT PROVES THE BANK DOES NOT MAKE A LOAN
## First National Bank of Montgomery v. Jerome Daly
## IN THE JUSTICE COURT
## County of Scott, Township of Credit River, Minnesota

133. *THE CREDIT RIVER CASE*

*Banks do not disclose that the borrower is actually the lender to the bank.*

The Credit River Case was conducted in the Township of Credit River, Minnesota, USA, on 12th

December 1968.Before a jury of 12 and Justice Mahoney, it was established that the money we are loaned by banks is created out of thin air with nothing of value behind it. And, that the borrower who signs the note and deed of trust on a mortgage loan is actually the lender to the bank, although this fact is not disclosed to the borrower and constitutes FRAUD on a number of levels which voids the note and deed of trust at the inception.

134. The case, between the First National Bank of Montgomery (plaintiff) vs Jerome Daly - the defendant, established a monumental precedent in law. This precedent has become the Achilles heel of all credit creation banks around the world. In the case, the plaintiff sought Common Law action for the recovery of the defendant's home due to default of mortgage payments. The defendant, acting as a self-litigant, stated that the plaintiff created the money and credit upon its own books (meaning out of thin air), by bookkeeping entry as the consideration for the Note and Mortgage, and alleged failure of consideration for the Mortgage Deed.

135. The president of the bank Lawrence V. Morgan, appearing as the plaintiff's only witness, admitted that all of the money or credit which was used as a consideration was created upon their books and that '*this was standard banking practice exercised by their bank in combination with the Federal Reserve Bank of Minneapolis, another private bank, further that he knew of no United States Statute or law that gave the plaintiff the authority to do this.*" The bank manager admitted that the bank had created the money (credit) out of thin air, or more accurately from the borrower signature on the note (borrower created the money) and loaned it to the defendant, without first explaining to the defendant, where the money came from.

136. Even though it was not challenged or determined in this court case, it is clear that the bank had conducted fraud. There was no money for the bank to loan in the first instance and yet the bank cheated the defendant by lying to him that they had loaned him money, actually his money.

The jury returned a unanimous verdict for the defendant and Justice Mahoney carried out the will of the jury. The judge ordered the return of the defendant's home as his rightful and lawful property and the mortgage contract was made null and void. Jerome Daly got to keep his home with no debt hanging over him and the bank walked away with nothing because they loaned nothing in the first place, because Jerome Daly was actually the lender.

137. Two weeks later Justice Mahoney was murdered. Who would have benefited from such an attack? Obviously the bank and those who benefit from the credit creation of the borrower signature and do not want it disclosed. The case was buried for a long time to ensure there wasn't a flood of cases using the precedent set.

Complete records of the Court Case can be obtained at:

http://www.lawlibrary.state.mn.us/CreditRiver/CreditRiver.html

The Credit River case "First National Bank of Montgomery v. Jerome Daly", the final judgment and Appeal are incorporated herein by this reference and attached hereto as Exhibits 8, 8-1 & 8-2.

**AFFIRMATIVE DEFENSE**
**TO ANY DEFENDANT(S) ACTION**
**THE DEFENDANT (S) ARE BARRED FROM BRINGING ANY ACTION BY THE STATUTE OF FRAUDS**

138. The Statute of Frauds is hereby raised as a affirmative defense to the Defendant ('s) /Plaintiff('s) UDC based in the fact that the Defendant was led to believe that he was a party to a mortgage agreement and loan and that the original lender would be the source of the loan and would be there in the future to rewrite the interest only loan when the adjustable rate accelerated added principal and raised the monthly payment, that was the pitch given to the Defendant by the original alleged lender prior to the Defendant's decision to enter into the alleged loan contract.

139. It turned out that the mortgage was not a mortgage loan at all but an investment contract in which the Defendant was made a uninformed third party to a investment contract to which Defendant would not

have entered into had he been informed and had prior knowledge. As Marie McDonnell points out in her Loan Analysis Report the loan was designed to fail from the beginning and was a **predatory loan**, illegal and unlawful. This Court must Dismiss Plaintiff ('s) UDC with prejudice on this basis alone.

## AFFIRMATIVE DEFENSE

## PLAINTIFF'S CANNOT CONDUCT A NON-JUDICAL FORECLOSURE BECAUSE NO CONFESSED JUDGMENT WAS DONE AS REQUIRED BY LAW

140. Non-Judicial Foreclosure is barred without a confession of judgment.

In a non-judicial foreclosure, the deed of trust has a power of sale condition in it that is a confession of judgment of the borrower and under California civil code 1131 – 1134 it says that there can be no confession of judgment without the borrower's consent and a court oath certified by an attorney

**CODE OF CIVIL PROCEDURE SECTION 1132-1134**

141. **Confessed Judgment is the power of sale clause**

1132. (a) A judgment by confession may be entered without action either for money due or to become due, or to secure any person against contingent liability on behalf of the defendant, or both, in the manner prescribed by this chapter. Such judgment may be entered in any superior court.

(b) A judgment by confession shall be entered only if an attorney independently representing the defendant signs a certificate that the attorney has examined the proposed judgment and has advised the defendant with respect to the waiver of rights and defenses under the confession of judgment procedure and has advised the defendant to utilize the confession of judgment procedure. The certificate shall be filed with the filing of the statement required by Section 1133.

1133. A statement in writing must be made, signed by the defendant, and verified by his oath, to the following effect:

1. It must authorize the entry of judgment for a specified sum;

2. If it be for money due, or to become due, it must state concisely the facts out of which it arose, and show that the sum confessed therefore is justly due, or to become due;

3. If it be for the purpose of securing the plaintiff against a contingent liability, it must state concisely the facts constituting the liability, and show that the sum confessed therefore does not exceed the same.

142. 1134. (a) The statement required by Section 1133 shall be filed with the clerk of the court in which the judgment is to be entered, who must endorse upon it, and enter a judgment of the court for the amount confessed with the costs provided in subdivision (b).

(b) At the time of filing, the plaintiff shall pay as court costs that shall become a part of the judgment the fee as provided in subdivision (b) of Section 70626 of the Government Code. No fee shall be collected from the defendant..

(c) The statement and affidavit, with the judgment endorsed thereon, together with the certificate filed pursuant to Section 1132, becomes the judgment roll.

143. **CA Foreclosure Law - Civil Code 2924**

Civil Code 2924.

(a) Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage, except when in the case of personal property it is accompanied by actual change of possession, in which case it is to be deemed a pledge. Where, by a mortgage created after July 27, 1917, of any estate in real property, other than an estate

at will or for years, less than two, or in any transfer in trust made after July 27, 1917, of a like estate to secure the performance of an obligation, a power of sale is conferred upon the mortgagee, trustee, or any other person, to be exercised after a breach of the obligation for which that mortgage or transfer is a security, the power shall not be exercised except where the mortgage or transfer is made pursuant to an order, judgment, or decree of a court of record, or to secure the payment of bonds or other evidences of indebtedness authorized or permitted to be issued by the Commissioner of Corporations, or is made by a public utility subject to the provisions of the Public Utilities Act, until all of the following apply:

144. The following non-judicial foreclosure only applies to Corporations **NOT** to private living men and women, The Defendant is not a Corporation or public entity or public utility:

(1) The trustee, mortgagee, or beneficiary, or any of their authorized agents shall first file for record, in the office of the recorder of each county wherein the mortgaged or trust property or some part or parcel thereof is situated, a notice of default. That notice of default shall include all of the following:

(A) A statement identifying the mortgage or deed of trust by stating the name or names of the trustor or trustors and giving the book and page, or instrument number, if applicable, where the mortgage or deed of trust is recorded or a description of the mortgaged or trust property.

(B) A statement that a breach of the obligation for which the mortgage or transfer in trust is security has occurred.

(C) A statement setting forth the nature of each breach actually known to the beneficiary and of his or her election to sell or cause to be sold the property to satisfy that obligation and any other obligation secured by the deed of trust or mortgage that is in default.

(D) If the default is curable pursuant to Section 2924c, the statement specified in paragraph (1) of subdivision (b) of Section 2924c.

(2) Not less than three months shall elapse from the filing of the notice of default.

(3) After the lapse of the three months described in paragraph (2), the mortgagee, trustee or other person authorized to take the sale shall give notice of sale, stating the time and place thereof, in the manner and for a time not less than that set forth in Section 2924f.

(b) In performing acts required by this article, the trustee shall incur no liability for any good faith error resulting from reliance on information provided in good faith by the beneficiary regarding the nature and the amount of the default under the secured obligation, deed of trust, or mortgage. In performing the acts required by this article, a trustee shall not be subject to Title 1.6c (commencing with Section 1788) of Part 4.

(c) A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice.

(d) All of the following shall constitute privileged communications pursuant to Section 47:

(1) The mailing, publication, and delivery of notices as required by this section.

(2) Performance of the procedures set forth in this article.

(3) Performance of the functions and procedures set forth in this article if those functions and procedures are necessary to carry out the duties described in Sections 729.040, 729.050, and 729.080 of the Code of Civil Procedure.

(e) There is a rebuttable presumption that the beneficiary actually knew of all unpaid loan payments on the obligation owed to the beneficiary and secured by the deed of trust or mortgage subject to the

notice of default. However, the failure to include an actually known default shall not invalidate the notice of sale and the beneficiary shall not be precluded from asserting a claim to this omitted default or defaults in a separate notice of default.

**DEFENDANT(S) CANNOT STATE A CLAIM FOR RELIEF BECAUSE DEFENDANT ('S) HAVE NO STANDING THEIR UNLAWFUL DETAINER COMPLAINT IS NOT VARIFIED AND CONTAINS HEARSAY, NO EVIDENCE THAT CAN SUPPORT A CLAIM AND THEY CANNOT SHOW THAT THEY AER PARTIES IN INTEREST**

145. The Defendant (s)/Plaintiff('s) UDC that is to be consolidated with this Case is NOT "VARIFIED" because the Defendant/Plaintiff(s) in the UDC and their Attorney David A. Wood (who signed the Plaintiff ('s) Unlawful Detainer Complaint is reported not to work for Wright Finley & Zak) and states in the UDC, **"I make this verification because the Plaintiff is absent from the County of Orange California" "I have read the forgoing Complaint and know its contents. I am informed and believe and on that ground allege the matters stated herein are true."** The so called verification is based on just information and belief, with NO personal knowledge so it is merely hearsay and inadmissible as evidence and does not constitute a verification. Anyone can record a trustee's deed and a copy of it is not evidence it is genuine, true, accurate and executed by someone with the legal capacity to do so and that the title chain of assignment is legal. With, no evidence contained in the UDC the Defendant/Plaintiff's has not stated a claim upon which relief can be granted and the UDC must be dismissed by this Court. Plaintiff was informed by Gretchen, a paralegal at Wright Finley and Zak on April 7, 2011, that David A. Wood no longer worked at Wright Finely and Zak therefore cannot represent any Plaintiff herein or make any statement on their behalf.

## OTHER CLAIMS FOR RELIEF

## DEFENDANT RESERVES THE RIGHT TO RAISE OTHER CLAIMS FOR RELIEF IN ANY AMENDED COMPLAINT IN THIS CASE

146. Plaintiff reserves the right to raise any other claim for relief in any amendment to an Answer and add any additional claims for relief exhibits or evidence to support any claim or fact and reserves the right to file or any complaint against Defendant (s) in this Case.

**WHEREFORE,** PLAINTIFF seeks a Judgment as follows"

1. Actual Economic and Non-Economic Damages.
2. General Damages according to proof at trial with such other and further relief as the Court may deem reasonable and just under the circumstances.
3. For a Declaration of the rights and duties of the parties relative to the Plaintiff's home to determine the actual status and validity of the loan, Deed of Trust, and Notice of Default prior to the Notice of Loan Rescission and after the Loan Rescission according to the TILA and Regulation Z Laws..
4. Declaratory relief to enforce any Administrate private Default Judgment that Plaintiff has obtained against the Defendant(s).
5. For Damages under common law according to the jury's judgment.
6. For an order enjoining the Defendants from continuing to violate the applicable laws alleged.
7. For special and punitive damages.
8. For an order restraining Defendant or his/hers or its agents or any other attorney or representative or office from engaging in or performing any act to foreclose on Plaintiff's home.
9. To VOID the Notice of Sale, Trustee's Deed and order Defendant to record a renconveyance of

all interest in the Note and Deed of Trust in connection with the subject mortgage within a 20 day period from the date of issuance of the order.

10. For an order of forfeiture of and return of all loan proceeds.

11. For cost of suit herein incurred.

12. For prejudgment interest allowed by law.

13. For an order of restitution requiring the Defendant(s) to payback all revenues acquired from Plaintiff by any unlawful, unfair, fraudulent and/or deceptive acts or practices.

14. This Court issue a Declaratory Judgment requiring Plaintiff's to prove ownership, holder's in due course of the Note, 1. lawful, legal assignment of Note and Deed of Trust to Plaintiff (s), 3. produce the original Note to ownership, 4. produce an accounting showing that Defendants made a loan from their deposits, credit or assets other than Defendant's credit and monetized Note, 5. produce accounting records that show no credit in any account for Defendant that was not given to him. 6. Prove that Defendant was not the source of the money that he received.

15. That Plaintiff's Unlawful Detainer Complaint CLJ 203244 be Dismissed with Prejudice.

16. That this Court issue a Quit Title order that voids Plaintiff's Trustee's Deed and reconveys any claimed interest in the subject property referred to as 115 15th Avenue, San Mateo, California Back to MARSHALL E. MIKELS and to Marshall-Edward; Mikels.

17. Award damages that the Jury determines proper and just.

18. Award damages to Plaintiff as a result of Defendant ('s) actions in the foreclosure and illegal activities referenced herein.

///

///

///

IN WITNESS WHEREOF I hereunto set my hand and seal on this 3rd day of January 2012 and hereby certify, swear and affirm that all the statements made above are true, correct and complete based on my personal knowledge, information and belief.

Without Prejudice, Under Reserve

Date: 01-03-2012 Declarant: Marshall-Edward: Mikels (Seal)

Marshall-Edward: Mikels, Secured Party/Creditor
and Authorized Representative For:
MARSHALL E. MIKELS 5496**** Defendant
and Trustee to the MCM Trust
Land and Property Owner as Described Above

**JURAT**

STATE OF CALIFORNIA )
) ss:
COUNTY OF Siskiyou )

Subscribed and sworn to (or affirmed) before me on this 3rd day of January 2012, by Marshall E. Mikels, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

(seal) Signature, Stacey L. Mack **NOTARY PUBLIC**

STACEY L. MACK
Commission # 1889548
Notary Public - California
Siskiyou County
My Comm. Expires May 16, 2014

PRELIMINARY REPORT
YOUR REFERENCE: MIKELS

Ticor Title Company
ORDER NO.: 896276-12

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 4, BLOCK J, AS SHOWN ON THAT CERTAIN MAP ENTITLED, MAP OF SUBDIVISION NO. 3 AND RESUBDIVISION OF BLOCK G AND H OF SUBDIVISION NO. 2 HAYWARD PARK, SAN MATEO COUNTY, CALIFORNIA, IN THE CITY OF SAN MATEO, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON OCTOBER 21, 1907, IN BOOK 5 OF MAPS AT PAGES 36, OFFICIAL RECORDS.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

# ADJUSTABLE RATE NOTE

**(Libor Six-Month Index (As Published in The Wall Street Journal)—Rate Caps)**
**(Interest Only ARM)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL

July 11, 2007 Gilbert, ARIZONA

115 15th Avenue
San Mateo, CALIFORNIA 94402
(Property Address)

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $1,350,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.375%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make my monthly payments on the 1st day of each month beginning on **September 1, 2007**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

Fisher Financial Group, Inc., dba, NationsChoice Mortgage
3303 East Baseline Road, #7-118
Gilbert , ARIZONA 85234

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $6,046.88. This amount may change.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of **August, 2012**, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

*106*

*MIN:* **100274686777116040** *Loan Number:* **NCM11604**

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate I am required to pay at the first Change Date will not be greater than **11.375%** or less than **4.000%** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) (**2.000%**) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **11.375%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is knows as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,

*MIN:* 100274686777116040 *Loan Number:* NCM11604

Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

(Seal)
Marshall E. Mikels -Borrower

(Seal)
-Borrower

*(Sign Original Only)*

Pay to the order of

Without Recourse this 11th day of July, 2007

By :

Its: Chad Fisher, President
Fisher Financial Group, Inc.
dba NationsChoice Mortgage
ISAOA

RECORDING REQUESTED BY
TICOR TITLE
TUSTIN-ORANGE CO. BRANCH

17

2007-108403
11:06am 07/18/07 DT Fee: 46.00
Count of pages 14
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 0 7 0 1 0 8 4 0 3 A R *

WHEN RECORDED, MAIL TO:
SMI-CSFB
3910 Kirby Drive, Suite 300
Houston, TEXAS 77098
ATTENTION: SMI-CSFB Laniece
Lamell/Trailing Doc Dept

This Instrument was prepared by:
Fisher Financial Group, Inc., dba,
NationsChoice Mortgage
3303 East Baseline Road, #7-118
Gilbert, ARIZONA 85234
480-461-1111

Assessor's Identification Number: 034-294-150
Loan Number: NCM11604
Order Number: 896276-12

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

# DEED OF TRUST

14P

MIN: 100274686777116040

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated July 11, 2007, together with all Riders to this document.

**(B) "Borrower"** is **Marshall E. Mikels a married man as his sole and seperate property.** Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is **Fisher Financial Group, Inc., dba, NationsChoice Mortgage.** Lender is **An Arizona Corporation,** organized and existing under the laws of **Arizona.**
Lender's address is **3303 East Baseline Road, #7-118, Gilbert, ARIZONA 85234.**

**(D) "Trustee"** is **Ticor Title**
Trustee's address is **18302 Irvine Blvd. Suite 100, Tustin, ORANGE County, CALIFORNIA 92780.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated July 11, 2007. The Note states that Borrower owes Lender ONE MILLION THREE HUNDRED FIFTY-THOUSAND and no/100 Dollars (U.S. $1,350,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2037.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] VA Rider |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |
| [ ] Other (Specify) - | | |

(J) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "**Escrow Items**" means those items that are described in Section 3.

(N) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of San Mateo:

**legal description attached hereto and made a part hereof**

Parcel Identification Number: **034-294-150**

which currently has the address of **115 15th Avenue**
**San Mateo, CALIFORNIA 94402** ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower

shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more

than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to

the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments

from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date**



Borrower(s) Initials [signature]

**specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________________ _______________________________

[signature] (Seal)
Marshall E. Mikels -Borrower

_______________________________ (Seal)
-Borrower

State of CALIFORNIA
County of San Mateo }ss.

On July 11th 2007 before me, Fredy P. Estrada Notary Public
a notary public, personally appeared Marshall E. Mikels, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

FREDY P. ESTRADA
COMM. # 1699688
NOTARY PUBLIC-CALIFORNIA
SAN MATEO COUNTY
My Comm. Exp. Oct. 21, 2010
(Seal)

Signature [signature]

*MIN:* 100274686777116040 *Loan Number:* NCM11604

# ADJUSTABLE RATE RIDER

**(Libor Six-Month Index (As Published in The Wall Street Journal)—Rate Caps)**
**(Interest Only ARM)**

THIS ADJUSTABLE RATE RIDER is made this 11th day of July, 2007, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed or Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation, ("Lender") of the same date and covering the property described in the Security Instrument and located at:

115 15th Avenue
San Mateo, CALIFORNIA 94402
(Property Address)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 5.375%. The Note also provides for changes in the interest rate and the monthly payments, as follows:

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make my monthly payments on the 1st day of each month beginning on September 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

Fisher Financial Group, Inc., dba, NationsChoice Mortgage
3303 East Baseline Road, #7-118
Gilbert, ARIZONA 85234

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $6,046.88. This amount may change.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

*MIN:* 100274686777116040 *Loan Number:* NCM11604

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of August, 2012, and on that day every SIXth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR percentage point(s) (4.000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate I am required to pay at the first Change Date will not be greater than 11.375% or less than 4.000% Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) (2.000%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 11.375%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

(Seal) -Borrower
Marshall E. Mikels

(Seal) -Borrower

# INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE RIDER

**LOAN NUMBER:** **NCM11604**

**PROPERTY ADDRESS:** **115 15th Avenue**
**San Mateo, CA 94402**

**THIS ADDENDUM** is made this **11th day of July, 2007** and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as the Addendum executed by the undersigned and payable to

**Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation**
(the Lender).

**THIS ADDENDUM** supersedes Sections 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C) Calculations of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the **FIRST TEN (10) YEARS** after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal prepayments.

Dated: July 11, 2007

[signature] (Seal)
Marshall E. Mikels -Borrower

_____________________ (Seal)
-Borrower

3.

RECORDING REQUESTED BY:
LPS Title Company - CA
WHEN RECORDED MAIL TO:
National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387
Title Order No. : 090778864

2009-146379
02:26pm 11/06/09 ND Fee: 12.00
Count of pages 2
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 0 9 0 1 4 6 3 7 9 A R *

APN: 034-294-150-7

**NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST**
**IMPORTANT NOTICE**

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).**

**This amount is $87,840.10, as of 11/06/2009 and will increase until your account becomes current.**

**While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your Note and Deed of Trust or Mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required by the Note and Deed of Trust or Mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.**

**Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by the transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).**

**Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.**

**To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:**

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387

Select Portfolio Servicing fka Fairbanks Capital Corporation
c/o National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020 Phone 602-264-6101 Sales Website: www.ndscorp.com/sales

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure. Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

This is an attempt to collect a debt and any information obtained will be used for that purpose.

NOTICE IS HEREBY GIVEN THAT : NATIONAL DEFAULT SERVICING CORPORATION is either the original Trustee, the duly appointed substituted Trustee or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 07/11/2007, executed by MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor, to secure certain obligations in favor of MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE as beneficiary recorded 07/18/2007, as Instrument No. 2007-108403 (or Book, Page) of Official Records in the Office of the County Recorder of SAN MATEO County, CA. Said obligations including ONE NOTE FOR THE ORIGINAL sum of $1,350,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL, INTEREST AND IMPOUNDS WHICH BECAME DUE ON 10/01/2008 AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST AND IMPOUNDS, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEY'S FEES.

That by reason thereof, the present beneficiary under such Deed of Trust has executed and delivered to duly appointed Trustee a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

This loan is exempt. Compliance with California Civil Code § 2923.5 and 2924.8 is not necessary to proceed with preparing and processing a notice of default.

Dated : November 6, 2009
Select Portfolio Servicing fka Fairbanks Capital Corporation, as Beneficiary by National Default Servicing Corporation, as Agent for the Beneficiary by LPS Title Company - CA, as Agent for National Default Servicing Corporation

Kevin Frost

By :

Kevin Frost - Authorized Agent

(Page 1 of 1)

2010-013797
09:00am 02/08/10 NT Fee: 15.00
Count of pages 1
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 1 0 0 0 1 3 7 9 7 A R *

WHEN RECORDED MAIL TO:
NATIONAL DEFAULT SERVICING CORPORATION
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

T.S. No. 09-21321-SP-CA
Loan No. 0010982387

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 07/11/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, (cashier's check(s) must be made payable to National Default Servicing Corporation), drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state; will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made in an "as is" condition, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: **MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**
Duly Appointed Trustee: **NATIONAL DEFAULT SERVICING CORPORATION**
Recorded **07/18/2007** as Instrument No. **2007-108403** of Official Records in the office of the Recorder of SAN MATEO County, California.
Date of Sale: **03/02/2010 at 1:00 P.M.**
Place of Sale: **At the Marshall Street entrance to the Hall of Justice and Records, 400 County Center, Redwood City, CA**
Estimated amount of unpaid balance and other charges: **$1,451,289.88**
Street Address or other common designation of real property: **115 15TH AVENUE, SAN MATEO, CA 94402**
A.P.N.: **034-294-150-7**

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale. If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

This loan is exempt. Compliance with California Civil Code § 2923.5and 2924.8 is not necessary to proceed with preparing and processing a notice of sale.

Regarding the property that is the subject of this Notice of Sale, the "mortgage loan servicer" as defined in California *Civil Code* Section 2923.53 (k) (3) declares that it has obtained from the Commissioner a final or temporary order of exemption pursuant to California *Civil Code* Section 2923.53 and that the exemption is current and valid on the date this Notice of Sale is recorded. The timeframe for giving a Notice of Sale specified in Subdivision (a) Section 2923.52 does not apply to this Notice of Sale pursuant to California *Civil Code* Sections 2923.52 or 2923.55.

Date: 02/08/2010

**NATIONAL DEFAULT SERVICING CORPORATION**
**7720 N. 16th Street, Suite 300**
**Phoenix, AZ 85020 phone 602-264-6101**
**Sales Line 714-730-2727; Sales Website: www.ndscorp.com/sales**

Nichole Alford, TRUSTEE SALES REPRESENTATIVE

WRIGHT, FINLAY & ZAK, LLP
Jonathan M. Zak, Esq., SBN 121592
Gwen R. Ribar, Esq., SBN 188024
William J. Idleman, Esq., SBN 258450
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660 *(Mikels/Pleadings/Demurrer)*
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Defendants, U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES SERIES 2007-3, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., and SELECT PORTFOLIO SERVICING, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| MARSHALL MIKELS,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES SERIES 2007-3; FISHER FINANCIAL GROUP, INC., dba NATIONSCHOICE MORTGAGE, an Arizona Corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; SELECT PORTFOLIO SERVICING, INC., a Utah Corporation; NATIONAL DEFAULT SERVICING , INC., an Arizona Corporation; and DOES 1-10 INCLUSIVE,<br><br>Defendants. | Case No.: CIV492452<br><br>**NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT BY U.S. BANK, MERS, AND SPS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: May 18, 2010<br>Time: 9:00 a.m.<br>Dept: LM<br><br>Complaint filed: March 1, 2010<br><br>*[Filed Concurrently with Request for Judicial Notice]* |

**TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 18, 2010, at 9:00 a.m., or as soon thereafter as may be heard in Dept. LM of the above-entitled court, located at Main Courthouse, Hall of Justice, 400 County Center, Redwood City, CA 94063-1655, Defendants U.S. Bank, National Association, as Trustee on behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates Series 2007-3, Mortgage Electronic Registration Systems, Inc., and Select Portfolio Servicing Inc. ("Defendants") will demur to each and every cause of action in the Complaint of Marshall Mikels on the grounds set forth in the accompanying Demurrer to the Complaint.

The Demurrer is made pursuant to *California Code of Civil Procedure* 430.10 (e) on the grounds that Plaintiff's Complaint fails to state facts sufficient to support any cause of action against Defendants.

This Demurrer will be based on this Notice of Demurrer, the accompanying Demurrers to the Complaint, Memorandum of Points and Authorities in Support of, the Request for Judicial Notice and the pleadings, papers, and records on file in this action, and upon such further oral and/or documentary evidence as may be presented at the hearing on this matter.

Respectfully submitted,

WRIGHT, FINLAY & ZAK, LLP

Dated: March 24, 2010

By: [signature]

Jonathan M. Zak, Esq.
Gwen H. Ribar, Esq.
William J. Idleman, Esq.
Attorneys for Defendants,
U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES SERIES 2007-3, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., and SELECT PORTFOLIO SERVICING INC.

**DEMURRER**

Defendants U.S. Bank, National Association, as Trustee on behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates Series 2007-3, Mortgage Electronic Registration Systems, Inc., and Select Portfolio Servicing Inc. ("Defendants") demur to Plaintiff's Complaint and to each of the below enumerated causes of action contained therein, on the following grounds:

**Entire Complaint**

Plaintiff's entire Complaint fails because he has not alleged facts sufficient to constitute any cause of action against Defendants.[1]

**First Cause of Action**

Plaintiff's first cause of action for Fraud fails because it does not allege facts sufficient to constitute a cause of action against Defendants. [2]

///
///
///
///
///
///
///
///
///
///
///
///
///

---

[1] *Code of Civil Procedure* §430.10 (c).

**Second Cause of Action**

Plaintiff's second cause of action for Accounting fails because it does not allege facts sufficient to constitute a cause of action against Defendants.[3]

Respectfully submitted,

WRIGHT, FINLAY & ZAK, LLP

Dated: March 29, 2010

By: [signature]

Jonathan M. Zak, Esq.
Gwen H. Ribar, Esq.
William J. Idleman, Esq.
Attorneys for Defendants,
U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES SERIES 2007-3, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., and SELECT PORTFOLIO SERVICING INC.

---

[2] *Code of Civil Procedure* §430.10 (e).
[3] *Code of Civil Procedure* §430.10 (e).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

This Complaint arises out of a default by Plaintiff Marshall Mikels ("Plaintiff") on a loan secured by the property located at 115 15th Avenue, San Mateo, California 94402 ("Property"). The loan was secured by a Deed of Trust recorded on July 18, 2007. Fisher Financial Group, Inc., dba NationsChoice Mortgage ("Fisher Financial") is the original lender on the Deed of Trust and no longer has an interest in the Property. Fisher Financial assigned its beneficial interest in the Property to U.S. Bank, National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Backed Pass Through Certificates, Series 2007-3 ("the Trust"). Select Portfolio Servicing, Inc. ("SPS") is the loan servicer for this mortgage and the attorney-in-fact for the Trust.

Plaintiff subsequently defaulted on his loan obligations and blames a failed stock market investment that he entered into with Fisher Financial with the loan proceeds as the reason for his default. Plaintiff makes no allegations against Mortgage Electronic Registration Systems, Inc. ("MERS"), SPS, or theTrust, (collectively "Defendants") but for unknown reasons, includes Defendants in his causes of action for fraud and accounting against Fisher Financial. Defendants were not part of the dealings between Plaintiff and Fisher Financial, nor are there any allegations against Defendants. Consequently, this Demurrer should be sustained without leave to amend for the reasons below.

**II.**

**STATEMENT OF FACTS**

On or about July 11, 2007, Plaintiff obtained a mortgage loan from Fisher Financial. The mortgage loan was in the amount of $1,350,000.00, as evidenced by a Deed of Trust secured by the Property.[4]

Plaintiff ultimately fell into arrears on his loan and National Default Servicing Corporation, on behalf of SPS, initiated the foreclosure process against the Property.[5] The

Notice of Default was recorded on November 6, 2009.[6] On or about November 27, 2009, Fisher Financial assigned its interest under the Deed of Trust to the Trust.[7] After Plaintiff failed to cure the default or tender the amount due on the loan, the Notice of Trustee's Sale was recorded on February 8, 2010.[8]

Plaintiff has not made any payments since at least November 6, 2009, as indicated on the Notice of Default.[9] Additionally, Plaintiff is challenging the validity of the foreclosure sale and has failed to allege the tender that is required to challenge a foreclosure sale.

## III.

## ARGUMENT

### A. A Demurrer is Proper Due to Plaintiff's Failure to State a Claim Upon Which Relief May be Granted.

*California Code of Civil Procedure* sections 430.10 (e) and 430.30 (a) allow a defendant to interpose general and special demurrers to a Complaint. Section 430.10 provides that the party against whom a complaint or cross complaint has been filed may object, by demurrer or answer, as provided in section 430.30, to the pleading on the grounds that the pleading does not state facts sufficient to constitute a cause of action. Furthermore, "without supporting facts demonstrating the illegality of a rule or regulation, an allegation that (the defendant) is in violation of a specific statute is purely conclusionary and insufficient to withstand demurrer."[10] Instead, a Plaintiff must plead facts sufficient to establish *every element of that cause of action.*[11]

### B. The Entire Complaint Fails Because Plaintiff Did Not Tender the Amounts Owed Under the Note and Deed of Trust.

---

[4] See Deed of Trust, attached as Exhibit "1" to the Request for Judicial Notice (RJN).
[5] See Notice of Default, attached as Exhibit "2" to RJN.
[6] See Notice of Default, attached as Exhibit "2" to RJN.
[7] See Corporate Assignment, attached as Exhibit "3" to RJN.
[8] See Notice of Trustee's Sale, attached as Exhibit "4" to RJN.
[9] See Notice of Default, attached as Exhibit "2" to RJN.
[10] See *Baker v. Miller* (1923) 190 Cal. 263, 267, 212 P. 11; *Joyce v. Tomasini* (1914) 168 Cal. 234, 237-238, 142 P. 67; *Taliaferro v. Wampler* (1954) 127 Cal.App.2d 306, 308, 273 P.2d 829.
[11] *Cantu v. Resolution Trust Corp*, (1992) 4 Cal.App.4th 857, 879.

Since Plaintiff has not tendered payment due under the Note and Deed of Trust, [12] none of the causes of action alleged in the Complaint may properly be maintained. To the extent that Plaintiff's Complaint challenges SPS or the Trust's non-judicial foreclosure sale, Plaintiff is required to allege tender. However, nowhere in the Complaint does Plaintiff allege that he tendered, or has the ability to tender, the amounts owed under the loan. Absent a tender of the undisputed amounts, Plaintiff cannot invoke the court's equitable powers to stop the lender from exercising its agreed upon power of sale. [13]

The Court of Appeals of California has explained:

> "This rule...is based upon the equitable maxim that a court of equity will not order a useless act performed....if plaintiffs could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the plaintiffs."[14]

Thus, as a condition precedent to any action challenging a foreclosure, the borrower must tender or offer to tender a sum sufficient to cure the default.[15] Further, the tender must have been made in *good faith*; the party making the tender must have had the *ability to perform*; and the tender must have been *unconditional*.[16] This tender requirement has been extended to apply to "any cause of action" arising from an alleged improper foreclosure.[17]

Because no facts are pled to show that Plaintiff has met the tender requirement, Plaintiff cannot maintain any cause of action arising from the alleged improper foreclosure. As a result, this demurrer to the entire complaint should be sustained without leave to amend.

## C. **Plaintiff's First Cause of Action for Fraud Fails to Allege Facts to Constitute a Cause of Action Against SPS, MERS, or the Trust.**

---

[12] See Complaint, generally.

[13] *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 (emphasis added.); see also, *United States Cold Storage v. Great Western Savings & Loan Assoc.* (1985) 165 Cal.App.3d 1214, 1222; *Karlsen v. American Savings & Loan Assoc.* (1971) 15 Cal.App.3d 112, 117.

[14] *F.P.B.I. Rehab 01 v. E&G Investments, Ltd.* (1989) 207 Cal.App.3d 1018, 1021.

[15] *Karlsen*, supra., at p. 117 (judgment on the pleadings granted); *Arnolds Management Corp. v. Fisher* (1984) 158 Cal.App.3d 575, 578-579.

[16] See, Miller & Starr, *supra.*; see also, *Civil Code* §1486 (full performance), 1493 (good faith), 1494 (unconditional) and 1495 (offeror must have ability to perform).

[17] *Karlsen, supra.*, at p. 117; *Arnolds Management Corp. v. Fisher, supra.*, 158 Cal.App.3d at 578-579.

The rule in California is clear: fraud must be specifically pleaded. The effect of this rule is two-fold: (a) general pleading of the legal conclusion of "fraud" is insufficient; the facts constituting the fraud must be alleged; (b) every element of the Plaintiff's claims for fraud must be alleged in the proper manner (i.e. factually and specifically), and the policy of liberal construction of the pleadings will not ordinarily be invoked to sustain a pleading defective in any material respect.[18] It is essential that the facts and circumstances which constitute the fraud should be set out clearly, concisely, and with sufficient particularity to apprise the opposite party of what he is called on to answer, and to enable the court to determine whether, on the facts pleaded, there is any foundation, for the charge of fraud.[19]

Moreover, the requirements for pleading fraud against a corporation are even more stringent.[20] The requirement of specificity in a fraud action against a corporation requires the Plaintiff to allege the names of the persons who performed the allegedly fraudulent conduct, their authority, and when it was performed.[21] A dismissal is proper where no specific facts are pled to show how, when, where, to who and by what means the representations were tendered, from what data the falsity of defendant's intentions could be inferred, or how, when, where, to who; and in what circumstance the plaintiff became justified in relying on these representations.[22]

Plaintiff's failure to properly plead a cause of action for fraud against SPS, MERS, and the Trust is even more salient in light of the fact that the standard for pleading fraud against a corporation is heightened.[23] Here, Plaintiff does not allege any facts against SPS, MERS, or the Trust, much less the "how, when, or where" elements of a claim for fraud.

Accordingly, the demurrer to this cause of action should be sustained without leave to amend.

**D. <u>Plaintiff's Second Cause of Action for Accounting Fails to Allege Facts to Constitute a Cause of Action Against SPS, MERS or the Trust.</u>**

---

[18] *Scafindi v. Western Loan and Building Company* (1946) 72 Cal. Ap.2d 550, 558.
[19] *Woodson v. Winchester* (1911) 16 Cal.App. 472, 473, 117 P. 565; *Allen v. Ramsay* (1960) 179 Cal.App.2d 843, 848, 4 Cal.Rptr. 575.)
[20] *Tarmann v. State Farm Mutual Auto Insurance Company* (1991) Cal.App.4th 153, 157.
[21] *Tarmann v. State Farm Mutual Auto Insurance Company* (1991) Cal.App.4th 153, 157.
[22] *Hill Trans. Co. v. Southwest Forest Industries Inc.* (1968) 266 Cal.App.2d 702, 707.

Similarly, the Complaint's Second Cause of Action for an Accounting fails to state facts sufficient to constitute a cause of action. An action for accounting is equitable in nature and is only permissible when (1) a fiduciary relationship between the parties exists or (2) a balance due from the defendant to the plaintiff is so complicated that an ordinary legal action demanding a fixed sum is impracticable.[24]

Initially, as a matter of law, there is no fiduciary relationship between a borrower and a lender. A California Appellate Court has held:

> "It has long been regarded as 'axiomatic that the relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor.' [Citation.] 'A Debt is not a trust and there is not a fiduciary relation between debtor and creditor as such.' [Citation.] The same principle should apply with even greater clarity to the relationship between a bank and its loan customers."[25]

In the present matter, Plaintiff provides no facts that would indicate that his relationship with SPS, MERS, or the Trust exceeds that of a traditional borrower and lender.[26] Therefore, the only possible way Plaintiff's cause of action can be valid is if a monetary balance owed by defendants to Plaintiff cannot be reasonably ascertained.[27]

However, the Complaint does not factually allege that (1) a balance is actually owed to Plaintiff or (2) the accounts for the Notes are so complicated that the amount at issue cannot be reasonably ascertained; the Complaint's allegations actually indicate the contrary.[28] Moreover, Plaintiff admits that he is behind on his monthly payments towards the Note.[29] Based on this admission, it is obvious that Defendants do not owe Plaintiff any money; if anything Plaintiff owes Defendants money, especially considering that he continues to fail to make his monthly payments under the Notes. Additionally, Plaintiff's own estimation that the amount owed is around $1,350,000, demonstrates that, if in fact money is owed to him, an ordinary legal action

---

[23] *Tarmann v. State Farm Mutual Auto Insurance Company* (1991) Cal.App.4th 153, 157.
[24] B.E. Witkin, *Witkin California Procedure*, Vol. 5, § 820 (5th Ed., WEST 2008) and referenced citations therein.
[25] *Kim v. Sumitomo Bank of California* (1993) 17 Cal.App.4th 974, 979.
[26] See Complaint, generally.
[27] See B.E. Witkin, *Witkin California Procedure*, Vol. 5, § 820 (5th Ed., WEST 2008).
[28] See Complaint, generally.

for a sum certain is the fitting form of action.[30] This cause of action is inappropriate with respect to SPS, MERS, and the Trust in this matter.

As a result, the demurrer to this cause of action should be sustained without leave to amend.

## IV.

## CONCLUSION

For all of the reasons set forth above, SPS, MERS, and the Trust's Demurrer should be sustained without leave to amend.

Respectfully submitted,

WRIGHT, FINLAY & ZAK, LLP

Dated: March 29, 2010 By: [signature]

Jonathan M. Zak, Esq.
Gwen H. Ribar, Esq.
William J. Idleman, Esq.
Attorneys for Defendants,
U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES SERIES 2007-3, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., and SELECT PORTFOLIO SERVICING INC.

---

[29] See Complaint, Attachment FR-6, lines 10-11.
[30] See Complaint, Attachment FR-5, lines 3-6; see also B.E. Witkin, *Witkin California Procedure*, Vol. 5, § 820 (5th Ed., WEST 2008).

**SUPERIOR COURT OF CALIFORNIA,**
**FOR SAN MATEO, COUNTY**
**Plaintiff's Summary Judgment Motion,**
**Memorandum of Points and Authorities,**
**Separate Statement of Undisputed Facts,**
**Declarations, Proofs of Service and**
**Proposed Court Order**
**Scheduled Hearing on September 28, 2011**
**EXHIBIT 1**

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No.: CLJ203244<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>(CCP § 1170.7)<br><br>*[Filed Concurrently with Plaintiff's Separate Statement of Undisputed Facts Supporting Evidence on Motion for Summary Judgment, Declarations in Support of Motion for Summary Judgment and [Proposed] Order/Judgment]*<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

**TO THE HONORABLE JUDGE/COMMISSIONER OF THE SUPERIOR COURT AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE THAT** on September 28, 2011 at 9:00 a.m., or as soon thereafter as the matter can be heard, in Department LM, of the above-entitled Court, located at 400 County Center, Redwood City, California 94063, ("Plaintiff"), U.S. BANK NATIONAL

ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3, will appear pursuant to California Code of Civil Procedure § 1170.7 to move the aforesaid Court for entry of judgment in its favor and against Defendant, MARSHALL E. MIKELS ("Defendant"), and all others in possession of the subject real property located at: 115 15TH AVENUE, SAN MATEO, CALIFORNIA 94402 (the "Property"), as prayed for in the Complaint of Plaintiff in the UD Action.

Said motion is made on the grounds that (1) there is no triable issue of material fact as to any issue contained in the UD Action, and (2) Plaintiff is legally entitled to immediate possession of the Property, and a judgment in its favor and against Defendant and all others in possession of the Property, as a matter of law.

This motion will be based on this Notice of Motion and Motion for Summary Judgment, the Memorandum of Points and Authorities set forth below, the Separate Statement of Undisputed Material Facts and Evidence, and supporting Evidence and Declarations, each of which are filed concurrently herewith, the pleadings, papers and records on file herein, and upon such further oral and/or documentary evidence as may be presented at the time of hearing for this matter.

DATED: August 15, 2011

WRIGHT, FINLAY & ZAK, LLP

By: [signature]
Madeleine K. Lee, Esq.
Attorneys' for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The instant Motion for Summary Judgment involves a standard residential unlawful detainer proceeding after a non-judicial foreclosure sale. As demonstrated below, and within the supporting Separate Statement of Undisputed Material Facts, and the accompanying Evidence and Declarations filed concurrently herewith, Plaintiff is entitled to judgment as a matter of law, and immediate possession of the subject real property.

Summarily, there are no triable issues as to any material fact in this unlawful detainer action. The undisputed facts in this case reflect that (1) Plaintiff acquired title to the subject property, which was duly perfected, through a nonjudicial foreclosure sale pursuant to the power of sale contained in the subject deed of trust; and duly perfected its title upon recordation of a Trustee's Deed Upon Sale (2) Defendant and all other Occupants, Tenants and Subtenants of the subject property were properly served with a notice to vacate pursuant to applicable California law; and (3) Despite the expiration of the notice period, Defendant continues to be in possession of the subject property without Plaintiff's permission or consent. These essential and material elements to this unlawful detainer proceeding have been established below, thus satisfy Plaintiff's burden of proof.

Therefore, since there is no triable issue of material fact in this matter and because Plaintiff is entitled to judgment as a matter of law, the instant Motion for Summary Judgment should be granted, and judgment be entered in favor of Plaintiff and against Defendant and all other Occupants, Tenants and Subtenants of the subject property.

## II. STATEMENT OF FACTS

A. On July 11, 2007, Defendant Marshall E. Mikels (the "Defendant") executed a Deed of Trust (the "Deed of Trust"), which secured repayment of an underlying Promissory Note (the "Note") in the principal amount of $1,350,000.00.[1] On July 18, 2007, the Deed of Trust was recorded in the Official Records of the County of San Mateo as Instrument No. 2007-108403, as

[1] A true and correct copy of the Deed of Trust is attached to the accompanying Declaration of Mindy C. Leetham as Exhibit "1".

against the title of the subject real property commonly known as 115 15th Avenue, San Mateo, California 94402 (the "Property").[2] Pursuant to the Deed of Trust, Defendant was the Trustor, Ticor Title was the Trustee, and Mortgage Electronic Registration Systems, Inc. ("MERS") was nominee beneficiary for the original lender, Fisher Financial Group, Inc., dba, NationsChoice Mortgage.[3]

**B.** On November 6, 2009, upon Defendant's default in payment under the Note, a Notice of Default and Election to Sell Under Deed of Trust ("NOD") was duly recorded against the Property's title in the Official Records of the County of San Mateo as Instrument No. 2009-146379.[4]

**C.** On February 8, 2010, a Substitution of Trustee, which substituted the original Trustee, Ticor Title, in favor of National Default Servicing Corporation, was recorded against the Property's title in the Official Records of the County of San Mateo as Instrument No. 2010-013796.[5]

**D.** On February 8, 2010, due to the uncured default under the Note and Deed of Trust, a Notice of Trustee's Sale was duly recorded against the Property's title in the Official Records of the County San Mateo as Instrument Number 2010-013797.[6]

**E.** On August 6, 2010, Plaintiff acquired title to the Property at the non-judicial foreclosure sale (the "Trustee's Sale"), which was held in accordance with *Civil Code* §2924 et seq.[7]

**F.** On August 17, 2010, title to the Property was perfected in the name of Plaintiff by the recordation of a Trustee's Deed Upon Sale ("TDUS") in the Official Records of the County of San Mateo as Instrument Number 2010-091521.[8]

---

[2] *Id.*
[3] *Id.*
[4] A true and correct copy of the NOD is attached to the accompanying Dec. Olivia A. Todd as Exhibit "1".
[5] A true and correct copy of the Substitution of Trustee is attached to the accompanying Dec. Mindy C. Leetham as Exhibit "2".
[6] A true and correct copy of the NOTS is attached to the accompanying Dec. Olivia A. Todd as Exhibit "2".
[7] A true and correct copy of Trustee's Deed Upon Sale is attached to Dec. Olivia A. Todd as Exhibit "3".
[8] A true and correct copy of the Trustee's Deed Upon Sale is attached to Dec. Olivia A. Todd as Exhibit "3".

G. On January 14, 2011, a California licensed process server served Defendant, and all occupants, tenants, and subtenants of the Property, with a written notice to quit (the "Notice") in compliance with *Code of Civil Procedure* §1162.[9]

H. On January 22, 2011, after Defendant refused to vacate and deliver possession of the Property to Plaintiff, Plaintiff filed a Complaint for Unlawful Detainer in the Superior Court of California, County of San Mateo, thereby initiating the instant unlawful detainer action against Defendant, and all other occupants, tenants, and subtenants of the Property (the "UD Action").

I. Defendant filed an Answer to the UD Action and has demanded a trial by jury. Defendant has raised affirmative defenses that exceed the scope allowed by law in an unlawful detainer proceeding.

## III. DISCUSSION

**A. Summary Judgment in an Unlawful Detainer proceeding.**

A Plaintiff in an action for unlawful detainer may move for summary judgment. *Code of Civil Procedure* § 1170.7 provides, in pertinent part:

> A motion for summary judgment may be made at any time after the answer is filed upon giving five days notice. Summary judgment shall be granted or denied on the same basis as a motion under Section 437c.

*Code of Civil Procedure* § 437c(c) states, in relevant part, that "[t]he motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law…."

"The purpose of the law of summary judgment is to provide courts a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is necessary to resolve their dispute."[10] Where a plaintiff seeks summary judgment, the plaintiff's burden is to prove each element of the cause of action, not to negate all possible defenses.[11] In *Aguilar v. Atlantic Richfield Co.*, the California Supreme Court held that a plaintiff moving for

---

[9] See Declaration of Alberto Reyes and Exhibits "1" and "2" attached thereto.
[10] *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 84, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.
[11] *Aguilar*, 25 Cal.4th at 849.

summary judgment is no longer required to disprove any defense asserted by a defendant, but must simply prove each element of its own cause of action.[12]

In ruling on a motion for summary judgment, the court first determines if the plaintiff has proved each element of the cause of action.[13] Once the plaintiff has met its burden, the burden shifts to the defendant, who must then show that a triable issue of one or more material facts actually exists as to that cause of action.[14] In opposing a summary judgment motion, the opposing party *cannot* rely on its pleadings, but must make an independent showing by a proper declaration, or by reference to a deposition or other discovery products, that there is sufficient proof of the matters alleged to raise a triable question of fact.[15] In making its determination, the Court shall consider all of the evidence set forth in the papers and all inferences reasonably deducible therefrom, saving evidence subject to a sustained objection and inferences contradicting other reasonable inferences or evidence.[16]

**B. Plaintiff has established the elements of an unlawful detainer action following the Trustee's Sale of the Property.**

A purchaser at a trustee's sale is entitled to immediate possession of the subject property.[17] Where applicable, the purchaser may bring an unlawful detainer action against the trustor, or anyone holding under the trustor, who refuses to relinquish possession.[18] The elements of an unlawful detainer action, in the context of real property sold at a trustee's sale, are set forth in *Code of Civil Procedure* § 1161a(b), which provides, in relevant part, as follows:

> In any of the following cases, a person who holds over and continues in possession of...real property **after a three-day notice to quit the property has been served** upon the person, or if there is a subtenant in actual occupation of the premises, also upon such subtenant...may

---

[12] *Id.*
[13] *Id.*
[14] *Id.*; *Code Civ. Proc.* § 437c(p)(1).
[15] *Code Civ. Proc.* § 437c(p)(1); see *Buehler v. Alpha Beta Co.* (1990) 224 Cal.App.3d 729, 733; *Orsetti v. City of Fremont* (1978) 80 Cal.App.3d 961, 966.
[16] *Code of Civil Procedure* § 437c(c).
[17] *Farris v. Pacific States Auxiliary Corp.* (1935) 4 Cal.2d 103.
[18] *Code Civ. Proc.* § 1161a; *MCA, Inc. v. Universal Diversified Enterprises Corp.* (1972) 27 Cal. App.3d 170; *Stephens, Partain & Cunningham v. Hollis* (1987) 196 Cal. App.3d 948, 952; *Evans v. Superior Court* (1977) 67 Cal. App.3d 162; California Judges Benchguides: *Landlord-Tenant Litigation: Unlawful Detainer*, § 31.26, pps. 31-24 (Benchguide 31, 1997).

express provision in a deed of trust, recitals in a trustee's deed may be furnished as sufficient proof of the regularity of the sale.[24]

"A successful challenge to the [trustee's] sale *requires* evidence of a failure to comply with the procedural requirements for the foreclosure sale that caused *prejudice* to the person attacking the sale."[25] The presumption of validity of the trustee's sale must prevail when the record lacks substantial evidence of a prejudicial procedural irregularity.[26] Thus, the trustor, or other person attacking the sale, cannot overcome the aforesaid presumption of validity without offering admissible evidence of both (1) an improper procedural irregularity, and (2) resulting prejudice.[27]

In the present matter, paragraph 22 of the Deed of Trust states, in pertinent part: "The recitals in the Trustee's Deed **shall be prima facie evidence of the truth of the statements made therein**."[28] (Emphasis added.) Moreover, the Trustee's Sale was conducted on August 6, 2010, and the TDUS was recorded in the Official Records of the County of San Mateo, on August 17, 2010.[29] Additionally, the TDUS states, among other items, the following:

> This conveyance is made pursuant to the powers conferred upon Trustee by said Deed of Trust executed MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor, recorded on 7/18/2007, Instrument No. 2007-108403 Official Records in the Office of the County Recorder of SAN MATEO County, CA. All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.[30] (Emphasis in the original).

[24] *Sorensen v. Hall* (1934) 219 Cal. 680; *Pacific States Savings & Loan Co. v. O'Neill* (1936) 7 Cal.2d 596; *Cobb v. California Bank* (1936) 6 Cal.2d 389.
[25] Miller & Starr, *Cal. Real Estate* § 10:210, pg. 640 (3d ed. 2000) (Emphasis added.)
[26] *Stevens v. Plumas Eureka Annex Min. Co.* (1935) 2 Cal.2d 493,497.
[27] Miller & Starr, supra, §10:211.
[28] Dec. Mindy C. Leetham at Exhibit "1".
[29] Dec. Olivia A. Todd at Exhibit "3".
[30] *See Id.*

By furnishing the court with admissible certified copies of the recorded Deed of Trust and the TDUS, Plaintiff has met its initial burden of proving that it acquired the Property at the Trustee's Sale, which was held in compliance with *Civil Code* §§ 2924 et seq., and that title to the Property has been duly perfected in the name of Plaintiff by the timely recording of the TDUS.

2. **Element Two**: ***Defendant and all others in possession were served with a Three Day Notice to Vacate in accordance with California Code of Civil Procedure section 1162.***

*Code of Civil Procedure* § 1162 states:

> The notices required by Sections 1161 and 1161a may be served, either:
> 1. By delivering a copy to the tenant personally; or,
> 2. If he be absent from his place of residence, and from his usual place of business, by leaving a copy with some person of suitable age and discretion at either place, and sending a copy through the mail addressed to the tenant at his place of residence; or,
> 3. If such place of residence and business can not be ascertained, or a person of suitable age or discretion there can not be found, then by affixing a copy in a conspicuous place on the property, and also delivering a copy to a person there residing, if such person can be found; and also sending a copy through the mail addressed to the tenant at the place where the property is situated. Service upon a subtenant may be made in the same manner.

The return of a registered process server creates a presumption of proper service.[31] It is enough that the plaintiff properly served the notice; the plaintiff need not provide that the notice was actually received the defendant.[32]

As demonstrated by the Declaration of Alberto Reyes, a California Registered Process Server, which is filed concurrently herewith, as well as Exhibit "2" to Plaintiff's Verified

[31] See *Bus. & Prof. Code* §§ 22350 et. seq.; *Evid. Code* § 647 ("The return of a process server registered pursuant to Chapter 16 (commencing with Section 22350) of Division 8 of the Business and Professions Code upon process or notice established a presumption, affecting the burden of producing evidence, of the facts stated in the return.")
[32] *Bank of America Nat'l Trust & Sav. Ass'n v. Button* (1937) 23 Cal.App.2d 651, 652; *Lamey v. Masciotra* (1969) 273 Cal.App.2d 709, 713-714.

Complaint herein, Defendant and all Occupants, Tenants and Subtenants of the Property, were lawfully and properly served with a written notice to vacate on January 14, 2011, in accordance with the law. Therefore, Plaintiff has met its initial burden of proof regarding the element of service of a Notice to Vacate.

3. **Element Three**: ***Defendant Remains in Possession of the Property.***

As demonstrated by the Declaration of John Lee submitted concurrently herewith, and Defendant's Answer herein, Defendant remains in possession of the Property after expiration of the time provided for in the Three Day Notice to Vacate served on Defendant, and all other Occupants, Tenants and Subtenants of the Property, on January 14, 2011. Consequently, the UD Action is proper.

**C. Defendant cannot establish a defense to this UD Action.**

1. ***Matters affecting the validity of the Deed of Trust or primary debt obligation itself, or other basic defects in Plaintiff's title, cannot be raised in this UD Action.***

The purchaser at a trustee's sale is entitled to immediate possession of the subject property.[33] The purchaser may bring an unlawful detainer action against the trustor, or anyone holding under the trustor, who refuses to relinquish possession.[34] The elements of an unlawful detainer action based upon the sale of real property at a trustee's sale are set forth in California *Code of Civil Procedure* Section 1161a, which provides in relevant part as follows:

> (b) In any of the following cases, a person who holds over and continues in possession of a manufactured home, mobile home, floating home or real property after a three-day written notice to quit the property has been served upon the person, or if there is a subtenant in actual occupation of the premises, also upon such subtenant, as described in Section 1162, may be removed therefrom as prescribed in this chapter:
>
> * * *
>
> (3) Where the property ***has been sold in accordance with Section 2924 of the Civil Code,*** under a power of sale contained in a deed of trust executed by such person, or a person under whom such person claims, and the title under the sale has been duly perfected. (emphasis added.)

---

[33] *Farris v. Pacific States Auxillary Corp* (1935) 4 C2d 103.

[34] Code Civ. Pro. 1161a; *MCA, Inc. v. Universal Diversified Enters. Corp.*, (1972) 27 Cal. App.3d 170.

## IV. CONCLUSION

As set forth above, there are no triable issues of material fact concerning the UD Action and Plaintiff is entitled to judgment as a matter of law. Accordingly, Plaintiff requests that this Court grant the instant summary judgment motion be entered in Plaintiff's favor in the UD Action and against Defendant and all unknown occupants, as prayed for in the Complaint.

DATED: August 15, 2011

WRIGHT, FINLAY & ZAK, LLP

By: ______________________
Madeleine K. Lee, Esq.
Attorneys' for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No. CLJ203244<br><br>**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE ON MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed Concurrently with Notice of Motion and Motion for Summary Judgment, Declarations in Support of Motion for Summary Judgment and [Proposed] Order/Judgment*]<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

**TO THE HONORABLE JUDGE/COMMISSIONER OF THE SUPERIOR COURT AND ALL PARTIES IN INTEREST:**

Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3 ("Plaintiff"), hereby submits this Separate Statement of Undisputed Material Facts,

together with reference to supporting evidence, in support of its Motion for Summary Judgment against Defendant Marshall Mikels ("Defendants") and all other occupants.

| Plaintiff's Undisputed Material Facts And Supporting Evidence | Defendant's Response And Supporting Evidence |
|---|---|
| **Fact No. 1:** On July 11, 2007, Marshall E. Mikels executed a Deed of Trust ("DOT") containing a power of sale, in favor of Mortgage Electronic Registration Systems, Inc. as nominee beneficiary for the Lender, Fisher Financial Group, Inc., dba NationsChoice to secure repayment of an underlying Note. **Certified copy of the DOT Trust (Exhibit "1" to Declaration of Mindy C. Leetham).** | |
| **Fact No. 2:** Mikels defaulted under the under the terms of the Note and Deed of Trust by failing to make required monthly mortgage payments due under. **Certified copy of the NOD (Exhibit "1" to Declaration of Olivia A. Todd); Declaration of Client ¶ 5.** | |
| **Fact No. 3:** On November 6, 2009, a Notice of Default (the "NOD"), was recorded. **Certified copy of the NOD (Exhibit "1" to Declaration of Olivia A. Todd).** | |
| **Fact No. 4**: On January 26, 2010, a Substitution of Trustee (the "SOT") was executed substituting in National Default Servicing Corporation ("NDSC") as the foreclosure trustee. **Certified copy of the SOT (Exhibit "2" to Declaration of Client).** | |
| **Fact No. 5:** On February 8, 2010, the Notice of Trustee's Sale (the "NOTS") was recorded. **Certified copy of the NOTS (Exhibit "2" to Declaration of Olivia A. Todd).** | |

| | |
|---|---|
| **Fact No. 6**: On August 6, 2010, Plaintiff acquired title to the Property at the Trustee's Sale. **Certified copy of Trustee's Deed Upon Sale (Exhibit "3" to Declaration of Olivia A. Todd).** | |
| **Fact No. 7**: On August 17, 2010, a Trustee's Deed Upon Sale executed by NDSC in favor of Plaintiff was duly recorded in the Official Records of San Mateo County as Instrument Number 2010-091521. **Certified copy of Trustee's Deed Upon Sale (Exhibit "3" to Declaration of Olivia A. Todd).** | |
| **Fact No. 8**: On January 14, 2011, a Notice to Vacate was served by a licensed process server on Mikels and All Other Occupants at the Property in compliance with Code of Civil Procedure section 1162. **Notice to Vacate (Exhibit "1" to Declaration of Alberto Reyes).** | |
| **Fact No. 9**: The process server executed a Proof of Service attesting to service of the Notice to Vacate. **Proof of Service (Exhibit "2" to Declaration of Alberto Reyes).** | |
| **Fact No. 10**: Defendants remain in possession of the Property without Plaintiff's authorization or consent. **Declaration of John Lee ¶ 3; Declaration of Client ¶ 7.** | |

DATED: August 15, 2011

WRIGHT, FINLAY & ZAK, LLP

Madeleine K. Lee, Esq.
Nicole M. Hoffman, Esq.
Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No.: CLJ203244<br><br>**DECLARATION OF MINDY C. LEETHAM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

TO DEFENDANT(S) HEREIN, THEIR ATTORNEYS OF RECORD, IF ANY, AND ALL PARTIES IN INTEREST.

Plaintiff and Movant herein submits the following Declaration of Mindy C. Leetham in Support of its Motion for Summary Judgment.

**DECLARATION OF MINDY C. LEETHAM**

I, Mindy C. Leetham, declare as follows:

1. I am a Compliance Specialist for Select Portfolio Servicing, Inc. ("SPS"), the servicing agent and attorney-in-fact for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3. I am authorized to make this Affidavit for and on behalf of SPS.

2. SPS utilizes computer systems maintaining record of acts, transactions, payments, communications, escrow account activity, disbursements, events, and analyses with respect to the mortgage loans which SPS services. (the " Loan Records") The information described herein and referenced below is found in the business records of said servicing agent. The entries in those records are made at the time of the events and conditions they describe either by people with first-hand knowledge of those events and conditions or from information provided by people with such first-hand knowledge. Recording such information is a regular practice of the servicing agent's or Plaintiff's regularly conducted business activities. Declarant has access to the Loan Records with respect to the subject loan, and has knowledge of how they are maintained. Based upon those records I have gained knowledge of the facts set forth herein and, if called upon as a witness to testify, I could and would competently testify as to those facts under penalty of perjury.

3. The Loan Records reflect that on July 11, 2007, Marshall Mikels executed a Deed of Trust ("Deed of Trust"), containing a power of sale, in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominal beneficiary for Fisher Financial Group, Inc., dba, NationsChoice Mortgage ("Lender") to secure repayment of an underlying Note in the principal amount of $1,350,000.00 ("Note"). Certified copies of the Deed of Trust and the Note are collectively attached as **Exhibit "1"** hereto.

4. The Loan Records further reflect that the Deed of Trust encumbered certain real property located at 115 15th Avenue, San Mateo, California 94402 ("Subject Property"), and secured repayment of the Note.

5. The Loan Records further reflect that in October 2008, Defendant defaulted under the terms of the Note and Deed of Trust by failing to make the monthly mortgage payments due thereunder. In connection with the default of the Note and Deed of Trust, on November 6, 2009, a Notice of Default and Election to Sell Under Deed of Trust (the "NOD") was duly recorded against the Property in the Official Records of San Mateo County as Instrument No. 2009-146379. A certified recorded copy of the NOD is attached to the Trustee Declaration as **Exhibit "2"**.

6. The Loan Records further reflect that on January 26, 2010, a Substitution of Trustee (the "SOT") was executed that substituted in National Default Servicing Corporation ("NDSC"), as Trustee. On February 8, 2010, the SOT was recorded in the Official Records of San Mateo County as Instrument No. 2010-013796. A certified copy of the SOT is attached as **Exhibit "3"** hereto.

7. The Loan Records further reflect that as of the date of this Declaration, and all relevant times hereto, Plaintiff, U.S. Bank National Association, As Trustee, On Behalf Of The Holders Of The Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 lacks possession of the Property due to Defendant's possession thereof, without Plaintiff's authorization or consent.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 15th day of August, 2011 at Salt Lake City, Utah.

Mindy C. Leetham

Mindy C. Leetham, Declarant

# EXHIBIT "1"

RECORDING REQUESTED BY
TICOR TITLE
TUSTIN-ORANGE CO. BRANCH

2007-108403
11:06am 07/18/07 DT Fee: 46.00
Count of pages 14
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder
* 2 0 0 7 0 1 0 8 4 0 3 A R *

WHEN RECORDED, MAIL TO:
**SMI-CSFB**
**3910 Kirby Drive, Suite 300**
**Houston, TEXAS 77098**
**ATTENTION: SMI-CSFB Laniece Lamell/Trailing Doc Dept**

This Instrument was prepared by:
**Fisher Financial Group, Inc., dba, NationsChoice Mortgage**
**3303 East Baseline Road, #7-118**
**Gilbert, ARIZONA 85234**
**480-461-1111**

Assessor's Identification Number: **034-294-150**
Loan Number: **NCM11604**
Order Number: **896276-12**

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

# DEED OF TRUST

14P

MIN: **100274686777116040**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **July 11, 2007**, together with all Riders to this document.

(B) **"Borrower"** is **Marshall E. Mikels a married man as his sole and seperate property**. Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is **Fisher Financial Group, Inc., dba, NationsChoice Mortgage**. Lender is **An Arizona Corporation**, organized and existing under the laws of **Arizona**.
Lender's address is **3303 East Baseline Road, #7-118, Gilbert, ARIZONA 85234**.

(D) **"Trustee"** is **Ticor Title**
Trustee's address is **18302 Irvine Blvd. Suite 100, Tustin, ORANGE County, CALIFORNIA 92780**.

(E) **"MERS"** is **Mortgage Electronic Registration Systems, Inc.** MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of **P.O. Box 2026, Flint, MI 48501-2026**, tel. **(888) 679-MERS**.

(F) **"Note"** means the promissory note signed by Borrower and dated **July 11, 2007**. The Note states that Borrower owes Lender **ONE MILLION THREE HUNDRED FIFTY- THOUSAND and no/100** Dollars (U.S. **$1,350,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2037**.

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] VA Rider |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |
| [ ] Other (Specify) - | | |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of San Mateo:

**legal description attached hereto and made a part hereof**

Parcel Identification Number: **034-294-150**

which currently has the address of **115 15th Avenue**
**San Mateo, CALIFORNIA 94402**
("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower



Borrower(s) Initials _____

shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is aid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain riority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if ny; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any ums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 0. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community ssociation Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. orrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for scrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's ligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such iver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been ived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may uire. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and eement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its ts under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. der may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such ocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time cified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount unds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with licable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including der, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay scrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, ally analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the s, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, ver, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as red by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in dance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required SPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more

11

1/01

7



Borrower(s) Initials [handwritten initials]

than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to



Borrower(s) Initials

the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.



Borrower(s) Initials M. M.

from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date**



Borrower(s) Initials [signature]

*MIN:* 100274686777116040

*Loan Number:* NCM11604

# ADJUSTABLE RATE RIDER

**(Libor Six-Month Index (As Published in The Wall Street Journal)—Rate Caps)**
**(Interest Only ARM)**

THIS ADJUSTABLE RATE RIDER is made this **11th day of July, 2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed or Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation**, ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**115 15th Avenue**
**San Mateo, CALIFORNIA 94402**
(Property Address)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of 5.375%. The Note also provides for changes in the interest rate and the monthly payments, as follows:

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first **120** payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make my monthly payments on the 1st day of each month beginning on **September 1, 2007**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**Fisher Financial Group, Inc., dba, NationsChoice Mortgage**
**3303 East Baseline Road, #7-118**
**Gilbert , ARIZONA 85234**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$6,046.88**. This amount may change.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

*MIN:* 100274686777116040

*Loan Number:* NCM11604

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of **August, 2012**, and on that day every **SIXth** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate I am required to pay at the first Change Date will not be greater than **11.375%** or less than **4.000%** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) (**2.000%**) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **11.375%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

(Seal) Marshall E. Mikels -Borrower

(Seal) -Borrower

# INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE RIDER

LOAN NUMBER: **NCM11604**

PROPERTY ADDRESS: **115 15th Avenue**
**San Mateo, CA 94402**

**THIS ADDENDUM** is made this **11th day of July, 2007** and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as the Addendum executed by the undersigned and payable to

**Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation**
(the Lender).

**THIS ADDENDUM** supersedes Sections 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C) Calculations of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the **FIRST TEN (10) YEARS** after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal prepayments.

Dated: July 11, 2007

[signature] (Seal)
Marshall E. Mikels -Borrower

_______________ (Seal)
-Borrower

PRELIMINARY REPORT
YOUR REFERENCE: MIKELS

Ticor Title Company
ORDER NO.: 896276-12

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 4, BLOCK J, AS SHOWN ON THAT CERTAIN MAP ENTITLED, MAP OF SUBDIVISION NO. 3 AND RESUBDIVISION OF BLOCK G AND H OF SUBDIVISION NO. 2 HAYWARD PARK, SAN MATEO COUNTY, CALIFORNIA, IN THE CITY OF SAN MATEO, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON OCTOBER 21, 1907, IN BOOK 5 OF MAPS AT PAGES 36, OFFICIAL RECORDS.

When embossed, this is certified to be a true copy of the records of the San Mateo Assessor-County Clerk-Recorder.

MAY 0 6 2011

Mark Church, Assessor-County Clerk-Recorder

By ____________

# EXHIBIT "2"

2009-146379
02:26pm 11/06/09 ND Fee: 12.00
Count of pages 2
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 0 9 0 1 4 6 3 7 9 A R *

RECORDING REQUESTED BY:
LPS Title Company - CA
WHEN RECORDED MAIL TO:
National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387
Title Order No. : 090778864

APN: 034-294-150-7

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).**

This amount is $87,840.10, as of 11/06/2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your Note and Deed of Trust or Mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required by the Note and Deed of Trust or Mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by the transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387

Select Portfolio Servicing fka Fairbanks Capital Corporation
c/o National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020 Phone 602-264-6101 Sales Website: www.ndscorp.com/sales

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure. Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

This is an attempt to collect a debt and any information obtained will be used for that purpose.

NOTICE IS HEREBY GIVEN THAT : NATIONAL DEFAULT SERVICING CORPORATION is either the original Trustee, the duly appointed substituted Trustee or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 07/11/2007, executed by MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor, to secure certain obligations in favor of MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE as beneficiary recorded 07/18/2007, as Instrument No. 2007-108403 (or Book, Page) of Official Records in the Office of the County Recorder of SAN MATEO County, CA. Said obligations including ONE NOTE FOR THE ORIGINAL sum of $1,350,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL, INTEREST AND IMPOUNDS WHICH BECAME DUE ON 10/01/2008 AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST AND IMPOUNDS, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEY'S FEES.

That by reason thereof, the present beneficiary under such Deed of Trust has executed and delivered to duly appointed Trustee a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

This loan is exempt. Compliance with California Civil Code § 2923.5 and 2924.8 is not necessary to proceed with preparing and processing a notice of default.

Dated : November 6, 2009
Select Portfolio Servicing fka Fairbanks Capital Corporation, as Beneficiary by National Default Servicing Corporation, as Agent for the Beneficiary by LPS Title Company - CA, as Agent for National Default Servicing Corporation

Kevin Frost

By :
Kevin Frost - Authorized Agent



When embossed, this is certified to be a true copy of the records of the San Mateo Assessor-County Clerk-Recorder.
MAY 03 2010
Mark Church, Assessor-County Clerk-Recorder
By

10

RECORDING REQUESTED BY:
LPS Title Company - CA

WHEN RECORDED MAIL TO:
National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387

APN: 034-294-150-7

2010-013796
09:00am 02/08/10 ST Fee: 21.00
Count of pages 3
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 1 0 0 0 1 3 7 9 6 A R *

3p

## SUBSTITUTION OF TRUSTEE

WHEREAS, **MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY** was the original Trustor(s), **TICOR TITLE** was the original Trustee and **MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE** was the original Beneficiary under that certain Deed of Trust dated **07/11/2007** and recorded on **07/18/2007** as instrument No. **2007-108403** in Book, Page, of Official Records of **SAN MATEO** County, State of **CA** and
WHEREAS, the undersigned is the present beneficiary under the said Deedof Trust, and
WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,
NOW, THEREFORE, the undersigned hereby substitutes **NATIONAL DEFAULT SERVICING CORPORATION, An Arizona Corporation, whose address is 7720 N. 16th Street, Suite 300, Phoenix,** Arizona 85020, as Trustee under said Deed of Trust.
Whenever the context hereof requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

**Select Portfolio Servicing, Inc., F/K/A Fairbanks Capital Corp., as servicing agent for U.S. Bank National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3**

Dated : 1/26/2010

By : Olivia A. Todd, President
By: Limited Power of Attorney

State of Arizona
County of Maricopa

On 1/26 2010, before me, Richard Michael Bowes, a Notary Public for said State, personally appeared Olivia A. Todd who personally known to me (or who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing is true and correct.

WITNESS my hand and official seal.

Signature ______________________

OFFICIAL SEAL
RICHARD MICHAEL BOWES
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 1, 2010

*National Default Servicing Corporation*

**SUBSTITUTION OF TRUSTEE**
**AFFIDAVIT OF MAILING**

**NDSC File No. : 09-21321-SP-CA**
**Loan No. : 0010982387**

On this day, February 5, 2010, I personally mailed by certified mail a copy of the attached Substitution of Trustee to the trustee of record under the Deed of Trust described in said Substitution, and a copy of the attached Substitution has been mailed prior to the recording thereof, in the manner provided in Section 2924(b) of the Civil Code of the State of California to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said Section.

I declare under penalty of perjury that the foregoing is true and correct.

CALLA WASHINGTON, TRUSTEE SALES REPRESENTATIVE

X **Substitution of Trustee**

MARSHALL E. MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E. MIKELS
207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED
________
207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED
________
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E MIKELS
C/O CLARK A. BARRET ATTORNEY AT LAW
1611 BOREL PLACE, SUITE 6
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
C/O CLARK A. BARRETT ST.
1611 BOREL PLACE, SUITE
SAN MATEO, CA 94402

MARSHALL MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

INTERESTDIRECT INC.
3303 EAST BASELINE ROAD, #7-118
GILBERT, AZ 85234

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS")
PO BOX 2026
FLINT, MI 48501-2026

INTERESTDIRECT INC., AN ARIZONA CORPORATION
C/O MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
P.O. BOX 2026
FLINT, MI 48501-2026

MARSHALL E. MIKELS, TRUSTEE
115 15TH AVENUE
SAN MATEO, CA 94402-2413

FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098

FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK
5151 CORPORATE DR
TROY, MI 48098-2639

FLAGSTAR BANK, FSB
C/O MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

When embossed, this is certified to be a true copy of the records of the San Mateo Assessor-County Clerk-Recorder.

MAY 02 2011

Mark Church, Assessor-County Clerk-Recorder

By ______

CLINDA IRENE ROBERTS
63 BOVET ROAD #111
SAN MATEO, CA 94402

P.O. BOX 2026
FLINT, MI 48501-2025

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No.: CLJ203244<br><br>**DECLARATION OF JOHN LEE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

**TO DEFENDANT(S) HEREIN, THEIR ATTORNEYS OF RECORD, IF ANY, AND ALL PARTIES IN INTEREST.**

Plaintiff and Movant herein submits the following Declaration of John Lee in Support of its Motion for Summary Judgment:

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No.: CLJ203244<br><br>**DECLARATION OF JOHN LEE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

**TO DEFENDANT(S) HEREIN, THEIR ATTORNEYS OF RECORD, IF ANY, AND ALL PARTIES IN INTEREST.**

Plaintiff and Movant herein submits the following Declaration of John Lee in Support of its Motion for Summary Judgment:

DECLARATION OF JOHN LEE

I, John Lee, declare:

1. I am a licensed California real estate salesperson or broker. I have personal knowledge of the facts state herein and, if called to testify thereon, I would and could so testify.

2. I have been retained to manage, market, and sell the property located at 115 15TH AVENUE, SAN MATEO, CALIFORNIA 94402 ("Property") on behalf of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3. My responsibilities include checking to determine if the Property is occupied and taking possession of the Property once it is vacant.

3. I have checked the occupancy of the Property. As of the date of this Declaration, the Property remains occupied and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3 does not have possession of it.

4. Pursuant to California Rules of Court, Rule 2.305(d), my signature by facsimile set forth below shall be deemed an original signature.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 8th day of ~~July~~ AUGUST 2011, at 9:30 AM FREMONT, CA. 94538.

John Lee.

JOHN LEE, Declarant

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007- 3,<br><br>Plaintiff,<br><br>vs.<br><br>MARSHALL MIKELS and DOES 1-10, inclusive,<br><br>Defendants | Case No.: CLJ203244<br><br>**DECLARATION OF OLIVIA A. TODD IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: September 28, 2011<br>TIME: 9:00 a.m.<br>DEPT: LM |

TO DEFENDANT(S) HEREIN, THEIR ATTORNEYS OF RECORD, IF ANY, AND ALL PARTIES IN INTEREST.

Plaintiff and Movant herein submits the following Declaration of Olivia A. Todd in Support of its Motion for Summary Judgment.

## DECLARATION OF OLIVIA A. TODD

I, Olivia A. Todd, declare as follows:

1. I am President at National Default Servicing Corporation, An Arizona Corporation, foreclosure trustee for U.S. Bank National Association, As Trustee, On Behalf Of The Holders Of The Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3.

2. I have personal knowledge of the facts set forth in this declaration and if called as a witness could and would competently testify as to those facts.

3. On November 6, 2009, National Default Servicing Corporation issued a Notice of Default and Election to Sell Under Deed of Trust ("Notice of Default"). The Notice of Default was also mailed in compliance with Civil Code Section 2924. National Default Servicing Corporation caused the Notice of Default to be recorded on November 6, 2009 as instrument number 2009-146379. A true and correct copy of the Notice of Default is attached hereto as **Exhibit "1"**.

4. On February 8, 2010, National Default Servicing Corporation issued a Notice of Trustee's Sale. The Notice of Trustee's Sale was also mailed, posted and published in compliance with Civil Code Section 2924. National Default Servicing Corporation caused the Notice of Trustee's Sale to be recorded on February 8, 2010 as instrument number 2010-013797. A true and correct copy of the Notice of Trustee's Sale is attached hereto as **Exhibit "2"**.

5. On August 6, 2010, Plaintiff was the highest bidder at the trustee's sale and took title to the Property. The Trustee's Deed Upon Sale was executed on August 12, 2010 and recorded on August 17, 2010 as instrument number 2010-091521. A true and correct copy of the Trustee's Deed Upon Sale is attached hereto as **Exhibit "3."**

I declare under penalty of perjury that the foregoing is true and correct. This

declaration was executed on this 15 of July, 2011 at Phoenix, Arizona.

Olivia A. Todd
President, National Default Servicing Corporation