# EXHIBIT "2"



**2010-013797**

09:00am 02/08/10 NT  Fee: 15.00
Count of pages 1
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

WHEN RECORDED MAIL TO:
NATIONAL DEFAULT SERVICING CORPORATION
7720 N. 16ᵗʰ Street, Suite 300
Phoenix, AZ 85020
0907788564

T.S. No. 09-21321-SP-CA .
Loan No. 0010982387

## NOTICE OF TRUSTEE'S SALE

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 07/11/2007. UNLESS YOU TAKE ACTION TO
PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF
THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

A public auction sale to the highest bidder for cash, (cashier's check(s) must be made payable to National Default Servicing
Corporation), drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or
federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and
authorized to do business in this state; will be held by the duly appointed trustee as shown below, of all right, title, and interest
conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described
below. The sale will be made in an "as is" condition, but without covenant or warranty, expressed or implied, regarding title,
possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and
late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges
and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably
estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY
Duly Appointed Trustee: NATIONAL DEFAULT SERVICING CORPORATION
Recorded 07/18/2007 as Instrument No. 2007-108403 of Official Records in the office of the Recorder of SAN MATEO
County, California.
Date of Sale: 03/02/2010 at 1:00 P.M.
Place of Sale: At the Marshall Street entrance to the Hall of Justice and Records, 400 County Center, Redwood City,
CA
Estimated amount of unpaid balance and other charges: $1,451,289.88
Street Address or other common designation of real property: 115 15TH AVENUE, SAN MATEO, CA  94402
A.P.N.: 034-294-150-7

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any,
shown above. If no street address or other common designation is shown, directions to the location of the property may be
obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.
If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of
monies paid to the Trustee, and the successful bidder shall have no further recourse.

This loan is exempt. Compliance with California Civil Code § 2923.5and 2924.8 is not necessary to proceed with preparing and
processing a notice of sale

Regarding the property that is the subject of this Notice of Sale, the "mortgage loan servicer" as defined in California *Civil
Code* Section 2923.53 (k)(3) declares that it has obtained from the Commissioner a final or temporary order of exemption
pursuant to California *Civil Code* Section 2923.53 and that the exemption is current and valid on the date this Notice of Sale is
recorded.  The timeframe for giving a Notice of Sale specified in Subdivision (a) Section 2923.52 does not apply to this Notice
of Sale pursuant to California *Civil Code* Sections 2923.52 or 2923.55.

Date: 02/08/2010                NATIONAL DEFAULT SERVICING CORPORATION
                                7720 N. 16ᵗʰ Street, Suite 300
                                Phoenix, AZ 85020  phone 602-264-6101
                                Sales Line 714-730-2727; Sales Website: www.ndscorp.com/sales

                                Nichole Alford, TRUSTEE SALES REPRESENTATIVE

When embossed, this is certified to be a true copy of the
records of the San Mateo Assessor-County Clerk-Recorder.

Mark Church, Assessor-County Clerk-Recorder

By

EXHIBIT "3"

RECORDING REQUESTED BY :

WHEN RECORDED MAIL TO :
U.S. Bank National Association
3815 S.W. Temple
Salt Lake City, UT 84115
FORWARD TAX STATEMENTS TO:
U.S. Bank National Association
3815 S.W. Temple
Salt Lake City, UT 84115

APN: 034-294-150-7

| NDSC File No. | : | 09-21321-SP-CA |
| Loan No. | : | 0010982387 |
| Title Order No. | : | 090778864 |

**2010-091521**

08:58am 08/17/10 TD Fee: 21.00
Count of pages 3
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

CITY OF SAN MATEO
REAL PROPERTY CONVEYANCE TAX

AMOUNT OF TAX DUE $ 77
COMPUTED ON TOTAL VALUE OF
THE CONSIDERATION.
Declarant's Signature    Firm Name
(or Agent)

## TRUSTEE'S DEED UPON SALE

Transfer Tax : 0
The Grantee herein WAS the Beneficiary
The amount of the unpaid debt was $1,496,571.49
The amount paid by the Grantee was $1,496,571.49
The property is in the city of SAN MATEO, County of SAN MATEO, State of CA.

**National Default Servicing Corporation, an Arizona Corporation, as the duly appointed Trustee (or successor Trustee or Substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without any covenant or warranty to :**

**U.S. Bank National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3**

herein called Grantee, the following described real property situated in SAN MATEO County :

**LOT 4, BLOCK J, AS SHOWN ON THAT CERTAIN MAP ENTITLED, MAP OF SUBDIVISION NO. 3 AND RESUBDIVISION OF BLOCK G AND H OF SUBDIVISION NO. 2 HAYWARD PARK, SAN MATEO COUNTY, CALIFORNIA, IN THE CITY OF SAN MATEO, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON OCTOBER 21, 1907, IN BOOK 5 OF MAPS AT PAGES 36, OFFICIAL RECORDS.**

This conveyance is made pursuant to the powers conferred upon Trustee by said Deed of Trust executed **MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY** , as Trustor, recorded on 07/18/07, Instrument No. 2007-108403 Official Records in the Office of the County Recorder of SAN MATEO County, CA.

All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.

**STATE OF ARIZONA**
**COUNTY OF MARICOPA**

On ___8·12___, 2010, before me, *Pamela Cardy*, a Notary Public for said State, personally appeared *Jamie Gorsuch* who personally known to me (or who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing is true and correct.

**WITNESS** MY HAND AND OFFICIAL SEAL

Pamela Cardy
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
JUNE 8, 2011

When embossed, this is certified to be a true copy of the records of the San Mateo Assessor-County Clerk-Recorder

Mark Church, Assessor-County Clerk-Recorder

MAY 0 8 2011

By

1  WRIGHT, FINLAY & ZAK, LLP
   Madeleine K. Lee, Esq., SBN 258520
2  4665 MacArthur Court, Suite 280
   Newport Beach, CA 92660
3  Tel. (949) 477-5050; Fax (949) 477-9200

4  Attorneys for Plaintiff,
5  U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS
   OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE
6  MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

7                        SUPERIOR COURT OF CALIFORNIA
8                           COUNTY OF SAN MATEO
9

10 | U.S. BANK NATIONAL ASSOCIATION, AS) | Case No. CLJ203244
11 | TRUSTEE, ON BEHALF OF THE ) |
   | HOLDERS OF THE ADJUSTABLE RATE ) | **PROOF OF SERVICE**
12 | MORTGAGE TRUST 2007-3 ADJUSTABLE ) |
   | RATE MORTGAGE BACKED PASS ) | *[Filed Concurrently with Notice of Motion and*
13 | THROUGH CERTIFICATES, SERIES 2007- ) | *Motion for Summary Judgment; Plaintiff's*
   | 3, ) | *Separate Statement of Undisputed Facts*
14 | ) | *Supporting Evidence on Motion for Summary*
   | Plaintiff, ) | *Judgment; Declarations in Support of Motion*
15 | ) | *for Summary Judgment; and (Proposed)*
   | v. ) | *Order/Judgment]*
16 | ) |
17 | MARSHALL MIKELS and DOES 1 through ) | DATE:   September 28, 2011
   | 10, inclusive, ) | TIME:   9:00 a.m.
18 | ) | DEPT:   LM
   | Defendants. ) |
19 | ) |

20 ─────────────────────────────

21     I, Erika Nakaue, declare:

22     I am employed in the County of Orange, State of California. I am over the age of eighteen

23 and am not a party to the within action. My business address is 4665 MacArthur Court, Suite 280,

24 Newport Beach, California 92660. I am readily familiar with the practices of Wright, Finlay & Zak,

25 LLP, for collection and processing of correspondence for mailing with the United States Postal

26 Service. Such correspondence is deposited with the United States Postal Service the same day in

27 the ordinary course of business. I am aware that on motion of party served, service is presumed

28                                    1

1  invalid if postal cancellation date or postage meter date is more than one day after date of deposit

2  for mailing in affidavit.

3      On August 31, 2011, served the following documents:

4      •  *NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF*

5      •  *PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE ON MOTION FOR SUMMARY JUDGMENT*

6      •  *DECLARATION OF MINDY C. LEETHAM*

7      •  *DECLARATION OF OLIVIA A. TODD*
    •  *DECLARATION OF BITA IMANI*

8      •  *DECLARATION OF JOHN LEE*
    •  *PROPOSED ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

9  on all interested parties herein by placing true copies thereof enclosed in sealed envelopes

10  addressed as follows:

11  *Marshall E. Mikels*                     *Marshall E. Mikels*

12  *207 Shasta Avenue*                    *115 15th Avenue*
*Mount Shasta, CA 96067*             *San Mateo, CA 94402*

13  BY MAIL SERVICE: I placed such envelope(s) for collection to be mailed on this date following

14  ordinary business practices.

15      I declare under penalty of perjury under the laws of the State of California that the foregoing

16  is true and correct. Executed on August 31, 2011 at Newport Beach, California.

17

18

19

20                      Erika Nakaue

21

22

23

24

25

26

27

28                 2

**WRIGHT FINLAY & ZAK**™
ATTORNEYS AT LAW
MacArthur Court, Ste. 280 Newport Beach, CA 92660

Marshall F. Mikels

207 Shasta Avenue

Mount Shasta, CA 96067

WRIGHT, FINLAY & ZAK, LLP
Madeleine K. Lee, Esq., SBN 258520
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel. (949) 477-5050; Fax (949) 477-9200

Attorneys for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON
BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3
ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES
2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3, <br><br> Plaintiff, <br><br> vs. <br><br> MARSHALL MIKELS and DOES 1-10, inclusive, <br><br> Defendants | Case No.: CLJ203244 <br><br> **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> *[Filed Concurrently with Notice of Motion and Motion for Summary Judgment; Plaintiff's Separate Statement of Undisputed Facts Supporting Evidence on Motion for Summary Judgment and Declarations in Support of Motion for Summary Judgment]* <br><br> DATE: September 28, 2011 <br> TIME: 9:00 a.m. <br> DEPT: LM |

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

The Motion of Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON

BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3

ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES

2007-3 ("Plaintiff"), for an order granting Summary Judgment was heard by the court on the

above-referenced date. Plaintiff appeared by counsel Wright, Finlay & Zak, LLP. Defendant

MARSHALL MIKELS ("Defendant") (appeared)(did not appear).

On consideration of all the evidence set forth in the papers submitted, and the inferences reasonable deductible there from, except that to which objection was sustained, the Court makes the following determinations for the specified reasons:

There is no triable issue as to any material fact and Plaintiff is entitled as a matter of law to summary judgment, in its favor and against Defendant, on its action for unlawful detainer for the following reasons:

1. Plaintiff, in support of its motion for summary judgment on this cause of action for unlawful detainer, proffered evidence that established each necessary element of this unlawful detainer as follows:

    a. On 8/6/2010 Plaintiff purchased the subject real property located at 115 15th Avenue, San Mateo, California 94402 ("Premises") at duly noticed and validly conducted Trustee's Sale. Plaintiff supplied certified copies of a Trustee's Deed Upon Sale with recitals of compliance with CC §2924, the Deed of Trust and the Substitution of Trustee, which established the foreclosure sale in compliance with CC § 2924 and perfection of title; See Certified Copy of Trustee's Deed Upon Sale attached as Exhibit "3" to Declaration of Olivia A. Todd; Certified copy of Deed of Trust attached as Exhibit "1" to Declaration of Mindy C. Leetham; Certified Copy of Substitution of Trustee attached as Exhibit "2" to Declaration of Mindy C. Leetham;

    b. Plaintiff properly served a three day Notice to Vacate Property on the defendant pursuant to CCP § 1161a(b). See Notice and Proof of Service attached as Exhibit "1" and "2" to the Declaration of Alberto Reyes; and

    c. Defendant has continued in possession after the expiration of said Notice to Vacate. See Declaration of John Lee and Mindy C. Leetham.

2. With Plaintiff having established each element of its right to possession, the burden of proof is shifted to Defendant pursuant to CCP § 437c(p)(1), but Defendant, in opposition to Plaintiff's motion, proffered no evidence which controverted the prima facie showing and thus failed to raise a triable issue of fact.

3. Plaintiff has dismissed, without prejudice, any claim for monetary damages and costs.

1   Accordingly,

2       IT IS SO ORDERED that the motion for order granting summary judgment be, and

3   hereby is, granted in favor of Plaintiff and against Defendant, that this adjudication shall be

4   carried into any final judgment subsequently entered into this action, and that judgment for

5   possession of the Premises be entered against Defendant and all occupants pursuant to CCP §

6   415.46, who have been defaulted.

7

    DATE:_____          _____
8
                                   JUDGE/COMMISSIONER OF THE SUPERIOR COURT
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    _____
                    [PROPOSED] ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                                            3

**MARIE MCDONNELL'S SUMMARY LOAN
SECURITIZATION ANALYSIS
EXHIBIT 1**

Marshall-Edward: Mikels
A Private Living Sovereign Man
By Special Appearance Rogatory
Authorized Representative For
MARSHALL E. MIKELS ***-**-8951
**Mailing and Service Address: 207 Shasta Avenue**
**Mount Shasta, California [96067]**
530-918-4162 / email biocorp@nctv.com
Residence Address **not for Service or mailing**:
115 15th Avenue, San Mateo, California [94402]

## United States District Court
### NOTHERN DISTRICT CALIFORNIA

| | |
|---|---|
| MARSHALL E. MIKELS | Case Number |
| Plaintiff | DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S **VERIFIED COMPLAINT FOR:** |
| v. | 1. FRAUD, AT THE INCEPTION PREDATORY LOAN ON A SENIOR |
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3, CHAD FISHER, FISHER FINANCIAL GROUP, INC. dba, NATIONS CHOICE MORTGAGE, INC, an Arizona Corporation qualified to do business in California; R.K. ARNOLD MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. a Virginia Corporation ("MERS"); TIMOTHY O'BRIEN, SELECT PORTFOLIO SERVICING INC., a Utah Corporation qualified to do business in California; California; OLIVIA A. TODD, NATIONAL DEFAULT SERVICING CENTER INC., an Arizona Corporation qualified to do business in California ("NDSC"), et al & DOES 1-100 | 2. FRAUD, STATUTE OF FRAUDS VIOLATION<br>3. FRAUD, NO LOAN WAS MADE<br>4. MORTGAGE FRAUD, RECORDING FORGED AND FRAUDULENT TITLE<br>5. RECISSION AND DAMAGES, 15 U.S.C. §1635, §1640, 12 C.F.R. § 226, U.S.C. § 2601<br>6. CONSTITUTIONAL VIOLATIONS CONSPIRACY AGAINST RIGHTS 18 U.S.C § 241 and DEPRIVATION OF RIGHTS UNDER THE COLOR OF LAW §242 OBSTRUCTION OF JUSTICE, 18, U.S.C., Chapter 73. § 1503<br>7. INJUNCTION<br>8. ACCOUNTING<br>9. DECLARTORY RELIEF<br>10. CONSOLIDATION ACTIONS WITH REMOVED UNLAWFUL DETAINER COMPLAINT Case Number CLJ203244<br>**DEMAND FOR JURY TRIAL** |
| Defendants | |

1

DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S COMPLAINT MIKELS v U.S. BANK N.A.
AND RELATED OR CONSOLIDATED ACTIONS

## DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR FRAUD AND OTHER CAUSES OF ACTION IN MIKELS V U.S. BANK N.A. AND RELATED OR CONSOLIDATED ACTIONS

Now comes the Affiant, Marie McDonnell, a citizen of the United States of America and resident of the Commonwealth of Massachusetts and declares as follows, under penalty of perjury:

I, Marie McDonnell, am a *Mortgage Fraud and Forensic Analyst* and a credentialed *Certified Fraud Examiner*. I am the founder and managing member of Truth In Lending Audit & Recovery Services, LLC of Orleans, Massachusetts and have twenty-four years' experience in transactional analysis, mortgage auditing, and mortgage fraud investigation. I am also the President of McDonnell Property Analytics, Inc., a litigation support and research firm that provides mortgage-backed securities research services and foreclosure forensics to attorneys nationwide. McDonnell Property Analytics also advises and performs services for county registers of deeds, attorneys general, courts and other governmental agencies.

I am the same Marie McDonnell who provided *amicus briefs* to the Massachusetts Land Court and to the Massachusetts Supreme Judicial Court in the landmark cases *U.S. Bank National Association v. Ibanez* and *Wells Fargo Bank, N.A. v. LaRace*, 458 Mass. 637 (2011) in which the courts vacated two foreclosures prosecuted by trustees of securitization trusts.[2] My seminal contribution in those cases was to shift the debate beyond defective assignments of mortgage to an examination of the fatal breaks in the chain of title that occurred due to the utter failure of the entities that securitized these mortgages to document the transfers between themselves.

---

[2] McDonnell's *Amicus* Brief in the matter of *U.S. Bank National Association v. Ibanez* is available on the Massachusetts Supreme Judicial Court's website at: http://www.ma-appellatecourts.org/search_number.php?dno=SJC-10694&get=Search .

2

DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S COMPLAINT MIKELS v U.S. BANK N.A. AND RELATED OR CONSOLIDATED ACTIONS

In January 2011, John O'Brien, Register of the Essex Southern District Registry of Deeds in Salem, Massachusetts, commissioned McDonnell Property Analytics, Inc. to conduct a forensic examination to test the integrity of his registry due to his concerns that: 1) Mortgage Electronic Registration Systems, Inc. ("MERS") boasts that its members can avoid recording assignments of mortgage if they register their mortgages into the MERS System; and 2) due to the robo-signing scandal spotlighting Linda Green as featured in a 60 Minutes exposé on the subject earlier this spring.

I accepted this commission on a pro bono basis because of its high and urgent value to the public trust, and to educate the 50 Attorneys General who are brokering a settlement with the subject banks in an attempt to resolve fraudulent foreclosure practices. I defined the scope of my examination as covering all assignments to and from JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., and Bank of America, N.A. that were recorded in the Southern Essex Registry during 2010. In a nutshell, I found that only sixteen percent (16%) of the 565 assignments of mortgage that I examined were valid; and an astonishing seventy-five percent (75%) were invalid for the following reasons: all of the invalid assignments contained false statements or omissions of material facts; 35.22% were robo-signed and contained other defects that nullified the assignment; 26.90% were deemed to be fraudulent because the signing officers knew or should have known that the documents contained false statements; and 9.910% were criminally fraudulent because they were recorded on or after August 7, 2010 when the Massachusetts Mortgage Fraud Statute was enacted into law (M.G.L. Ch. 266 § 35A(b)(4). My entire report with exhibits is available at no charge to the public at: http://salemdeeds.com and at https://www.truthinlending.net.

On September 30, 2011, I submitted a second *amicus brief* to the Massachusetts Supreme Judicial Court in the matter of *Henrietta Eaton v. Federal National Mortgage Association* (SJC-

5.      On August 6, 2010, a foreclosure sale was held and the Plaintiff allegedly took title to Defendant's Property.

6.      Plaintiff has engaged this Examiner to review the foreclosure paperwork that has been filed against his title and prepare an analysis to assist this Court in its determination as to the Plaintiff's COMPLAINT, MIKLS v U.S. BANK N.A. referenced above and a related actions by U.S. BANK N.A. v MIKELS, Plaintiff's U.S. BANK'S UNLAWFUL DETAINER COMPLAINT and the U.S. BANK'S MOTION FOR SUMMARY JUDGMENT in Case CLJ203244 alleged claims of perfected title contained therein.

7.      The issues I will address here are similar in nature to those I confronted when researching and writing my amicus brief submitted last year to the Massachusetts Supreme Judicial Court in the landmark cases *U.S. Bank National Association v. Ibanez* and *Wells Fargo Bank, N.A. v. LaRace*, 458 Mass. 637 - Mass: Supreme Judicial Court 2011.

8.      Due to prior commitments, I was unable accommodate Mr. Mikels request for an additional brief in time for the deadline for the submission of Mr. Mikels' COMPLAINT, MIKELS v U.S. BANK N.A. filed in this United States District Court, NORTHERN DISTRICT OF CALIFORNIA However,  the analysis I completed on February 28, 2010 referenced above is applicable and complete along with this Declaration to address the question of Defendant U.S. BANK N.A. alleged claim to perfected title in this action and in earlier actions referenced above by U.S. BANK N.A. v MIKELS.

9.      On October 15, 2011 I inspected the recorded documents in the official records of the of San Mateo County Recorder, attached hereto and I have inspected U.S. BANK'S UNLAWFUL DETAINER COMPLAINT and MOTION FOR SUMMARY JUDGMENT filed in the State Court as Case Number CLJ203244. I and found the recorded documents that were used by Plaintiffs to conduct the subject Trustee's Sale on August 6, 2010 and claim to perfected title in their

5

UNLAWFUL DETAINER COMPLAINT, were the same recorded documents which I inspected and addressed in my February 28, 2010 *Securitization & foreclosure Analysis* attached hereto as **Exhibit 1 & 2**, and the Recorder's Records as **Exhibit 3**. Therefore, my findings in my *Securitization & foreclosure Analysis* done on February 28, 2010 apply equally to the issue of alleged perfected title that the Defendant(s) U.S. BANK N.A. has claimed and referenced in Plaintiff Mr. Mikels COMPLAINT and have claimed in their related MOTION FOR SUMMARY JUDGMENT and UNLAWFUL DETAINER COMPLAINT filed in the State Court Case Number CLJ203244.

10.     My analysis and "FINDINGS" on pages 14 through 17, "Exhibit "M "Bogus and Missing Assignments", "EXHIBIT "F" "Corporate Assignment of Deed of Trust November 27, 2009", "EXHIBIT "G" "Substitution of Trustee January 26, 2010" and my Affidavit dated March 1, 2010 attached hereto as **Exhibit 1**, are applicable in this U.S. District Court Case and in plaintiff U.S. BANK'S unlawful detainer case CLJ203244 and is evidence that:

11.     I found the Loan in question was unconscionable; that Fisher Financial and the Credit Suisse entities that securitized the Note and Deed of Trust knew that the Loan would inevitably default; that the Corporate Assignment of Deed of Trust is both invalid and unauthorized; that the Substitution of Trustee was not duly authorized; and that any foreclosure based on these false documents, if challenged, would be subject to reversal by a court of competent jurisdiction due to these procedural and substantive failures. See, my February 28, 2010 *Securitization & foreclosure Analysis* attached hereto as **Exhibit 2 and a summary as Exhibit 1.**

12.     My February 28, 2010 *Securitization & foreclosure Analysis* was prepared at the request of Mr. Mikels' attorney Timothy Fong to provide evidence for a Complaint and Motion for a TRO to enjoin a scheduled Trustee's Sale for March 2, 2010.  On March 1, 2010 Mr. Mikels' attorney filed a Complaint and Motion for a TRO in the SUPERIOR COURT, SAN MATEO COUNTY CASE NO. CIV492452 for fraud. The TRO was not granted much to my amazement

6

because of the hard evidence of forged and bogus recorded documents involved in the chain of title. Thereafter The Trustee's Sale scheduled for March 2, 2010 was postponed by the above Plaintiff/Parties/alleged Lender and Agents. **See Mr. Mikels Complaint for Fraud Exhibit 3-A.**

13.    Thereafter, I informed Mr. Mikels that a Notice of Loan Recession under the Federal Truth and Lending Act (TILA) was another option that was available to him for consumer protection in the case of fraud and non-disclosure and thereafter Mr. Mikels filed a substitution of attorney to represent self on March 10, 2010 and filed a Request for Dismissal of his Complaint without prejudice on April 16, 2010, with the intent to use his right of loan recession to seek justice.

14.    On March 29, 2010 Mr. Mikels delivered a *"NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST"* dated March 29, 2010 which voided the Deed of Trust automatically by operation of federal law on that date. See, the above referenced Notice of Loan Recession and the Proof of Delivery incorporated herein by this reference and attached hereto as **Exhibit 4 & 4-A.**

15.    Thereafter, the Plaintiff(s)/alleged Lender and Agents held a Trustee's Sale on August 6, 2010 in spite of the fact that the Deed of Trust had been voided automatically by the *"NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST"* dated March 29 2010 and delivered to the above referenced Plaintiff and Parties on that date.

16.    The TILA Loan Recession Law (attached hereto) states:

rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[36] whichever occurs last. **If the required notice and material disclosures are not delivered, the right to rescind shall expire three years after the occurrence giving rise to the right of rescission,** or upon transfer of all of the consumer's interest in the property, or upon sale of

**(d) *Effects of rescission.* (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge.**

**(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.**

**(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section.** When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. **If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.**

The above TILA Law reads plainly that the Deed of Trust is voided upon delivery of the NOTICE OF LOAN RECESSION. And, that section d(2) of the above referenced law required that Plaintiff had Twenty (20) Days in which to file a reconveyance release of lien on Mr. Mikels' property and pay back all money that had been paid by Mr. Mikels. And, If Mr. Mikels payments were not returned by the Plaintiff and a reconveyance was not recorded within the 20 day period Mr. Mikels was not obligated under the section d(3) of the law to perform until the Plaintiff first performed their obligation under step d(2) of the above referenced law.

17.     The Plaintiff did not take possession of Mr. Mikels property thereafter, the Deed of trust had been voided by the section d (1) of the above referenced loan recession law and Plaintiff(s) did not file a complaint for declatory relief with a court of competent jurisdiction within the twenty (20) day performance period prescribed in section d (2) of the law, therefore the Plaintiff defaulted. The law further states that "if the creditor does not take possession of the money or property within twenty days after the consumers tender, the consumer may keep it without further obligation."

18.     Mr. Mikels has informed me that he did make a tender of Notary's Presentment of "Constructive Notice of Conditional Acceptance" dated May 7, 2010 to Plaintiff and a "Notice of

8

DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S COMPLAINT MIKELS v U.S. BANK N.A. AND RELATED OR CONSOLIDATED ACTIONS

1   Fault in Dishonor (Opportunity to Cure) dated June 7, 2010, which Plaintiff failed or refused to

2   respond to and thereafter a Notary's "Notice of Default in Dishonor" dated June 21, 2010 and a

3   Notary's "Certification of Non Performance / Dishonor / Liability dated June 23, 2010 that was

4   delivered to Plaintiff by Notary Certificate of Service" dated June 23, 2010, See, 12 CFR, FDIC

5   Law, 6500, 226.15 and Regulation Z 226.15 Right of Recession incorporated herein as **Exhibit 5**.

6

7        19.     Therefore, in just addressing the operation of section d(1) the above reference law

8   with respect to the automatic voiding of the Deed of Trust upon Mr. Mikels delivery of the Notice of

9   Loan Recession, any claim to perfected title by the Plaintiff(s)/alleged Lender or others or standing

10  to file an Unlawful Detainer action cannot be supported by the Deed of Trust dated 7/11/2007

11  Recorded on  JULY 18, 2007 in the County of San Mateo as Document number # 2007108403 that

12  was used in Plaintiff('s) U.S. BANK UNLAWFUL DETAINER COMPLAINT and relied upon as

13

14  evidence of perfected title to Mr. Mikels property.

15       20.     Finally, there is the issue for this Court's consideration in the ORDER OF THE

16  DEPARTMENT OF THE TREASURY COMPTROLLER OF THE CURRENCY "CONSENT

17  ORDER" dated April 13, 2011, which addressed wide spread fraud committed by thirteen of the

18  largest banks and mortgage servicers in the servicing and foreclosure of mortgage loans. The above

19  "CONSENT ORDER" applies to U.S. Bank N.A. and Wells Fargo as Master Servicer in the

20

21  securitization of Mr. Mikels Loan Note. See, Exhibit J of my *Securitization & Foreclosure Analysis*

22  attached hereto as **Exhibit 6**, which shows U.S. Bank N.A. and Wells Fargo as Master Servicer as

23  parties to Mr. Mikels Mortgage, Loan Note, Securitization and servicing and are subject to the

24  "CONSENT ORDER".

25       21.     Defendant(s) U.S.BANK/alleged Lender and Agents conducted a foreclosure sale on

26  Mr. Mikels Deed of Trust on **August 6, 2010**. The "CONSENT ORDER" that U.S. Bank N.A. and

27

28  Wells Fargo are a subject to requires that a third party independent review be performed on

foreclosures conducted between **January 1, 2009 to December 31, 2010**, Mr. Mikels has informed

me that he has not received any option letter for a third party review as of this date and the above

referenced Plaintiff(s)/Parties/alleged Lender or Agents have not performed any third party review of

the foreclosure on Mr. Mikels' property to Mr. Mikels' knowledge or my own. Therefore, in my

opinion based on the requirements of the "CONSENT ORDER" the Plaintiff(s) can not proceed with

any court action until a third party review of the foreclosure is completed by an independent third

party. See, a copy of the "CONSENT ORDERS" subject to Wells Fargo and U.S. Bank N.A.

attached hereto as **Exhibit 7 & 7-A.**


I declare under penalty of perjury that the above is true and correct. Executed this 17th day of

December 2011 in Dennis, Massachusetts.

*Marie Mc Donnell*

Marie McDonnell, Affiant
*Mortgage Fraud and Forensic Analyst*
*Certified Fraud Examiner, ACFE*
Truth In Lending Audit & Recovery Services, LLC
P.O. Box 2067
Orleans, Massachusetts  02653
(v) 508-694-6866
(f) 508-694-6874
E-Mail: Marie.McDonnell@truthinlending.net

This signature page has been transmitted by facsimile

DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S COMPLAINT MIKELS v U.S. BANK N.A.
AND RELATED OR CONSOLIDATED ACTIONS

**SUMMARY OF MARIE MCDONNELL'S LOAN
ANALYSIS,
1. Predatory Loan
2. NO PERFECTED TITLE due to
Forged and Fraudulent Recording of Assignment and
Title Documents**

**EXHIBIT 1**

# Table Of Exhibits

*Exhibit ~ A.*   Recent Cases & Professional Profile

*Exhibit ~ B.*   Interest-Only Adjustable Rate Note

*Exhibit ~ C.*   Deed of Trust

*Exhibit ~ D.*   ARMT 2007-3 Term Sheet

*Exhibit ~ E.*   Notice of Default & Election to Sell, 11/6/2009

*Exhibit ~ F.*   Corporate Assignment of Deed of Trust, 11/27/2009

*Exhibit ~ G.*   Substitution of Trustee, 1/26/2010

*Exhibit ~ H.*   2009 AFN Member Directory

*Exhibit ~ I.*   Mortgage Servicer Schedule

*Exhibit ~ J.*   Securitization Flow Chart

*Exhibit ~ K.*   Historic Default Rates

*Exhibit ~ L.*   Tranche Structure Paydown & Tranche Structure Paydown at Default Rate

*Exhibit ~ M.*   Bogus & Missing Assignments

# EXHIBIT "M"

## Bogus & Missing Assignments

**SECURITIZATION & FORECLOSURE ANALYSIS**

Marshall E. Mikels v. U.S. Bank, N.A. as Trustee of ARMT 2007-3 Trust

## BOGUS & MISSING ASSIGNMENTS

Borrower: Marshall E. Mikels
Lender: Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage
Assignee: Adjustable Rate Mortgage Trust 2007-3

**TRANSFERS & ASSIGNMENTS REQUIRED BY SECURITIZATION DOCUMENTS**

**BOGUS ASSIGNMENTS RECORDED IN OFFICIAL RECORDS - COUNTY OF SAN MATEO, CA**

Marshall E. Mikels
**MORTGAGOR**
**$1,350,000.00**

SETTLEMENT DATE: JULY 11, 2007

↓ NOTE & MORTGAGE ↓

A. Fisher Financial Group, Inc.
**ORIGINATOR**

FISHER FINANCIAL GROUP, INC. SOLD THE LOAN TO
DLJ MORTGAGE CAPITAL, INC. ON JULY 11, 2007

**MISSING ASSIGNMENT #1**

B. DLJ Mortgage Capital, Inc.
**SELLER / SPONSOR**

DLJ MORTGAGE CAPITAL, INC. SOLD THE LOAN TO
CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP. ON OR ABOUT DECEMBER 1, 2007

**MISSING ASSIGNMENT #2**

C. Credit Suisse First Boston Mortgage Securities Corp.
**DEPOSITOR**

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. SOLD
THE LOAN TO ARMT 2007-3 ON OR ABOUT DECEMBER 26, 2007

**MISSING ASSIGNMENT #3**

D. Adjustable Rate Mortgage Trust 2007-3
**TRUST FUND - ISSUING ENTITY**

HOLDS POOL OF LOANS; ISSUES CERTIFICATES
CLOSING DATE: DECEMBER 26, 2007

U.S. Bank National Association
**TRUSTEE**

ARMT 2007-3

---

Marshall E. Mikels
**MORTGAGOR**
**$1,350,000.00**

SETTLEMENT DATE: JULY 11, 2007

↓ NOTE & MORTGAGE ↓

A. Fisher Financial Group, Inc.
**ORIGINATOR**

FISHER FINANCIAL SOLD LOAN TO DLJ MORTGAGE
CAPITAL, INC. ON JULY 11, 2007

**BOGUS ASSIGNMENT**

D. Adjustable Rate Mortgage Trust 2007-3
**TRUST FUND - ISSUING ENTITY**

HOLDS POOL OF LOANS; ISSUES CERTIFICATES
CLOSING DATE: DECEMBER 26, 2007

U.S. Bank National Association
**TRUSTEE**

ARMT 2007-3

Truth In Lending Audit & Recovery Services, LLC
Copyright 2010

Paid Mortgage Insurance, Pool Insurance, or the Note may have been pledged or sold at a discount to a debt buyer.

Moreover, Mr. Mikels has asserted a claim of fraud and he has a right to know the true nature of the mortgage transaction he entered into i.e., was this a suitable and sustainable home mortgage loan; or was it designed to fail so that institutional investors could strip him of his equity, leverage his mortgage obligation dollar for dollar by a ratio of $60 to $1 (more or less), and then foreclose on his home of 39 years in order to get paid for the $n^{th}$ time?

## FINDINGS

Based on my review of the loan documents provided to Mr. Mikels at settlement; the Complaint Mr. Mikels filed with the Superior Court, County of San Mateo; the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission; the Official Records of San Mateo County; information available on the Mortgage Electronic Registration Systems, Inc. website; my research using the Bloomberg Terminal; and my specialized knowledge in the fields of real estate finance, foreclosure and the securitization process, I find the following:

### I.    Unsuitable Loan Terms

The Interest-Only Adjustable Rate Mortgage product given to Mr. Mikels by Fisher Financial was unsuitable, unsustainable, and inappropriate given his current income and credit profile.

Fisher Financial's loan officer, Eric Brass, induced Mr. Mikels to refinance his preexisting first and second mortgage loans which totaled approximately $635,000.00 into a new loan in the amount of $1,350,000.00 so that he could cash out $715,000.00 in home equity and invest the proceeds (less closing costs of $41,500.00) in the stock market. Mr. Brass represented to Mr. Mikels that he could double or triple the cost of his mortgage loan by doing this and persuaded Mr. Mikels that he had to move fast to take advantage of low rates.

According to the Uniform Residential Loan Application contained in his file, Mr. Mikels' monthly income was $19,600.00 at this time of which $3,401.00 was dedicated to mortgage payments for principal and interest, and $249.00 was required to pay for homeowners insurance and real estate taxes. Thus, Mr. Mikels' debt-to-income ratio for housing expenses was an ultra-conservative 19%. The Application also states that the present market value of Mr. Mikels' home was $1,800,000.00 which meant that his loan-to-value ratio was only 35%.

Mr. Brass steered Mr. Mikels away from a low-cost fixed rate loan into a complex, high-cost subprime Alternative Mortgage Transaction that was destined to fail unless representations made by Mr.

Brass to Mr. Mikels i.e., that he could offset his mortgage payments and increase his income by investing the proceeds of the loan, panned out.

I analyzed the subject loan and found that the disclosed interest rate of <u>5.375%</u> was, in reality, a deeply discounted "teaser" rate good for the first five years after which it would adjust to its fully indexed interest rate of <u>9.375%</u>. Likewise, the monthly payment which covered interest-only for the first ten years would increase from $6,046.88 to $10,546.88 on the first adjustment date and double from $6,046.88 to $12,473.79 on September 1, 2017 when the loan was forced to amortize over the remaining term to maturity. By this time, Mr. Mikels would be 71 years old and even if his income remained the same, the monthly payment required to cover principal and interest would consume 64% of his gross income.

For these reasons, Eric Brass' representations to Mr. Mikels e.g., that he did not have to be concerned about future spikes in the interest rate because another low-cost refinance could be arranged, were material to Mr. Mikels' decision to proceed with the transaction.

In reality, Fisher Financial and Eric Brass knew or should have known that the refinance boom was in a freefall and they were desperately trying to fill their pipeline in order to feather their own nests before the housing bubble burst. By all appearances, Fisher Financial made this loan to Mr. Mikels without regard to the ultimate consequences for him down the road.

## II.   Failure to Disclose the Risk of Default

My analysis of the history of the Adjustable Rate Mortgage Trust securitizations from September 2004 through December 2007 indicates that Fisher Financial and the Credit Suisse entities that securitized the Mikels Loan knew that the combination of lax underwriting standards and the volatile Adjustable Rate Mortgage product types being promoted combined to create an abnormally high risk of default for homeowners.

## III.   Suspicious Documents

As Servicer for the ARMT 2007-3 Trust, Select Portfolio Servicing, Inc. is, no doubt, authorized under the Pooling and Servicing Agreement to prosecute foreclosure actions on behalf of the Trust. <u>However, that authority is not a license to manufacture documents that do not truthfully set forth the facts as these relate to the conveyance of a particular Note and Deed of Trust from the originating Lender to intermediaries, and finally, into the Trust.</u>

### Corporate Assignment of Deed of Trust

In the instant case, Bill Koch, an employee of SPS, executed and recorded a Corporate Assignment of Deed of Trust in the Official Records of San Mateo County on February 8, 2010, which purports to convey all right title and interest in the subject Note and Deed of Trust as of November 27,

2009 from Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage to U.S. Bank National Association, as Trustee, on Behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 ("ARMT 2007-3"). (See Exhibit F. – Corporate Assignment of Deed of Trust)

As established above, this Assignment contradicts the securitization pathway set forth in the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission which informs us that Fisher Financial was required to sell the Mikels mortgage obligation to DLJ Mortgage Capital, Inc. (the Seller/Sponsor); subsequently, DLJ was required to sell the Mikels mortgage obligation to Credit Suisse First Boston Mortgage Securities Corp. (the Depositor) on or about the Cut-Off Date December 1, 2007; finally, Credit Suisse was to convey the pooled assets, including the Mikels mortgage obligation, into the ARMT 2007-3 Trust Fund (the Issuing Entity) on or about December 26, 2007, the closing Date for the securitization.

According to the endorsement on the Note, Fisher Financial divested its interest in the Mikels Loan on **July 11, 2007**; hence, SPS's Corporate Assignment of Deed of Trust which purports to convey the Mikels' mortgage obligation directly into the ARMT 2007-3 Trust more than two years after the fact on **November 27, 2009** is controverted by a preponderance of the evidence.

To illustrate how the Mikels Note and Deed of Trust had to be conveyed into the ARMT 2007-3 Trust according to the securitization documents versus how SPS claims the transaction proceeded, I prepared a flow chart that compares the two. (See Exhibit M. - Bogus & Missing Assignments)

### Substitution of Trustee

In considering whether to enjoin the Trustee's Sale scheduled to take place on Tuesday, March 2, 2010, the Court must determine whether this Substitution of Trustee is a valid document given the following facts:

1. Whereas SPS purports to substitute the Trustee of the Deed of Trust on behalf of ARMT 2007-3 as the Trust's servicing agent, an officer of SPS did not execute the document.

2. Rather, the Substitution of Trustee was executed by Olivia A. Todd who is President of National Default Servicing Corporation. Accordingly, this document is self-serving as NDSC appointed itself as Successor Trustee without presenting any evidence that it was authorized by SPS or U.S. Bank as Trustee of the ARMT 2007-3 Trust to do so.

3. Finally, the Corporate Assignment of Deed of Trust from Fisher Financial to U.S. Bank as Trustee of the ARMT 2007-3 Trust is a contrivance and is untruthful according to a preponderance of the evidence. Therefore, the Substitution of Trustee – which depends upon the Assignment – must also fail as well because no authority was conveyed to SPS, U.S. Bank or NDSC by virtue of the Assignment.

## IV.    **Occupational Fraud and Abuse**

As a Certified Fraud Examiner, I am trained to recognize well-defined areas of occupational fraud and abuse that fall into the general categories of corruption, asset misappropriation and fraudulent statements. Mortgage fraud is a growing area of interest for the Federal Bureau of Investigation ("FBI"), however, the focus up until now has been on crimes being perpetrated against financial institutions by industry insiders with no attention whatsoever given to the multifarious ways in which unregulated corporate entities have preyed upon unwitting consumers such as Mr. Mikels.

At the time the subject loan was originated, Mr. Mikels had good credit, a solid income, low debt, and a high net worth. How then, after 39 years of responsible homeownership, does Mr. Mikels now find himself facing foreclosure and on the verge of losing everything he has worked his whole life to acquire?

I believe that my *Securitization & Foreclosure Analysis* only scratches the surface of the financial fraud that belies Mr. Mikels' situation. Mr. Mikels' request for a Temporary Restraining Order is well founded in light of the facts addressed herein and in the interest of justice, the Court should grant his request.

Respectfully submitted,

Marie Mc Donnell

Marie McDonnell, CFE
Mortgage Fraud and Forensic Analyst
**TRUTH IN LENDING AUDIT & RECOVERY SERVICES, LLC**
P.O. Box 2760, Orleans, MA  02653
Tel. (508) 255-8829   Fax (508) 255-9626

# EXHIBIT "F"

## Corporate Assignment of Deed of Trust
### November 27, 2009

(Page 1 of 1)

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:

BILL KOCH
SELECT PORTFOLIO SERVICING, INC
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

04011886?

**2010-013795**
09:00am 02/08/10 AT Fee: 15.00
Count of pages 1
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

## CORPORATE ASSIGNMENT OF DEED OF TRUST

San Mateo, California   SELLER'S SERVICING #: 0010982387   "MIKELS"
INVESTOR #: M63
MERS #: 100274688777116040

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE hereby grants, assigns and tranfers to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3  at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115 all beneficial interest under that certain Deed of Trust dated 07/11/2007 , in the amount of $1,350,000.00, executed by MARSHALL E. MIKELS A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY to MERS AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA, NATIONSCHOICE MORTGAGE  and Recorded: 07/18/2007 as Instrument No.: 2007-108403 in San Mateo County , State of California

Together with the note or notes therein described or referred to, in said Deed of Trust, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE
On _____ NOV 2 7 2009 _____

Bill Koch, Assistant Secretary



STATE OF Utah
COUNTY OF Salt Lake

On NOV 2 7 2009 , before me, KIMBERLY CLARK, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Bill Koch, Assistant Secretary ,MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA, NATIONSCHOICE MORTGAGE,  personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

KIMBERLY CLARK
Notary Expires: 12/11/2011 #572135

NOTARY PUBLIC
KIMBERLY CLARK
3815 South 92 West
Salt Lake City, Utah 84115
My Commission Expires
December 11, 2011
STATE OF UTAH

(This area for notarial seal)

*KDO*KDOAMRC*11/24/2009 03:33:08 PM* AMRCS3AMRC0000000000000000382577* CASAM M* 0010982387 CASTATE_TRUST_ASSIGN_ASSN *ACK*ACKAMRC*

# EXHIBIT "G"

## Substitution of Trustee
### January 26, 2010

**RECORDING REQUESTED BY:**
LPS Title Company - CA

**WHEN RECORDED MAIL TO:**
National Default Servicing Corporation
7720 N. 16ᵗʰ Street, Suite 300
Phoenix, AZ 85020

NDSC File No.   : 09-21321-SP-CA
Loan No.        : 0010982387

APN: 034-294-150-7

**2010-013796**
09:00am 02/08/10 ST Fee: 21.00
Count of pages 3
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 1 0 0 0 1 3 7 9 6 A R *

## SUBSTITUTION OF TRUSTEE

WHEREAS, MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY was the original Trustor(s), TICOR TITLE was the original Trustee and MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE was the original Beneficiary under that certain Deed of Trust dated 07/11/2007 and recorded on 07/18/2007 as instrument No. 2007-108403 in Book, Page, of Official Records of SAN MATEO County, State of CA and

WHEREAS, the undersigned is the present beneficiary under the said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

NOW, THEREFORE, the undersigned hereby substitutes NATIONAL DEFAULT SERVICING CORPORATION, An Arizona Corporation, whose address is 7720 N. 16ᵗʰ Street, Suite 300, Phoenix, Arizona 85020, as Trustee under said Deed of Trust.

Whenever the context hereof requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Select Portfolio Servicing, Inc., F/K/A Fairbanks Capital Corp., as servicing agent for U.S. Bank National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3

Dated : 1/26/2010

By : Olivia A. Todd, President
By: Limited Power of Attorney

State of Arizona
County of Maricopa

On ____1/26____, 20 10, before me, Richard Michael Bowes, a Notary Public for said State, personally appeared Olivia A. Todd who personally known to me (or who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing is true and correct.

WITNESS my hand and official seal.

Signature _____

OFFICIAL SEAL
RICHARD MICHAEL BOWES
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 1, 2010

## *National Default Servicing Corporation*

### SUBSTITUTION OF TRUSTEE
### AFFIDAVIT OF MAILING

**NDSC File No. :**   **09-21321-SP-CA**
**Loan No.       :**   **0010982387**

On this day, February 5, 2010, I personally mailed by certified mail a copy of the attached Substitution of Trustee to the trustee of record under the Deed of Trust described in said Substitution, and a copy of the attached Substitution has been mailed prior to the recording thereof, in the manner provided in Section 2924(b) of the Civil Code of the State of California to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said Section.

I declare under penalty of perjury that the foregoing is true and correct.

*Calla Washington*

CALLA WASHINGTON, TRUSTEE SALES REPRESENTATIVE

**X**   **Substitution of Trustee**

MARSHALL E. MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E. MIKELS
207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED

207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED

115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E MIKELS
C/O CLARK A. BARRET ATTORNEY AT LAW
1611 BOREL PLACE, SUITE 6
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
C/O CLARK A. BARRETT ST.
1611 BOREL PLACE, SUITE
SAN MATEO, CA 94402

MARSHALL MIKELS

115 15TH AVENUE
SAN MATEO, CA 94402

INTERESTDIRECT INC.
3303 EAST BASELINE ROAD, #7-118
GILBERT, AZ 85234

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. ("MERS")
PO BOX 2026
FLINT, MI 48501-2026

INTERESTDIRECT INC., AN ARIZONA
CORPORATION
C/O MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.
P.O. BOX 2026
FLINT, MI 48501-2026

MARSHALL E. MIKELS, TRUSTEE
115 15TH AVENUE
SAN MATEO, CA 94402-2413

FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098

FLAGSTAR BANK, FSB, A FEDERALLY
CHARTERED SAVINGS BANK
5151 CORPORATE DR
TROY, MI 48098-2639

FLAGSTAR BANK, FSB
C/O MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

(Page 3 of 3)

P.O. BOX 2026
FLINT, MI 48501-2026

GLINDA IRENE ROBERTS
63 BOVET ROAD #111
SAN MATEO, CA 94402

1 | TIMOTHY Y. FONG
ATTORNEY AT LAW
2 | CA SBN#255221
3 | 3333 Bowers Avenue, STE 130
Santa Clara, CA 95054
4 | Tel 408-627-7810
Fax 408-457-9417
5 | tyfong919@gmail.com
Attorney for plaintiff
6 | Marshall Mikels

7

8 | SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN MATEO
9

10 | MARSHALL MIKELS,                                    Case No.
                                        Plaintiff
11 |                       Vs
U.S. BANK, NATIONAL
12 | ASSOCIATION, 45202-3923 AS
TRUSTEE ON BEHALF OF THE
13 | HOLDERS OF THE ADJUSTABLE
RATE MORTGAGE TRUST 2007-3
14 | ADJUSTABLE RATE MORTGAGE
BACKED PASS THROUGH
15 | CERTIFICATES SERIES 2007-3,
AND TRUSTEE AND OR AGENT FOR
16 | BENEFICIARIES KNOWN OR
UNKNOWN; FISHER FINANCIAL
17 | GROUP, INC., DBA,
NATIONSCHOICE MORTGAGE, AN
18 | ARIZONA CORPORATION QUALIFIED
TO DO BUSINESS IN CALIFORNIA;
19 | MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., A
20 | VIRGINIA CORPORATION
("MERS"); SELECT PORTFOLIO
21 | SERVICING INC. ("SPS"), A
UTAH CORPORATION QUALIFIED TO
22 | DO BUSINESS IN CALIFORNIA;
NATIONAL DEFAULT SERVICING
23 | CENTER, INC. AN ARIZONA
CORPORATION QUALIFIED TO DO
24 | BUSINESS IN CALIFORNIA
("NDSC"); DOES 1 THROUGH 100,
25 |
26 |                                        Defendants
27

28

1

**AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

I, Marie McDonnell, being duly sworn declare as follows:

1.      I, Marie McDonnell, am a *Mortgage Fraud and Forensic Analyst* and a credentialed Certified Fraud Examiner.  I am the founder and managing member of Truth In Lending Audit & Recovery Services, LLC located in Orleans, Massachusetts and have twenty-three years' experience in transactional analysis and mortgage fraud investigation.

2.      Attorney Timothy Y. Fong engaged me to perform a Securitization and Foreclosure Analysis with respect to a certain consumer mortgage transaction consummated on July 11, 2007 by and between Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage ("Fisher Financial") and Marshall E. Mikels that was secured by Mr. Mikels' primary residence located at 115 15th Avenue, San Mateo, California 94402 (the "Loan").

3.      Presently, Mr. Mikels' property is scheduled to be sold at a Trustee's Sale on Tuesday, March 2, 2010 by a party other than the originating Lender, Fisher Financial.

4.      The purpose of my analysis is to present the Court with evidence that is readily available in the public records of which the Court may take judicial notice that supports Mr. Mikels' request for a Temporary Restraining Order enjoining the Trustee's Sale.

5.      I present my *Securitization & Foreclosure Analysis* in a separate report which I attach hereto and incorporate herein as Exhibit #1.

6.      My *Securitization & Foreclosure Analysis* is true and accurate to the best of my present knowledge given the evidence available to me as of this date.  I am prepared to testify to the facts and findings contained therein if and when that opportunity arises.

2

AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

/ / /

I declare under penalty of perjury that the above is true and correct. Executed this 1st day of March, 2010 in Orleans, MA.

*Marie M° Donnell*

Marie McDonnell, Affiant
*Mortgage Fraud and Forensic Analyst*
*Certified Fraud Examiner, ACFE*
Truth In Lending Audit & Recovery Services, LLC
30 Main Street, Rear
P.O. Box 2760
Orleans, Massachusetts  02653


COMMONWEALTH OF MASSACHUSETTS

COUNTY OF BARNSTABLE, SS

At Orleans, Massachusetts, on this _1ST_ day of _MARCH_, 20_10_, before me, the undersigned authority, personally appeared MARIE MCDONNELL, proved to me through evidence of identity, to wit: *a Massachusetts Driver's License,* to be the signer(s) of the attached document, and who swore or affirmed to me, under the penalties of perjury, that the contents of said document are truthful and accurate, to the best of her knowledge and belief.

Subscribed to and sworn before me.

*Jennifer M Leonard*

Notary Public

My Commission expires: _9/13/2013_

JENNIFER M. LEONARD
Notary Public
Commonwealth of Massachusetts
My Commission Expires
September 13, 2013

3

AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

**Court Record Filings San Mateo
EXHIBIT 1-A**

| Home | Complaints/Parties | Actions | Minutes | Pending Hearings | Case Report | Images |

# Actions

Open Quick Search

## Case CLJ203244 - U.S. BANK VS MARSHALL E MIKELS, ET AL

Move To This Date

| Viewed Date | Action Text | Disposition | Image |
|---|---|---|---|
| 08/31/2011 | AFFIDAVIT OF NOTICE OF INTENT TO FILE A CLAIM BY PLAINTIFF FILED | | |
| 08/11/2011 | PROOF OF SERVICE OF AFFIDAVIT OF NOTICE,INTENT, ETC SERVED ON BETH LABSON FREEMAN BY MAIL WITH A SERVICE DATE OF 08/05/11. | | |
| 08/11/2011 | PROOF OF SERVICE OF AFFIDAVIT OF NOTICE OF INTENT,NOTICE,ETC SERVED ON MR. JAN ESTEP BY MAIL WITH A SERVICE DATE OF 08/05/11. | | |
| 04/21/2011 | JURY TRUST POSTED BY DEFENDANT ON BEHALF OF MARSHALL E MIKELS | | |
| 04/20/2011 | PROOF OF SERVICE OF NTC OF DEFTS REQ FOR JT. 1ST AMENDED ANSWER SERVED ON U.S. BANK NATIONALASSOCIATION AS TRUSTEE, BY PERSONAL SERVICE WITH A SERVICE DATE OF 04/13/11 | | |
| 04/20/2011 | NOTICE OF DEFENDANTS UNAVAILABILITY FOR HEARING/TRIAL FILED BY MARSHALL E MIKELS | | |
| 04/14/2011 | DEFENDANT LISTED 2 ADDRESS ON THE ANSWER AND INDICATED THE MAILING ADDRESS AS 207 SHASTA AVE | | |
| 04/14/2011 | DEMAND FOR JURY TRIAL FILED BY MARSHALL E MIKELS | | |
| 04/14/2011 | AMENDED ANSWER TO COMPLAINT (UNLAWFUL DETAINER) FILED 01/21/2011 OF U.S. BANK NATIONALASSOCIATION AS TRUSTEE, FILED BY MARSHALL E MIKELS | | N/A |
| 04/11/2011 | NOTICE OF FILING OF FIRST AMENDED VARIFIED ANSWER FILED BY MARSHALL E MIKELS | | |
| 04/11/2011 | PROOF OF SERVICE OF ANSWER SERVED ON U.S. BANK NATIONALASSOCIATION,AS TRUSTEE, BY PERSONAL SERVICE WITH A SERVICE DATE OF 04/06/11. | | |
| 04/06/2011 | (1.) ANSWER TO COMPLAINT (UNLAWFUL DETAINER) FILED 01/21/2011 OF U.S. BANK NATIONALASSOCIATION AS TRUSTEE, FILED BY MARSHALL E MIKELS, REPRESENTED BY PRO/PER - PRAYER AMOUNT LESS THAN $10,000.00 | | N/A |
| 04/01/2011 | OPPOSITION PLACED IN FILE RECEIVED NOT FILED . FILED | | |
| 04/01/2011 | ORDER FOR POSTING AND MAILING SIGNED BY JUDGE FOILES ON 04/01/11, FILED. | | |

CLI203244 Actions - San Mateo Civil

http://openaccess1.sanmateocourt.org/openaccess/CIVIL/CivilDetails.asp?courtcode=A&cas...

| Date | Action |
|---|---|
| 04/01/2011 | EX-PARTE APPLICATION FOR POSTING AND MAILING FILED BY U.S. BANK NATIONALASSOCIATION AS TRUSTEE. |
| 03/22/2011 | UNLAWFUL DETAINER CASE UNSEALED PER CCP 1161.2 |
| 03/10/2011 | LETTER SENT TO DEFT WITH ANSWER FORM AND FEE WAIVER FORM |
| 03/10/2011 | NOTICE TO COURT, AFFIDAVIT, RECEIVED AND PLACED IN THE COURT FILE |
| 03/02/2011 | ORDER DENYING SERVICE OF SUMMONS BY POSTING FILED BY PLAINTIFF. SIGNED BY %%X % ON JUDGE BUCHWALD. |
| 03/02/2011 | EX PARTE APPLICATION FOR ORDER OF POSTING AND MAILING OF SUMMONS. DECLARATION RE DILIGENCE FILED |
| 02/24/2011 | NOTE TO JUDGE BUCHWALD FROM DEFENDANT SENT TO DEPT 10 AND RETURED BY JUD AND PLACED IN FILE |
| 02/03/2011 | ORDER DENYING SERVICE OF SUMMONS BY POSTING FILED BY PLAINTIFF. SIGNED BY %%X %, ON GB. |
| 02/03/2011 | EX PARTE APPLICATION FOR ORDER OF POSTING AND MAILING OF SUMMONS. DECLARATION RE DILIGENCE FILED |
| 01/21/2011 | 5 DAY SUMMONS, ISSUED AND FILED. |
| 01/21/2011 | UNLAWFUL DETAINER FILING NOTICES MAILED TO ALL PARTIES PER CCP 1161.2 |
| 01/21/2011 | UNLAWFUL DETAINER CASE SEALED PER CCP 1161.2 |
| 01/21/2011 | (L) TRACK ASSIGNMENT: UNLAWFUL DETAINER |
| 01/21/2011 | DAILY RENTAL VALUE $50.00, ADDRESS 115 15TH AVENUE SAN MATEO CA 94402. 5 DAY SUMMONS ISSUED |
| 01/21/2011 | (L) COMPLAINT FILED (UNLAWFUL DETAINER) - PRAYER AMOUNT $10,000.00 OR LESS |

because of the hard evidence of forged and bogus recorded documents involved in the chain of title. Thereafter The Trustee's Sale scheduled for March 2, 2010 was postponed by the above Plaintiff/Parties/alleged Lender and Agents. **See Mr. Mikels Complaint for Fraud Exhibit 3-A.**

13.     Thereafter, I informed Mr. Mikels that a Notice of Loan Recession under the Federal Truth and Lending Act (TILA) was another option that was available to him for consumer protection in the case of fraud and non-disclosure and thereafter Mr. Mikels filed a substitution of attorney to represent self on March 10, 2010 and filed a Request for Dismissal of his Complaint without prejudice on April 16, 2010, with the intent to use his right of loan recession to seek justice.

14.     On March 29, 2010 Mr. Mikels delivered a *"NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST"* dated March 29, 2010 which voided the Deed of Trust automatically by operation of federal law on that date. See, the above referenced Notice of Loan Recession and the Proof of Delivery incorporated herein by this reference and attached hereto as **Exhibit 4 & 4-A.**

15.     Thereafter, the Plaintiff(s)/alleged Lender and Agents held a Trustee's Sale on August 6, 2010 in spite of the fact that the Deed of Trust had been voided automatically by the *"NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST"* dated March 29 2010 and delivered to the above referenced Plaintiff and Parties on that date.

16.     The TILA Loan Recession Law (attached hereto) states:

rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[36] whichever occurs last. **If the required notice and material disclosures are not delivered, the right to rescind shall expire three years after the occurrence giving rise to the right of rescission,** or upon transfer of all of the consumer's interest in the property, or upon sale of

**DECLARATION OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFF'S COMPLAINT MIKELS v U.S. BANK N.A. AND RELATED OR CONSOLIDATED ACTIONS**

**MARIE MCDONNELL'S COMPLETE LOAN
SECURITIZATION ANALYSIS
EXHIBIT 2**

# Securitization & Foreclosure Analysis

Mortgagor

Marshall E. Mikels
115 15th Avenue, San Mateo, California 94402

Mortgagee

Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage
Mortgage Electronic Registration Systems, Inc. as Nominee

Assignee

U.S. Bank, National Association as Trustee on Behalf of the Holders of
the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage
Backed Pass Through Certificates, Series 2007-3

February 28, 2010



Prepared By

**MARIE MCDONNELL**
TRUTH IN LENDING AUDIT & RECOVERY SERVICES, LLC
Mortgage Fraud and Forensic Analysts
P.O. Box 2760, Orleans, Massachusetts 02653
(v) 508-255-8829   (f) 508-255-9626
Marie.McDonnell@truthinlending.net

# Table Of Contents

SUBJECT..................................................................................................................................................3
    PURPOSE & USE OF REPORT:..............................................................................................3
    ISSUES: ..............................................................................................................................3
    PARTIES:.............................................................................................................................3
    DOCUMENTS REVIEWED: ...................................................................................................3

QUALIFICATIONS ...................................................................................................................................4
    Methodologies ....................................................................................................................4
    Securitization Analysis ........................................................................................................4
    Relevance ...........................................................................................................................5
    Basis for Opinions ...............................................................................................................5

FACTUAL BACKGROUND ....................................................................................................................6
  LOAN ORIGINATION..............................................................................................................6
  FORECLOSURE PROCEEDINGS ..............................................................................................7
    Notice of Default ................................................................................................................7
    Corporate Assignment of Deed of Trust ..............................................................................7
    Substitution of Trustee .......................................................................................................7
  SECURITIZATION OF THE MIKELS MORTGAGE OBLIGATION ................................................8
    Underwriting Standards .....................................................................................................10
    Performance Analytics of the ARMT 2007-3 Trust Fund.......................................................12

FINDINGS...............................................................................................................................................14
    I.    Unconscionable Loan Terms ...................................................................................14
    II.   Failure to Disclose the Risk of Default......................................................................15
    III.  Suspicious Documents ............................................................................................15
    Corporate Assignment of Deed of Trust ..............................................................................15
    Substitution of Trustee.......................................................................................................16
    IV.  Occupational Fraud and Abuse.................................................................................17

**DISCLAIMER**

The opinions expressed herein do not constitute legal advice or conclusions of law but emerge logically from the facts as these became known to the Analyst through her forensic examination of the evidence. This report is intended, in significant part, to educate the Court with respect to the arcane aspects of how residential mortgage lending over the last two decades has shifted from a direct lender-borrower relationship to an intricate web of "participants" and "third-party handlers" who profit from deconstructing the lender-borrower relationship.

## SUBJECT

The Subject of this analysis involves a consumer mortgage transaction secured by residential property located at 115 15th Avenue, San Mateo, California 94402 which, presently, is in foreclosure.

## PURPOSE & USE OF REPORT:

This Expert Report is submitted on behalf of Marshall E. Mikels in support of his Motion for a Temporary Restraining Order enjoining a Trustee's Sale scheduled to take place on March 2, 2010.

## ISSUES:

(1)   Unconscionable Loan Terms
(2)   Failure to Disclose Risk
(3)   Suspicious Documents
(4)   Occupational Fraud and Abuse

## PARTIES:

| | |
|---|---|
| Origination Date: | July 11, 2007 |
| Mortgage Broker: | None |
| Originator : | Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage |
| Nominee: | Mortgage Electronic Registration Systems, Inc. |
| Seller: | DLJ Mortgage Capital, Inc. |
| Depositor: | Credit Suisse First Boston Mortgage Securities corp. |
| Issuing Entity: | Adjustable Rate Mortgage Trust 2007-3 |
| Underwriter | Credit Suisse Securities (USA) LLC |
| Trustee: | U.S. Bank, National Association |
| Custodian: | Wells Fargo Bank, N.A. |
| Master Servicer: | Wells Fargo Bank, N.A. |
| Cut-Off Date: | December 1, 2007 |
| SEC CIK: | 0001405751 |
| SEC Accession: | 1068238-7-830 |
| SEC File No. | 333-140945 |
| SEC Website: | http://www.secinfo.com/d1zj61.uph.htm#2q9w |
| PSA: | Private Placement – Not Available |
| New York State Corporations: | Issuing Entity is not Registered (http://appsext8.dos.state.ny.us/corp_public/corpsearch.entity_search_entry) |

## DOCUMENTS REVIEWED:

Loan Origination File (Incomplete); Copy of Foreclosure Filings. Researched SEC registration filings with respect to ARMT 2007-3; Researched Bloomberg Professional with respect to ARMT 2007-3; Researched Mortgage Electronic Registration Systems, Inc. website for originator and servicer lookups.

## QUALIFICATIONS

I, Marie McDonnell, am a *Mortgage Fraud and Forensic Analyst* and a credentialed Certified Fraud Examiner. I am the founder and managing member of Truth In Lending Audit & Recovery Services, LLC located in Orleans, Massachusetts and have twenty-three years' experience in transactional analysis and mortgage fraud investigation.

My professional practice involves crisis and foreclosure intervention, problem resolution, and mediation on behalf of consumers who are experiencing difficulties with their mortgage lenders and servicers. A significant portion of my time over the past eighteen years has been dedicated to providing litigation support services to attorneys representing consumers and debtors in bankruptcy who have been negatively impacted by lender abuses in the origination, servicing, and foreclosure of these complex mortgage transactions. My background and methodologies are more particularly described in the Professional Profile attached hereto. (*See* Exhibit A. - Recent Cases & Professional Profile)

### Methodologies

Over the past nineteen years, I have developed, extensively tested, and reliably employed a proprietary set of auditing tools and protocols that enable me to track with precision a lender's loan servicing system and determine with particularity whether a problem is the result of borrower failure, lender malfeasance, or whether it is technology and policy related.

My process begins by assembling documentation from borrowers, lenders, closing agents, loan servicers, and related third parties so that I have a well rounded view of the entire loan history. I then integrate the data into a Microsoft Excel spreadsheet and map out each transaction by date in all contractual, custodial and collection accounts.

This mapping modality enables me to pinpoint where and why problems arise. Through my forensic auditing skills, I am able to detect and quantify a lender's failure to comply with state and federal truth in lending laws; expose errors, omissions, or the imposition of unauthorized fees and costs; describe inappropriate handling of the escrow and suspense accounts; uncover equity skimming schemes; and discover other unfair and deceptive acts and practices as these are defined by the Federal Trade Commission. I am also able to reconstruct lost or suppressed data through a variety of forensic accounting techniques; detect unconscionable loan terms; and uncover fraud.

### Securitization Analysis

Over the past nine years, I have made a concerted effort to study the securitization of residential mortgage transactions into Mortgage Backed Securities that were sold to institutional investors and traded in the global capital markets. My forensic analysis of these transactions enables me to trace a consumer's loan from its inception, through multiple purchase and sale transactions in the secondary market, and into a particular securitization deal. I have found that the vast majority of subprime loans

and Alternative Mortgage Transactions originated for the securitization sector between the years 2000 and 2007 are replete with fraud.

To facilitate my research in this regard, I license access to Bloomberg Professional, an electronic database used by institutional investors and hedge funds to monitor Mortgage Backed Securities, Asset Backed Receivables, and other financial products in which they hold a stake. The Bloomberg Terminal allows me to peer into the servicer tapes supplied to the Indenture Trustees on a monthly basis. Here, I can identify the loan in question and review the historical default rates and other analytics that measure the toxicity of a given pool of loans. This information allows me to evaluate the systemic nature of the institutional fraud in play, and the motivation of a servicer to foreclose on as many mortgages as possible before the Trust Fund collapses in Ponzi scheme fashion.

### Relevance

The information contained in this *Securitization & Foreclosure Analysis* is precisely on point because it addresses whether the entities prosecuting the foreclosure of the subject property have established by a preponderance of the evidence the complete, unbroken chain of conveyance of authority necessary to document their right to enforce the Adjustable Rate Note and Deed of Trust at issue.

### Basis for Opinions

Discovery has not yet been conducted at this early stage of the litigation which severely compromises Mr. Mikels' ability to defend his property from foreclosure by a party other than the originating lender who is attempting to exercise the statutory power of sale contained in the Deed of Trust.

The information, analysis and conclusions expressed herein are based strictly on the following: the loan closing documents provided to Mr. Mikels at settlement; Mr. Mikels Complaint filed with the Superior Court of California, County of San Mateo; documents filed in the Official Records of San Mateo County incident to the foreclosure in question; a Free Writing Prospectus Term Sheet for the 2007-3 Trust available at the Securities and Exchange Commission's public access website; research obtained using Bloomberg Professional; information available at the Mortgage Electronic Registration Systems, Inc. website; and my specialized knowledge in the fields of real estate finance, foreclosure and the securitization process.

## FACTUAL BACKGROUND

### LOAN ORIGINATION

On July 11, 2007, Marshall E. Mikels entered into a consumer mortgage transaction with Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage ("Fisher Financial") to refinance his primary residence located at 115 15th Avenue, San Mateo, California 94402 (the "Loan"). Mr. Mikels, as sole obligor, executed an Interest-Only Adjustable Rate Note in the amount of $1,350,000.00 financed initially at 5.375% for a term of thirty years. Monthly payments were set at $6,046.88 for the first five (5) years after which, the interest rate would adjust every six months based on the six-month LIBOR rate plus a margin of 4.000% rounded to the nearest one-eighth of one percent (.125%). In the month following the each interest rate adjustment, the monthly payment would reset in an amount sufficient to cover the accrued Interest-Only for a period of five (5) years. On the tenth anniversary of the Loan, the Interest-Only Period would expire and monthly payments would increase to an amount sufficient to amortize the Loan over the remaining twenty-year term to maturity. (*See* Exhibit B.- Interest-Only Adjustable Rate Note)

To secure his obligations under the Note, Mr. Mikels executed a Deed of Trust in favor of the Lender, Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage. Paragraph "D" under the Deed of Trust's Definitions, nominated Mortgage Electronic Registration Systems, Inc. ("MERS") to act on behalf of the Lender and the Lender's assigns with respect to the Security Instrument, even though MERS itself has no pecuniary interest in the Mikels Note. The Deed of Trust was recorded on July 18, 2007 as instrument number 2007-108403 in the Official Records maintained by the County Recorder for San Mateo County, California. (*See* Exhibit C.- Deed of Trust)

Unbeknownst to Mr. Mikels at the time, Fisher Financial originated the Mikels Loan pursuant to a Mortgage Loan Purchase Agreement with DLJ Mortgage Capital, Inc. ("DLJ"), a subsidiary of Credit Suisse Holdings (USA), Inc. ("Credit Suisse"). (*See* Exhibit D.- ARMT 2007-3 Term Sheet, Page S-28, Affiliates and Related Transactions)

DLJ served as a conduit through which independent mortgage brokers and lenders of modest means, such as Fisher Financial, could gain access to Credit Suisse's enormous capacity for originating, processing, and funding residential mortgage loans which was made possible through the securitization of these transactions by Wall Street investment banks.

At settlement, Fisher Financial received $33,750.00 (2.50%) in loan origination fees; $995.00 in loan discount fees; $225.00 in notary fees; and $2,982.02 in prepaid interest for a total of $37,952.02. Oddly, Fisher Financial credited $20,250.00 towards Mr. Mikels' closing costs on Line 204 of the HUD-1 Settlement Statement; but then had him sign a three-year Note to repay the "debt" in 36 installments of $5612.5 each. In addition to the foregoing, Fisher Financial would have received an undisclosed yield

spread premium when it sold the Mikels loan to DLJ; and it would have been paid to release its mortgage servicing rights to Select Portfolio Servicing, Inc. ("SPS").

## FORECLOSURE PROCEEDINGS

### Notice of Default

Subsequent to these events, Mr. Mikels allegedly defaulted on his mortgage payment obligations. On November 6, 2009, Kevin Frost issued and recorded in the Official Records of San Mateo County a Notice of Default and Election to Sell Under Deed of Trust on behalf of "Select Portfolio Servicing fka Fairbanks Capital Corporation, as Beneficiary by National Default Servicing Corporation, as Agent for the Beneficiary by LPS Title Company – CA, as Agent for National Default Servicing Corporation." (_See_ Exhibit E.- Notice of 1/6/2009)

### Corporate Assignment of Deed of Trust

On February 8, 2010, Bill Koch, an employee of SPS, executed and recorded a Corporate Assignment of Deed of Trust in the Official Records of San Mateo County which purports to convey all right title and interest in the subject Note and Deed of Trust as of November 27, 2009 from Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage to U.S. Bank National Association, as Trustee, on Behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 ("ARMT 2007-3"). (_See_ Exhibit F.- Corporate Assignment of Deed of Trust)

The evidence will show that Fisher Financial <u>did</u> <u>not</u> sell the Mikels mortgage obligation to ARMT 2007-3 on November 27, 2009.  Rather, Chad Fisher, President of Fisher Financial Group, Inc. dba NationsChoice Mortgage sold the Mikels Note and Deed of Trust to DLJ Mortgage Capital, Inc. on July 11, 2007 within hours of originating the Loan.  (_See_ Exhibit B.- Interest-Only Adjustable Rate Note, Page 4; and  Exhibit D. - ARMT 2007-3 Term Sheet, Page S-25) [1]

### Substitution of Trustee

On January 26, 2010, Select Portfolio Servicing, Inc., f/k/a Fairbanks Capital Corp., as servicing agent for U.S. Bank National Association, as Trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 executed a Substitution of Trustee that purported to appoint National Default Servicing Corporation of

---

[1] **DLJ Mortgage Capital Underwriting Standards**

The sponsor (DLJ) acquires mortgage loans through its whole-loan flow acquisition channel from originators that the sponsor has determined met its qualified correspondent requirements.

Phoenix, Arizona ("NDSC") as Successor Trustee to Ticor Title.  This all-important document was subsequently recorded in the Official Records of San Mateo County on February 8, 2010 in order to begin prosecuting a foreclosure action against Mr. Mikels.  (*See* Exhibit G.- Substitution of Trustee)

To test the veracity of this document, I performed a Google search for the identity of the person who executed the Substitution of Trustee, Olivia A. Todd, and discovered that she is not the President of SPS as the document indicates; rather, she works for National Default Servicing Corporation.  (*See* Exhibit H.- 2009 AFN Member Directory)

Accordingly, this document is self-serving as NDSC boldly appointed itself as Successor Trustee without presenting any evidence that it was authorized by SPS or U.S. Bank as Trustee of the ARMT 2007-3 Trust to do so.

### SECURITIZATION OF THE MIKELS MORTGAGE OBLIGATION

The disclosure in the Corporate Assignment of Deed of Trust that the Mikels Loan had been packaged into the ARMT 2007-3 deal allowed me to search for it using the Bloomberg Terminal.  There, I learned that this securitization is a "Private Placement" which means that only qualified investors – hedge funds most likely – would be permitted to invest in these high-risk securities.

I am able to confirm that the Mikels Loan is being tracked as a receivable in the ARMT 2007-3 Trust.  (*See* Exhibit I.- Mortgage Loan Schedule)

In order to document how the Mikels mortgage obligation had to be conveyed into the ARMT 2007-3 Trust Fund according to the Pooling and Servicing Agreement that governs the Trust, I downloaded the only available filing registered with the SEC which is a Free Writing Prospectus ARMT 2007-3 Term Sheet.  (*See*: http://www.secinfo.com/d1zj61.uph.htm#5aoi)  (*See* Exhibit D. - ARMT 2007-3 Term Sheet)

I then integrated this information with details contained in the loan origination documents and mapped out the participants in a Securitization Flow Chart which graphically illustrates how the Mikels Note and Deed of Trust should have been conveyed into the ARMT 2007-3 Trust Fund as follows: (*See* Exhibit J. - Securitization Flow Chart)

(1) <u>Originating Lender</u>:  Fisher Financial ("Lender") granted the Mikels loan on July 11, 2007 in the amount of $1,350,000.00. Mr. Mikels ("Mortgagor") executed a Deed of Trust of even date in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for the Lender and Lender's assigns.  Ticor Title ("Trustee") was appointed Trustee under the Deed of Trust.  [*See* Exhibits B. & C.]

(2) <u>Seller/Sponsor</u>: Fisher Financial sold the Mikels mortgage obligation to DLJ Mortgage Capital, Inc. on July 11, 2007 in conformance with the Term Sheet filed with the Securities and Exchange Commission referenced above. [*See* Exhibit D. – Pages S-19 & S-33][2]

(3) <u>Depositor</u>: According to the Term Sheet, Credit Suisse First Boston Mortgage Securities Corp. purchased the Mikels Loan from DLJ Mortgage Capital, Inc. on or before December 1, 2007, which was the Cut-Off Date for the ARMT 2007-3 securitization. [*See* Exhibit D. – Page S-36][3]

(4) <u>Trust Fund/Issuing Entity</u>: Credit Suisse First Boston Mortgage Securities Corp. was required to deposit the Mikels Note and Mortgage ("mortgage obligation") into the ARMT 2007-3 on or before December 26, 2007, the designated Closing Date for the deal. [*See* Exhibit D. – Page S-36][4]

---

[2] **THE SPONSOR AND THE SELLER**

DLJ Mortgage Capital, Inc., a Delaware Corporation (*"DLJMC"*), is referred to in the prospectus supplement as the *"sponsor,"* a *"seller"* and an *"originator."* Its executive offices are located at 11 Madison Avenue, New York, NY 10010. The sponsor is an affiliate of the depositor, the underwriter, the cap counterparty, if applicable, the cap counterparty, if applicable, and SPS.

The sponsor, together with its affiliates, is involved in mortgage-backed securitizations and other structured financing arrangements. The sponsor has been engaged in the securitization of assets since its inception in 1988. In connection with these activities, the sponsor uses special purpose entities, such as the depositor, primarily for (but not limited to) the securitization of residential mortgages and home equity loans.

In the normal course of its securitization program, the sponsor acquires mortgage loans from third party originators and through its affiliates. The sponsor or its affiliates structure securitization transactions in which the mortgage loans are sold to the depositor and the depositor issues the securities supported by the cash flows generated by the mortgage loans and secured by the mortgage loans. The sponsor will make certain representations and warranties to the depositor and the trustee regarding the mortgage loans and if such representations and warranties are breached, the sponsor may have an obligation to repurchase or substitute such mortgage loans from the depositor (or directly from the trustee). To mitigate these risks, however, to the extent the mortgage loans being securitized have been originated by third parties, the sponsor will generally obtain appropriate representations and warranties from these third parties upon the acquisition of such mortgage loans.

[3] **THE DEPOSITOR**

Credit Suisse First Boston Mortgage Securities Corp., the depositor, was incorporated in the State of Delaware on December 31, 1985, as a wholly-owned subsidiary of First Boston Securities Corporation, the name of which was subsequently changed to Credit Suisse First Boston Securities Corporation, or CSFBSC. CSFBSC, the name of which was subsequently changed to Credit Suisse First Boston Management LLC and more recently to Credit Suisse Management LLC, is an indirect wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc. The principal executive offices of the depositor are located at 11 Madison Avenue, New York, N.Y. 10010. Its telephone number is (212) 325-2000.

The depositor was organized, among other things, for the purposes of establishing trusts, selling beneficial interests in those trusts and acquiring and selling mortgage assets to those trusts. None of the depositor, its parent or any of the depositor's affiliates will ensure or guarantee distributions on the certificates. The depositor will acquire the mortgage loans directly or through one or more affiliates.

After issuance of the certificates, the depositor will have no material obligations with respect to the certificates and mortgage loans, other than the (i) the right to appoint a successor trustee or trust administrator upon the resignation or removal of the trustee or trust administrator, as applicable, and (ii) the obligation to indemnify the underwriter against certain liabilities under the Securities Act of 1933, as amended.

[4] **THE ISSUING ENTITY**

On the closing date, and until the termination of the trust, the applicable Adjustable Rate Mortgage Trust series will be a common law trust formed under the laws of the state of New York pursuant to the pooling and servicing agreement. The issuing entity will not have any liabilities as of the closing date. The fiscal year end of the issuing entity will be December

(5)   Trustee: U.S. Bank National Association was appointed Trustee of the ARMT 2007-3 Trust for the benefit of the Certificateholders. [*See* Exhibit D. – Page S-36]

(6)   Master Servicer & Document Custodian: Wells Fargo Bank, N.A. was appointed as Master Servicer, Trust Administrator, Securities Administrator, and Document Custodian. [*See* Exhibit D. – Page S-32]

(7)   Underwriter: Credit Suisse Securities (USA) LLC underwrote the securities for this deal. [*See* Exhibit D. – Page S-70]

In this securitization, Credit Suisse entities permeate the entire process from start to finish and have the means, motive and opportunity to override the system of checks and balances built into the structure when it serves their purpose to do so.

### Underwriting Standards

The central most important way in which Credit Suisse Securities (USA) LLC overrode the system of checks and balances necessary to ensure the safety and soundness of both the financial institutions investing in the Mortgage Backed Securities, and the homeowners who entered into these Adjustable Rate Mortgage transactions was that it tampered with tried and true underwriting standards established by the Government Sponsored Enterprises, Fannie Mae, Freddie Mac, and Ginnie Mae. The Free Writing Prospectus ARMT 2007-3 Term Sheet describes the abandonment of Generally Accepted Underwriting Practices and states as follows: (*See* Exhibit D. – Page S-24)

> The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, bor-

---

31 of each year. The assets of the issuing entity are described herein under "Description of the Certificates--Assets of the Trust."

The issuing entity will not have any employees, officers or directors. The trustee, the depositor, the master servicer, the servicers, the modification oversight agent, if applicable, and the trust administrator will act on behalf of the Issuing Entity, and may only perform those actions on behalf of the issuing entity that are specified in the pooling and servicing agreement. See "Servicing of the Mortgage Loans" in the prospectus supplement.

The trustee, on behalf of the issuing entity, is only permitted to take such actions as are specifically provided in the pooling and servicing agreement. Under the pooling and servicing agreement, the trustee on behalf of the issuing entity will not have the power to issue additional certificates representing interests in the issuing entity, borrow money on behalf of the issuing entity or make loans from the assets of the issuing entity to any person or entity, without the amendment of the pooling and servicing agreement by certificateholders and the other parties thereto as described under "Description of the Certificates -- Amendment" in the prospectus.

If the assets of the issuing entity are insufficient to pay the certificateholders all principal and interest owed, holders of certificates may not receive all of their expected payments of interest and principal and may suffer a loss. The issuing entity, as a common law trust, is not eligible to be a debtor in a bankruptcy proceeding. In the event of bankruptcy of the sponsor, the depositor or any originator, it is not anticipated that the assets of the issuing entity would become part of the bankruptcy estate or subject to the bankruptcy control of a third party.

rower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower. **Neither the depositor nor any affiliate, including DLJ Mortgage Capital, has re-underwritten any mortgage loan**. [Emphasis Supplied]

The mortgage loans have been originated under "full documentation," "alternative documentation," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative documentation," "reduced documentation," "stated income/stated asset" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories.

Generally, an "alternative documentation" program requires information regarding the mortgagor's income (i.e., W 2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full documentation" loan, however, alternative forms of standard verifications are used.

Generally, under both "full documentation" and "alternative documentation" programs at least one year of income documentation is provided.

Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator.

**The underwriting for mortgage loans originated under the "no income/no asset" program may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score**. [Emphasis Supplied]

By removing established underwriting standards and accountability; by turning a blind eye; and by motivating risky behavior with lucrative commissions, the participants in the ARMT 2007-3 securitization willfully and knowingly traded safety and soundness for volume production. One of the moral hazards that resulted from this paradigm shift was a Wild, Wild West culture in which consumers, such as Mr. Mikels, were targeted in a variety of confidence schemes in order to obtain their signatures on loan documents that were only so much grist for the securitization mills.

## Performance Analytics of the ARMT 2007-3 Trust Fund

In addition to researching the SEC filings, I downloaded from Bloomberg the Historic Default Rate for the ARMT 2007-3 deal which shows an exponential rise in the 60+ day default rate on a month to month basis that now stands at an alarming rate of 43.77%. This figure represents the sum of the percentage of loans that are grouped within the 60, 90, Real Estate Owned, and foreclosure delinquency buckets. (*See* Exhibit K. - Historic Default Rates)

Bloomberg's Tranche Structure Paydown screen shows that the income stream from performing loans should continue to fund the Trust until April 2022; however, given the escalating default rate and a loss severity of 50% (which is typical these days); this entire Trust Fund will have imploded by next year at this time. As a result, reclaimed capital from foreclosure sales is needed to supplement the income from performing loans as the tranche structure collapses in Ponzi scheme fashion. (*See* Exhibit L. - Tranche Structure Paydown & Tranche Structure Paydown At Default Rate)

It is important for the Court to understand several things in light of these statistics:

- Systemic default rates such as we see in the ARMT 2007-3 Trust Fund cannot possibly be explained by fraud on the part of individual borrowers who were isolated, unorganized, and geographically distanced from one another.

- Rather, default rates of this magnitude are the result of an organized enterprise and indicate that all internal controls were intentionally suspended by executives at the highest level of the corporate structure.

- California consumers were specifically targeted by the originators for inclusion in this deal and comprised 25.5% of the pooled assets initially; Illinois loans comprised 11.5% of the deal at closing; and Florida ranked third at 7.7%.

The Court should also understand that the entities who originated, securitized, and now service the Mikels Loan have all been paid and continue to receive revenue notwithstanding the success or failure of the loans in the ARMT 2007-3 Trust. This fact was known in advance by all of the participants in the Adjustable Rate Mortgage Trust Series namely: DLJ Mortgage Capital, Inc., Credit Suisse First Boston Mortgage Securities Corp., Credit Suisse Securities (USA) LLC, Select Portfolio Servicing, Inc., Wells Fargo Bank, N.A., and U.S. Bank National Association.

To illustrate this fact, I used the Bloomberg Terminal to research all 24 securitizations involving the Adjustable Rate Mortgage Trust Issuing Entity and found that there is a long history of double-digit default rates that worsened as the housing bubble began to burst which was triggered initially by the collapse of the Bear Stearns hedge funds in the spring of 2007. (*See* Table Below)

## History of Adjustable Rate Mortgage Trust Securitizations

| Date of Issue | ARMT Series # | ALL Collateral | 60+ Default Rate at January 2010 |
|---|---|---|---|
| 9/27/2004 | 2004-1 | 12.06% | The ARMT Series booked its first deal in September 2004 and ramped up quickly.  Deals were closed in virtually every month from September 2004 through November 2005. |
| 10/26/2004 | 2004-2 | 18.02% | |
| 10/25/2004 | 2004-3 | 13.91% | |
| 11/23/2004 | 2004-4 | 17.55% | |
| 12/27/2004 | 2004-5 | 15.54% | |
| 1/25/2005 | 2005-1 | 23.19% | |
| 2/23/2005 | 2005-2 | 19.00% | |
| 3/29/2005 | 2005-3 | 16.42% | The exponentially increasing double-digit default rate shown here is a clear sign that the Adjustable Rate Mortgage products being sold to consumers were unsafe and unsound. |
| 4/27/2005 | 2005-4 | 18.33% | |
| 5/25/2005 | 2005-5 | 21.72% | |
| 6/28/2005 | 2005-7 | 18.50% | Moreover, the history of these deals illustrates the intentionality of the participants in the securitizations i.e., the Credit Suisse entities, DLJ Mortgage Capital, Inc., Select Portfolio Servicing, Wells Fargo Bank, and U.S. Bank National Association. |
| 7/27/2005 | 2005-6A | 37.22% | |
| 7/27/2005 | 2005-8 | 18.36% | |
| 8/29/2005 | 2005-9 | 23.86% | |
| 9/29/2005 | 2005-10 | 19.07% | |
| 10/27/2005 | 2005-11 | 31.06% | |
| 11/28/2005 | 2005-12 | 33.11% | |
| 2/21/2006 | 2006-1 | 35.32% | Only four (4) deals were closed in 2006. |
| 4/27/2006 | 2006-2 | 14.85% | |
| 5/25/2006 | 2006-2A | 2.00% | |
| 7/28/2006 | 2006-3 | 41.27% | |
| 2/28/2007 | 2007-1 | 43.33% | Only three (3) deals were closed in 2007. |
| 5/30/2007 | 2007-2 | 40.83% | The entire Series was shut down after the 2007-3 deal closed. |
| 12/26/2007 | 2007-3 | 43.77% | **The Mikels Loan is being tracked in the 2007-3 deal.** |

Given this track record, it is reasonable to assume that the participants in the ARMT 2007-3 securitization had mastered a business model that gleaned higher profits from mortgage defaults and foreclosure proceedings than from originating and servicing performing loans.  The institutional investors who funded these deals must have understood and profited from the model as well; otherwise, the capital markets would have shut off access to funding long ago and Adjustable Rate Mortgage Trust would have been out of business within its first year.  In the real world, no legitimate business operation could survive by causing so much damage to its customers and lending sources.

Beyond the disclosed and discoverable profit centers enjoyed by the participants in the ARMT 2007-3 securitization, there are hidden profit centers that must be rooted out in order to determine what, if anything, Mr. Mikels owes and to whom.  This would include investigating how many times the Mikels Loan was used as a guarantee to support Collateralized Debt Obligations, Credit Default Swaps, synthetic derivatives, short selling bids, etc.  In addition, the Mikels Loan may be covered by Lender-

Paid Mortgage Insurance, Pool Insurance, or the Note may have been pledged or sold at a discount to a debt buyer.

Moreover, Mr. Mikels has asserted a claim of fraud and he has a right to know the true nature of the mortgage transaction he entered into i.e., was this a suitable and sustainable home mortgage loan; or was it designed to fail so that institutional investors could strip him of his equity, leverage his mortgage obligation dollar for dollar by a ratio of $60 to $1 (more or less), and then foreclose on his home of 39 years in order to get paid for the $n^{th}$ time?

## FINDINGS

Based on my review of the loan documents provided to Mr. Mikels at settlement; the Complaint Mr. Mikels filed with the Superior Court, County of San Mateo; the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission; the Official Records of San Mateo County; information available on the Mortgage Electronic Registration Systems, Inc. website; my research using the Bloomberg Terminal; and my specialized knowledge in the fields of real estate finance, foreclosure and the securitization process, I find the following:

### I.   Unsuitable Loan Terms

The Interest-Only Adjustable Rate Mortgage product given to Mr. Mikels by Fisher Financial was unsuitable, unsustainable, and inappropriate given his current income and credit profile.

Fisher Financial's loan officer, Eric Brass, induced Mr. Mikels to refinance his preexisting first and second mortgage loans which totaled approximately $635,000.00 into a new loan in the amount of $1,350,000.00 so that he could cash out $715,000.00 in home equity and invest the proceeds (less closing costs of $41,500.00) in the stock market. Mr. Brass represented to Mr. Mikels that he could double or triple the cost of his mortgage loan by doing this and persuaded Mr. Mikels that he had to move fast to take advantage of low rates.

According to the Uniform Residential Loan Application contained in his file, Mr. Mikels' monthly income was $19,600.00 at this time of which $3,401.00 was dedicated to mortgage payments for principal and interest, and $249.00 was required to pay for homeowners insurance and real estate taxes. Thus, Mr. Mikels' debt-to-income ratio for housing expenses was an ultra-conservative 19%. The Application also states that the present market value of Mr. Mikels' home was $1,800,000.00 which meant that his loan-to-value ratio was only 35%.

Mr. Brass steered Mr. Mikels away from a low-cost fixed rate loan into a complex, high-cost subprime Alternative Mortgage Transaction that was destined to fail unless representations made by Mr.

Brass to Mr. Mikels i.e., that he could offset his mortgage payments and increase his income by investing the proceeds of the loan, panned out.

I analyzed the subject loan and found that the disclosed interest rate of 5.375% was, in reality, a deeply discounted "teaser" rate good for the first five years after which it would adjust to its fully in-dexed interest rate of 9.375%. Likewise, the monthly payment which covered interest-only for the first ten years would increase from $6,046.88 to $10,546.88 on the first adjustment date and double from $6,046.88 to $12,473.79 on September 1, 2017 when the loan was forced to amortize over the remaining term to maturity. By this time, Mr. Mikels would be 71 years old and even if his income remained the same, the monthly payment required to cover principal and interest would consume 64% of his gross income.

For these reasons, Eric Brass' representations to Mr. Mikels e.g., that he did not have to be con-cerned about future spikes in the interest rate because another low-cost refinance could be arranged, were material to Mr. Mikels' decision to proceed with the transaction.

In reality, Fisher Financial and Eric Brass knew or should have known that the refinance boom was in a freefall and they were desperately trying to fill their pipeline in order to feather their own nests before the housing bubble burst. By all appearances, Fisher Financial made this loan to Mr. Mikels without regard to the ultimate consequences for him down the road.

## II.   Failure to Disclose the Risk of Default

My analysis of the history of the Adjustable Rate Mortgage Trust securitizations from September 2004 through December 2007 indicates that Fisher Financial and the Credit Suisse entities that securi-tized the Mikels Loan knew that the combination of lax underwriting standards and the volatile Adjusta-ble Rate Mortgage product types being promoted combined to create an abnormally high risk of default for homeowners.

## III.   Suspicious Documents

As Servicer for the ARMT 2007-3 Trust, Select Portfolio Servicing, Inc. is, no doubt, authorized under the Pooling and Servicing Agreement to prosecute foreclosure actions on behalf of the Trust. However, that authority is not a license to manufacture documents that do not truthfully set forth the facts as these relate to the conveyance of a particular Note and Deed of Trust from the originating Lender to intermediaries, and finally, into the Trust.

### Corporate Assignment of Deed of Trust

In the instant case, Bill Koch, an employee of SPS, executed and recorded a Corporate Assign-ment of Deed of Trust in the Official Records of San Mateo County on February 8, 2010, which pur-ports to convey all right title and interest in the subject Note and Deed of Trust as of November 27,

2009 from Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage to U.S. Bank National Association, as Trustee, on Behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3 ("ARMT 2007-3"). (*See* Exhibit F. -- Corporate Assignment of Deed of Trust)

As established above, this Assignment contradicts the securitization pathway set forth in the Free Writing Prospectus ARMT 2007-3 Term Sheet filed with the Securities and Exchange Commission which informs us that Fisher Financial was required to sell the Mikels mortgage obligation to DLJ Mortgage Capital, Inc. (the Seller/Sponsor); subsequently, DLJ was required to sell the Mikels mortgage obligation to Credit Suisse First Boston Mortgage Securities Corp. (the Depositor) on or about the Cut-Off Date December 1, 2007; finally, Credit Suisse was to convey the pooled assets, including the Mikels mortgage obligation, into the ARMT 2007-3 Trust Fund (the Issuing Entity) on or about December 26, 2007, the closing Date for the securitization.

According to the endorsement on the Note, Fisher Financial divested its interest in the Mikels Loan on **July 11, 2007**; hence, SPS's Corporate Assignment of Deed of Trust which purports to convey the Mikels' mortgage obligation directly into the ARMT 2007-3 Trust more than two years after the fact on **November 27, 2009** is controverted by a preponderance of the evidence.

To illustrate how the Mikels Note and Deed of Trust had to be conveyed into the ARMT 2007-3 Trust according to the securitization documents versus how SPS claims the transaction proceeded, I prepared a flow chart that compares the two. (*See* Exhibit M. - Bogus & Missing Assignments)

### Substitution of Trustee

In considering whether to enjoin the Trustee's Sale scheduled to take place on Tuesday, March 2, 2010, the Court must determine whether this Substitution of Trustee is a valid document given the following facts:

1. Whereas SPS purports to substitute the Trustee of the Deed of Trust on behalf of ARMT 2007-3 as the Trust's servicing agent, an officer of SPS did not execute the document.

2. Rather, the Substitution of Trustee was executed by Olivia A. Todd who is President of National Default Servicing Corporation. Accordingly, this document is self-serving as NDSC appointed itself as Successor Trustee without presenting any evidence that it was authorized by SPS or U.S. Bank as Trustee of the ARMT 2007-3 Trust to do so.

3. Finally, the Corporate Assignment of Deed of Trust from Fisher Financial to U.S. Bank as Trustee of the ARMT 2007-3 Trust is a contrivance and is untruthful according to a preponderance of the evidence. Therefore, the Substitution of Trustee – which depends upon the Assignment – must also fail as well because no authority was conveyed to SPS, U.S. Bank or NDSC by virtue of the Assignment.

## IV.   Occupational Fraud and Abuse

As a Certified Fraud Examiner, I am trained to recognize well-defined areas of occupational fraud and abuse that fall into the general categories of corruption, asset misappropriation and fraudulent statements.  Mortgage fraud is a growing area of interest for the Federal Bureau of Investigation ("FBI"), however, the focus up until now has been on crimes being perpetrated against financial institutions by industry insiders with no attention whatsoever given to the multifarious ways in which unregulated corporate entities have preyed upon unwitting consumers such as Mr. Mikels.

At the time the subject loan was originated, Mr. Mikels had good credit, a solid income, low debt, and a high net worth.  How then, after 39 years of responsible homeownership, does Mr. Mikels now find himself facing foreclosure and on the verge of losing everything he has worked his whole life to acquire?

I believe that my *Securitization & Foreclosure Analysis* only scratches the surface of the financial fraud that belies Mr. Mikels' situation.  Mr. Mikels' request for a Temporary Restraining Order is well founded in light of the facts addressed herein and in the interest of justice, the Court should grant his request.

Respectfully submitted,

*Marie Mc Donnell*

Marie McDonnell, CFE
Mortgage Fraud and Forensic Analyst
TRUTH IN LENDING AUDIT & RECOVERY SERVICES, LLC
P.O. Box 2760, Orleans, MA  02653
Tel. (508) 255-8829  Fax (508) 255-9626

# Table Of Exhibits

*Exhibit ~ A.*   Recent Cases & Professional Profile

*Exhibit ~ B.*   Interest-Only Adjustable Rate Note

*Exhibit ~ C.*   Deed of Trust

*Exhibit ~ D.*   ARMT 2007-3 Term Sheet

*Exhibit ~ E.*   Notice of Default & Election to Sell, 11/6/2009

*Exhibit ~ F.*   Corporate Assignment of Deed of Trust, 11/27/2009

*Exhibit ~ G.*   Substitution of Trustee, 1/26/2010

*Exhibit ~ H.*   2009 AFN Member Directory

*Exhibit ~ I.*   Mortgage Servicer Schedule

*Exhibit ~ J.*   Securitization Flow Chart

*Exhibit ~ K.*   Historic Default Rates

*Exhibit ~ L.*   Tranche Structure Paydown & Tranche Structure Paydown at Default Rate

*Exhibit ~ M.*   Bogus & Missing Assignments

# EXHIBIT "A"

## Recent Cases
### & Professional Profile

**SECURITIZATION & FORECLOSURE ANALYSIS**

Marshall E. Mikels v. U.S. Bank, N.A. as Trustee of ARMT 2007-3 Trust

*Marie Therese McDonnell*

30 Main Street, Rear ✦ Post Office Box 2760 ✦ Orleans, MA 02653 ✦ (508) 255-8829
**December 2009**

## SUMMARY OF RECENT CASES

2009    *In re: Javier Pena And Sandra Pena, Pena v. Washington Mutual Bank*, In The United States Bankruptcy Court For The Southern District Of Texas, Houston Division, Adversary Proceeding #: 08-03324.

- Complex Case of Systemic and Repeated Mortgage Servicing Abuses; Bankruptcy Code Violations; Real Estate Settlement Procedures Act Violations; Conversion of Trustee Funds, etc.

- Trial Scheduled to begin January 11, 2010.

2009    *U.S. Bank National Association v. Ibanez, Miscellaneous Cases Nos. 384283, 386018 & 386755,* In The Commonwealth Of Massachusetts, The Trial Court Land Court, Department, Judge Keith C. Long.

- Admitted as Expert Amicus Curiae.  Submitted Expert Reports on April 17, 2009 and June 29, 2009.

- Wrongful Foreclosures; Securitization Analyses; Standing and Real Party In Interest Challenges.

- In a landmark decision, the Honorable Keith C. Long issued Judgment in Favor of Ibanez and Larace October 14, 2009.  The decision was heavily influenced by my contributions.

2009    *Citibank, N.A. v. Donna L. Hacker and Randall E. Hacker*, In The Circuit Court Of The Tenth Judicial Circuit Peoria County, Illinois, Case No. 08-CH-203.

- Wrongful Foreclosures; Securitization Analysis; Standing and Real Party In Interest Challenges; Violations of the Illinois Mortgage Law; Violations of the Illinois High Risk Home Loan Act; Violations of the Truth In Lending Act.

- Petition for Relief from Judgment of Foreclosure and Expert Affidavit Docketed on October 5, 2009.

2009    *In re: Dennis Wayne Couch and Pennie Jo Couch; Couch v. Countrywide Home Loans, Inc.*; In The United States Bankruptcy Court, Western District Of Washington, Seattle Division; Bankruptcy Case No. 06-13331-TTG, Adversary Proceeding No. 08-01070.

- Complex Case of Systemic and Repeated Mortgage Servicing Abuses; Bankruptcy Code Violations; Real Estate Settlement Procedures Act Violations; Conversion of Trustee Funds; Wrongful Foreclosures; Securitization Analyses; Standing and Real Party In Interest Challenges, etc.

- Trial Pending.  Attended Mediation Conference on September 29, 2009 in Seattle,

Washington conducted by the Honorable Karen A. Overstreet, Chief Judge.

2009    *Jonathan Barry and Jami Falck-Barry v. Dutsche Bank National Trust Company et al.*; In The Superior Court of Essex County, Commonwealth of Massachusetts; Civil Action No. 2009-1982(B).

- Wrongful Foreclosures; Securitization Analyses; Standing and Real Party In Interest Challenges; Violations of the Massachusetts Consumer Credit Cost Disclosure Act; Violations of MGL ch. 183 § 28C (Borrower's Interest Test); Violations of The Fremont Test.
- Complaint and Expert Affidavit Docketed on October 19, 2009.

2009    *Deutsche Bank National Trust Company v. Steven M. Feck, et al.*; In The Common Pleas Court Of Clermont County, Ohio, Case No. 2008-CVE-807, Judge W. Kenneth Zuk.

- Wrongful Foreclosure; Securitization Analysis; Standing and Real Party In Interest Challenges.
- Motion For Relief From Judgment of Foreclosure and Affidavit Docketed on August 7, 2009.
- Court Order Vacating Judgment of Foreclosure Issued on October 5, 2009.

2009    *In re: Steven M. Vo, Vo v. Twin-Vest, LLC et al.*, In The United States Bankruptcy Court For The District Of Nevada, Case No. 09-19429, Adv. Proc. No. 09-1156.

- Wrongful Foreclosure; Securitization Analysis; Standing and Real Party In Interest Challenges; Assignment Fraud; Notary Fraud.
- Litigation Pending.  Expert Affidavit Docketed on October 19, 2009.

2009    *Copperfield Investments LLC, v. James Reyes, et al.*, In The Common Pleas Court of Ottawa County, Ohio, Case No. 08-CV-606-E, Judge Bruce Winters.

- Wrongful Foreclosure; Securitization Analysis; Standing and Real Party In Interest Challenges.
- Expert Affidavit filed on June 15, 2009.

2009    *Eleanor and Ralph Schiano v. Argent Mortgage Company et al.*, In The United States District Court For The District of New Jersey, Newark, Docket No. 05-1771 (JLL).

- Securitization Analysis; Standing and Real Party In Interest Challenges.
- Litigation Pending.

2009    *In re: Michael C. Larrabee, Larrabee v. Ameriquest Mortgage Company, et al.*, In The United States Bankruptcy Court For The District of Massachusetts, Case No. 08-18815-WCH; Adversary

Proceeding No. 09-01233.

- Truth In Lending Act Violations; Rescission Rights; Wrongful Foreclosure; Securitization Analysis; Standing and Real Party In Interest Challenges; Mortgage Servicing Abuses.

- Litigation Pending.

2009   *In re: David W. Cross, Cross v. Wells Fargo Bank, N.A.; Wells Fargo Mortgage, Inc.; d/b/a America's Servicing Company,* In The United States Bankruptcy Court For The Middle District Of Florida Jacksonville Division, Adv. Proc. No. 3:08-ap-00127-PMG.

- Complex Case of Systemic and Repeated Mortgage Servicing Abuses; Bankruptcy Code Violations; Real Estate Settlement Procedures Act Violations; Conversion of Trustee Funds, etc.

- Litigation Pending.  Submitted a Masterwork Expert Report on August 10, 2009.

2009   *In re: Quinous Howard Jr. & Jacquelyn Howard, Howard v. Countrywide Home Loans Inc.,* In The United States Bankruptcy Court For The Middle District Of Florida Jacksonville Division, Adv. Proc. No. 08-00185.

- Complex Case of Systemic and Repeated Mortgage Servicing Abuses; Bankruptcy Code Violations; Real Estate Settlement Procedures Act Violations; Conversion of Trustee Funds; Two Accounts Created For One Obligation, etc.

- Expert Reports Filed February 29, 2009.

- Settled Satisfactorily on the Day of Mediation in Favor of Howard.

2009   *Marvin Boyd & Barbara Boyd v. Allied Home Mortgage Capital Corporation and Bank United,* In The United States District Court For The Northern District Of Ohio, Western Division, Civil Action No. 3:07 CV 01192.

- Breach of Fiduciary Duties; Bait and Switch in Loan Terms; Yield Spread Premium Fraud; No Net Tangible Benefit.

- Expert Report Filed March 10, 2009.

- Settled on the day of Arbitration in Favor of Boyd as to Allied.  Litigation Pending as to Bank United.

2009   *The Bank of New York Mellon Trust etc., v. Charles A. Gowitzka,* In The Common Pleas Court of Erie County, Ohio, Case No. 09-CV-0142, Judge Roger E. Binette.

- Wrongful Foreclosure; Home Ownership and Equity Protection Act Violations; Truth In Lending Act Violations; Securitization Analysis; Standing and Real Party In Interest Challenges.

- Report of findings submitted to Gowitzka's attorney on May 21, 2009.

- Settled Satisfactorily in Favor of Gowitzka.

2009   *The Bank of New York Trust Company, N.A. as Trustee v. Sharon L. Clark,* In The Court Of Common Pleas Of Lorain County, Ohio, Case No. 08-CV-157182, Judge Edward M. Zaleski.

- Truth In Lending Act Violations; Wrongful Foreclosure; Securitization Analysis; Standing and Real Party In Interest Challenges.
- Expert Affidavit filed on June 8, 2009.
- Settled Satisfactorily in Favor of Clark.

2008   *Bruce A. Wolffing & Mary R. Wolffing v. Household Finance Corporation II et al.,* In The State Of Vermont Chittenden Superior Court, Chittenden County, Ss. Docket No. 1324-05 Cnc.

- Truth In Lending Right of Rescission; Predatory Lending; Securitization; Standing and Real Party In Interest Challenges.
- Expert Affidavit Filed November 17, 2008.
- Litigation Pending.

2008   *In re: Elizabeth Nutase, Nutase v. Eastern Savings Bank, FSB,* United States Bankruptcy Court For The District Of Maryland At Greenbelt, Adv. Proc. No 05-09227-NVA.

- Truth In Lending Right of Rescission; TILA Failure to Disclose Demand Feature.
- Expert Affidavits Filed on October 26, 2006 and March 19, 2007.  Expert Reports Filed on June 25, 2007and January 3, 2008.
- Settled Satisfactorily in Favor of Nutase.

2008   *Mark J. Zokle v. Chase Bank USA, N.A. et al,* In The Common Pleas Court of Erie County, Ohio, Case No. 2008-CV-1130.

- Truth In Lending Right of Rescission; Securitization; Standing and Real Party In Interest Challenges.
- Notice of Rescission and Securitization Diagram Filed as Exhibits to Complaints Filed December 17, 2008 and February 9, 2009.
- Litigation Pending.

2008   *Rebecca S. Smith, individually, and on behalf of a class of those similarly situated, v. GMAC Mortgage Corporation,* In The United States District Court For The Western District Of North Carolina, Statesville Division, Case No. 5:06-cv-00125-RLV-DCK, Removed to Federal Court on September 22, 06.

- Mortgage Servicing Abuses; Wrongful Foreclosure; Breach of Fiduciary Duty.
- Expert Report Presented January 16, 2008.

- Settled Satisfactorily in Favor of Smith.

2007  *Barbara L. Abbott v. Washington Mutual Bank, Et. Al,* In The United States District Court For The Eastern District Of Pennsylvania, Civil Action No. 05-CV-4497.

- Truth In Lending Right of Rescission; Serial Refinancing; Predatory Lending. Testified at Trial, February 6, 2008.
- Expert Reports Filed September 23, 2007 and January 21, 2008.
- Appeal Pending.

2007  *In re: Brenda B. Davidson, Davidson v. CitiFinancial Corporation, LLC,* In the United States Bankruptcy Court For The Northern District Of Alabama, Southern Division. In this case, I am a Fact Witness who discovered and developed the very technical cause of action; Ralph Summerford, CPA, CFE, CIRA, CVA is the designated expert.

- Truth In Lending Right of Rescission; Systemic TILA Defect; Wrongful Foreclosure.
- Case closed.

2007  *In re: David R. Figard and Rebecca J. Figard, Figard v. PHH Mortgage Corporation,* In The United States Bankruptcy Court Western District Of Pennsylvania, Adv. Proc. No. 06-70268-JAD.

- Steering; Mortgage Servicing Abuses; Wrongful Foreclosure.
- Expert Report Filed June 20, 2007.

2007  *In re: Howard E. Dougal & Denise R. Dougal, Dougal v. Saxon Mortgage as Servicer, and Deutsche Bank Trust Company Americas,* In The United States Bankruptcy Court Western District Of Pennsylvania, Adv. Proc. No. 07-07069-TPA.

- Truth In Lending Right of Rescission; Bait & Switch; Predatory Lending.
- Expert Report Presented December 3, 2007.

2007  *In re: Javier Pena And Sandra Pena, Pena v. Washington Mutual Bank,* In The United States Bankruptcy Court For The Southern District Of Texas, Houston Division, Case No. 03-45813-H4-13.

- Independent Accounting Ordered by The Honorable Jeff Bohm.
- Expert Report Filed July 9, 2007.

2007  *Thomas A. Hilchey and Robin M. Crevier v. Ameriquest Mortgage Co., Inc., et al.,* Suffolk County Superior Court, Business Session, Commonwealth of Massachusetts, BLS No. 07-0586BLS1. Case Filed February 8, 2007.

- Truth In Lending Right of Rescission; Bait & Switch in Loan Terms; Predatory

Lending.

- Settled Satisfactorily in Favor of Hilchey & Crevier.

2007   *Wells Fargo Bank, N.A. v. Matthew C. Borowski,* District Court, Clark County, Nevada, Case No. A505694.

- Truth In Lending Right of Rescission; Bait & Switch in Loan Terms.
- Expert Report Filed March 10, 2007.
- Settled Satisfactorily in Favor of Borowski.

2004   *Robert John Wright v. EMC Mortgage Corporation,* In the District Court, 134th Judicial District, Dallas, Texas.

- Truth In Lending Violations; Mortgage Servicing Abuses; Wrongful Foreclosure.
- [Testified at Trial, Qualified as Expert – 2004]
- Mediated Settlement.

END

*Marie Therese McDonnell*

30 Main Street, Rear ✦ Post Office Box 2760 ✦ Orleans, MA 02653 ✦ (508) 255-8829
**February 2010**

| | |
|---|---|
| **PROFESSION:** | Mortgage Fraud and Forensic Analyst |
| **BUSINESS:** | TRUTH IN LENDING AUDIT & RECOVERY SERVICES, LLC |
| **OBJECTIVE:** | To Raise the Standard of Truth in Lending Through Auditing, Education, and Advocacy |

---

### QUALIFICATIONS

**Formal Education, Professional Development, Self-Study**

### Merrimack College
*North Andover, Massachusetts*
  ✦ Bachelor of Arts in American Studies with a Minor in Biology

I graduated in 1970 with honors from Merrimack College, North Andover, Massachusetts earning a Baccalaureate in American Studies supported by a solid background in math and science. I entered college in the Fall of 1966 having had the equivalent of five years of high school math. Courses included Fundamentals of Mathematics, Algebra I and II, Geometry I and II, Calculus I and II, and Trigonometry I and II. The first five of eight college semesters adhered to the strict curriculum required of Biology majors, and were heavily concentrated in science and math. Coursework included: two semesters of General Biology and General Chemistry with labs, Principles of Mathematics I and II; two semesters of Morphogenesis and Organic Chemistry with labs, Principles of Mathematics III and IV; Cellular Biochemistry, Advanced Botany and General Physics all with labs; and Structure of Invertebrates with lab.

### Real Estate & Finance

**American Real Estate Academy**
  ✦ Salespersons Qualifying Course, October 1986
  ✦ Real Estate Brokers Course, January 1988
  ✦ Licensing Renewal Course, August 2002
  ✦ 1031 Exchange, April 2007
  ✦ Residential Rental Agency, April 2007
  ✦ Foreclosures Estate Sales And Auctions, April, 2007
  ✦ Residential Mortgage Loan Market & Credit Today, April 2007
  ✦ Seller Agency, April 2007
  ✦ Buyer Agency, April 2007

**Commonwealth of Massachusetts**
  ✦ Registered Real Estate Salesperson, December 1986
  ✦ Registered Real Estate Broker, February 1988

**Massachusetts Association of Realtors**
*Earned Graduate, Realtor's Institute Designation (G.R.I.)*
  ✦ Graduate Realtor's Institute I, February 1987
  ✦ Graduate Realtor's Institute II, April 1987
  ✦ Graduate Realtor's Institute III, September 1988
  ✦ HP-12C Calculator, October 1988
  ✦ Financing Concepts, November 1988

**Commercial-Investment Real Estate Council**
* CI 100: Marketing Techniques for Leasing and Selling Commercial Property, September 1988

**National Counsel of Exchangors**
*Earned Designation of Certified Exchange Consultant from The Academy of Real Estate, High Honors*
* Gold card Qualifying Course - Wally Walker, January 1989
* Trade Secrets of Exchanging - Warren G. Harding, July 1989

**Miscellaneous Real Estate Courses**
* Nothing Down - Robert Allen, November 1986
* Boot Camp - Tom Hopkins, January 1987
* Sales Training - Tom Hopkins, April 1987
* The Art of Real Estate Counseling - Charles Chatham, August 1988
* Tom Peters' Excellence 1991, April 1991

**Real Estate Finance**
* Complete Course on Discounted Mortgages - Carl Abe, April 1988
* International Financing - Robert Findling, October 1988
* Mortgage Buying Workshop - Mike Meeker, March 1990 and May 1990
* Roth IRA Wealthbuilding - Dyches Boddiford & Peter Fortunato, March 2001
* Private Lending - Dyches Boddiford, May 2001

**Real Estate Acquisition**
* Option Fundamentals - Jack Miller, June 2001
* Corporation & LLC Combo Class – Jack Miller, May 2002

## Mortgage Auditing

**Consumer Loan Advocates**
* ARM AID-Mortgage Auditing Workshop, September 1991

**Self-Study**
* Understanding The Time Value of Money, Jack V. Michaels
* Mathematics of Finance, Cissell, Cissell & Flaspohler
* Handbook of Financial Mathematics, Justin H. Moore
* The Cost of Credit, National Consumer Law Center
* Forensic Accounting and Fraud Investigation for Non-Experts, Silverstone & Sheetz
* Financial Mathematics Handbook, Muksian
* Advanced Algebra, The University of Chicago School Mathematics Project
* Capitalization Theory and Techniques, Akerson

## Structured Finance

**Bloomberg Seminars**

**Self-Study: Books**
* The Handbook of Mortgage-Backed Securities, Fabozzi (2001)
* Foundations of Financial Markets and Institutions, Fabozzi, Modigliani & Ferri (1998)
* Bond Markets, Analysis and Strategies, Fabozzi (2000)
* Fixed Income Mathematics, Fabozzi (1997)

**Self-Study: Publications**
* Legal Criteria for U.S. Structured Finance Transactions, Standard & Poors (2006)
* Common Terms in Structured Finance, Thatcher Proffitt, (2007)
* Structured Finance Glossary of Securitization Terms, Standard & Poors (2003)
* Securitization Glossary, Nomura (2004)
* Indexing Parties from Securitization Trusts and Mortgage-Backed Certificates into Land Record Indexes in the State of Georgia, Kobierowski (2008)
* Reg AB: Static Pool Survey and Structural Diagrams of Flow of Funds, Deloitte (2006)
* Litigation Issues in Securitizations, Boisture
* The Economics of Asset Securitization, Elul (2005)
* What to do When the Chain Breaks: The Missing Assignment Dilemma, Wolf (1997)

**Self-Study:  Research & White Papers**
- Understanding The Securitization Of Subprime Mortgage Credit, Ashcraft & Schuermann (2007) (FRB Study)
- Predatory Structured Finance, Peterson (2006)
- Regions Morgan Keegan: The Abuse of Structured Finance, Craig McCann, PhD, CFA (2008)
- Securitization and Its Discontents: The Dynamics of Financial Product Development, Kettering (2007)
- Turning a Blind Eye: Wall Street Finance of Predatory Lending, Engle & McCoy (2006)
- The Delinquency of Subprime Mortgages, Danis & Pennington-Cross (2003) SEC Research

# Legal

**Massachusetts Bar Association & Boston Bar Association**
- Foreclosure Defense Training, September 1992
- Massachusetts Mortgage Foreclosures, June 1997
- Presenter:  Recent Foreclosure Developments in Massachusetts, April 13, 2010

**Practising Law Institute**
- Consumer Financial Services Litigation, April 2001

**O. Max Gardner III**
- Bankruptcy Boot Camp, September 2006
- Co-Taught Speaking On Securitization Boot Camp, February 2007
- Bankruptcy Boot Camp, December 2009 - Co-Taught Session On Securitization

# Regulations & Compliance

**Massachusetts Bankers Association**
- Bank Compliance Academy, November 1998

**CUNA Mutual Group**
- Truth In Lending School, July 1999

**BankersOnline**
- Truth In Lending – How To Audit Open-End Credit, December 2005
- How To Comply With The Rescission Rules, June 2006

**Handbooks & Reference Tools**
- Truth In Lending Comptroller's Handbook, Office of the Comptroller of the Currency, 2008
- National Consumer Law Center Manuals
- Handbook of Escrow Procedures, Chandler, Mortgage Bankers Association of America
- Handbook of Loan Administration, Mortgage Bankers Association of America
- Quality Control for Mortgage Servicers, Kider, Mortgage Bankers Association of America

**Self-Study**
- Truth In Lending Act, Regulation Z, Official Staff Commentary
- Real Estate Settlement Procedures Act, Regulation X
- Alternative Mortgage Transaction Parity Act
- Home Ownership Equity Protection Act
- Federal Trade Commission Act – Unfair and Deceptive Acts and Practices
- Truth-in-Lending Manual - Ralph C. Clontz, Jr.
- Truth in Lending - National Consumer Law Center
- Repossessions & Foreclosures - National Consumer Law Center
- Unfair and Deceptive Acts and Practices - National Consumer Law Center
- Mortgage and Consumer Loan Disclosure Handbook - Kenneth F. Hall
- Residential Mortgage Lending: State Regulation Manual - Negroni & Pfaff

# Technology

**COMP USA Computer Training**
- Microsoft® Windows 95®, December 1996
- Microsoft® Excel Introduction 7.0, December 1996
- Microsoft® Excel 7.0 Tools & Techniques, December 1996
- Quicken 5.0 for Windows – Introduction, December 1996

- Microsoft® Introduction to Access 2.0, March 1997
- Microsoft® Access 7.0 – Level I, March 1997

## Association of Certified Fraud Examiners

**Certified Fraud Examiner, February 2010**

**Member**

**CFE Courses**
- Building Your Fraud Examination Practice, June 2005
- Communicating the Results of Your Fraud Examination, June 2005
- CFE Exam Review Course, February 2010

## Real Estate Bar Association of Massachusetts

**Member**

## American Bankruptcy Institute

**Member**

# *Marie Therese McDonnell*

30 Main Street, Rear ✚ Post Office Box 2760 ✚ Orleans, MA 02653 ✚ (508) 255-8829
**November 2007**

|  |  |
|---|---|
| **PROFESSION:** | Mortgage Fraud and Forensic Analyst |
| **BUSINESS:** | TRUTH IN LENDING AUDIT & RECOVERY SERVICES, LLC |
| **OBJECTIVE:** | To Raise the Standard of Truth in Lending Through Auditing, Education, and Advocacy |

## SPECIAL ASSISTANCE TO LEGAL PROFESSIONALS

### Consulting, Litigation Support, Scientific Method Proof

**CONSULT:** Real Estate Lending has undergone revolutionary changes over the last thirty years that have transformed the face of the industry. Driven by the maturing baby boomers' need for housing, access to residential mortgage financing exploded during the 1980's as a result of various legislative initiatives that opened new markets, expanded the role of government sponsored enterprises, introduced *creative financing arrangements*, and lowered down payment requirements. Concurrently, advances in computer design and information technology facilitated this unprecedented growth by, among other things, expanding the dimensions of time and space within which financial services companies conduct business, ultimating in a mortgage lender's present ability to come into a consumer's home through online marketing 24 hours a day, 7 days a week.

The industry is changing so rapidly that it is extremely difficult to stay abreast of new developments. Much of the marketplace is presently unregulated and as sub-prime lending flourishes, legislators are being pressured to do something about it. The trouble is few agree on how to define the problems so they can be addressed. It is here that the roles of the legal professional and consumer advocate combine to create solutions.

A great deal of my time over the past twenty-three years of practice has been devoted to providing special assistance to attorneys representing consumers who must defend against or who wish to initiate litigation involving real estate mortgage loan transactions. My role is to detect, define, and prove the specific causes of action that arise incident to the mortgage contract, to identify infractions of various state and federal laws, and to explain why some practices, though legal, are unfair and deceptive.

Having consulted in numerous civil and criminal lawsuits involving both private rights and class actions, I find that even the most experienced attorneys fail to raise fundamental issues of law because they cannot fathom the loan mechanics or the heavily regulated mortgage lending process itself. Consequently, they undervalue actual, consequential and statutory damages and are handicapped in determining the compounding effect as well as the carry-over impact of these damages. The specific support services I provide attorneys include:

**LITIGATION SUPPORT:**
- **Assessment of Damages.** Audit the loan to establish actual damages; explain and quantify consequential damages; research statutory damages; compile total damages giving them the time value of money; extrapolate damages over a class of consumers.

- **Bankruptcy Court.** Calculate pre-petition arrearage; critique and challenge the creditor's proof of claim; discover whether there is a basis for recoupment or rescission of the loan.

- **Breach of Contract.** Evaluate whether errors are random and inadvertent, or whether there are material breaches of contract that are systemic to the loan or to a class of loans.

- **Commercial Lending.** Extract the loan terms described in the mortgage contract and set up a template for the administration of the loan; compare the lender's history to determine whether the interest calculation method described was actually employed; research the appropriate index and compute interest rate and payment adjustments according to the contract; calculate damages giving them the time value of money.

- **Delinquent Loans**. Determine whether the delinquency is due to lender malfeasance; discover whether there are offsets to the debt that can mitigate or cure the default.

- **Federal Regulations**. Analyze whether the lender has complied with the Truth In Lending Act; Real Estate Settlement Procedures Act; Home Ownership Equity Protection Act; the Parity Act; and Unfair and Deceptive Acts and Practices standards.

- **Foreclosure Defenses**. Audit the loan to determine whether there are truth-in-lending violations; a lender breach of contract has occurred; or errors and omissions exist that constitute special defenses. In cases where there is a genuine hardship, negotiate loss mitigation strategies to ameliorate the situation.

- **Forensic Accounting**. Reconstruct lost or suppressed data, to the extent that is possible.

- **Negligence**. Show how the lender's negligence caused harm to the borrower e.g., by setting up the loan to amortize too quickly; miscalculating interest rate and monthly payment adjustments; over-funding the escrow account; holding payments in a suspense account rather than applying them to the loan; debiting the escrow account for non-escrow items; failing to apply monthly payments on a timely basis; collecting funds that were never applied to the loan; creating or exacerbating a default by applying funds to the wrong account; misapplying trustee payments in bankruptcy, etc.

- **Predatory Lending**. Analyze whether the borrower could afford the loan as structured; perform debt-to-income and loan-to-value ratios; check to see whether proper disclosures were timely delivered; calculate HOEPA thresholds; determine whether the borrower has been victimized by flipping, equity skimming, bait and switch, overreaching, misrepresentation, etc.

- **Residential Lending**. Perform proprietary Truth In Lending Analysis, Amortization Analysis, and Escrow Analysis to determine homogeneity and compliance with state and federal laws.

- **State Laws**. Review individual state laws to uncover additional lender liability and to build the case for damages.

- **Sub-Prime Lending**. Study the lender's advertising and sales techniques; review the paper trail covering the entire life cycle of the loan to look for misrepresentation, flipping, reverse-redlining, equity skimming, packing, unconscionableness, usury, or other unfair and deceptive acts and practices. Determine where there is a unique interest calculation method that cannot be evaluated with off-the-shelf loan amortization software.

- **Unconscionable Contract**. Analyze whether the language of the Note, while giving the appearance of propriety, is so ambiguous and costly that no reasonable consumer could have understood the bargain and therefore, no meeting of the minds occurred.

- **Usury**. Detect and explain the mechanism by which illegal interest is collected in excess of the loan agreement based on the benchmark that the mortgage contract sets the usury ceiling for a particular transaction.

**SCIENTIFIC METHOD:** Because there is no recognized licensing procedure or trade association for mortgage auditors, I have worked diligently to establish credibility based on the quality and verifiability of my work product. Whereas, I consider the precise protocols and software I employ to be guarded trade secrets, I state my conclusions in such a way that anyone with a high school education should be able to follow the paper trail and independently verify my results by performing the appropriate mathematical calculations.

To ensure that the causes of action pled survive the litigation process, I work closely with attorneys to develop *proof* of my findings based on the Scientific Method that meets the standards called for by the U.S. Supreme Court in its decision on <u>Daubert V. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)</u>. Each *proof* is designed to resolve the central question at issue by carrying out the mathematics described in loan documents and comparing that to what actually happened. The calculation tools used in my analysis comply

with industry standards and are crosschecked with secondary and tertiary systems, also renowned in banking and accounting communities for their precision and reliability. In some cases, I find it necessary to use the algebraic formulas to illustrate the problem and arrive at the correct answer.

Using the Scientific Method, complex financial problems can often be reduced to one simple equation. In that ideal case the problem can be resolved to a certainty by performing the mathematical calculation.

Most often, problem resolution is more complex because no contract can anticipate everything that can go wrong in the human experience. In those instances, I must look beyond the loan agreement for answers and to a different methodology for problem solving. Frequently, federal and state laws will govern the issue at hand but in this rapidly evolving world of consumer finance, legislation lags significantly behind innovation.

In cases where there are gaps in the evidence or loopholes in the law, I rely upon the rules of logic and the intellectual standards for critical thinking to govern my approach. Bearing in mind public policy and the intent of the parties when entering into the contract, I establish a syllogism supported by the facts in order to deduce a logical conclusion.

**REFERENCES:** Due to the high error rate achieved through employing my auditing protocols, and the amount of money involved, I routinely recommend that my clients seek a legal opinion, especially when lenders are reluctant to own up to their mistakes. Over the years, I have been retained by a number of class action law firms and private attorneys who wanted my assistance in both evaluating their cases prior to instituting litigation as well as for trial preparation. Several references are provided below:

- The Federal Defender Program, Inc., Atlanta, GA; Cohen, Milstein, Hausfeld & Toll, Washington, D.C.; Holstein, Mack & Klein, Chicago, IL; The Heideman Law Group, Washington, D.C.; Lawrence Walner & Associates, Chicago, IL., Ackerson Kauffman Fex, Washington D.C.

- Henry L. Shepherd III, Orleans, MA; Paul Pacifico, Westport, CT; John A. Milici, Norwalk, CT; Jonathan F. Wehle, New York, NY; Solomon M. Feldman, Boston, MA; James V. Somers, Hartford, CT; Tom G. Kontos, La Jolla, CA., Michael Murphy, Burbank, California; Richard J. Cohen, Centerville, MA; Roy W. Tilsley, Manchester; NH, Gerald J. Zyphers, Newton, MA; J. Gordon Gibbs, Danville, IN; Phillips & Angley, Boston, MA.

- George B. Merrill, Baltimore, MD; Wallace & Graham, Salisbury, NC; David Donaldson, Birmingham, AL; Rawle Andrews, Washington, D.C.; Mary K. Wheeler, Duncansville, PA; Robert J. Haeger, Gaithersburg, MD; Michael Gregg Morin, Severn, MD; Bruce A. Bierhans, Stoughton, MA; Sheldon Toplitt, Stoughton, MA; Carlin J. Phillips, North Dartmouth, MA; Craig Friedberg, Las Vegas, NV.

**EXPERT WITNESS:** Criminal defense and civil litigation firms have retained me as an expert, principally to assist them in preparing for trial. Bringing my analytical skills and proprietary technology to the evidence allows me to develop strategic advantages which are unanticipated and often indisputable because they emanate from the lender's own documents. I have been deposed on a number of occasions for a variety of purposes incident to my scheduled trial testimony and have written numerous affidavits. It has been my experience that cases are usually settled, or are dismissed before trial. I was retained to testify as an expert in the following cases:

- Everett R. Eldredge, III and Caroline M. Eldredge v. Associates Home Equity Services, Inc.
- People's Bank v. Douglas Perkins, et. al
- Edmund J. Shanley and Kelly R. Shanley v. Rockland Trust Company
- Sharon Harley McIver v. Elizabeth A. White, et. al,
- Denton v. Federal National Mortgage Association
- IN RE: Arthur Williams, United States Bankruptcy Court, District of Massachusetts
- The Dime Savings Bank of New York, FSB v. Salvador Carrero, Defendant/ Plaintiff-In-Counterclaim
- Mary M. Lewis v. The Dime Savings Bank of New York, FSB
- Robert Salois and Dianne E. Salois, and others, v. The Dime Savings Bank of New York, FSB (Non-testifying)
- The United States of America v. William H. Walsh, United States District Court, District of Massachusetts
- The United States of America v. Martha L. Nelson, USDC, Northern District of Georgia (Non-testifying)

3

- The United States of America v. William B. Steiger, United States District Court, District of Connecticut
- Kevin A. Bannan and CLI Graphics, Inc. v. Fifth Third Bank *Et. Al*
- Pacific Fidelity Inc., Aziz Khan and Deanna Khan v. California Federal Bank n/k/a Citibank
- Ruth A. Buddington v. Daniel Schneider, Buyers' Edge Ltd., *Et. Al*
- Michael Dillon v. Fairbanks Capital Corp.
- Curtis E. Frazier v. Fairbanks Capital Corp.
- Litton Loan Servicing v. Betti McCarthy, (Fairbanks Capital Corp. Loan)
- *In re:* Peter M. Hadley, United States Bankruptcy Court, District of Massachusetts
- Option One v. Jeffrey W. Duff and Kathy J. Duff
- Jeffrey W. Duff and Kathy J. Duff v. Advanta Mortgage Corp., Chase Manhattan Mortgage Corporation, et. al
- Robert John Wright v. EMC Mortgage Corporation
- U. S. Department Of Housing And Urban Development v. Sharon Y. Harley
- Elizabeth Nutase and Daniel Nutase vs. Eastern Savings Bank, FSB
- Edward Ralph Mekeel, Jr., and Cynthia Anne Mekeel v. Select Portfolio Servicing and Washington Mutual Bank, F.A.
- David R. Figard Rebecca J. Figard v. PHH Mortgage Corp.
- Thomas A. Hilchey and Robin M. Crevier  v. Ameriquest Mortgage Co., Inc., AMC Mortgage Services, Inc., Washington Mutual, Inc., and Scott Pierce
- *In re:* Javier Pena and Sandra Pena (Wells Fargo Home Mortgage and Washington Mutual Bank, F.A.)
- Rebecca S. Smith, Individually And On Behalf Of A Class Of Those Similarly Situated v. GMAC Mortgage Corporation.

**TILA RESCISSION:** During the summer of 1991 I began studying the Truth in Lending Act and subsequently developed, tested, and successfully employed my Truth in Lending Analysis to assist consumers and their attorneys in identifying material disclosure violations that enabled homeowners to raise their extended right to rescind and cancel certain mortgage transactions.

The Truth In Lending Act is a strict liability statute and dictates that upon delivery to the creditor of a valid Notice of Rescission the mortgage becomes void by operation of law. Within twenty (20) days thereafter, the creditor must take steps to discharge the mortgage and return to the consumer all sums paid in connection with the transaction. Once the creditor has complied, the consumer must tender the original principal amount of the loan. Should the creditor fail to perform its duties in strict accord with the statute, the consumer's obligation to tender never arises causing the proceeds of the loan to vest in the consumer.

Rescission of a mortgage transaction is available for three years after consummation of the loan and provides an absolute defense to foreclosure. Unfortunately, consumers are largely unaware that this right exists. In fact, few attorneys understand the importance of this provision of the Truth in Lending Act no less have the specialized knowledge and skills to properly raise a consumer's rights. As a result, the most powerful consumer protection laws in the country are being underutilized while billions of dollars annually are secretly siphoned from the hard earned income and home equity of unsuspecting homeowners.

In the spring of 2004 I developed a process, under the guidance of counsel, that enabled me to exercise a consumer's extended right to rescind their mortgage transaction pursuant to the administrative procedures laid out in the Truth in Lending Act and its implementing Regulation Z. Since then I have successfully used this process to stop foreclosures and rescind loans. In situations where the creditor failed to perform its duties, I have had to refer the case to an attorney for enforcement.

Below is a partial list of clients who had truth in lending violations that subjected the loan to rescission or reimbursement:

| | | |
|---|---|---|
| A. Denton, Massachusetts | P. Hadley, Massachusetts | A. Middleton, Massachusetts |
| B. McCarthy, Massachusetts | P. Madsen, Massachusetts | K. Lombardi, Massachusetts |
| M. McGowan, Massachusetts | K. Chetwynd, Massachusetts | A. Williams, Massachusetts |
| E. Eldredge, Massachusetts | V. Marotta, Massachusetts | S. Dukes, Maryland |

| | | |
|---|---|---|
| ‣ J. Lincoln, Massachusetts | ‣ B. Davidson, Alabama | ‣ M. Perkins, Connecticut |
| ‣ R. Vogt, Massachusetts | ‣ C. Erickson, Massachusetts | ‣ C. Frazier, Connecticut |
| ‣ M. Fields, Massachusetts | ‣ M. Tolf, Massachusetts | ‣ J. Wright, Texas |
| ‣ M. Hutchinson, Massachusetts | ‣ L. Flagg, Massachusetts | ‣ M. Pichichero, California |
| ‣ P. Dusoe, Massachusetts | ‣ D. Hart, Massachusetts | ‣ L. Hayes, Massachusetts |
| ‣ M. Larrabee, Massachusetts | ‣ D. Quigley, Massachusetts | ‣ G. Sheehan, Massachusetts |
| ‣ N. Jacobs, Massachusetts | ‣ T. Glivinski, Massachusetts | ‣ M. Borowski, Nevada |
| ‣ R. Rimstad, Minnesota | ‣ J. Mattson, Minnesota | ‣ T. Keefer, Minnesota |

## PROFESSIONAL SERVICES

### Real Estate Counseling, Mortgage Loan Auditing, Foreclosure Prevention

**REAL ESTATE COUNSELING:** I am a licensed Real Estate Broker in Massachusetts, and occasionally offer professional representation in real estate and finance transactions under single agency arrangements with buyer and seller clients. I am qualified to deal in both residential and commercial matters and find that an up to date knowledge of real estate acquisition, disposition, exchanging, taxation and financing is essential.

Real Estate Counseling, as I implement it, involves the physical and economic analysis of the subject property, proposed or existing debt and equity financing, a realistic review of client resources, and a clear definition of client objectives. It is an educational approach in which I teach my clients how to create, preserve, and grow real estate equities while structuring out risk wherever possible. It is such an important and helpful process that I integrate my real estate counseling skills in all aspects of my work.

**AUDITING:** My primary focus over the past ten years has been to develop and test three proprietary mortgage auditing protocols that enable me to examine minutely the structural elements of commercial and residential mortgage loan transactions. When offered to the public, I refer to these generally as my Truth In Lending Analysis, Amortization Analysis, and Escrow Analysis. The objectives of each are as follows.

- **Truth In Lending Analysis**. Determine whether the Truth In Lending Disclosure Statement form complies with Regulation Z and that the calculations accurately reflect the mortgage contract and loan commitment.

- **Amortization Analysis**. Set up a control based on the loan agreement; reverse engineer the interest calculation method used by lender; cross-reference lender's history with borrower's records; track distribution of payments to principal, interest, escrow, late charges, suspense, corporate and all custodial accounts.

- **Escrow Analysis**. Setup escrow account dating back to the loan closing; track all credits and disbursements to and from escrow; verify the transactions with primary source data provided by borrower, taxing authority and other payees; analyze the lender's Annual Escrow Analysis checking for accuracy and conformance with the Real Estate Settlement Procedures Act.

When I perform all three analyses on a random sampling of loans, deviations emerge in eight of ten cases. These aberrations manifest as: truth in lending violations; conflicting terms among the mortgage loan documents; failure of loan servicing to conform to the terms of the note, mortgage and riders; failure to issue notices of servicing transfers or interest rate and payment changes; interest rate overcharges; missing or improperly applied payments; illegal deductions from escrow accounts; and other acts that give rise to consumer rights under state and federal laws.

Due to the high percentage of error detection when I employ my proprietary protocols, most cases will lead to further analysis and often, to a legal referral. Of interest to attorneys representing consumers in these matters, my audits reveal:

- Bankruptcy attorneys risk malpractice by failing to challenge the creditors' claims in behalf of their clients and by reaffirming a debt that has legitimate offsets. A mortgage audit would reveal, for example, whether a commercial lender is in breach, thus giving the borrower a basis upon which to reform his loan. A residential consumer may have a right to rescind the loan under truth-in-lending laws, or to recoupment under the Uniform Commercial Code and state laws.

- Delinquent loans, including those in bankruptcy, have approximately a 98% error rate constituting overcharges to the borrower and offering defenses to the lender's collection actions.

- Commercial loans are fraught with errors due to the unique and complex language in the Notes, the number of interest rate adjustments, and the propensity for human error as more manual servicing is required. In this arena, small unit overcharges translate to large damages claims that could be particularly important to the cash flow of a small business, or to stockholder profits in big business.

- Class action lawsuits would be more socially responsible and have a better chance of success, if plaintiff attorneys would conduct mortgage audits on a fair sampling of the class while in the discovery phase. The intelligence gathered would reveal the risks and rewards of proceeding to trial as well as establish the economic basis upon which to conduct meaningful settlement negotiations.

- Many private right and class action settlement agreements do not expunge the elements that gave rise to damages, or inadvertently, attorneys create new overcharges by failing to comprehend the true economic impact of the deal they've structured at the molecular level.

**FORECLOSURE PREVENTION:** I am very experienced in foreclosure intervention and have found that most foreclosures can be detained or stopped without having to file for bankruptcy by submitting a Qualified Written Request pursuant to RESPA and stating that the mortgage is being audited. In cases where the lender can be shown to have liability, fruitful negotiations will ensue. When a genuine hardship is responsible for the default, loss mitigation strategies can be successfully implemented to benefit all concerned.

## ELEMENTS OF MORTGAGE LOAN ANALYSIS

### Synopsis, Loan Type, Math & Money, Technology, Regulations

**SYNOPSIS:** The scope of my services, as they relate to the analysis of mortgage loans, covers the entire life cycle over three principal periods: 1) from application to closing; 2) the loan servicing history from consummation to payoff; and 3) in the case of a default, through collections, loss mitigation, bankruptcy and foreclosure.

I have devised a three-tiered analytical process, which begins with laying the mathematical foundation for the credit obligation described in the mortgage contract. The second level requires that I precisely reconstruct the lender's loan servicing history. While doing so, I replicate the interest rate formulas and other mathematical operations actually used in administering the loan. In this way, I create an active matrix, which allows me to track the lender's accounting *to the penny*. At the third level, I correlate data obtained from the borrower and other primary sources to investigate whether conflicts, errors or omissions exist. This three-dimensional structure, when synchronized, reveals the exact transactional events that constitute breach of contract or consumer rights violations.

The above-described process requires the ability to translate contractual finance language into its mathematical form and effect. Beyond that, it is of utmost importance, in the detection of consumer rights violations, to have a working knowledge of the mortgage lending process itself, and attendant regulations governing the industry.

**LOAN TYPE:** After the passage in 1982 of the Alternative Mortgage Transaction Parity Act, a host of highly sophisticated loan products flooded the market which, in addition to allowing for variable interest rates, permitted limitless new combinations of asynchronous interest rate and payment changes that consumers and mortgage bankers alike vaguely understand. Fixed rate loans are themselves highly dynamic, especially when classified as graduated payment mortgages, buydowns, or exact-days interest loans.

Complicating matters even further is the use of differing amortization and interest calculation methods, which are not revealed to consumers in pre-settlement program disclosures, nor in their promissory notes. For these reasons, hands-on experience is an essential element in mortgage finance analysis.

To properly identify the loan type under review, I employ, in concert, my knowledge of the operative language contained in the loan agreement; my skill at expressing that language mathematically; my ability to compute accurately the federal Truth In Lending Disclosure Statement that describes residential transactions; and finally, my protocols for probing the loan servicing history for clues as to whether the interest calculation and amortization methods chosen by the lender conform to the loan agreement. Notwithstanding the foregoing, many of these creative financing arrangements cannot be tracked with off-the-shelf loan amortization software, leaving consumers at the mercy of their lender for information regarding the status of their loans.

**MATH & MONEY:** Money has time value. Its value in mortgage financing depends upon the rate of return bargained for; the reliability of cash flow; and the attendant risk. The basic time value of money formulas are expressed mathematically in algebraic language and require the use of all the arithmetical operations plus exponential and logarithmic functions. With the advent of financial calculators, computer technology, and software programs that contain built-in formulas for performing essential time value of money functions, the layperson should be able to understand the effect of mortgage financing, without knowing the mathematics of finance in use.

I have learned the hard way, however, that this is not always true. When confronted with unique interest calculation methods, I must unravel the math and the law to ascertain whether systemic violations are adversely affecting a class of consumers. Even when a particular method is legal, I rarely find that it was disclosed and that it constitutes an unfair and deceptive act and practice.

Despite the accuracy of the calculation tools I depend upon, the potential for human error is directly proportional to the complexity of the task at hand. Throughout the auditing process, I interpose a rigorous system of checks and balances to ensure the integrity and reliability of my results. Whereas the system adheres to standard auditing techniques, the precise protocols are highly effective in identifying variants, and have become proprietary trade secrets of THE MORTGAGE COUNSELOR.

**TECHNOLOGY:** Presently, I rely upon three software programs when analyzing mortgage finance transactions, all of which are renown for their accuracy. These are: "T-Value" developed by TimeValue Software of Irvine California; "APRWIN" developed by Alan Dombrow for the Office of the Comptroller of the Currency; and "Microsoft Excel" from Microsoft.

I use "T-Value" in three principal ways: first, to solve conventional loan amortization problems; second to compute the annual percentage rate of a given transaction; and third, to check the accuracy of my customized loan amortization schedules when working in "Microsoft Excel".

I use "APRWIN" to crosscheck the accuracy of "T-Value" when calculating annual percentage rates; to establish a control against which to compare federal Truth In Lending Disclosure Statements prepared by

# EXHIBIT "D"

## ARMT 2007-3 Term Sheet
### July 6, 2007

**SECURITIZATION & FORECLOSURE ANALYSIS**

Marshall E. Mikels v. U.S. Bank, N.A. as Trustee of ARMT 2007-3 Trust

SEC Info - Adjustable Rate Mortgage Trust 2007-3 · FWP · Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 81 of 150

**SEC Info**   Home   Search   My Interests   Help   User Info   *Marie McDonnell*

## Adjustable Rate Mortgage Trust 2007-3 · FWP · Adjustable Rate Mortgage Trust 2007-3 · On 7/6/07

Filed On 7/6/07 10:37am ET · SEC File 333-14094-05 · Accession Number 1068238-7-830

Find ____   in ☐ this entire Filing   Show ☐ Docs searched and ☐ every "hit".
Help... *Wildcards:* ? (any letter), * (many). *Logic:* for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | As/For/On Docs/Pgs | Issuer | Agent |
|---|---|---|---|---|---|
| 7/06/07 | Adjustable Rate Mortgage...2007-3 **FWP** | **FWP** | 1:40 | Adjustable Rate Mortgage...2007-3 | Orrick Herrington...LLP/FA |

**Free Writing Prospectus · Rule 163/433**
**Filing Table of Contents**

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: **FWP** | Amt 2007-3 Term Sheet | HTML | 374K |

## Document Table of Contents

Top

*(sequential)*   **Page**

1 1st Page
" Risk Factors
" Risk of Loss
" If Servicing is Transferred, Delinquencies May Increase
" Violation of Various Federal and State Laws May Result in Losses on the Mortgage Loans
" Recent Developments Affecting SPS
" Introduction
" Description of the Mortgage Pool
" General
" Mortgage Adjustment Rate of Adjustable Rate Mortgage Loans
" Interest Only Mortgage Loans
" The Indices
" One-Month LIBOR
" Six-Month LIBOR
" One-Year LIBOR
" One-Year CMT
" Mortgage Loan Statistical Information
" Prefunding and Conveyance of Subsequent Mortgage Loans
" Underwriting Standards
" DLJ Mortgage Capital Underwriting Standards
" Credit Suisse Financial Corporation Underwriting Standards
" Static Pool Information
" Affiliates and Related Transactions
" The Cap and Swap Counterparty
" Servicing of Mortgage Loans
" Servicing Compensation and Payment of Expenses
" Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans
" Advances from the Servicers and Master Servicer
" Optional Purchase of Defaulted Loans; Specially Serviced Loans

*(alphabetic)*

• Alternative Formats (RTF, XML, et al.)
• Additional Information
• Additional Issuances of Certificates
• Additional Yield Considerations Applicable Solely to the Residual Certificates
• Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans
• Advances from the Servicers and Master Servicer
• Affiliates and Related Transactions
• Allocation of Losses; Subordination of Class C-B Certificates
• Annex I Global Clearance, Settlement and Tax Documentation Procedures
• Assets of the Trust
• Assignment of Mortgage Loans
• Book-Entry Registration
• Cap and Swap Counterparty, The
• Capitalized Interest Account
• Certain Matters Regarding the Servicers and the Master Servicer
• Certain Yield and Prepayment Considerations
• Credit Enhancement -- The Floating Rate Loan Group Certificates
• Credit Suisse Financial Corporation Underwriting Standards
• Cross-Collateralization -- The Senior-Subordinate Loan Groups
• Definitive Certificates
• Depositor, The
• Description of the Certificates
• Description of the Mortgage Pool
• Determination of One-Month LIBOR
• Distributions
• Distributions of Interest -- The Floating Rate Loan Group Certificates
• Distributions of Interest -- The Senior-Subordinate Loan Groups
• Distributions of Principal -- The Floating Rate Loan Group Certificates
• Distributions of Principal -- The Senior-Subordinate Loan Groups
• DLJ Mortgage Capital Underwriting Standards
• ERISA Considerations
• Evidence as to Compliance

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 82 of 150

- Special Servicing Agreements
  - The Master Servicer and the Trust Administrator
  - The Sponsor and the Seller
  - The Depositor
  - Description of the Certificates
  - Assets of the Trust
  - Book-Entry Registration
  - Definitive Certificates
  - Distributions
  - Determination of One-Month LIBOR
  - Prefunding Account
  - Capitalized Interest Account
  - The Senior-Subordinate Loan Groups
  - Glossary of Terms -- The Senior-Subordinate Loan Groups
  - Priority of Distributions -- The Senior-Subordinate Loan Groups
  - Distributions of Interest -- The Senior-Subordinate Loan Groups
  - Distributions of Principal -- The Senior-Subordinate Loan Groups
  - Allocation of Losses; Subordination of Class C-B Certificates
  - Cross-Collateralization -- The Senior-Subordinate Loan Groups
  - Glossary of Terms -- The Floating Rate Loan Group Certificates
  - Distributions of Interest -- The Floating Rate Loan Group Certificates
  - Distributions of Principal -- The Floating Rate Loan Group Certificates
  - Credit Enhancement -- The Floating Rate Loan Group Certificates
  - Overcollateralization
  - Additional Issuances of Certificates
  - Pooling and Servicing Agreement
  - Assignment of Mortgage Loans
  - Representations and Warranties Regarding the Mortgage Loans
  - Optional Termination; Terminating Auction Sale
  - Reports to Certificateholders
  - Evidence as to Compliance
  - The Issuing Entity
  - The Trustee
  - Certain Matters Regarding the Servicers and the Master Servicer
  - The Trust Administrator
  - Restrictions on Transfer of the Class AR and Class AR-L Certificates
  - Voting Rights
  - Certain Yield and Prepayment Considerations
  - Factors Affecting Prepayments on the Mortgage Loans
  - Mandatory Prepayment
  - Additional Yield Considerations Applicable Solely to the Residual Certificates
  - Federal Income Tax Consequences
  - Tax Treatment of the Offered Certificates
  - Tax Treatment of the Floating Rate Loan Group Certificates
  - The Notional Principal Contract Component
  - Penalty Protection
  - Method of Distribution
  - Legal Opinions
  - Additional Information
  - Ratings
  - Legal Investment
  - ERISA Considerations

- Factors Affecting Prepayments on the Mortgage Loans
- Federal Income Tax Consequences
- General
- Glossary of Terms -- The Floating Rate Loan Group Certificates
- Glossary of Terms -- The Senior-Subordinate Loan Groups
- If Servicing is Transferred, Delinquencies May Increase
- Indices, The
- Interest Only Mortgage Loans
- Introduction
- Issuing Entity, The
- Legal Investment
- Legal Opinions
- Mandatory Prepayment
- Master Servicer and the Trust Administrator, The
- Method of Distribution
- Mortgage Adjustment Rate of Adjustable Rate Mortgage Loans
- Mortgage Loan Statistical Information
- Notional Principal Contract Component, The
- One-Month LIBOR
- One-Year CMT
- One-Year LIBOR
- Optional Purchase of Defaulted Loans; Specially Serviced Loans
- Optional Termination; Terminating Auction Sale
- Overcollateralization
- Penalty Protection
- Pooling and Servicing Agreement
- Prefunding Account
- Prefunding and Conveyance of Subsequent Mortgage Loans
- Priority of Distributions -- The Senior-Subordinate Loan Groups
- Ratings
- Recent Developments Affecting SPS
- Reports to Certificateholders
- Representations and Warranties Regarding the Mortgage Loans
- Restrictions on Transfer of the Class AR and Class AR-L Certificates
- Risk Factors
- Risk of Loss
- Senior-Subordinate Loan Groups, The
- Servicing Compensation and Payment of Expenses
- Servicing of Mortgage Loans
- Six-Month LIBOR
- Special Servicing Agreements
- Sponsor and the Seller, The
- Static Pool Information
- Tax Treatment of the Floating Rate Loan Group Certificates
- Tax Treatment of the Offered Certificates
- The Cap and Swap Counterparty
- The Depositor
- The Indices
- The Issuing Entity
- The Master Servicer and the Trust Administrator
- The Notional Principal Contract Component
- The Senior-Subordinate Loan Groups
- The Sponsor and the Seller
- The Trust Administrator
- The Trustee
- Trust Administrator, The
- Trustee, The
- Underwriting Standards
- Violation of Various Federal and State Laws May Result in Losses on the Mortgage Loans

"   Annex | Global Clearance, Settlement and Tax Documentation Procedures          • Voting Rights

*This is an EDGAR HTML document rendered as filed. | Alternative Formats |*

Sponsored Ads.

SEC Defense Lawyer
Nationwide Representation Former SEC Prosecutor

Ads by Google

TERM SHEET SUPPLEMENT

(For use with base prospectus dated April 20, 2007)

DLJ MORTGAGE CAPITAL, INC.
Sponsor and Seller

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.
Depositor

ARMT Program
ADJUSTABLE RATE MORTGAGE-BACKED PASS THROUGH CERTIFICATES
(Issuable in Series)

You should consider carefully the
risk factors beginning on page
5-7 in this term sheet supplement.

This term sheet supplement may be
used to offer and sell the
certificates offered hereby only
if accompanied by the prospectus.

Offered Certificates:

o   The depositor will sell the offered certificates of any series pursuant to a prospectus supplement
    and the related base prospectus. The certificates will be issued in one or more series, each having its own
    designation. Each series will be issued in one or more classes of senior certificates and one
    or more classes of subordinated certificates. Each class will evidence beneficial ownership of,
    and the right to a specified portion of future payments on, the mortgage loans and any other
    assets included in the related trust. A term sheet may accompany this term sheet supplement for
    any series and may set forth additional information about the mortgage loans, the certificates
    and the trust for that series. Principal and interest, as applicable, on the offered
    certificates will be paid monthly.

o   The offered certificates will represent ownership interests only in the Adjustable Rate Mortgage
    Trust to which this term sheet supplement relates, and will not represent ownership interests in
    or obligations of the sponsor, the seller, the depositor, the master servicer, the special
    servicer, the modification oversight agent (if applicable), the depositor, the trust
    administrator, the trustee, the underwriter or any of their affiliates.

Adjustable Rate Mortgage Trust:

o   each adjustable rate mortgage trust, also referred to as the issuing entity, will be established
    to hold assets transferred to it by the depositor. The assets of each trust will be specified in
    the prospectus supplement for the particular series of certificates and will consist of a
    pool of adjustable-rate and fixed-rate one-to four family residential first lien mortgage
    loans.

o   the adjustable-rate mortgage loans generally provide for a fixed interest rate during an initial
    period of one month, three months, six months, one year, two years, three years, four years,
    five years, seven years or ten years from the date of origination of the related mortgage loan
    and thereafter provide for adjustments to the interest rate generally every six months or
    twelve months, generally based on the one-month LIBOR, six-month LIBOR, one-year LIBOR or
    one-year CMT indices, as specified in the related mortgage note; and

o   will make multiple REMIC elections for federal income tax purposes.

THE ISSUER HAS FILED A REGISTRATION STATEMENT (INCLUDING A PROSPECTUS) WITH THE SEC FOR THE OFFERING
TO WHICH THIS COMMUNICATION RELATES WITH A FILE NUMBER OF 333-140945. BEFORE YOU INVEST, YOU SHOULD
READ THE PROSPECTUS IN THAT REGISTRATION STATEMENT AND OTHER DOCUMENTS THE ISSUER HAS FILED WITH THE
SEC FOR MORE COMPLETE INFORMATION ABOUT THE ISSUER AND THIS OFFERING. YOU MAY GET THESE DOCUMENTS
FOR FREE BY VISITING EDGAR ON THE SEC WEBSITE AT WWW.SEC.GOV. ALTERNATIVELY, THE ISSUER, ANY
UNDERWRITER OR ANY DEALER PARTICIPATING IN THE OFFERING WILL ARRANGE TO SEND YOU THE PROSPECTUS IF
YOU REQUEST IT BY CALLING TOLL-FREE 1-800-221-1037.

THIS TERM SHEET IS NOT REQUIRED TO CONTAIN ALL INFORMATION THAT IS REQUIRED TO BE INCLUDED IN THE
BASE PROSPECTUS AND THE PROSPECTUS SUPPLEMENT THAT WILL BE PREPARED FOR THE SECURITIES OFFERING
TO WHICH THIS TERM SHEET RELATES. THIS TERM SHEET IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN
OFFER TO BUY THESE SECURITIES IN ANY STATE WHERE SUCH OFFER, SOLICITATION OR SALE IS NOT PERMITTED.

THE INFORMATION IN THIS TERM SHEET IS PRELIMINARY, AND MAY BE SUPERSEDED BY AN ADDITIONAL TERM SHEET PROVIDED TO YOU PRIOR TO THE TIME YOU ENTER INTO A CONTRACT OF SALE. THIS PRELIMINARY TERM SHEET IS BEING DELIVERED TO YOU SOLELY TO PROVIDE YOU WITH INFORMATION ABOUT THE OFFERING OF THE SECURITIES REFERRED TO HEREIN. THE SECURITIES ARE BEING OFFERED WHEN, AS AND IF ISSUED. IN PARTICULAR, YOU ARE ADVISED THAT THESE SECURITIES, AND THE ASSET POOLS BACKING THEM, ARE SUBJECT TO MODIFICATION OR REVISION (INCLUDING, AMONG OTHER THINGS, THE POSSIBILITY THAT ONE OR MORE CLASSES OF SECURITIES MAY BE SPLIT, COMBINED OR ELIMINATED), AT ANY TIME PRIOR TO ISSUANCE OR AVAILABILITY OF A FINAL PROSPECTUS. AS A RESULT, YOU MAY COMMIT TO PURCHASE SECURITIES THAT HAVE CHARACTERISTICS THAT MAY CHANGE, AND YOU ARE ADVISED THAT ALL OR A PORTION OF THE SECURITIES MAY NOT BE ISSUED THAT HAVE THE CHARACTERISTICS DESCRIBED IN THESE MATERIALS. OUR OBLIGATION TO SELL SECURITIES TO YOU IS CONDITIONED ON THE SECURITIES AND THE UNDERLYING TRANSACTION HAVING THE CHARACTERISTICS DESCRIBED IN THESE MATERIALS.

A CONTRACT OF SALE WILL COME INTO BEING NO SOONER THAN THE DATE ON WHICH THE RELEVANT CLASS HAS BEEN PRICED AND WE HAVE CONFIRMED THE ALLOCATION OF SECURITIES TO BE MADE TO YOU; ANY "INDICATIONS OF INTEREST" EXPRESSED BY YOU, AND ANY "SOFT CIRCLES" GENERATED BY US, WILL NOT CREATE BINDING CONTRACTUAL OBLIGATIONS FOR YOU OR US. YOU MAY WITHDRAW YOUR OFFER TO PURCHASE SECURITIES AT ANY TIME PRIOR TO OUR ACCEPTANCE OF YOUR OFFER.

ANY LEGENDS, DISCLAIMERS OR OTHER NOTICES THAT MAY APPEAR AT THE BOTTOM OF THE EMAIL COMMUNICATION TO WHICH THIS TERM SHEET IS ATTACHED RELATING TO (1) THESE MATERIALS NOT CONSTITUTING AN OFFER (OR A SOLICITATION OF AN OFFER), (2) NO REPRESENTATION THAT THESE MATERIALS ARE ACCURATE OR COMPLETE AND MAY NOT BE UPDATED OR (3) THESE MATERIALS POSSIBLY BEING CONFIDENTIAL, ARE NOT APPLICABLE TO THESE MATERIALS AND SHOULD BE DISREGARDED. SUCH LEGENDS, DISCLAIMERS OR OTHER NOTICES HAVE BEEN AUTOMATICALLY GENERATED AS A RESULT OF THESE MATERIALS HAVING BEEN SENT VIA BLOOMBERG OR ANOTHER SYSTEM.

Credit Suisse

May 5, 2007

TABLE OF CONTENTS

|  | Page |
|---|---|
| RISK FACTORS | |
| Risk of Loss | S-7 |
| Limited Obligations | S-7 |
| Liquidity Risks | S-8 |
| Book-Entry Certificates | S-8 |
| Special Yield and Prepayment Considerations | S-9 |
| Potential Inadequacy of Credit Enhancement | S-14 |
| Holding Subordinate Certificates Creates Additional Risks | S-15 |
| If Servicing is Transferred, Delinquencies May Increase | S-16 |
| Violation of Various Federal and State Laws May Result in Losses on the Mortgage Loans | S-16 |
| Recent Events | S-16 |
| Recent Developments Affecting the FHA | S-17 |
| INTRODUCTION | S-18 |
| DESCRIPTION OF THE MORTGAGE POOL | S-19 |
| General | S-19 |
| Mortgage Adjustment Date of Adjustable Rate Mortgage Loans | S-19 |
| Interest Only Mortgage Loans | S-20 |
| The Indices | S-21 |
| Mortgage Loan Statistical Information | S-21 |
| Underwriting Standards | S-23 |
| DLJ Mortgage Capital Underwriting Standards | S-23 |
| Credit Suisse Financial Corporation Underwriting Standards | S-25 |
| AFFILIATES AND RELATED TRANSACTIONS | S-26 |
| THE CAP AND SWAP COUNTERPARTY | S-28 |
| SERVICING OF MORTGAGE LOANS | S-28 |
| General | S-28 |
| Servicing Compensation and Payment of Expenses | S-29 |
| Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans | S-30 |
| Advances from the Servicers and Master Servicer | S-31 |

Options Purchase of Defaulted Loans; Specially Serviced Loans ..... S-32
Special Servicing Agreements ..... S-32
THE MASTER SERVICER AND THE TRUST ADMINISTRATOR ..... S-33
THE SPONSOR AND THE SELLER ..... S-33
THE DEPOSITOR ..... S-36
DESCRIPTION OF THE CERTIFICATES ..... S-36
    General ..... S-36
    Assets of the Trust ..... S-36
    Non-Entity Registration ..... S-37
    Certificate Certificates ..... S-37
    Distributions ..... S-38
    Determination of One-Month LIBOR ..... S-38
    Prefunding Account ..... S-38
    Capitalized Interest Account ..... S-39
    The Senior-Subordinate Loan Groups ..... S-39

S-3

Glossary of Terms—The Senior-Subordinate Loan Groups ..... S-39
Priority of Distributions—The Senior-Subordinate Loan Groups ..... S-45
Distributions of Interest—The Senior-Subordinate Loan Groups ..... S-46
Distributions of Principal—The Senior-Subordinate Loan Groups ..... S-46
Allocation of Losses; Subordination of Class C-B Certificates ..... S-47
Cross-Collateralization—The Senior-Subordinate Loan Groups ..... S-48
Glossary of Terms—The Floating Rate Loan Group Certificates ..... S-49
Distributions of Interest—The Floating Rate Loan Group Certificates ..... S-52
Distributions of Principal—The Floating Rate Loan Group Certificates ..... S-53
Credit Enhancement—The Floating Rate Loan Group Certificates ..... S-54
Additional Issuances of Certificates ..... S-56
POOLING AND SERVICING AGREEMENT ..... S-56
Assignment of Mortgage Loans ..... S-56
Representations and Warranties Regarding the Mortgage Loans ..... S-57
Optional Termination; Terminating Auction Sale ..... S-58
Reports to Certificateholders ..... S-59
Evidence as to Compliance ..... S-61
The Issuing Entity ..... S-62
The Trustee ..... S-62
Certain Matters Regarding the Servicers and the Master Servicer ..... S-63
The Trust Administrator ..... S-64
Restrictions on Transfer of the Class A6 and Class A6-II Certificates ..... S-65
Voting Rights ..... S-65
CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS ..... S-65
Factors Affecting Prepayments on the Mortgage Loans ..... S-65
Mandatory Prepayment ..... S-66
Additional Yield Considerations Applicable Solely to the Residual Certificates ..... S-66
FEDERAL INCOME TAX CONSEQUENCES ..... S-67
    General ..... S-67
    Tax Treatment of the Offered Certificates ..... S-67
    Tax Treatment of the Floating Rate Loan Group Certificates ..... S-68
    Penalty Protection ..... S-70
METHOD OF DISTRIBUTION ..... S-70
LEGAL OPINIONS ..... S-70
ADDITIONAL INFORMATION ..... S-71
RATINGS ..... S-71
LEGAL MATTERS ..... S-71
ERISA CONSIDERATIONS ..... S-72
ANNEX I    GLOBAL CLEARANCE, SETTLEMENT AND TAX
           DOCUMENTATION PROCEDURES ..... I-1

S-4

This term sheet supplement is not required to, and does not, contain all information that is required to be included in the related base prospectus and the prospectus supplement for any series.

This term sheet supplement and any related term sheet for a series is not an offer to sell or a solicitation of an offer to buy these securities in any state where such offer, solicitation or sale is not permitted.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 86 of 150

http://www.secinfo.com/d1zj61.uph.htm#2q9w

This term sheet supplement is being delivered to you solely to provide you with information about the offering of the Certificates referred to in this term sheet supplement and any related term sheet and to solicit an offer to purchase the Certificates, when, as and if issued. Any such offer to purchase may be made by you will not be accepted and will not constitute a contractual commitment by you to purchase any of the Certificates until we have accepted your offer to purchase Certificates. We will not accept any offer by you to purchase Certificates, and you will not have any contractual commitment to purchase any of the Certificates until after you have received this term sheet provided to you prior to the time you enter into a contract of sale. You may withdraw your offer to purchase Certificates at any time prior to our acceptance of your offer.

**IMPORTANT NOTICE ABOUT INFORMATION PRESENTED IN THIS TERM
SHEET SUPPLEMENT, ANY RELATED TERM SHEET AND THE RELATED BASE
PROSPECTUS WITH RESPECT TO ANY SERIES OF OFFERED CERTIFICATES**

You should rely on the information contained in this document or to which we have referred you in this term sheet supplement. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities.

We provide information to you about the offered certificates in two separate documents that progressively provide more detail:

o   The accompanying prospectus, which provides general information, some of which may not apply to your series of certificates; and

o   This term sheet supplement, which describes the specific terms of your series of certificates.

The depositor's principal executive offices are located at Eleven Madison Avenue, New York, New York 10010. Its telephone number is (212) 325-2000.

We include cross-references in this term sheet supplement and the accompanying prospectus to captions in these materials where you can find further related discussions.

References herein made to the trust, offered certificates, mortgage loans, mortgage pool, prospectus supplement, pooling and servicing agreement, assignment, assumption agreement and other similar terms refer only to the particular series of offered certificates to which this term sheet supplement relates.

S-5

**EUROPEAN ECONOMIC AREA**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each underwriter will represent and agree that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the issuing entity of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**UNITED KINGDOM**

Each underwriter will represent and agree that:

    (a)  it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act (the "FSMA")) received by it in connection with the issue or sale of the Certificates in circumstances in which Section 21(1) of the FSMA does not apply to the issuing entity; and

    (b)  it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Certificates in, from or otherwise involving the United Kingdom.

**RISK FACTORS**

    The offered certificates are not suitable investments for all investors. In particular, you are encouraged to not purchase any class of offered certificates unless you understand the prepayment, credit, liquidity and market risks associated with that class.

    The offered certificates are complex securities. You are encouraged to possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this term sheet supplement and the accompanying base prospectus in the context of your financial situation and tolerance for risk.

    You are encouraged to carefully consider, among other things, the following factors in connection with the purchase of the offered certificates:

**Risk of Loss**

The return on your certificates may be affected by losses on the mortgage loans, which could occur for a variety of reasons.

Geographic concentration may affect risk of loss on the mortgage loans.

The underwriting guidelines used to originate the mortgage loans may impact losses.

There is a risk that there may be a delay in receipt of liquidation proceeds and liquidation proceeds may be less than the mortgage loan balance.

Losses on the mortgage loans in the

Losses on the mortgage loans may occur due to a wide variety of causes, including a decline in real estate values and adverse changes in the borrower's financial condition. A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are concentrated may increase the risk of losses on the mortgage loans.

If the regional economy or housing market in an area representing a concentration of mortgage loans in the mortgage pool weakens, the mortgage loans may experience high rates of loss and delinquency, resulting in losses to certificateholders. The economic condition and housing market in that area may be adversely affected by a variety of events including a downturn in certain industries or other businesses concentrated in that area, natural disasters such as earthquakes, hurricanes, floods, wildfires and eruptions, and civil disturbances such as riots. The depositor cannot predict whether, or to what extent or for how long, such events may occur.

See "Description of the Mortgage Pool—General" in this term sheet supplement.

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this term sheet supplement. The underwriting standards typically differ from, and are generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac. In addition, the mortgage loans may have been made to mortgagors with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. Consequently, the mortgage loans may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards.

Substantial delays could be encountered in connection with the liquidation of defaulted mortgage loans. Further, liquidation expenses such as legal fees, real estate taxes and maintenance and preservation expenses will reduce the portion of liquidation proceeds payable to you. If a mortgaged property fails to provide adequate security for the mortgage loan and the available credit enhancement is insufficient to cover the loss, you will incur a loss on your investment.

Because the Class C-B Certificates represent interests in the mortgage loans in

senior-subordinate loan groups may reduce the yield on the class or classes related to that loan group.

all the senior-subordinate loan groups, the class principal balances of these classes of certificates could be reduced to zero as a result of realized losses on the mortgage loans in any of the senior-subordinate loan groups. Therefore, the allocation of realized losses on the mortgage loans to the Class C-B Certificates will reduce the subordination provided by those classes of Certificates to all of the Senior-Subordinate Certificates, including the senior certificates related to the other senior-subordinate loan groups that did not suffer any losses. This will increase the likelihood that future realized losses may be allocated to senior certificates related to the senior-subordinate loan groups that did not suffer those previous losses.

See "Description of the Certificates—Cross-Collateralization—The Senior-Subordinate Loan Groups" in this term sheet supplement.

The value of your certificates may be reduced if losses are higher than expected.

If the performance of the related mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of the certificates may be lowered in the future. This would probably reduce the value of those certificates. None of the depositor, the servicers, the master servicer, the special servicer, the seller, the trustee, the trust administrator, the underwriter or any other entity will have any obligation to supplement any credit enhancement, or to take any other action to maintain any rating of the certificates.

Limited Obligations

Payments on the mortgage loans are the only source of payments on the offered certificates.

The certificates represent interests only in the trust. The certificates do not represent any interest in or any obligation of the depositor, the servicers, the master servicer, the counterparties, the underwriter or any of their affiliates. If proceeds from the assets of the trust are not sufficient to make all payments provided for under the pooling and servicing agreement, investors will have no recourse to the depositor, the servicers, the master servicer, the special servicer, the seller, the counterparties, the underwriter or any other entity, and will incur losses if the credit enhancement for their class of offered certificates is exhausted.

Liquidity Risks

You may have to hold your offered certificates to their maturity because of difficulty in reselling the offered certificates.

A secondary market for the offered certificates may not develop. Even if a secondary market does develop, it may not continue or it may be illiquid. Neither the underwriter nor any other person will have any obligation to make a secondary market in your certificates. Illiquidity means an investor may not be able to find a buyer to buy its securities readily or at prices that will enable the investor to realize a desired yield. Illiquidity can have a severe adverse effect on the market value of the offered certificates. Any class of offered certificates may experience

Illiquidity, although generally illiquidity is more likely for classes that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

Book-Entry Certificates

The absence of physical certificates may cause delays in payments and cause difficulty in pledging or selling the offered certificates.

The offered certificates may not be issued in physical form. Offered certificates not issued in physical form will be transferable only through The Depository Trust Company (referred to in this term sheet supplement

S-8

as DTC), participating organizations, indirect participants and certain banks. The ability to pledge a certificate to a person that does not participate in DTC may be limited because of the absence of a physical certificate. In addition, certificateholders may experience some delay in receiving distributions on these certificates because distributions will not be sent directly to their beneficial owners directly to them. Instead, the trust administrator will send all distributions to DTC, which will then credit those distributions to the participating organizations. Those organizations will in turn credit those distributions to certificateholders have either directly or indirectly through indirect participants.

See "Description of the Certificates—Book-Entry Registration" in this term sheet supplement.

Special Yield and Prepayment Considerations

The yield to maturity on your certificates will depend on various

The yield to maturity on each class of offered certificates will depend on a variety of factors, including:

factors, including the rate of
prepayments.

o   the rate and timing of principal payments on the related mortgage loans
    (including prepayments, defaults and liquidations, and repurchases due to
    breaches of representations or warranties);

o   the pass-through rate for that class;

o   interest shortfalls due to mortgagor prepayments on the related mortgage
    loans;

o   whether an optional termination or an auction of one or more loan groups
    occurs;

o   the purchase price of that class; and

o   whether losses on the mortgage loans are covered by credit enhancement.

The rate of prepayments is one of the most important and least predictable of
these factors.

In general, if a class of certificates is purchased at a price higher than its
outstanding certificate principal balance and principal distributions on that
class occur faster than assumed at the time of purchase, the yield will be lower
than anticipated. Conversely, if a class of certificates is purchased at a price
lower than its outstanding certificate principal balance and principal
distributions on that class occur more slowly than assumed at the time of
purchase, the yield will be lower than anticipated.

S-9

The rate of prepayments on the mortgage
loans will be affected by various factors.

Since mortgagors can generally prepay their mortgage loans at any time, the rate
and timing of principal payments on the offered certificates are highly
uncertain. Generally, when market interest rates increase, borrowers are less
likely to prepay their mortgage loans. Such reduced prepayments could result in
a slower return of principal to holders of the offered certificates at a time
when they may be able to reinvest such funds at a higher rate of interest than
the pass-through rate on their class of certificates. Conversely, when market
interest rates decrease, borrowers are generally more likely to prepay their
mortgage loans. Such increased prepayments could result in a faster return of
principal to holders of the offered certificates at a time when they may not be
able to reinvest such funds at an interest rate as high as the pass-through rate
on their class of certificates.

The interest rate on the adjustable-rate mortgage loans included in the trust generally
adjust after a one month, three month, six month, one year, two year, three
year, four year, five year, seven year or ten year initial fixed-rate period.
We are not aware of any publicly available statistics that set forth principal
prepayment experience of adjustable-rate mortgage loans of the type
included in the trust over an extended period of time, and the experience with
respect to the mortgage loans included in the trust is insufficient to draw any
conclusions with respect to the expected prepayment rates on such mortgage
loans. Adjustable-rate mortgage loans may be subject to a greater rate of
principal prepayments in a declining interest rate environment. For example, if
prevailing mortgage interest rates fall significantly, fixed-rate mortgage loans
and adjustable-rate mortgage loans with an initial fixed-rate period could be
subject to higher prepayment rates than if prevailing interest rates remain
constant because the availability of fixed-rate mortgage loans at
competitive interest rates may encourage mortgagors to refinance their mortgage
loans to "lock in" a lower fixed interest rate. The features of adjustable-rate
mortgage loan programs during the past years have varied significantly in
response to market conditions including the interest-rate environment, consumer
demand, regulatory restrictions and other factors. The lack of uniformity of
the terms and provisions of such adjustable-rate mortgage loan programs have
made it impracticable to compile meaningful comparative data on prepayment rates
and, accordingly, we cannot assure you as to the rate of prepayments on the
mortgage loans in stable or changing interest rate environments.

Refinancing programs, which may involve soliciting all or some of the mortgagors
to refinance their mortgage loans, may increase the rate of prepayments on the
mortgage loans. These refinancing programs may be offered by an originator, the
servicer, the special servicer, the master servicer, any sub-servicer or their
affiliates, and may include streamlined documentation programs.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 90 of 150

Some or all of the mortgage loans may impose a premium for certain early full or partial prepayments of a mortgage loan. Generally, each such mortgage loan provides for payment of a prepayment premium in connection with certain voluntary, full or partial prepayments made within the period of time specified in the related mortgage note, generally ranging from three months to five years from the date of origination of such mortgage loan. The amount of the applicable prepayment premium, to the extent permitted under applicable law, is as provided in the related mortgage note; generally, such amount is equal to six months' interest on any amounts prepaid during any 12-month period in excess of

S-10

20% of the original principal balance of the related mortgage loan or a specified percentage of the amounts prepaid. Such prepayment premiums may discourage mortgagors from prepaying their mortgage loans during the penalty period and, accordingly, affect the rate of prepayment of such mortgage loans even in a declining interest rate environment. Any such prepayment premiums will either be retained by the related servicer or will be paid to the holder of the Class P Certificates and will not be available for payment of the offered certificates.

The seller may be required to purchase mortgage loans from the trust in the event certain breaches of representations and warranties made by it have not been cured. In addition, the special servicer has the option to purchase certain mortgage loans from the trust that become ninety days or more delinquent. See "*Servicing of Mortgage Loans—Optional Purchase of Defaulted Loans; Specially Serviced Loans*" in this term sheet supplement. These purchases will have the effect on the holders of the offered certificates as a prepayment of the mortgage loans.

After an initial fixed-rate period, each adjustable-rate mortgage loan provides for adjustments to the interest rate generally every six months or twelve months. The interest rate on each adjustable-rate mortgage loan will adjust to equal the sum of an index and a margin. The interest rate on adjustable-rate mortgage loans may be subject to limitations stated in the mortgage note with respect to increases and decreases for any adjustment (i.e., a "periodic cap"). In addition, the interest rate on the adjustable-rate mortgage loans may be subject to an overall maximum and minimum interest rate. See "*Description of the Mortgage Pool*" in this term sheet supplement.

With respect to the variable rate offered certificates, other than the floating rate loan group certificates, the pass-through rates may decrease, and may decrease significantly, after the mortgage interest rates on the mortgage loans begin to adjust as a result of, among other factors, the dates of adjustment, the margins, changes in the index and any applicable periodic cap or lifetime rate change limitations. Each mortgage loan has a maximum mortgage interest rate and substantially all of the mortgage loans have a minimum mortgage interest rate. Generally, the minimum mortgage interest rate is the applicable margin. In the event that, despite the prevailing market interest rates, the mortgage interest rate on any mortgage loan cannot increase due to a maximum mortgage interest rate limitation or a periodic cap, the yield on the related certificates could be adversely affected.

See "*Description of the Mortgage Pool*" and "*Certain Yield and Prepayment Considerations*" in this term sheet supplement.

Your investment in the floating rate loan group certificates involves the risk that the level of one-month LIBOR may change in a direction opposite from that is different from the level of the index used to determine the interest rates on the related adjustable-rate mortgage loans. In addition, because the mortgage interest rates on the adjustable-rate mortgage loans adjust at different times and in different amounts, there may be times when one-month LIBOR plus the applicable margin could exceed the applicable interest rates on the related certificates (other than any reducing the pass-through rates on the related certificates (other than any class of floating rate loan group certificates covered by a related swap

S-11

agreement), at least temporarily. This difference up to certain limits described herein will be paid to you on future distribution dates only to the extent that there is sufficient excess cash flow generated from (i) excess interest on the extent that is sufficient excess cash flow generated from (i) excess interest on the mortgage loans in the related loan group on such distribution date pursuant

The yield on your certificates will also be affected by changes in the mortgage interest rate.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 91 of 150

http://www.secinfo.com/d1zj61.uph.htm#2q9w

to the priorities set forth in this term sheet supplement and (ii) from any related cap agreement. Payments under any cap agreement are subject to the credit risk of the cap counterparty. No assurances can be given that such additional funds will be available.

**Amounts available under any related swap agreement from the swap counterparty may be limited.**

Net swap payments payable to the supplemental interest trust trustee, on behalf of the supplemental interest trust, by the swap counterparty under a related swap agreement will be used to cover any interest shortfalls that may occur as a result of the decline in the net funds cap or the related group below the formula rate for the related certificates as described in the term sheet to this term sheet supplement, if applicable. However, if the swap counterparty defaults on its obligations under the swap agreement, then there may be insufficient funds to cover such amounts. If the swap counterparty defaults on its obligations under swap agreement, then the formula rate for the related certificates will become capped at the net funds cap of the related group as described in the term sheet to this term sheet supplement, if applicable. To the extent that distributions on the related certificates depend in part on payments to be received by the supplemental interest trust trustee under the related swap agreement, the ability of the trust administrator to make such distributions on such certificates will be subject to the credit risk of the swap counterparty.

**Interest Only Certificates are especially sensitive to rapid prepayments of the related mortgage loans.**

Interest Only Certificates receive only payments of interest and are sensitive to variations in the yield on the related mortgage loans. If the rate of prepayments on the related mortgage loans is faster than expected, the yield to the Interest Only Certificates will be lower than expected and under certain prepayment scenarios an investor therein may not fully recoup their initial investment.

On any distribution date on which the pass-through rate of any LIBOR Certificates is based on the net wac rate of the related loan group, the Interest Only Certificate holders with respect to that loan group may receive little or no distributions of interest. In addition, amounts distributed as described for Interest Only Certificates on any distribution date may be withheld to cover basis risk shortfalls on the LIBOR Certificates for the related loan group. Any amounts so withheld will not be reimbursed to the holders of the Interest Only Certificates.

**Interest only mortgage loans have a greater degree of risk of default.**

Some or all of the mortgage loans may not provide for any payments of principal prior to a certain time, which may range from the first adjustment date of a mortgage loan to ten years from the origination of a mortgage loan. These mortgage loans may involve a greater degree of risk because, if the related mortgagor defaults, the outstanding principal balance of that mortgage loan will be higher than for an amortizing mortgage loan.

**An optional termination or an auction sale of the trust may adversely affect the certificates.**

When the aggregate stated principal balance of the mortgage loans in all of the pass-through rate loan groups has been reduced to the threshold described in the term sheet related to this term sheet supplement, and certain conditions in the pooling and servicing agreement are satisfied, the terminating entity as described in the pooling and servicing agreement may purchase all of the pass-through rate loan group mortgage loans. If the terminating entity exercises its rights to purchase these mortgage

5-12

loans as described above, such purchase of mortgage loans would cause an early retirement of the related certificates.

When the aggregate stated principal balance of the mortgage loans in all floating rate loan groups has been reduced to the threshold described in the term sheet related to this term sheet supplement and, if applicable, the amounts on deposit in any prefunding account on the closing date and certain conditions in the pooling and servicing agreement are satisfied, the terminating entity as described in the pooling and servicing agreement may purchase all of the floating rate loan group mortgage loans. If the terminating entity exercises its rights to purchase these mortgage loans as described above, such purchase of mortgage loans would cause an early retirement of the floating rate loan group certificates.

If specified in the term sheet related to this term sheet supplement, the option to purchase the pass-through rate loan group mortgage loans as described above is not exercised and the aggregate outstanding principal balance of the pass-through rate loan group mortgage loans declines below the threshold described in the term sheet related to this term sheet supplement, the trust

administrator will conduct an auction to sell the pass-through rate loan group mortgage loans.

If specified in the term sheet related to this term sheet supplement, the option to purchase the floating rate loan group mortgage loans as described above is not exercised and the aggregate outstanding principal balance of the floating rate loan group mortgage loans declines below the threshold described in the term sheet related to this term sheet supplement, the trust administrator will conduct an auction to sell the pass-through rate loan group mortgage loans.

See "*Pooling and Servicing Agreement--Optional Termination; Terminating Auction Sale*" in this term sheet supplement.

If either an option termination or an auction occurs, the purchase price paid by the terminating entity or the auction purchaser will be passed through to the related certificateholders. This would have the same effect as if all of the remaining mortgagors made prepayments in full. Any class of certificates purchased at a premium could be adversely affected by an optional purchase or an auction sale of the related group or groups of mortgage loans.

See "*Yield, Prepayment and Maturity Considerations*" in the prospectus.

S-13

**Inadequate amount of subsequent mortgage loans will affect the timing and rate of return on an investment in the related offered certificates related to the related floating rate loan group.**

If the amount of subsequent mortgage loans for any floating rate loan group purchased by the trust is less than the amount deposited in the prefunding account on the closing date, if applicable, holders of the offered certificates related to such loan group that are entitled to payments of principal will receive a prepayment of principal of the amount remaining in the prefunding account on the distribution date set forth in the prospectus supplement. The types of mortgage loans that can be purchased as subsequent mortgage loans are similar to the applicable initial mortgage loans; however, the aggregate characteristics of the mortgage loans in such loan group after the prefunding period may differ from the aggregate characteristics of the initial mortgage loans in such loan group as of the closing date.

See "*Description of the Mortgage Pool--Prefunding and Conveyance of Subsequent Mortgage Loans*" in this term sheet supplement.

**Potential Inadequacy of Credit Enhancement**

The subordination, overcollateralization and other credit enhancement features described in this term sheet supplement are intended to enhance the likelihood that the related classes of certificates in varying degrees will receive regular payments of interest and principal, but such credit enhancements are limited in nature and may be insufficient to cover all losses on the mortgage loans. None of the depositor, the seller, the servicers, the special servicer, the trustee, the underwriter, the master servicer or the trust administrator will have any obligation to supplement any credit enhancement.

**Certain factors may limit the amount of excess interest on the mortgage loans in the floating rate loan groups thereby reducing overcollateralization.**

In order to create overcollateralization, it will be necessary that the floating rate loan group mortgage loans generate more interest than is needed to pay interest on the floating rate loan group certificates and the related fees and expenses of the trust. We expect that the floating rate loan group mortgage loans will generate interest in those amounts, at least during certain periods, because the weighted average mortgage rate on the floating rate loan group mortgage loans is higher than the net WAC rate on the floating rate loan group certificates. We cannot assure you, however, that enough excess interest will be generated to reach the target level of overcollateralization level. The following factors will affect the amount of excess interest that the floating rate loan group mortgage loans will generate:

o   **Prepayments.** Each time a floating rate loan group mortgage loan is prepaid, total excess interest after the date of prepayment will be reduced because that mortgage loan will no longer be outstanding and generating interest. Prepayment of a disproportionately high number of floating rate loan group mortgage loans with high mortgage rates would have a greater adverse effect on future excess interest.

o   **Defaults.** The actual rate of defaults on the floating rate loan group mortgages may be higher than expected. Defaulted floating rate loan group mortgage loans may be liquidated, and liquidated mortgage loans will no longer be outstanding and generating interest.

o   **Level of One-Month LIBOR.** If one-month LIBOR increases, more money will be

needed to distribute interest to the holders of the related floating rate loan group certificates, so less money will be

S-14

available as excess interest.

**Holding Subordinate Certificates Creates Additional Risks**

The protections afforded the senior certificates in this transaction create risks for the holders of the subordinate certificates. Prior to any purchase of subordinate certificates, consider the following factors that may adversely impact your yield:

o   Because the subordinate certificates receive interest and principal distributions after the related senior certificates receive such distributions, there is a greater likelihood that the subordinate certificates will not receive the distributions to which they are entitled on any distribution date.

o   Except under the circumstances described in this term sheet supplement, the Class C-B Certificates entitled to principal are not entitled to a full proportionate share of principal prepayments on the related mortgage loans until the beginning of the sixth year after the closing date. In addition, if certain losses on the related mortgage loans exceed stated levels, a portion of the principal distribution payable to such classes of Class C-B Certificates with higher alphanumerical class designations will be paid to classes of Class C-B Certificates with lower alphanumerical class designations.

o   If the related servicer or the master servicer determines not to advance a delinquent payment on any mortgage loan because such amount is not recoverable from a mortgagor, there may be a shortfall in distributions on the certificates which will impact the related subordinate certificates.

o   The Floating Rate Loan Group Subordinate Certificates are not expected to receive principal distributions until, at the earliest, the distribution date set forth in the prospectus supplement, unless the class principal balances of the Floating Rate Loan Group Senior Certificates have been reduced to zero prior to such date.

o   After extinguishing all other credit enhancement available to a group, losses on the mortgage loans will be allocated to the related subordinate certificates in inverse order of their priority of payment. A loss allocation results in a reduction of a class principal balance without a corresponding distribution of cash to the holder. A lower class principal balance will result in less interest accruing on the certificate.

o   The earlier in the transaction that a loss on a mortgage loan occurs, the greater the impact on the yield.

S-15

**If Servicing is Transferred, Delinquencies May Increase**

In certain circumstances, the entity specified in the pooling and servicing agreement, or its trustee, may request that SPS or the master servicer resign and appoint a successor servicer, as applicable. If this happens, a transfer of servicing will occur that may result in a temporary increase in the delinquencies on the transferred mortgage loans, which in turn may result in delays in distributions on the offered certificates and/or losses on the offered certificates.

The servicing function for the mortgage loans for which SPS will be responsible for servicing under the pooling and servicing agreement has recently been transferred to SPS. Servicing transfers may result in a temporary increase in delinquencies on the transferred mortgage loans.

In addition, at the option of the sponsor, the servicing function for all or a portion of the mortgage loans serviced by SPS may be transferred to a successor servicer that meets the requirements of a successor servicer in the pooling and

servicing agreement. Such successor servicer will service such mortgage loans in accordance with the servicing provisions set forth in the pooling and servicing agreement. We cannot assure you that such servicing transfer will occur.

Any servicing transfer will involve notifying mortgagors to remit payments to the new servicer instead of the servicer, transferring loan files and records to the new servicer and entering loan and mortgagor data on the management information systems of the new servicer, and such transfers could result in misdirected notices, misapplied payments, data input errors and other problems. Servicing transfers may result in a temporary increase in delinquencies, defaults and losses on the mortgage loans. There can be no assurance as to the severity or duration of any increase in the rate of delinquencies, defaults or losses due to transfers of servicing.

**Violation of Various Federal and State Laws May Result in Losses on the Mortgage Loans**

Applicable state laws generally regulate interest rates and other charges, require certain disclosures, and require licensing of mortgage loan originators. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

o   the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the borrowers regarding the terms of the mortgage loans;

o   the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public

S-16

assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o   the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience.

Violations of certain provisions of these state and federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement. In particular, the originator's failure to comply with certain requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject the trust to monetary penalties, and result in the obligors' rescinding the mortgage loans against the trust.

The seller will represent that any and all requirements of any federal and state law including applicable predatory and abusive lending laws) applicable to the origination of each mortgage loan sold by it have been complied with. In the event of a breach of that representation, the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this term sheet supplement.

Recent Events

The current situation in Iraq has caused significant uncertainty with respect to global markets. The short-term and long-term impact of these events is uncertain, but could have a material effect on general economic conditions, consumer confidence and market liquidity. No assurance can be given as to the effect of these events on the rate of delinquencies and losses on the mortgage loans and servicing decisions with respect thereto. Any adverse impact as a result of these events would be borne by the holders of the offered certificates.

The response of the United States to the events of September 11, 2001 and the current situation in Iraq involves military operations. The Servicemembers Civil Relief Act and comparable state laws, collectively referred to herein as the Relief Act, provide relief to borrowers who enter active military service and to borrowers in reserve status, including members of the National Guard, who are called to active duty after the origination of their mortgage loan. The Servicemembers Civil Relief Act provides generally that these borrowers may not be charged interest on a mortgage loan in excess of 6% per annum during the

period of the borrower's active duty. Shortfalls that occur due to the application of the Relief Act are not required to be paid by the borrower at any future time, will not be advanced by the servicer to the extent excess interest is insufficient, will reduce accrued interest on each class of certificates in the related loan group on a pro rata basis. In addition, the act imposes limitations that would impair the ability of a servicer to foreclose on an affected loan during the borrower's period of active duty status, and, under some circumstances during an additional period thereafter.

S-17

## Recent Developments Affecting SPS

In the past, SPS entered into consent agreements with certain regulatory agencies, including a Consent Agreement dated November 23, 2003 with the FTC and HUD. In some of these agreements, while not admitting liability, SPS agreed to refund certain amounts to consumers, establish redress funds, refrain from engaging in certain actions or implement certain practices prospectively.

SPS is examined for compliance with state and local laws by numerous regulators. No assurance can be given that SPS's regulators will not inquire into its practices, policies or procedures in the future. It is possible that any of SPS's regulators will order SPS to change or revise its practices, policies or procedures in the future. Any such change or revisions may have a material impact on the future income from SPS's operations.

The occurrence of one or more of the foregoing events or a determination by any court or regulatory agency that SPS's policies and procedures do not comply with applicable law could lead to downgrades by one or more rating agencies, a transfer of SPS's servicing responsibilities, increased delinquencies on the mortgage loans serviced by SPS, delays in distributions or losses on the offered certificates, or any combination of these events.

S-18

Some of the statements contained or incorporated by reference in this term sheet supplement and the accompanying base prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," "assumed characteristics," "structuring assumptions," "prepayment assumption," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include, among others, general economic and business conditions, competition, changes in political, social and economic conditions, regulatory initiatives and compliance with governmental regulations, customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what we predict in our forward-looking statements.

## INTRODUCTION

The depositor will establish an Adjustable Rate Mortgage Trust relating to each series of Adjustable Rate Mortgage Backed Pass-Through Certificates on the closing date, pursuant to a pooling and servicing agreement among the depositor, the seller, the servicers (except for the designated servicers), the master servicer, the special servicer, the modification oversight agent (if applicable), the trustee and the trust administrator, dated as of the cut-off date.

Some capitalized terms used in this term sheet supplement have the meanings given below under "Description of the Certificates—Certificate Terms—The Senior Subordinate Loan Groups" and "—The Floating Rate Loan Group Certificates" or in the prospectus under "Glossary."

## DESCRIPTION OF THE MORTGAGE POOL

### General

Information relating to the mortgage loans to be included in the mortgage pool will be presented in the related term sheet.

The mortgage loans acquired by the depositor from DLJ Mortgage Capital, Inc. ("DLJ Mortgage Capital") were previously purchased by DLJ Mortgage Capital in secondary market transactions from various mortgage loan originators and purchasers. The sponsor selected the mortgage loans for sale to the depositor from among its portfolio of mortgage loans based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates,

Case 3:12-cv-00066-EMC   Document 1-1   Filed 01/04/12   Page 96 of 150

principal balance, credit scores and other characteristics. In making this selection, the depositor took into account investor preferences and the depositor's objective of obtaining the most favorable combination of ratings on the certificates.

Under the pooling and servicing agreement, the depositor will assign the mortgage loans to the trustee for the benefit of the holders of the certificates.

The mortgage loans will be secured by first liens on fee simple interests or leaseholds in one- to four-family residential real properties. The property securing a mortgage loan is referred to as the mortgaged property. The mortgage pool will consist of mortgage loans with terms to maturity of generally 30 years from the date of origination or modification.

Each mortgage loan will be a conventional fixed-rate mortgage loan or adjustable-rate mortgage loan evidenced by a mortgage note.

Substantially all of the mortgage loans will contain "due-on-sale" clauses. The enforcement of a due-on-sale clause will generally have the same effect as a prepayment on a mortgage loan. Some of the mortgage loans may be assumable by purchasers of the mortgaged property rather than prepaid by the related borrowers in connection with the sales of the those mortgage properties. Any such assumption will reduce the rate of prepayments of the mortgage loans and extend the weighted average life of the related offered certificates. See "Yield, Prepayment and Maturity Considerations" in the prospectus.

Substantially all of the mortgage loans will provide for payments due on the first day of each month. Scheduled monthly payments made by the mortgagors on the initial mortgage loans either earlier or later than the scheduled due dates will not affect the amortization schedule or the relative application of those payments to principal and interest.

As of the cut-off date, the initial mortgage loans will have the characteristics as indicated in the related term sheet.

A portion of the mortgage loans may be 30 days or more delinquent as of the cut-off date.

No mortgage loan may be subject to a buydown agreement.

A portion of the aggregate Cut-off Date Principal Balance of the mortgage loans may have an original principal balance that conforms to Fannie Mae and Freddie Mac guidelines.

S-19

For purposes of describing the delinquency characteristics of the mortgage loans in the prospectus supplement, a mortgage loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the last business day immediately prior to the next monthly due date. The determination as to whether a mortgage loan falls into this category is made as of the close of business on the last business day of each month. For example, a mortgage loan with a payment due on January 1 that remained unpaid as of the close of business on January 31 would then be described as 30 to 59 days delinquent in the description of the mortgage loans contained in the prospectus supplement for February.

Some of the mortgages loan may provide for payment of a prepayment premium in connection with certain voluntary, full or partial prepayments made within the period of time specified in the related mortgage note, generally ranging from three months to five years from the date of origination of such mortgage loan. The amount of the applicable prepayment premium, to the extent permitted under applicable law, will be as provided in the related mortgage note; generally, such amount is generally equal to three months' interest on any amounts prepaid during any 12-month period in excess of 20% of the original principal balance of the related mortgage loan or a specified percentage of the amounts prepaid. Any such prepayment premiums will either be retained by the related servicer or will be paid to the holder of the Class P Certificates and will not be available for payment of the offered certificates.

All of the initial mortgage loans as of the cut-off date will have LTV ratios at origination of 100% or less. It is anticipated that, with some exceptions, each initial mortgage loan with an LTV ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae, Freddie Mac, or any nationally recognized statistical rating organization. The primary mortgage insurance or any initial mortgage insurance; the immediately preceding sentence will not be required for any of these new appraisal, the principal balance of the related LTV ratio is 80% or less or, based on a appraised value or as otherwise provided by law. loan represents 80% or less of the new

Mortgage loans may be secured by mortgaged properties with respect to which second lien mortgage loans were originated at the same time as the first lien mortgage loan. The owners of the mortgaged properties may obtain second lien mortgage loans at any time without the sponsor's knowledge and, thus, more mortgaged properties than described above may also secure second lien

will be treated as holding a certificate with amortizable bond premium will depend on such beneficial owner's purchase price (or in the case of a Carryover Certificate (as defined below), the portion of the purchase price allocated to the regular interest component) and the distributions remaining to be made on such certificates at the time of its acquisition by such beneficial owner. Holders of such classes of certificates should consult their tax advisors regarding the possibility of

S-67

making an election to amortize such premium. See *"Material Federal Income Tax Consequences--Taxation of Owners of REMIC Regular Certificates," "--Market Discount"* and *"--Premium"* in the prospectus.

## Status of the Offered Certificates

The Certificates (other than the Notional Principal Contract Components of the Carryover Certificates) will be treated as assets described in Section 7701(a)(19)(c) of the Code, and as "real estate assets" under Section 856(c)(5)(b) of the Code, generally, in the same proportion that the assets of the trust, exclusive of the assets not included in any REMIC, would be so treated. In addition, the interest derived from the Certificates (other than the Notional Principal Contract Components of a Carryover Certificate) will be interest on obligations secured by Mortgages on real property for purposes of section 856(c)(3) of the Code, subject to the same limitation in the preceding sentence. The Notional Principal Contract Components of the Carryover Certificates will not qualify, however, as assets described in Section 7701(a)(19)(c) of the Code or as real estate assets under Section 856(c)(5)(b) of the Code, qualified mortgages within the meaning of section 860G(a)(3) of the Code if held by another REMIC.

## The Class AR and Class AR-L Certificates

Purchasers of the Class AR and Class AR-L Certificates should consider carefully the tax consequences of an investment in those certificates discussed in the prospectus and should consult their own tax advisors for those consequences. See *"Material Federal Income Tax Consequences--Taxation of Owners of REMIC Residual Certificates"* in the prospectus. Specifically, prospective holders of the Class AR and Class AR-L Certificates should consult their tax advisors regarding whether, at the time of acquisition, a Class AR or Class AR-L Certificate will be treated as representing beneficial ownership of *"noneconomic"* residual interests and *"tax avoidance potential"* residual interests as these characteristics affect the circumstances under which the transfer of Class AR and Class AR-L Certificate will be respected for federal income tax purposes. See *"Material Federal Income Tax Consequences--Taxation of Owners of REMIC Residual Certificates--Noneconomic REMIC Residual Certificates," "--Excess Inclusions"* and *"--Tax and Restrictions on Transfers of REMIC Residual Certificates to Specific Organizations"* in the prospectus.

The IRS recently issued final regulations addressing the tax treatment of payments made by a transferor of a non-economic REMIC residual interest to induce the transferee to acquire that residual interest ("inducement fees"). The regulations (i) require the transferee to recognize an inducement fee in income over the expected remaining life of the REMIC in a manner that reasonably reflects the after-tax costs and benefits of holding that residual interest and (ii) specify that inducement fees constitute income from sources within the United States. The regulations will apply to any inducement fee received in connection with the acquisition of a Residual Certificate.

## Tax Treatment of the Floating Rate Loan Group Certificates

For federal income tax purposes, a beneficial owner of a Floating Rate Loan Group Certificate will be treated as holding an undivided interest in a REMIC regular interest corresponding to that certificate (other than any Excess Interest Certificate) (a *"Carryover Certificate"*) as having entered into a limited recourse notional principal contract. The REMIC regular interest corresponding to each Carryover Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the certificate to which it corresponds, except that (i) the maximum interest rate of each Carryover Certificate for each distribution date will be equal to the weighted average of the net mortgage rates of the mortgage loans at the beginning of the related due period, minus (a) a fraction, expressed as a percentage, the numerator of which is any net swap payment made to the swap provider and (2) 12, and the denominator of which is equal to the aggregate collateral balance of the Floating Rate Loan Group (the *"Net Swap Payment Rate"*), multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the immediately preceding Accrual Period, and (ii) any termination payment will be treated as payable solely from Monthly Excess Cashflow. As a result of the foregoing, the amount of distributions on the REMIC regular interest corresponding to a Carryover Certificate may differ from the actual amount of distributions on the Carryover Certificate.

Any amount payable on a Carryover Certificate in excess of the amount payable on the corresponding REMIC regular interest will be deemed to have been paid to the holder of that Carryover Certificate pursuant to the notional principal contract. Alternatively, any amount payable on the REMIC regular interest corresponding to a

S-68

**Additional Yield Considerations Applicable Solely to the Residual Certificates**

The Residual Certificateholders' after-tax rate of return on their Residual Certificates will reflect their after-tax rate of return, reduced by the taxes required to be paid with respect to the Residual Certificates. Holders of Residual Certificates may have tax liabilities with respect to their Residual Certificates during the early years of the trust's term that substantially exceed any distributions payable thereon during any such period. In addition, holders of Residual Certificates may have tax liabilities with respect to their Residual Certificates the present value of which substantially exceeds the present value of distributions payable thereon and of any tax benefits that may arise with respect thereto. Accordingly, the after-tax rate of return on the Residual Certificates may be negative or may otherwise be significantly adversely affected. The timing and amount of taxable income attributable to the Residual

S-66

Certificates will depend on, among other things, the timing and amounts of prepayments and losses experienced with respect to the mortgage pool.

The Residual Certificateholders should consult their tax advisors as to the effect of taxes and the receipt of any payments made to those holders in connection with the purchase of the Residual Certificates on after-tax rates of return on the Residual Certificates. See *"Federal Income Tax Consequences"* in this term sheet supplement and *"Material Federal Income Tax Consequences"* in the prospectus.

**FEDERAL INCOME TAX CONSEQUENCES**

## General

The pooling and servicing agreement provides that the trust (exclusive of any Floating Rate Loan Swap Agreement and the assets held in any Floating Rate Loan Swap Agreement Account) will comprise multiple REMICs in a tiered REMIC structure. The pooling and servicing agreement will designate a single class of interest in each REMIC as the residual interest in that REMIC. The Class AR-L Certificates will represent ownership of the residual interest in the lower-tier REMICs, which will hold the mortgage loans, and the Class AR Certificates will represent ownership of the residual interest in each remaining REMIC. Elections will be made to treat each REMIC created by the pooling and servicing agreement as a REMIC for federal income tax purposes.

Upon the issuance of the offered certificates, Orrick, Herrington & Sutcliffe LLP ("Tax Counsel") will deliver its opinion to the effect that, assuming compliance with the pooling and servicing agreement, each REMIC will qualify as a REMIC within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended (the "Code").

**Tax Treatment of the Offered Certificates**

Each offered certificate, other than a Class AR and Class AR-L Certificate, will evidence ownership of a REMIC regular interest. See *"Tax Treatment of the Floating Rate Loan Group Certificates"* for a discussion of additional tax information for the Floating Rate Loan Group Certificates.

*Original Issue Discount*

For federal income tax information reporting purposes, certain classes of offered certificates may be issued with original issue discount based on their issue price. The prepayment assumption that will be used in determining the rate of accrual of original issued discount, market discount, and bond premium, if any, will be a rate equal to 25% CPR for the mortgage loans in the Senior-Subordinate Loan Groups and 30% CPR for the mortgage loans in the Floating Rate Loan Group. No representation is made that the mortgage loans will actually prepay at these rates or at any other rates.

If the method for computing original issue discount described in the prospectus results in a negative amount for any period with respect to a beneficial owner, the amount of original issue discount allocable to such period would be zero and such beneficial owner will be permitted to offset such negative amount only against future original issue discount (if any) attributable to such certificates.

In certain circumstances OID Regulations permit the beneficial owner of a debt instrument to recognize original issue discount under a method that differs from that used by the issuer. Accordingly, it is possible that the beneficial owner of an offered certificate may be able to select a method for recognizing original issue discount that differs from that used by the entity identified as the "tax matters person" in the pooling and servicing agreement in preparing reports to the beneficial owner and the IRS.

Certain classes of the offered certificates may be treated for federal income tax purposes as having been issued at a premium. Whether any beneficial owner of such a class of offered certificates

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 99 of 150

http://www.secinfo.com/d1zj61.uph.htm#2q9w

"pass-through entity" (other than in connection with such individual's trade or business). Pass-through entities include partnerships, S corporations, grantor trusts and non-publicly offered regulated investment companies, but do not include estates, non-grantor trusts, cooperatives, real estate investment trusts and certain publicly offered regulated investment companies. Further, such a beneficial owner will not be able to recognize a net deduction with respect to the notional principal contract component in computing the beneficial owner's alternative minimum tax liability.

Because a beneficial owner of a Carryover Certificate will be required to include in income the amount deemed to have been paid by such owner pursuant to the notional principal contract but may not be able to deduct that amount from income, a beneficial owner of a Carryover Certificate may have income that exceeds cash distributions on the Carryover Certificate in any period and over the term of the Carryover Certificate. As a result, the Carryover Certificates may not be a suitable investment for any taxpayer whose net deduction with respect to the notional principal contract would be subject to the limitations described above.

## Sale or Exchange of Offered Certificates

Upon the sale, exchange or other disposition of a Carryover Certificate, the beneficial owner of the certificate must allocate the amount realized between the components of the certificate based on relative fair market values of those components at the time of sale and must treat the sale, exchange or other disposition as a sale, exchange or disposition of the REMIC regular interest component and the notional principal contract component. Assuming that the Carryover Certificate is held as a "capital asset" within the meaning of Section 1221 of the Code, gain or loss on the disposition of an interest in the notional principal contract component should be capital gain or loss, and gain or loss on disposition of the REMIC regular interest component should generally, subject to the limitation described in the prospectus, be capital gain or loss.

## Penalty Protection

If penalties were asserted against purchasers of the offered certificates in respect of their treatment of the offered certificates for tax purposes, the summary of tax considerations contained, and the opinions stated, herein and in the prospectus may not meet the conditions necessary for purchasers' reliance on that summary and those opinions to exculpate them from the asserted penalties.

## METHOD OF DISTRIBUTION

In accordance with the terms and conditions of the related underwriting agreement, Credit Suisse Securities (USA) LLC (an affiliate of the depositor and DLJ Mortgage Capital), will purchase and the depositor will sell, the offered certificates. It is expected that delivery of the offered certificates will be made only in book-entry form through the Same Day Funds Settlement System of DTC on or about the closing date, against payment therefor in immediately available funds. It is expected that the Class AR and Class AR-L Certificates will be available for delivery at the office of the applicable underwriter, against payment therefor in immediately available funds.

In connection with the offered certificates, the underwriter has agreed, in accordance with the terms and conditions of the underwriting agreement, to purchase all of the offered certificates if any of the offered certificates are purchased thereby.

The underwriting agreement provides that the obligations of the underwriter to pay for and accept delivery of the offered certificates are subject to the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the offered certificates by the underwriter may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. The underwriter may effect the transactions by selling the offered certificates to or through dealers, and these dealers may receive

S-70

compensation in the form of underwriting discounts.

concessions or commissions from the underwriter for whom they act as agent. In connection with the sale of the offered certificates, the underwriter may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriter and any dealers that participate with the underwriter in the distribution of any offered certificates may be deemed to be underwriters, and any profit on the resale of the offered certificates positioned by them may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended. Proceeds to the depositor from the sale of the offered certificates, before deducting expenses payable by the depositor, will be approximately set forth in the prospectus supplement.

The underwriting agreement provides that the depositor will indemnify the underwriter, and that under limited circumstances the underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 100 of 150

http://www.secinfo.com/d1z61.uph.htm#2q9w

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

2/25/2010 6:54 PM

61 of 68

thereof.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the prospectus under "The Agreements—Reports to Securityholders," which will include information as to the outstanding certificate principal balance of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

The underwriter is an affiliate of the depositor, the cap counterparty, swap counterparty, DLJ Mortgage Capital, Inc and SPS.

## LEGAL OPINIONS

Certain legal matters relating to the certificates will be passed upon for the depositor and the underwriter by Orrick, Herrington & Sutcliffe llp, Los Angeles, California.

## ADDITIONAL INFORMATION

The depositor has filed the registration statement with the Securities and Exchange Commission. The depositor also files, as to some of the information requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and, accordingly, will file reports thereunder and reports required under the pooling and servicing agreement with the Securities and Exchange Commission. The registration statement and the exhibits thereto, and reports and other information filed by the depositor under the Exchange Act can be inspected and copied at the Public Reference Room maintained by the Securities and Exchange Commission at 100 F Street, NE, Washington, DC 20549, and at certain of its Regional Offices located as follows: Chicago Regional Office, Citicorp Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60661-2511; and Northeast Regional Office, 233 Broadway, New York, New York 10279 and electronically through the Securities and Exchange Commission's Electronic Data Gathering, Analysis and Retrieval System at the Securities and Exchange Commission's Web Site (http://www.sec.gov). Information on the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at 1-800-SEC-0330. Exchange Act reports as to any series filed with the Securities and Exchange Commission will be filed under the issuing entity's name.

The issuing entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed in Pooling and Servicing Agreement—Evidence as to Compliance" herein, required to be filed under Regulation AB), periodic distribution reports on Form 10-D, current reports on Form 8-K and amendments to those reports, together with such other reports to certificateholders or information about the securities as shall have been filed with the Securities and Exchange Commission will be posted on the trust administrator's internet web site as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Securities and Exchange Commission.

## RATINGS

It is a condition to the issuance of the offered certificates that each class of certificates be assigned at least the ratings designated in the term sheet to which this term sheet supplement

S-71

relates for such class of certificates by one or more rating agencies including that they be rated by Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Services ("S&P").

The ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of distributions on the underlying mortgage loans to which such certificateholders are entitled. The rating process addresses the structural and legal aspects associated with such certificates, including the nature of the underlying mortgage loans. The ratings assigned to mortgage pass-through certificates do not represent any assessment of the likelihood that principal prepayments might differ from those originally anticipated, and do not address the possibility that certificateholders might suffer a lower than anticipated yield. Additionally, the ratings assigned by S&P to the Residual Certificates address only the return of the Class Principal Balance and interest on that Balance at the pass-through rate.

The ratings on the LIBOR Certificates do not constitute statements regarding the payment of any Basis Risk Shortfall.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings

initially assigned to the offered certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the offered certificates.

The rating agencies have stated that it is their standard policy to monitor ratings on publicly offered securities for which a rating has been provided, as to each rating agency rating each class of offered certificates in accordance with the rating agencies' particular surveillance policies unless the issuer requests a rating without surveillance. A rating agency will monitor the rating it issues on an ongoing basis and may update the rating after conducting its regular review of the issuer's creditworthiness or after conducting a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a change of rating. The depositor has not requested that any rating agency not monitor their ratings of the offered certificates, and the depositor has not requested that any rating agency use any monitoring procedures other than their standard monitoring procedures.

The fees paid by the depositor to the rating agencies at closing include a fee for ongoing surveillance by the rating agencies for so long as any certificates are outstanding. However, the rating agencies are under no obligation to the depositor to continue to monitor or provide a rating on the certificates.

## LEGAL INVESTMENT

When issued, the offered certificates identified in the term sheet to which this term sheet relates will be "mortgage related securities" for purposes of SMMEA, so long as they are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization. After the prefunding period, the offered certificates identified in the term sheet to which this term sheet relates will be "mortgage related securities" for purposes of SMMEA, so long as they are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization and, as such, are legal investments for certain entities to the extent provided in SMMEA. SMMEA provides, however, that states could override its provisions on legal investment and restrict investments in mortgage related securities by taking specified legislative action on or prior to October 3, 1991. Certain states have enacted legislation which overrides the preemption provisions of SMMEA.

The depositor makes no representations as to the proper characterization of any class of the offered certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of the offered certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of offered certificates. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of the offered certificates constitutes a legal investment or is subject to investment, capital or other restrictions.

See "*Legal Investment*" in the prospectus.

S-72

## ERISA CONSIDERATIONS

Any fiduciary that proposes to cause an employee benefit plan or other retirement arrangement that is subject to Title I of ERISA and/or to Section 4975 of the Code (an "ERISA Plan") to acquire any of the offered certificates should consult with its counsel about the consequences under any of the provisions of ERISA and the Code of the ERISA Plan's acquisition and ownership of those certificates. See "*ERISA Considerations*" in the prospectus. Section 406 of ERISA and Section 4975 of the Code prohibit "parties in interest" (as defined in Section 3(14) of ERISA) and "disqualified persons" (as defined in Section 4975(e)(2) of the Code) with respect to an ERISA Plan from engaging in specific transactions involving the ERISA Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes various excise taxes on prohibited transactions involving ERISA Plans and other arrangements (including, but not limited to, individual retirement accounts) described under that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving ERISA Plans not subject to the requirements of Section 4975 of the Code.

Some employee benefit plans, including governmental plans and some church plans, are not subject to ERISA's requirements. Accordingly, assets of those plans may be invested in the offered certificates without regard to the ERISA considerations described in the prospectus supplement and in the prospectus, subject to the provisions of other applicable federal, state and local law. However, any of these plans that are qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may be subject to the prohibited transaction rules described in Section 503 of the Code.

Except as noted above, investments by ERISA Plans (excluding plans or other retirement arrangements that are subject to Section 4975 of the Code) are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the

requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. A fiduciary that decides to invest the assets of an ERISA Plan in the offered certificates should consider, among other factors, the extreme sensitivity of the investment to the rate of principal payments, including prepayments, on the mortgage loans.

The U.S. Department of Labor ("DOL") has granted an individual administrative exemption to the underwriter (the "Exemption") from some of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code for the initial purchase, the holding and the subsequent resale by ERISA Plans of securities, including certificates, issued by asset backed entities, including trusts, that consist of particular receivables, loans and other obligations that meet the general conditions and requirements of the Exemption. Assuming that the general conditions of the Exemption are met, the Exemption applies to certificates that qualify for the Exemption and that represent fractional undivided interests in a trust consisting of mortgage loans like the mortgage loans in the trust.

For a general description of the conditions that must be satisfied for the Exemption to apply, see "*ERISA Considerations*" in the prospectus. Subject to the following, it is expected that the Exemption will apply to the acquisition and holding by ERISA Plans of the offered certificates, other than the Class AR and Class AR-L Certificates, and that all conditions of the Exemption other than the conditions that are within the control of the investors will be satisfied. Any ERISA Plan proposing to acquire offered certificates should determine whether the ERISA Plan satisfies all of the applicable conditions. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent of the mortgage loans included in the trust by aggregate unamortized principal balance of the assets of the trust.

Any class of certificates rated at least BBB- or Baa3 by at least one of S&P, Fitch Ratings, Moody's, DBRS limited or DBRS ("Exemption Eligible Certificates") at the time of acquisition may be eligible for exemptive relief under the Exemption, assuming that such rights to receive payments with respect to any Swap Agreement. Any person purchasing an Exemption Eligible Certificate and the right to receive payments with respect to the Swap Agreement, will have acquired, for purposes of ERISA, (i) the Exemption Eligible Certificate without the right to receive those related payments from the Supplemental Interest Trust; and (ii) the right to receive those payments from the Supplemental Interest Trust. The Exemption may not apply to the acquisition, holding or resale of the right to receive payments with respect to the Swap Agreement from the Supplemental Interest Trust. Accordingly, the acquisition of the right to receive payments from the Supplemental Interest Trust by a Plan could result in a prohibited transaction unless another statutory or administrative exemption is available. Because the ERISA's prohibited transaction rules is applicable. Exemptive relief may be available under Section 408(b)(17) of ERISA, Section 408(b)(17) provides a statutory exemption for certain prohibited transactions between a Plan and a person or entity that is a party in

S-73

interest to such Plan (other than a party in interest that is a fiduciary, or its affiliate, that has or exercises discretionary authority or control or renders investment advice with respect to the assets of the Plan involved in the transaction) if the transaction is based on providing services to the Plan for no more than reasonable compensation. One or more alternative exemptions issued by the DOL ("Investor-Based Exemptions") may be available with respect to the initial purchase, holding and resale of the right to receive payments from the Supplemental Interest Trust, including, but not limited to:

o     Prohibited Transaction Class Exemption ("PTCE") 84-14, regarding transactions negotiated by "qualified professional asset managers";

o     PTCE 90-1, regarding investments by insurance company pooled separate accounts;

o     PTCE 91-38, regarding investments by bank collective investment funds;

o     PTCE 95-60, regarding investments by insurance company general accounts; or

o     PTCE 96-23, regarding transactions negotiated by certain in-house asset managers.

Each beneficial owner of an Exemption Eligible Certificate or any interest therein shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein on or prior to the termination of the Swap Agreement, Section 408(b)(17) or at least one Investor-Based Exemption or other applicable exemption applies. In the right to receive payments from the Supplemental Interest Trust. A Plan fiduciary should also consider its general fiduciary obligations under ERISA in determining whether to purchase any Exemption Eligible Certificates on behalf of a Plan in reliance upon the Exemption, Section 408(b)(17) and any Investor-Based Exemptions.

The rating of a security may change, if a class of certificates, such as the subordinate offered certificates, is no longer rated at least BBB- or Baa3 by at least one of S&P, Fitch Ratings,

Moody's, DBRS Limited or DBRS, certificates of that class will no longer be eligible for relief under the Exemption (although if a Plan that had purchased the certificate when it had an investment-grade rating by Moody's or S&P, Fitch Ratings or Moody's would not be required by the Exemption to dispose of it), in addition, because the characteristics of the Class AR and Class AR-L Certificates will not meet the requirements of the Exemption, the purchase and holding of any other exemption issued under ERISA, the purchase and holding of the Class AR and Class AR-L Certificates may not be prohibited transactions or the composition of excise taxes or civil penalties. Consequently transfers of the Class AR and Class AR-L Certificates and any subordinate offered certificates rated below investment grade (collectively, "ERISA Restricted Offered Certificates") will not be registered by the trust administrator unless the trustee or the trust administrator receives the following:

○   a representation from the transferee of the ERISA Restricted Offered Certificates, acceptable to and in form and substance satisfactory to the trust administrator, to the effect that that that transferee is not a Plan nor a person acting on behalf of, or using the assets of, any such Plan or arrangement to effect the transfer;

○   if the purchaser is an insurance company, a representation that the purchaser is an insurance company which is purchasing subordinate offered certificates (but no other ERISA Restricted Offered Certificates) with funds contained in an "insurance company general account," as that term is defined in Section V(e) of PTCE 95-60, and that the purchase and holding of the subordinate offered certificates are covered under Sections I and III of PTCE 95-60; or

○   an opinion of counsel satisfactory to the trust administrator that the purchase or holding of the ERISA Restricted Offered Certificates by a Plan, any person acting on behalf of a Plan or using a Plan's assets, will not result in prohibited transactions under Section 406 of ERISA and/or Section 4975 of the Code and will not subject the depositor, the trustee, the trust administrator, the master servicer or any other servicer to any obligation in addition to those undertaken in the pooling and servicing agreement.

In the event that the representation is violated, or any attempt to transfer to a Plan or person acting on behalf of a Plan or using a Plan's assets is attempted without the opinion of counsel, the attempted transfer or acquisition shall be void and of no effect.

S-74

It should be noted that PTCE 95-60 may provide exemptive relief for any potential prohibited transactions discussed above in connection with payments under the Swap Agreement if an ERISA Restricted Offered Certificate entitles the holder to receive payments with respect to the Swap Agreement and is purchased by a Plan investor that is an insurance company general account.

Prospective Plan investors should consult with their legal advisors concerning the impact of ERISA and Section 4975 of the Code, the applicability of the Exemption and the potential consequences in their specific circumstances, prior to making an investment in the offered certificates. Moreover, each Plan fiduciary should determine whether and under the general standards of investment prudence and diversification, an investment in the offered certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

S-75

## ANNEX I

## GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES

Except in certain limited circumstances, the offered certificates will be offered globally (the "Global Securities") and will be available only in book-entry form. Investors in the Global Securities may hold such Global Securities through any of The Depository Trust Company ("DTC"), Clearstream, Luxembourg or Euroclear. The Global Securities will be tradeable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Clearstream, Luxembourg and Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between Clearstream, Luxembourg or Euroclear and DTC Participants holding Certificates will be effected on a delivery-against-payment basis through the respective Depositaries of Clearstream, Luxembourg and Euroclear (in such capacity) and as DTC Participants.

Non-U.S. holders (as described below) of Global Securities will be subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their Participants.

Initial Settlement

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interest in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC. As a result, Clearstream, Luxembourg and Euroclear will hold positions on behalf of their respective Participants through their respective Depositaries, which in turn will hold such positions in accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Clearstream, Luxembourg or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary Global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

Trading between DTC Participants. Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage loan asset backed certificates issues in same-day funds.

Trading between Clearstream, Luxembourg and/or Euroclear Participants. Secondary market trading between Clearstream, Luxembourg Participants or Euroclear Participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

Trading between DTC seller and Clearstream, Luxembourg or Euroclear purchaser. When Global Securities are to be transferred from the account of a DTC Participant to the account of a Clearstream, Luxembourg Participant or a

Euroclear Participant, the purchaser will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear Participant at least one business day prior to settlement. Clearstream, Luxembourg or Euroclear will instruct the respective Depositary, as the case may be, to receive the Global Securities against payment. Payment will include interest accrued on the Global Securities from and including the last coupon date to and excluding the settlement date, on the basis of the actual number of days in such interest period and a year assumed to consist of 360 days. For transactions settling on the last day of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective Depositary of the DTC Participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to their respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream, Luxembourg Participant's or Euroclear Participant's account. The securities credit will appear the next day (European time) and the cash debit will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Clearstream, Luxembourg or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream, Luxembourg Participants and Euroclear Participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream, Luxembourg or Euroclear. Under this approach, they may take on credit exposure to Clearstream, Luxembourg or Euroclear until the Global Securities are credited to their accounts one day later.

As an alternative, if Clearstream, Luxembourg or Euroclear has extended a line of credit to them, Clearstream, Luxembourg Participants or Euroclear Participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream,

Luxembourg Participants or Euroclear Participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream, Luxembourg Participant's or Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for sending Global Securities to the respective European Depositary for benefit of Clearstream, Luxembourg Participants or Euroclear Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants a cross-market transaction will settle no differently than a trade between two DTC Participants.

Trading between Clearstream, Luxembourg or Euroclear Seller and DTC Purchaser. Due to time zone differences in their favor, Clearstream, Luxembourg Participants and Euroclear Participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective Depositary, to a DTC Participant. The seller will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg Participant or Euroclear Participant at least one business day prior to settlement. In these cases Clearstream, Luxembourg or Euroclear will instruct the respective Depositary, as appropriate, to deliver the Global Securities to the DTC Participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in such interest period and a year assumed to consist of 360 days. For transactions settling on the first day of the month, the payment will be reflected in the account of the Clearstream, Luxembourg Participant or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream, Luxembourg Participant's or Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream, Luxembourg Participant or Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If the settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream, Luxembourg Participant's or Euroclear Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream, Luxembourg or Euroclear and that purchase Global Securities from DTC Participants for delivery to Clearstream, Luxembourg Participants or Euroclear Participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

(a)    borrowing through Clearstream, Luxembourg or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream, Luxembourg or Euroclear accounts) in accordance with the clearing system's customary procedures;

(b)    borrowing the Global Securities in the U.S. from a DTC Participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Clearstream, Luxembourg or Euroclear account in order to settle the sale side of the trade; or

(c)    staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Clearstream, Luxembourg Participant or Euroclear Participant.

Certain U.S. Federal Income Tax Documentation Requirements

A beneficial owner that is not a United States person within the meaning of Section 770(a)(30) of the Internal Revenue Code of 1986 holding a book-entry certificate through Clearstream, Euroclear or DTC may be subject to U.S. withholding tax unless such beneficial owner provides certain documentation to the trustee or to the U.S. entity required to withhold tax (the "U.S. withholding agent") establishing an exemption from withholding. A holder that is not a United States person may be subject to 30% withholding unless:

I. The trust administrator or the U.S. withholding agent receives a statement—

(a)    from the beneficial owner on Internal Revenue Service (IRS) Form W-8BEN (or any successor form) that—

        (i)   is signed by the beneficial owner under penalties of perjury,

        (ii)  certifies that such beneficial owner is not a United States person, and

(iii) provides the name and address of the beneficial owner, or

(b) from a securities clearing organization, a bank or other financial institution that holds customers' securities in the ordinary course of its trade or business that--

(i) is signed under penalties of perjury by an authorized representative of the financial institution,

(ii) states that the financial institution has received an IRS Form W-8BEN (or any successor form) from the beneficial owner or that another financial institution acting on behalf of the beneficial owner has received such IRS Form W-8BEN (or any successor form),

(iii) provides the name and address of the beneficial owner, and

(iv) attaches the IRS Form W-8BEN (or any successor form) provided by the beneficial owner;

II. the beneficial owner claims an exemption from, or reduced rate based on a treaty and provides a properly executed IRS Form W-8BEN (or any successor form) to the trustee or the U.S. withholding agent;

III. the beneficial owner claims an exemption stating that the income is effectively connected to a U.S. trade or business and provides a properly executed IRS Form W-8ECI (or any successor form) to the trustee or the U.S. withholding agent; or

IV. the owner is a nonwithholding partnership and provides a properly executed IRS Form W-8IMY (or any successor form) with all necessary attachments to the trustee or the U.S. withholding agent. Certain pass-through entities that have entered into agreements with the Internal Revenue Service (for example qualified intermediaries) may be subject to different documentation requirements; it is recommended that such owner consult with their tax advisors when purchasing the certificates.

A beneficial owner holding book-entry certificates through Clearstream or Euroclear provides the forms and statements referred to above by submitting them to the person through which it holds an interest in the book-entry certificates, which is the clearing agency, in the case of persons holding directly on the books of the clearing agency. Under certain circumstances a Form W-8BEN, if furnished with a taxpayer identification number (TIN), will remain in effect until the status of the beneficial owner changes, or a change in circumstances makes any information on the form incorrect, provided at least one payment is reported annually to the beneficial owner on IRS Form 1042-S. A Form W-8BEN, if furnished without a TIN, and a Form W-8ECI will remain in effect for a period starting on the date the form is signed and ending on the last day of the third succeeding calendar year, unless a change in circumstances makes any information on the form incorrect.

In addition, all beneficial owners holding book-entry certificates through Clearstream, Euroclear or DTC may be subject to backup withholding unless the beneficial owner:

I. provides a properly executed IRS Form W-8BEN or Form W-8ECI (or any successor forms) if that person is not a United States person;

II. provides a properly executed IRS Form W-9 (or any substitute form) if that person is a United States person; or

III. is a corporation, within the meaning of Section 7701(a) of the Internal Revenue Code of 1986, or otherwise establishes that it is a recipient exempt from United States backup withholding.

This summary does not deal with all aspects of federal income tax withholding or backup withholding that may be relevant to investors that are not United States persons within the meaning of Section 7701(a)(30) of the Internal Revenue Code. Such investors are advised to consult their own tax advisors for information concerning their holding and disposing of the book-entry certificates. For example, additional rules may apply in the case of beneficial owners holding Certificates through a partnership or grantor trust.

The term United States person means (1) a citizen or resident of the United States, (2) an entity, for federal income tax purposes, that is a corporation or partnership organized in or under the laws of the United States or any state thereof or the District or Columbia (other than a partnership that is not treated as a United States person under any applicable Treasury regulations), (3) an estate the income of which is includible in gross income for United States tax purposes, regardless of its source, (4) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust, and (5) to the extent provided in regulations, certain trusts in existence on August 20, 1996 that are treated as United States persons prior to such date and that elect to continue to be treated as United States persons.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 107 of 150

**Dates Referenced Herein**

| *This FWP Filing* | *Date* | *Other Filings* |
|---|---|---|
| | 6/30/95 | |
| | 8/20/96 | |
| | 3/27/00 | |
| | 9/11/01 | |
| | 11/23/03 | |
| | 10/4/05 | |
| | 1/1/06 | |
| | 1/16/06 | |
| | 7/1/06 | |
| | 12/31/06 | |
| | 3/1/07 | |
| | 4/20/07 | |
| | 7/5/07 | |
| Filed On / Filed As Of | 7/6/07 | |

Top                                              List All Filings

Filing Submission  -  Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Sponsored Ads...

*Copyright © 2010 Fran Finnegan & Company.  All Rights Reserved.*
*About – Privacy – Redactions – Help — Wed, 17 Feb 18:23:42.2 GMT*

RECORDING REQUESTED BY:
LPS Title Company - CA
WHEN RECORDED MAIL TO:
National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

NDSC File No. : 09-21321-SP-CA
Loan No. : 0010982387
Title Order No. : 090778864

**2009-146379**
02:26pm 11/06/09 ND Fee: 12.00
Count of pages 2
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*20090145379AR*

APN: 034-294-150-7

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).**

**This amount is $87,840.10, as of 11/06/2009 and will increase until your account becomes current.**

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your Note and Deed of Trust or Mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required by the Note and Deed of Trust or Mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by the transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

[Page 1 of 2]

NDSC File No. :   09-21321-SP-CA
Loan No.      :   0010982387

Select Portfolio Servicing fka Fairbanks Capital Corporation
c/o National Default Servicing Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020     Phone 602-264-6101   Sales Website: www.ndscorp.com/sales

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

This is an attempt to collect a debt and any information obtained will be used for that purpose.

NOTICE IS HEREBY GIVEN THAT : NATIONAL DEFAULT SERVICING CORPORATION is either the original Trustee, the duly appointed substituted Trustee or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 07/11/2007, executed by MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor, to secure certain obligations in favor of MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE as beneficiary recorded 07/18/2007, as Instrument No. 2007-108403 (or Book, Page)  of Official Records in the Office of the County Recorder of SAN MATEO County, CA.  Said obligations including ONE NOTE FOR THE ORIGINAL sum of $1,350,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of :  FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL, INTEREST AND IMPOUNDS WHICH BECAME DUE ON 10/01/2008 AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST AND IMPOUNDS, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEY'S FEES.

That by reason thereof, the present beneficiary under such Deed of Trust has executed and delivered to duly appointed Trustee a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

This loan is exempt. Compliance with California Civil Code § 2923.5 and 2924.8 is not necessary to proceed with preparing and processing a notice of default.

Dated :     November 6, 2009
Select Portfolio Servicing fka Fairbanks Capital Corporation, as Beneficiary by National Default Servicing Corporation, as Agent for the Beneficiary by LPS Title  Company - CA,  as Agent for National Default Servicing Corporation

By :

Kevin Frost - Authorized Agent

[Page     2     of     2]

**2010-013795**
09:00am 02/08/10 AT  Fee: 15.00
Count of pages 1
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*201 0001 3795 AR*

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:

BILL KOCH
SELECT PORTFOLIO SERVICING, INC
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

0407786+

## CORPORATE ASSIGNMENT OF DEED OF TRUST

San Mateo, California   SELLER'S SERVICING #: 0010982387   "MIKELS"
INVESTOR #: M83
MERS #: 100274686777116040

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE hereby grants, assigns and tranfers to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3  at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115 all beneficial interest under that certain Deed of Trust dated 07/11/2007 , in the amount of $1,350,000.00, executed by MARSHALL E. MIKELS A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY to MERS AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA, NATIONSCHOICE MORTGAGE  and Recorded: 07/18/2007  as Instrument No.: 2007-108403 in San Mateo County , State of California

 Together with the note or notes therein described or referred to, in said Deed of Trust, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE
On _____ NOV 2 7 2009

Bill Koch, Assistant Secretary

SEAL

STATE OF Utah
COUNTY OF Salt Lake
On NOV 2 7 2009 _____, before me, KIMBERLY CLARK, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Bill Koch, Assistant Secretary ,MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE,  personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

KIMBERLY CLARK
Notary Expires: 12/11/2011  #572135

NOTARY PUBLIC
KIMBERLY CLARK
3815 South 92 West
Salt Lake City, Utah  84115
My Commission Expires
December 11, 2011
STATE OF UTAH

(This area for notarial seal)

*KDO*KDOAMRC*11/24/2009 03:33:06 PM* AMRC83AMRC00000000000000000382577* CASAM N° 0010982387 CASTATE_TRUST_ASSIGN_ASSN *ACK*ACKAMRC*



**2010-013796**
09:00am 02/08/10 ST Fee: 21.00
Count of pages 3
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY:**
LPS Title Company - CA

**WHEN RECORDED MAIL TO:**
National Default Servicing Corporation
7720 N. 16ᵗʰ Street, Suite 300
Phoenix, AZ 85020

NDSC File No.  : 09-21321-SP-CA
Loan No.       : 0010982387

APN: 034-294-150-7

## SUBSTITUTION OF TRUSTEE

WHEREAS, MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY was the original Trustor(s), TICOR TITLE was the original Trustee and MERS - NOMINEE FOR FISHER FINANCIAL GROUP, INC., DBA NATIONSCHOICE MORTGAGE was the original Beneficiary under that certain Deed of Trust dated 07/11/2007 and recorded on 07/18/2007 as instrument No. 2007-108403 in Book, Page, of Official Records of SAN MATEO County, State of CA and

WHEREAS, the undersigned is the present beneficiary under the said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

NOW, THEREFORE, the undersigned hereby substitutes NATIONAL DEFAULT SERVICING CORPORATION, An Arizona Corporation, whose address is 7720 N. 16ᵗʰ Street, Suite 300, Phoenix, Arizona 85020, as Trustee under said Deed of Trust.

Whenever the context hereof requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Select Portfolio Servicing, Inc., F/K/A Fairbanks Capital Corp., as servicing agent for U.S. Bank National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3

Dated : 1/26/2010

By : Olivia A. Todd, President
By: Limited Power of Attorney

State of Arizona
County of Maricopa

On _____ 1/26 20 10 , before me, Richard Michael Bowes, a Notary Public for said State, personally appeared Olivia A. Todd  who personally known to me (or who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of  Arizona that the foregoing is true and correct.

WITNESS my hand and official seal.



OFFICIAL SEAL
RICHARD MICHAEL BOWES
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 1, 2010

Signature _____

## *National Default Servicing Corporation*

### SUBSTITUTION OF TRUSTEE
### AFFIDAVIT OF MAILING

NDSC File No. :    **09-21321-SP-CA**
Loan No.      :    **0010982387**

On this day, February 5, 2010, I personally mailed by certified mail a copy of the attached Substitution of Trustee to the trustee of record under the Deed of Trust described in said Substitution, and a copy of the attached Substitution has been mailed prior to the recording thereof, in the manner provided in Section 2924(b) of the Civil Code of the State of California to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said Section.

I declare under penalty of perjury that the foregoing is true and correct.

_Calla Washington_
_____
CALLA WASHINGTON, TRUSTEE SALES REPRESENTATIVE

**X**    **Substitution of Trustee**

MARSHALL E. MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E. MIKELS
207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED
_____
207 SHASTA AVE
MOUNT SHASTA, CA 96067

MARSHALL E. MIKELS
TRUSTEE OF THE MCM TRUST, DATED
_____
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
115 15TH AVENUE
SAN MATEO, CA 94402

MARSHALL E MIKELS
C/O CLARK A. BARRET ATTORNEY AT LAW
1611 BOREL PLACE, SUITE 6
SAN MATEO, CA 94402

MARSHALL EDWARD MIKELS
C/O CLARK A. BARRETT ST.
1611 BOREL PLACE, SUITE
SAN MATEO, CA 94402

MARSHALL MIKELS

115 15TH AVENUE
SAN MATEO, CA 94402

INTERESTDIRECT INC.
3303 EAST BASELINE ROAD, #7-118
GILBERT, AZ 85234

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. ("MERS")
PO BOX 2026
FLINT, MI 48501-2026

INTERESTDIRECT INC., AN ARIZONA
CORPORATION
C/O MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.
P.O. BOX 2026
FLINT, MI 48501-2026

MARSHALL E. MIKELS, TRUSTEE
115 15TH AVENUE
SAN MATEO, CA 94402-2413

FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098

FLAGSTAR BANK, FSB, A FEDERALLY
CHARTERED SAVINGS BANK
5151 CORPORATE DR
TROY, MI 48098-2639

FLAGSTAR BANK, FSB
C/O MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

P.O. BOX 2026
FLINT, MI 48501-2026

GLINDA IRENE ROBERTS
63 BOVET ROAD #111
SAN MATEO, CA 94402

# EXHIBIT "H"

## 2009 AFN Member Directory

# 2009 AFN Member Directory

## New *Growth* for a
## New Beginning

*Now more than ever servicing professionals need far-sighted leadership, focused education and reasoned legal advice. AFN members are nationally recognized leaders in their fields.*



**afn**
American Legal &
Financial Network

## McCalla Raymer, LLC



McCalla Raymer LLC

John G. Aldridge, Jr.
Six Concourse Parkway
Suite 3200
Atlanta, GA 30328
Phone: 678-281-6500
Fax: 678-281-6501
jga@mccallaraymer.com
www.mccallaraymer.com

### Member in GA

McCalla Raymer, LLC is a full-service law firm providing legal representation to the mortgage industry. McCalla Raymer provides traditional representation typically associated with residential and commercial foreclosure and eviction proceedings, Chapter 7, 11, and 13 bankruptcy actions, the disposition of REO property, and related litigation. Additionally, the firm provides services related to the national management of clients' bankruptcy and eviction portfolios, national proof of claim processing, and commercial litigation, including matters related to TILA, RESPA, and mortgage fraud. The firm also has a team of professionals exclusively devoted to developing loss mitigation solutions that keep borrowers in their homes, thereby reducing the financial loss sustained by its clients.

## Mercer Belanger



Mercer Belanger

Jennifer McNair
111 Monument Circle
Suite 3400
Indianapolis, IN 46204
Phone: 317-636-3551
Fax: 317-636-6680
jmcnair@indylegal.com
www.indylegal.com

### Member in IN

Mercer Belanger is an Indiana firm proud to be a member of the Fannie Mae Retained Attorney Network. Our creditor-rights practice group counsels clients in the areas mortgage banking, foreclosure, bankruptcy, collection and related litigation throughout the state of Indiana. Our experienced attorneys and staff also handle title claims, loss mitigation, evictions and REO closings. We are a mid-sized firm with decades of experience poised for the future with creative legal solutions to meet tomorrow's industry challenges. Mercer Belanger prides itself on offering quality legal service to its clients and provides the personalized service you deserve.

## Mickel Law Firm PA

MICKEL
LAW

*Since 1978*

ARKANSAS

Delbert Mickel
1501 North University Avenue
Suite 966
Little Rock, AR 72207
Phone: 501-664-4808
Fax: 501-664-0631
dmickel@mickellaw.com
mickellaw.com

### Member in AR

Mickel Law Firm PA has been assisting lenders with collateral in Arkansas since 1978. The professional and experienced staff at Mickel Law provides services for all types of lenders needing assistance in residential and commercial foreclosure, deed in lieu, bankruptcy, loan modifications, evictions, mobile home issues and titles, REO closings and default management for Arkansas. Considerable experience with Fannie Mae, Freddie Mac, FHA, VA and other investor regulations. Statewide coverage for Arkansas.

## Millsap & Singer, LLC



MILLSAP & SINGER LLC

Vernon D. Singer
612 Spirit Drive
Chesterfield, MO 63005
Phone: 636-537-0110
Fax: 636-537-0067
vsinger@msfirm.com
www.msfirm.com

### Member in MO

Millsap & Singer, LLC (MSPC) provides legal representation to banks and mortgage lenders throughout the state of Missouri. Consisting of 13 attorneys and approximately 80 paralegal/staff personnel, MSPC has been successfully representing mortgage lenders for over 30 years. MSPC holds an "AV" rating, which is Martindale Hubbell's Law Directory's highest rating. With offices in St. Louis and Kansas City, MSPC provides representation in foreclosure, bankruptcy, eviction and mortgage-related litigation matters throughout the entire state of Missouri.

## National Default Servicing Corporation



NDSC

Olivia A. Todd, Mark S. Bosco
2525 East Camelback Road
Suite 200
Phoenix, AZ 85016
Phone: 602-264-6101
Fax: 602-264-6378
otodd@ndscorp.com or
msb@tblaw.com
www.ndscorp.com

### Member in NV, CA

National Default Servicing Corporation (NDSC) was founded in 1995 by the principals at Tiffany & Bosco, P.A. NDSC is a full-service default firm that provides both nationwide default outsourcing services, as well as foreclosure, bankruptcy, eviction and REO services, for the states of Nevada and California. Our in-house tracking system gives us the ability to generate step templates, and modeled after the foreclosure, bankruptcy, eviction or REO process for a particular state. Our goal is to exceed our clients' expectations through unsurpassed customer service, innovative technology, aggressive timeline management and superior mortgage servicing knowledge and expertise.

## Nielson & Sherry P.S.C.



NIELSON & SHERRY
ATTORNEYS AT LAW

Richard M. Nielson
639 Washington Avenue
Newport, KY 41071
Phone: 859-655-7000
Fax: 859-655-7001
rnielson@nsattorneys.com
www.nsattorneys.com

### Member in KY

Nielson & Sherry, founded in 1993, focuses on legal issues concerning the banking, lending and real estate industries. In particular, Nielson & Sherry focuses its efforts on legal matters relating to residential and commercial real estate, including real estate closings, REO closings, loss mitigation, foreclosures, evictions, title claims, lender litigation, and creditors' bankruptcy issues. Nielson & Sherry's concentration on Kentucky title and default services sets us apart in the industry. Our Kentucky focus assists us in working through the diverse issues that arise in the 120 counties that make up the commonwealth. Nielson & Sherry's knowledge of local rules and customs of Kentucky's diverse regions help our clients maintain strict time frames in default management.

## Pierce & Associates, P.C.



Denis Pierce
1 North Dearborn Street
Suite 1300
Chicago, IL 60602
Phone: 312-346-9088
Fax: 312-551-4400
dpierce@atty-pierce.com
www.atty-pierce.com

### Member in IL

Pierce & Associates has represented residential mortgage lenders since 1975. The firm offers full-service, cradle-to-grave representation to over 100 lenders, including the 25 largest lender/servicers in the country. With a staff of over 300 and advanced technology, the firm consistently receives the highest rankings among all the Illinois firms. The firm excels in "excellence in customer service" and is top-ranked in timeline performance. The firm is also approved designated/retained counsel for the two GSEs for the state of Illinois. For further information on the firm, visit our Web site at www.atty-pierce.com.

## Pite Duncan, LLP

PITE
DUNCAN
LLP

John Duncan
4375 Jutland Drive
Suite 200
San Diego, CA 92117
Phone: 858-750-7600
Fax: 619-590-1385
jduncan@piteduncan.com
www.piteduncan.com

### Member in CA

Pite Duncan, LLP, an AV-rated 40-attorney law firm, provides regulatory, compliance, litigation, bankruptcy, and eviction services for over 100 mortgage loan servicers, banks, credit unions, and trustees in the states of Alaska, Arizona, California, Hawaii, Idaho, Nevada, Oregon, Texas, Utah and Washington. In conjunction with foreclosure affiliate Cal-Western Reconveyance Corporation, Pite Duncan is authorized to handle designated counsel California bankruptcy and litigation work for Freddie Mac. Pite Duncan is also a Fannie Mae Retained firm in California, Arizona, Washington and Texas.

## Potestivo & Associates



POTESTIVO & ASSOCIATES

Brian Potestivo
811 South Boulevard
Suite 100
Rochester Hills, MI 48307
Phone: 248-853-4400
Fax: 248-853-0404
bpotestivo@potestivolaw.com
www.potestivolaw.com

### Member in MI

Potestivo & Associates provides exceptional legal services and client representation to the mortgage banking and servicing industries, merging experience with the industry's leading technologies to handle all aspects of default servicing, including foreclosures, bankruptcies, landlord/tenant matters, title resolution, loss mitigation, REO disposition, and litigation. The firm is also part of Fannie Mae's Retained Attorney Network. Potestivo & Associates' client service oriented culture is supported by skilled attorneys and a large, dedicated staff supporting full-service operations in Michigan and Illinois. Potestivo & Associates develops and implements legal solutions for your unique situation, transforming award-winning service and timelines to your competitive advantage.

# EXHIBIT "I"

## Mortgage Servicer Schedule

**SECURITIZATION & FORECLOSURE ANALYSIS**
Marshall E. Mikels v. U.S. Bank, N.A. as Trustee of ARMT 2007-3 Trust

Mortgage Servicer Schedule

Mikels Securitization

Adjustable Rate Mortgage Trust 2007-3

> The loan level details here are sufficiently consistent with the terms of the Adjustable Rate Note provided by Fisher Financial Group, Inc. to Marshall E. Mikels on July 11, 2007.
>
> Hence, we may reasonably conclude that Mr. Mikels' loan is being tracked in the ARMT 2007-3 Trust Fund.

| Loan | Pay History | Curr. Amt | Orig. Amt | Rate | Orig. LTV | Score | Type | Index | MTR | Life Cap | Life Flr | Margin | GEO | Spcl Svc | Property Type | Occ | Zip Code | MSA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4299930230 | CCCCCCCCCCCCCCCCCCCCCC | 3,935,000 | 3,835,000 | 6.6 | 84.8 | 733 | ARM | LIBOR6MO | 33 | 12.6 | 2.25 | 2.25 | CT | | Single Housing | Own | 6831 | Bridgeport-Stamford-Norwalk, CT |
| 9889919488 | CCCCCCCCCCCCCCCCCCCCCC | 1,999,945 | 2,000,000 | 7.38 | 64.5 | 777 | ARM | LIBOR6MO | 55 | 13.38 | 3 | 3 | NY | Bankruptcy | Multi-Family-2F | Inv | 11201 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 9699634357 | BBBBFF6B3CCCCCCCCCCCC | 1,600,867 | 1,610,000 | 8 | 70 | 756 | ARM | LIBOR6MO | 28 | 14 | 4.25 | 4.25 | IN | | PUD (Planned Unit Development) | Own | 27049 | Indianapolis-Carmel, IN |
| 9789534425 | CCCCCCCCCCCCCCCCCCCCCC | 1,600,000 | 1,600,000 | 6.88 | 69.6 | 673 | ARM | LIBOR6MO | 30 | 12.87 | 3 | 3 | NV | | PUD (Planned Unit Development) | Own | 46032 | Las Vegas-Paradise, NV |
| 4399953230 | FF999996663363363330CCC | 1,531,983 | 1,532,000 | 6.88 | 66.6 | 673 | ARM | LIBOR6MO | 30 | 12.25 | 3 | 3 | NV | Foreclosure | PUD (Planned Unit Development) | Own | 89134 | Las Vegas-Paradise, NV |
| 9999979432 | CCCCCCCCCCCCCCCCCCCCCC | 1,500,000 | 1,500,000 | 6.38 | 60 | 682 | ARM | LIBOR6MO | 49 | 12.38 | 2.25 | 2.25 | NJ | | Single Housing | Own | 7627 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 1499954462 | CCCCCCCCCCCCCCCCCCCCCC | 1,500,000 | 1,500,000 | 7.13 | 75 | 718 | ARM | LIBOR6MO | 21 | 13.12 | 5 | 5 | FL | | Single Housing | Own | 33146 | Miami-Fort Lauderdale-Pompano Beach, FL |
| 1889540956 | CCCCCCCCCCCCCCCCCCCCCC | 1,500,000 | 1,500,000 | 6.88 | 68.2 | 693 | ARM | LIBOR12MO | 25 | 10.88 | 2.25 | 2.25 | CA | | PUD (Planned Unit Development) | Own | 92003 | Los Angeles-Long Beach-Santa Ana, CA |
| 2899921562 | CCCCCCCCCCCCCCCCCCCCCC | 1,377,000 | 1,377,000 | 6.63 | 42.4 | 663 | ARM | LIBOR12MO | 83 | 11.63 | 2.75 | 2.75 | CA | | Single Housing | Vac | 92037 | San Diego-Carlsbad-San Marcos, CA |
| 9589320412 | FF999999999863CCCCCCCCCC | 1,350,000 | 1,350,000 | 8.13 | 75 | 787 | ARM | LIBOR6MO | 31 | 11.38 | 4 | 4 | CA | Foreclosure | Single Housing | Own | 94402 | San Francisco-Oakland-Fremont, CA |
| 5287973552 | CCCCCCCCCCCCCCCCCCCCCC | 1,320,000 | 1,320,000 | 6.63 | 80 | 689 | ARM | LIBOR12MO | 89 | 11.63 | 2.25 | 2.25 | CA | | Single Housing | Own | 91202 | Los Angeles-Long Beach-Santa Ana, CA |
| 9270293526 | CCCCCCCCCCCCCCCCCCCCCC | 1,300,000 | 1,300,000 | 6.88 | 63.4 | 745 | ARM | LIBOR6MO | 49 | 12.38 | 2.75 | 2.75 | CA | | Multi-Family-2F | Own | 90291 | Los Angeles-Long Beach-Santa Ana, CA |
| 4199972229 | 9999RRRRRFFFF63CCCCCCCC | 1,200,000 | 1,200,000 | 5.75 | 63.2 | 720 | ARM | LIBOR6MO | 39 | 11.75 | 3.25 | 3.25 | UT | | Single Housing | Own | 84098 | Salt Lake City, UT |
| 1299946401 | CCCCCCCCCCCCCCCCCCCCCC | 1,165,902 | 1,165,902 | 7.13 | 75 | 645 | ARM | LIBOR6MO | 20 | 13.12 | 5 | 5 | CA | Bankruptcy | Single Housing | Own | 20171 | Washington-Arlington-Alexandria, DC-VA-MD-WV |
| 799939448 | CCCCCCCCCCCCCCCCCCCCCC | 1,100,000 | 1,100,000 | 5.38 | 50 | 749 | ARM | LIBOR6MO | 87 | 11.38 | 2.25 | 2.25 | CA | | Single Housing | Own | 94114 | San Francisco-Oakland-Fremont, CA |
| 4199909243 | 9BFCF6B3CCCCCCCCCCCCCCC | 1,000,000 | 1,000,000 | 6.88 | 68 | 671 | ARM | LIBOR6MO | 30 | 12.87 | 2.25 | 2.25 | MA | | Single Housing | Own | 2043 | Boston-Cambridge-Quincy, MA-NH |
| 4199907440 | CCCCCCCCCCCCCCCCCCCCCC | 1,000,000 | 1,000,000 | 7.75 | 80 | 675 | ARM | LIBOR6MO | 30 | 10.75 | 2.25 | 2.25 | NH | | Single Housing | Own | 1945 | Boston-Cambridge-Quincy, MA-NH |
| 888985544 | CCCCCCCCCCCCCCCCCCCCCC | 1,000,000 | 1,000,000 | 5.75 | 73.5 | 631 | ARM | LIBOR12MO | 27 | 10.75 | 2.25 | 2.25 | CA | | Single Housing | Own | 95148 | San Jose-Sunnyvale-Santa Clara, CA |
| 599918420 | CCCCCCCCCCCCCCCCCCCCCC | 980,069 | 980,069 | 8.75 | 62.5 | 626 | ARM | LIBOR6MO | 53 | 14.75 | 2.75 | 2.75 | TX | | Single Housing | Own | 78737 | Austin-Round Rock, TX |
| 1499066543 | CCCCCCCCCCCCCCCCCCCCCC | 999,999 | 999,999 | 3.5 | 79.6 | 708 | ARM | LIBOR6MO | 2 | 12.87 | 2.88 | 2.88 | GA | | Single Housing | Own | 30097 | Atlanta-Sandy Springs-Marietta, GA |
| 9991999 | CCCCCCCCCCCCCCCCCCCCCC | 977,794 | 999,999 | 6.38 | 77.8 | 672 | ARM | LIBOR12MO | 49 | 14.37 | 2.37 | 2.37 | MD | | Single Housing | Own | 21218 | Baltimore-Towson, MD |
| 9289819428 | CCCCCCCCCCCCCCCCCCCCCC | 999,975 | 999,975 | 6.38 | 76.9 | 749 | ARM | LIBOR6MO | 52 | 12.38 | 4 | 4 | CO | | Single Housing | Own | 80524 | Greeley, CO |
| 799930441 | 3CCCCCCCCCCCCCCCCCCCCC | 996,467 | 996,800 | 8.38 | 63.2 | 696 | ARM | LIBOR6MO | 52 | 14.38 | 2.38 | 2.38 | CA | | Single Housing | Own | 95240 | Stockton, CA |
| 9889821472 | RRRFFF6B3CCCCCCCCCCCC | 989,800 | 990,000 | 6.63 | 90 | 768 | ARM | LIBOR6MO | 49 | 12.62 | 4 | 4 | AZ | | Single Housing | Own | 85297 | Phoenix-Mesa-Scottsdale, AZ |
| 4199944247 | FFFFFFFFFFFF63CCCCCCCC | 970,322 | 990,000 | 6.25 | 90 | 696 | ARM | LIBOR6MO | 56 | 14.25 | 3 | 3 | UT | | Single Housing | Own | 84020 | Salt Lake City, UT |
| 4799854287 | 3RRRRRRFFFFFF836363CCCCCC | 988,000 | 988,000 | 7 | 70 | 766 | ARM | LIBOR6MO | 91 | 13 | 3.25 | 3.25 | DC | | Single Housing | Own | 20009 | Washington-Arlington-Alexandria, DC-VA-MD-WV |
| 99918482 | RRRRRRFFFFFF83663C3CCCC | 976,070 | 976,000 | 6.83 | 81.3 | 639 | ARM | LIBOR6MO | 53 | 14.62 | 2.62 | 2.62 | TN | REO | Single Housing | Inv | 37919 | Knoxville, TN |
| 6909947493 | CCCCCCCCCCCCCCCCCCCCCC | 958,175 | 960,000 | 7.13 | 80 | 718 | ARM | LIBOR6MO | 27 | 13.12 | 3.25 | 3.25 | NV | REO | PUD (Planned Unit Development) | Own | 89135 | Las Vegas-Paradise, NV |
| 87913045 | RRRRR633FFFFF33CCCCCCC | 956,410 | 960,000 | 6.88 | 95 | 642 | ARM | LIBOR6MO | 11 | 12.87 | 2.25 | 2.25 | CA | REO | PUD (Planned Unit Development) | Own | 94506 | San Francisco-Oakland-Fremont, CA |
| 199943431 | 9999999963CCCCCCCCCCCC | 960,000 | 960,000 | 7.75 | 80 | 645 | ARM | LIBOR6MO | 29 | 13.75 | 5 | 5 | NY | Foreclosure | Single Housing | Own | 10504 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 688885507 | FFFFFFFFFFFFFFFFFFFF83 | 959,920 | 959,645 | 6.88 | 80 | 660 | ARM | LIBOR12MO | 55 | 11.87 | 2.25 | 2.25 | FL | | Condo | Own | 33160 | Miami-Fort Lauderdale-Pompano Beach, FL |
| 4399945276 | FFFFFFFFFFFFFFFFFFFF83 | 952,850 | 952,650 | 8.75 | 90 | 703 | ARM | LIBOR6MO | 55 | 14.75 | 3 | 3 | CT | | Single Housing | Inv | 6880 | Bridgeport-Stamford-Norwalk, CT |
| 9789922469 | CCCCCCCCCCCCCCCCCCCCCC | 949,524 | 950,000 | 6.38 | 67 | 767 | ARM | LIBOR6MO | 55 | 12.38 | 3 | 3 | NY | | Single Housing | Own | 10536 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 289922401 | CCCCCCCCCCCCCCCCCCCCCC | 820,000 | 948,000 | 6.63 | 90 | 802 | ARM | LIBOR6MO | 55 | 11.63 | 2.25 | 2.25 | CA | | Single Housing | Inv | 90274 | Los Angeles-Long Beach-Santa Ana, CA |
| 299958422 | FFFFF63CCCCCCCCCCCCCCCC | 937,500 | 937,500 | 7.5 | 75 | 804 | ARM | LIBOR6MO | 23 | 13.5 | 2.75 | 2.75 | WY | REO | Condo | Vac | 83001 | Jackson, WY |
| 9289338466 | CCCCCCCCCCCCCCCCCCCCCC | 935,000 | 935,000 | 5.75 | 39 | 797 | ARM | LIBOR6MO | 55 | 11.75 | 4 | 4 | CA | | Multi-Family-2F | Own | 92662 | Los Angeles-Long Beach-Santa Ana, CA |
| 4299940204 | BBBBBCCCCCCCCCCCCCCCCC | 925,155 | 925,155 | 6.5 | 95 | 660 | ARM | LIBOR6MO | 30 | 14.5 | 3 | 3 | TX | Bankruptcy | PUD (Planned Unit Development) | Vac | 78257 | San Antonio, TX |
| 9889949416 | RRRRRRRRRRRRRRR6FFCCC | 913,110 | 912,000 | 8.25 | 95 | 562 | ARM | LIBOR6MO | 53 | 14.25 | 3 | 3 | NC | REO | PUD (Planned Unit Development) | Own | 28173 | Charlotte-Gastonia-Concord, NC-SC |
| 889923480 | CCCCCCCCCCCCCCCCCCCCCC | 903,000 | 903,000 | 6 | 80 | 700 | ARM | LIBOR6MO | 53 | 14.25 | 3 | 3 | CA | | Single Housing | Inv | 96761 | Boulder, CO |
| 4499970290 | CCCCCCCCCCCCCCCCCCCCCC | 896,154 | 897,750 | 6.88 | 95 | 700 | ARM | LIBOR6MO | 88 | 12.87 | 3.25 | 3.25 | CO | | Multi-Family-2F | Own | 80302 | Boulder, CO |
| 299920403 | 33333333CCCCCCCCCCCCCCCC | 888,000 | 888,000 | 7.5 | 78.6 | 642 | ARM | LIBOR6MO | 62 | 13.5 | 3.25 | 3.25 | DC | | Single Housing | Own | 20011 | Washington-Arlington-Alexandria, DC-VA-MD-WV |
| 4599965251 | FFF99966833CCCCCCCCCCCC | 864,000 | 864,000 | 6.38 | 90 | 686 | ARM | LIBOR6MO | 90 | 12.38 | 2.25 | 2.25 | CA | Foreclosure | PUD (Planned Unit Development) | Own | 92672 | San Diego-Carlsbad-San Marcos, CA |
| 099950492 | CCCCCCCCCCCCCCCCCCCCCC | 883,974 | 884,000 | 8.75 | 90 | 714 | ARM | LIBOR6MO | 26 | 14.75 | 5 | 5 | VA | | Single Housing | Own | 23503 | Virginia Beach-Norfolk-Newport News, VA-NC |
| 3888685551 | CCC99999999999963CCCCCC | 713,950 | 860,000 | 6.38 | 69.5 | 675 | ARM | LIBOR6MO | 49 | 12.38 | 2.75 | 2.75 | CA | | Single Housing | Own | 92866 | Los Angeles-Long Beach-Santa Ana, CA |
| 699945442 | CCCCCCCCCCCCCCCCCCCCCC | 833,240 | 855,000 | 8.13 | 95 | 624 | ARM | LIBOR6MO | 26 | 14.12 | 8.12 | 8.12 | FL | | Single Housing | Own | 34212 | Sarasota-Bradenton-Venice, FL |
| 4099954255 | FB6K3CCCCCCCCCCCCCCCCC | 840,000 | 840,000 | 6.5 | 70 | 755 | ARM | LIBOR6MO | 52 | 12.5 | 8.31 | 8.31 | CA | Foreclosure | Multi-Family-2F | Inv | 92037 | San Diego-Carlsbad-San Marcos, CA |
| 9889979419 | CCCCCCCCCCCCCCCCCCCCCC | 840,000 | 840,000 | 7.88 | 80 | 791 | ARM | LIBOR6MO | 55 | 12 | 3.25 | 3.25 | CA | | Single Housing | Own | 92663 | Los Angeles-Long Beach-Santa Ana, CA |
| 9889972419 | CCCCCCCCCCCCCCCCCCCCCC | 831,800 | 831,800 | 7.88 | 80 | 782 | ARM | LIBOR6MO | 55 | 10.88 | 3.25 | 3.25 | NJ | | Single Housing | Own | 7713 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 988947492 | CCCCCCCCCCCCCCCCCCCCCC | 819,243 | 825,000 | 6 | 73 | 782 | ARM | LIBOR6MO | 55 | 13.5 | 3 | 3 | CA | | Single Housing | Own | 92007 | San Diego-Carlsbad-San Marcos, CA |
| 4699953288 | BFFFF999963CCCCCCCCCCCC | 821,000 | 821,000 | 7.88 | 94.4 | 688 | ARM | LIBOR6MO | 55 | 13.88 | 3 | 3 | CA | Bankruptcy | Single Housing | Own | 90703 | Los Angeles-Long Beach-Santa Ana, CA |
| 8687965570 | CCCCCCCCCCCCCCCCCCCCCC | 820,000 | 820,000 | 6.13 | 61 | 706 | ARM | LIBOR6MO | 27 | 12.13 | 2.25 | 2.25 | CA | | Single Housing | Own | 92262 | Riverside-San Bernardino-Ontario, CA |
| 9889947092 | CCCCCCCCCCCCCCCCCCCCCC | 817,000 | 817,000 | 8.13 | 85 | 719 | ARM | LIBOR6MO | 55 | 13.12 | 3 | 3 | CA | | Single Housing | Own | 94530 | San Francisco-Oakland-Fremont, CA |
| 4089642273 | CCCCCCCCCCCCCCCCCCCCCC | 815,000 | 815,000 | 6.13 | 80 | 700 | ARM | LIBOR6MO | 58 | 14.13 | 3 | 3 | MD | Foreclosure | Single Housing | Own | 20764 | Baltimore-Towson, MD |
| 8889659232 | CCCCCCCCCCCCCCCCCCCCCC | 808,000 | 808,000 | 6.25 | 80 | 718 | ARM | LIBOR12MO | 89 | 11.25 | 2.25 | 2.25 | CA | | PUD (Planned Unit Development) | Own | 94550 | San Jose-Sunnyvale-Santa Clara, CA |
| 5287973539 | 33333CCCCCCCCCCCCCCCCCC | 803,000 | 803,000 | 5.63 | 76.5 | 641 | ARM | LIBOR12MO | 89 | 11.63 | 2.25 | 2.25 | CA | | Single Housing | Own | 92037 | San Diego-Carlsbad-San Marcos, CA |
| 5287973545 | CCCCCCCCCCCCCCCCCCCCCC | 800,000 | 800,000 | 6.13 | 59.3 | 756 | ARM | LIBOR12MO | 89 | 11.12 | 2.25 | 2.25 | CA | | Single Housing | Own | 93110 | Santa Barbara-Santa Maria-Goleta, CA |

Truth In Lending Audit & Recovery Services, LLC
Copyright BLOOMBERG 2/20/2010

# EXHIBIT "J"

## Securitization Flow Chart

# MIKELS SECURITIZATION FLOW CHART

Adjustable Rate Mortgage Trust 2007-3



**ARROW LEGEND**

Purple - Mortgage Documents
Blue - Securities Certificates
Orange - Investor Funds

Truth In Lending Audit & Recovery Services, LLC
Copyright 2010

# EXHIBIT "K"

## Historic Default Rates

# Historical Default Rates

## Mikels Securitization

### Adjustable Rate Mortgage Trust 2007-3

| USD Bal Wtd (Deal: ARMT 2007-3) | 01/2010 | 12/2009 | 11/2009 | 10/2009 | 09/2009 | 08/2009 | 07/2009 | 06/2009 | 05/2009 | 04/2009 | 03/2009 | 02/2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance (M) | 447,700 | 456,570 | 465,110 | 473,667 | 484,963 | 492,975 | 505,038 | 512,885 | 522,132 | 532,365 | 538,228 | 545,066 |
| Pool Factor | 0.712 | 0.727 | 0.74 | 0.754 | 0.772 | 0.785 | 0.804 | 0.816 | 0.831 | 0.847 | 0.857 | 0.867 |
| # of Loans | 1,297 | 1,324 | 1,347 | 1,371 | 1,401 | 1,426 | 1,451 | 1,469 | 1,495 | 1,522 | 1,538 | 1,553 |
| WAC | 7.091 | 7.097 | 7.118 | 7.127 | 7.147 | 7.196 | 7.214 | 7.227 | 7.234 | 7.241 | 7.245 | 7.253 |
| WAM/Age | 327/33 | 328/32 | 329/31 | 330/30 | 331/29 | 332/28 | 333/27 | 334/26 | 335/25 | 336/24 | 337/23 | 338/22 |
| WALTV (Amort) | 77.09% | 77.07% | 77.23% | 77.38% | 77.50% | 77.53% | 77.57% | 77.63% | 77.73% | 78.01% | 78.17% | 78.33% |
| Delinq 30 days | 3.81% | 4.18% | 3.99% | 4.00% | 2.90% | 3.06% | 4.17% | 4.32% | 3.19% | 3.35% | 4.73% | 6.38% |
| Delinq 60 days | 3.49% | 3.04% | 3.27% | 2.50% | 2.83% | 4.02% | 3.56% | 3.27% | 3.16% | 3.85% | 5.39% | 4.05% |
| Delinq 90 days | 16.72% | 17.70% | 16.01% | 16.89% | 16.28% | 10.90% | 11.01% | 12.75% | 11.86% | 9.94% | 4.72% | 3.96% |
| Bankruptcy | 3.37% | 2.78% | 2.60% | 2.45% | 1.91% | 2.12% | 1.86% | 1.71% | 1.84% | 1.47% | 1.32% | 1.16% |
| Foreclosure | 15.83% | 15.37% | 15.94% | 14.69% | 15.02% | 18.28% | 17.42% | 14.56% | 14.49% | 14.64% | 16.17% | 15.49% |
| REO | 7.73% | 7.31% | 7.68% | 7.71% | 7.37% | 7.05% | 6.51% | 6.45% | 6.49% | 6.80% | 6.73% | 5.79% |
| Delinq. 60+ | 43.77% | 43.42% | 42.90% | 41.79% | 41.50% | 40.25% | 38.50% | 37.03% | 36.00% | 35.23% | 33.01% | 29.29% |
| Delinq. 90+ | 40.28% | 40.38% | 39.63% | 39.29% | 38.67% | 36.23% | 34.94% | 33.76% | 32.84% | 31.38% | 27.62% | 25.24% |
| Cum. Loss | 8.24% | 7.44% | 6.76% | 6.12% | 5.36% | 4.72% | 3.82% | 3.26% | 2.44% | 1.82% | 1.49% | 1.25% |
| Second Lien | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Limited Doc. | 78.59% | 78.41% | 78.45% | 78.44% | 78.60% | 78.71% | 78.96% | 79.22% | 79.20% | 79.01% | 78.99% | 79.01% |
| Arm Collat. % | 100 | | | | | | | | | | | |
| Credit Score | 701 | 702 | 702 | 702 | 701 | 701 | 701 | 701 | 701 | 701 | 701 | 701 |
| Balance < 417 | 45.44 | | | | | | | | | | | |
| 1 Mo. CPR | 20.7 | 19.7 | 19.4 | 24.4 | 17.6 | 25 | 16.7 | 19.1 | 20.6 | 12.1 | 13.8 | 11 |
| Geo 1st % | CA 34.6 | CA 34.5 | CA 34.2 | CA 34.3 | CA 33.9 | CA 33.7 | CA 33.5 | CA 33.6 | CA 33.6 | CA 33.4 | CA 33.4 | CA 33.3 |
| Geo 2nd % | FL 13.7 | FL 13.7 | FL 13.7 | FL 13.7 | FL 13.8 | FL 13.7 | FL 13.4 | FL 13.5 | FL 13.3 | FL 13.1 | FL 13.1 | FL 12.9 |
| Geo 3rd % | NY 6.9 | NY 7.0 | NY 6.9 | NY 6.8 | NY 6.8 | NY 6.7 | NY 6.6 | NY 6.5 | NY 6.4 | NY 6.3 | NY 6.3 | NY 6.3 |
| Geo 4th % | NV 5.5 | NV 5.5 | NV 5.7 | NV 5.8 | NV 5.8 | NV 5.8 | NV 5.9 | NV 6.0 | NV 6.0 | NV 5.9 | NV 5.9 | NV 5.9 |

Truth In Lending Audit & Recovery Services, LLC
(c) BLOOMBERG 2/20/2010

# Historical Default Rates

## Mikels Securitization
### Adjustable Rate Mortgage Trust 2007-3

| USD Bal Wtd (Deal: ARMT 2007-3) | 01/2009 | 12/2008 | 11/2008 | 10/2008 | 09/2008 | 08/2008 | 07/2008 | 06/2008 | 05/2008 | 04/2008 | 03/2008 | 02/2008 | 01/2008 | Issuance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance (M) | 550,493 | 556,843 | 563,309 | 569,518 | 576,042 | 580,199 | 583,354 | 589,828 | 598,462 | 602,182 | 611,426 | 617,720 | 623,647 | 628,389 |
| Pool Factor | 0.876 | 0.886 | 0.896 | 0.906 | 0.917 | 0.923 | 0.928 | 0.939 | 0.952 | 0.958 | 0.973 | 0.983 | 0.992 | 1 |
| # of Loans | 1,568 | 1,577 | 1,591 | 1,604 | 1,618 | 1,629 | 1,636 | 1,648 | 1,667 | 1,676 | 1,697 | 1,717 | 1,732 | 1,750 |
| WAC | 7.262 | 7.262 | 7.252 | 7.259 | 7.267 | 7.271 | 7.275 | 7.283 | 7.29 | 7.29 | 7.28 | 7.276 | 7.272 | 7.266 |
| WAM/Age | 339/21 | 340/20 | 341/19 | 342/18 | 343/17 | 344/16 | 345/15 | 346/14 | 347/13 | 348/12 | 349/11 | 350/10 | 351/9 | 352/8 |
| WALTV (Amort) | 78.31% | 78.36% | 78.38% | 78.48% | 78.50% | 78.57% | 78.65% | 78.63% | 78.63% | 78.61% | 78.45% | 78.38% | 78.39% | 78.37% |
| Deling 30 days | 4.95% | 5.70% | 3.78% | 4.00% | 3.54% | 3.39% | 4.16% | 3.06% | 3.02% | 2.89% | 2.82% | 2.87% | 0.14% | |
| Deling 60 days | 4.12% | 3.02% | 3.23% | 2.93% | 3.08% | 3.35% | 2.58% | 2.83% | 2.83% | 2.29% | 2.50% | 0.13% | 0.00% | |
| Deling 90 days | 3.45% | 4.11% | 1.78% | 1.61% | 1.61% | 2.00% | 1.46% | 1.30% | 0.69% | 0.46% | 0.02% | 0.00% | 0.00% | |
| Bankruptcy | 0.93% | 0.98% | 1.20% | 0.94% | 0.75% | 0.42% | 0.24% | 0.14% | 0.25% | 0.18% | 0.11% | 0.07% | 0.00% | 0.00% |
| Foreclosure | 15.09% | 11.81% | 12.59% | 11.18% | 9.87% | 7.18% | 7.12% | 5.18% | 3.68% | 2.01% | 0.00% | 0.00% | 0.00% | 0.00% |
| REO | 3.92% | 3.81% | 3.00% | 2.63% | 2.11% | 1.62% | 0.53% | 0.41% | 0.20% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Delinq. 60+ | 26.58% | 22.75% | 20.60% | 18.35% | 16.67% | 14.15% | 11.69% | 9.72% | 7.40% | 4.76% | 2.63% | 0.13% | 0.00% | |
| Delinq. 90+ | 22.46% | 19.73% | 17.37% | 15.42% | 13.59% | 10.80% | 9.11% | 6.89% | 4.57% | 2.47% | 0.13% | 0.00% | 0.00% | |
| Cum. Loss | 0.95% | 0.86% | 0.67% | 0.45% | 0.35% | 0.30% | 0.22% | 0.10% | 0.02% | 0.00% | 0.00% | 0.00% | 0.00% | |
| Second Lien | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Limited Doc. | 78.94% | 78.97% | 78.97% | 79.13% | 79.14% | 79.08% | 79.10% | 79.32% | 79.17% | 79.12% | 78.70% | 78.47% | 78.34% | 78.06% |
| Arm Collat. % | | | | | | | | | | | | | | 100 |
| Credit Score | 701 | 702 | 702 | 701 | 702 | 701 | 701 | 701 | 701 | 701 | 701 | 702 | 702 | 702 |
| Balance < 417 | | | | | | | | | | | | | | 43.51 |
| 1 Mo. CPR | 12.6 | 12.7 | 12.1 | 12.6 | 8.1 | 6.1 | 12.2 | 15.8 | 7 | 16.5 | 11.4 | 10.6 | 8.5 | |
| Geo 1st % | CA 33.4 | CA 33.7 | CA 34.1 | CA 34.1 | CA 33.8 | CA 33.6 | CA 33.7 | CA 33.6 | CA 33.4 | CA 33.3 | CA 33.5 | CA 33.2 | CA 33.0 | CA 32.8 |
| Geo 2nd % | FL 12.9 | FL 12.8 | FL 12.7 | FL 12.6 | FL 12.6 | FL 12.4 | FL 12.4 | FL 12.6 | FL 12.8 | FL 12.7 | FL 12.6 | FL 12.5 | FL 12.4 | FL 12.4 |
| Geo 3rd % | NY 6.3 | NY 6.4 | NY 6.3 | NY 6.2 | NY 6.2 | NY 6.2 | NY 6.2 | NY 6.2 | NY 6.1 | NY 6.1 | NY 6.0 | NY 5.6 | NY 6.1 | NY 6.1 |
| Geo 4th % | NV 5.8 | NV 5.9 | NV 5.8 | NV 5.8 | NV 5.9 | NV 5.8 | NV 5.8 | NV 5.7 | NV 5.7 | NV 5.7 | NV 5.6 | NV 5.6 | NV 5.5 | NV 5.5 |

# EXHIBIT "L"

## Tranche Structure Paydown & Tranche Structure Paydown at Default Rate

# Securitization Screen Shots

Lender:  Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage
Borrower:  Marshall E. Mikels
Trust Fund:  Adjustable Rate Mortgage Trust 2007-3

## Tranche Structure Paydown



# Securitization Screen Shots

Lender:  Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage
Borrower:  Marshall E. Mikels
Trust Fund:  Adjustable Rate Mortgage Trust 2007-3

## Tranche Structure Paydown At Default Rate



# EXHIBIT "M"

## Bogus & Missing Assignments

**SECURITIZATION & FORECLOSURE ANALYSIS**

Marshall E. Mikels v. U.S. Bank, N.A. as Trustee of ARMT 2007-3 Trust

## BOGUS & MISSING ASSIGNMENTS

Borrower:  Marshall E. Mikels
Lender:  Fisher Financial Group, Inc. d/b/a NationsChoice Mortgage
Assignee:  Adjustable Rate Mortgage Trust 2007-3

**TRANSFERS & ASSIGNMENTS REQUIRED BY SECURITIZATION DOCUMENTS**

**BOGUS ASSIGNMENTS RECORDED IN OFFICIAL RECORDS - COUNTY OF SAN MATEO, CA**

Marshall E. Mikels
**MORTGAGOR**
**$1,350,000.00**

SETTLEMENT DATE: JULY 11, 2007

Marshall E. Mikels
**MORTGAGOR**
**$1,350,000.00**

SETTLEMENT DATE: JULY 11, 2007

**NOTE & MORTGAGE**

**NOTE & MORTGAGE**

A.  Fisher Financial Group, Inc.
**ORIGINATOR**

FISHER FINANCIAL GROUP, INC. SOLD THE LOAN TO
DLJ MORTGAGE CAPITAL, INC. ON JULY 11, 2007

A.  Fisher Financial Group, Inc.
**ORIGINATOR**

FISHER FINANCIAL SOLD LOAN TO DLJ MORTGAGE
CAPITAL, INC. ON JULY 11, 2007

**MISSING ASSIGNMENT #1**

**BOGUS ASSIGNMENT**

B.  DLJ Mortgage Capital, Inc.
**SELLER / SPONSOR**

DLJ MORTGAGE CAPITAL, INC. SOLD THE LOAN TO
CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP. ON OR ABOUT DECEMBER 1, 2007

D.  Adjustable Rate Mortgage Trust 2007-3
**TRUST FUND - ISSUING ENTITY**

HOLDS POOL OF LOANS; ISSUES CERTIFICATES
CLOSING DATE: DECEMBER 26, 2007

**MISSING ASSIGNMENT #2**

U.S. Bank National Association
**TRUSTEE**

ARMT 2007-3

C.  Credit Suisse First Boston Mortgage Securities Corp.
**DEPOSITOR**

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. SOLD
THE LOAN TO ARMT 2007-3 ON OR ABOUT DECEMBER 26, 2007

**MISSING ASSIGNMENT #3**

D.  Adjustable Rate Mortgage Trust 2007-3
**TRUST FUND - ISSUING ENTITY**

HOLDS POOL OF LOANS; ISSUES CERTIFICATES
CLOSING DATE: DECEMBER 26, 2007

U.S. Bank National Association
**TRUSTEE**

ARMT 2007-3

Truth In Lending Audit & Recovery Services, LLC
Copyright 2010

1  TIMOTHY Y. FONG
   ATTORNEY AT LAW
2  CA SBN#255221
3  3333 Bowers Avenue, STE 130
   Santa Clara, CA 95054
4  Tel 408-627-7810
   Fax 408-457-9417
5  tyfong919@gmail.com
   Attorney for plaintiff
6  Marshall Mikels

7

8              SUPERIOR COURT OF CALIFORNIA
                  COUNTY OF SAN MATEO
9

10 MARSHALL MIKELS,                           Case No.
                              Plaintiff
11                   Vs
   U.S. BANK, NATIONAL
12 ASSOCIATION, 45202-3923 AS
   TRUSTEE ON BEHALF OF THE
13 HOLDERS OF THE ADJUSTABLE
   RATE MORTGAGE TRUST 2007-3
14 ADJUSTABLE RATE MORTGAGE
   BACKED PASS THROUGH
15 CERTIFICATES SERIES 2007-3,
16 AND TRUSTEE AND OR AGENT FOR
   BENEFICIARIES KNOWN OR
17 UNKNOWN; FISHER FINANCIAL
   GROUP, INC., DBA,
18 NATIONSCHOICE MORTGAGE, AN
19 ARIZONA CORPORATION QUALIFIED
   TO DO BUSINESS IN CALIFORNIA;
20 MORTGAGE ELECTRONIC
   REGISTRATION SYSTEMS, INC., A
21 VIRGINIA CORPORATION
22 ("MERS"); SELECT PORTFOLIO
   SERVICING INC. ("SPS"), A
23 UTAH CORPORATION QUALIFIED TO
   DO BUSINESS IN CALIFORNIA;
24 NATIONAL DEFAULT SERVICING
   CENTER, INC. AN ARIZONA
25 CORPORATION QUALIFIED TO DO
26 BUSINESS IN CALIFORNIA
   ("NDSC"); DOES 1 THROUGH 100,
27                              Defendants

28
                                  1
   AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY
                              RESTRAINING ORDER

1
2    **AFFIDAVIT OF MARIE MCDONNELL IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
3                        **TEMPORARY RESTRAINING ORDER**
4
5    I, Marie McDonnell, being duly sworn declare as follows:

6         1.       I, Marie McDonnell, am a *Mortgage Fraud and Forensic Analyst* and a credentialed

7    Certified Fraud Examiner. I am the founder and managing member of Truth In Lending Audit &

8    Recovery Services, LLC located in Orleans, Massachusetts and have twenty-three years' experience
9
     in transactional analysis and mortgage fraud investigation.
10
11        2.       Attorney Timothy Y. Fong engaged me to perform a Securitization and Foreclosure

12   Analysis with respect to a certain consumer mortgage transaction by and between Fisher Financial

13   Group, Inc. d/b/a NationsChoice Mortgage ("Fisher Financial") and Marshall E. Mikels on July 11,

14   2007 secured by Mr. Mikels' primary residence located at 115 15th Avenue, San Mateo, California

15   94402 (the "Loan").
16
          3.       Presently, Mr. Mikels' property is scheduled to be sold at a Trustee's Sale on
17
18   Tuesday, March 2, 2010 by a party other than the originating Lender, Fisher Financial.

19        4.       The purpose of my analysis is to present the Court with evidence that is readily

20   available in the public records of which the Court may take judicial notice that supports Mr. Mikels'

21   request for a Temporary Restraining Order enjoining the Trustee's Sale.

22        5.       I present my *Securitization & Foreclosure Analysis* in a separate report which I attach
23
     hereto and incorporate herein as Exhibit #1.
24
          6.       My *Securitization & Foreclosure Analysis* is true and accurate to the best of my
25
26   present knowledge given the evidence available to me as of this date. I am prepared to testify to the

27   facts and findings contained therein if and when that opportunity arises.

28
                                                    2

mortgage loans.

The loan-to-value ("LTV") ratio of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the stated principal balance of the mortgage loan at the date of determination and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the related mortgaged property and its appraised value determined in an appraisal obtained by the originator at origination of the mortgage loan, or (b) in the case of a refinance, the appraised value of the mortgaged property at the time of such refinance. No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTV ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on those mortgage loans.

**Mortgage Adjustment Rate of Adjustable Rate Mortgage Loans**

Generally, each adjustable rate mortgage loan has an initial fixed mortgage interest rate for approximately one month, three months, six months, one year, two years, three years, four years, five years, seven years or ten years after the origination of such mortgage loan. Each mortgage note related to an adjustable rate mortgage loan generally will provide for adjustments to the mortgage interest rate thereon on or about one month from, three months from, six months from, or the first, second, third, fourth, fifth or seventh anniversary of, the first due date, as applicable, and in each case generally either every one month, six months or twelve months thereafter (each, an "Adjustment Date"). On each Adjustment Date, the mortgage interest rate on each adjustable rate mortgage loan will adjust to the sum of the applicable index and the number of basis points specified in the applicable mortgage note (the "Margin"), rounded to the nearest one eighth of one percent, subject to the limitation that, with respect to certain mortgage loans, the mortgage interest rate at such adjustment may not vary from the mortgage interest rate in effect immediately prior to such adjustment by more than the number of basis points specified in the mortgage note (the "Periodic Cap"). In addition, adjustments to the mortgage interest rate for all of the adjustable rate mortgage loans are subject to a lifetime maximum interest rate (a "Rate Ceiling"). Similarly, many adjustable rate mortgage loans specify a lifetime minimum interest rate (a "Rate Floor") which in most cases is equal to the Margin for that mortgage loan. Except with respect to any adjustments during an initial interest only

S-20

period, on the first due date following each Adjustment Date for each adjustable rate mortgage loan, the monthly payment for the mortgage loan will be adjusted, if necessary, to an amount that will fully amortize such mortgage loan at the adjusted mortgage interest rate over its remaining scheduled term to maturity.

**Interest Only Mortgage Loans**

Some or all of the mortgage loans (in each case by Cut-off Date Principal Balance) (the "Interest Only Mortgage Loans") will not provide for any payments of principal prior to a certain time, which may range from the first Adjustment Date of a mortgage loan to ten years from the origination of a mortgage loan.

**The Indices**

The Indices for the initial adjustable-rate mortgage loans in each loan group generally will be as One-Year CMT, One-Month LIBOR, Six-Month LIBOR or One-Year LIBOR.

**One-Month LIBOR**

"One-Month LIBOR" is defined to be the rate for one month U.S. dollar denominated deposits offered in the London interbank market as published by The Wall Street Journal, or some other source generally accepted in the residential mortgage loan origination business, including Fannie Mae, and most recently available as of the first business day of the month immediately preceding the month of the applicable Adjustment Date. In the event such Index is no longer available, the applicable servicer or the master servicer will select a substitute Index in accordance with the terms of the related mortgage note and in compliance with federal and state law.

Listed below are historical values of certain average yields, which are related to One-Month LIBOR. The monthly averages shown are intended only to provide an historical summary of the movements in One-Month LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P., and may not be identical to One-Month LIBOR as published by a different source for the same period.

**One-Month LIBOR**

| Month | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|
| January.......... | 5.320008 | 4.570008 | 2.590008 | 1.100008 | 1.340008 | 1.847508 | 5.570008 | 5.885008 |

| Month | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| February | 5.32000 | 4.63313 | 2.71625 | 1.09750 | 1.33750 | 1.87000 | 5.20750 | 5.91875 |
| March | 5.32000 | 4.80938 | 2.87000 | 1.09000 | 1.30000 | 1.87875 | 5.08000 | 6.13250 |
| April | 5.32000 | 5.00000 | 3.08875 | 1.10000 | 1.32000 | 1.84000 | 4.43250 | 6.29125 |
| May | 5.32000 | 5.11063 | 3.13000 | 1.11375 | 1.32000 | 1.84375 | 4.05750 | 6.65375 |
| June | | 5.33438 | 3.34000 | 1.36875 | 1.12000 | 1.87375 | 3.16250 | 6.64188 |
| July | | 5.39060 | 3.51875 | 1.50375 | 1.10000 | 1.82000 | 3.75000 | 6.62063 |
| August | | 5.33000 | 3.70000 | 1.67000 | 1.11938 | 1.82000 | 3.58125 | 6.63000 |
| September | | 5.32180 | 3.86375 | 1.67400 | 1.19125 | 1.81625 | 2.63000 | 6.61750 |
| October | | 5.32135 | 4.04400 | 2.00000 | 1.12000 | 1.71625 | 2.62750 | 6.62000 |
| November | | 5.35000 | 4.09000 | 2.00000 | 1.12000 | 1.43875 | 2.11875 | 6.80375 |
| December | | 5.32188 | 4.29375 | 2.29000 | 1.17000 | 1.38000 | 1.87375 | 6.56125 |
| | | | 4.39000 | 2.40000 | 1.12000 | | | |

## Six-Month LIBOR

    "Six-Month LIBOR" is defined to be the rate for six-month U.S. dollar denominated deposits offered in the London interbank market as published by The Wall Street Journal, or some other source generally accepted in the residential mortgage loan origination business, including Fannie Mae, and most recently available as of the first business day of the month immediately preceding the month of the applicable Adjustment Date. In the event such Index is no longer available, the applicable servicer or the master servicer will select a substitute Index in accordance with the terms of the related mortgage note and in compliance with federal and state law.

S-21

    Listed below are historical values of certain average yields, which are related to Six-Month LIBOR. The monthly averages shown are intended only to provide an historical summary of Six-Month movements in Six-Month LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to Six-Month LIBOR as published by a different source for the same period.

### Six-Month LIBOR

| Month | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|
| January | 5.40125% | 4.81000% | 3.11000% | 1.21375% | 1.34875% | 2.03375% | 5.26250% | 6.28875% |
| February | 5.33000 | 4.99000 | 3.04670 | 1.17000 | 1.34000 | 2.03000 | 4.90750 | 6.33125 |
| March | 5.32969 | 5.14000 | 3.46000 | 1.16000 | 1.23125 | 2.33000 | 4.71000 | 6.52625 |
| April | 5.36000 | 5.22000 | 3.40875 | 1.29000 | 1.29000 | 2.32000 | 4.30250 | 6.73125 |
| May | 5.38475 | 5.33000 | 3.53750 | 1.57750 | 1.21375 | 2.08000 | 3.98000 | 7.10500 |
| June | | 5.58938 | 3.71000 | 1.94000 | 1.11938 | 1.95625 | 3.90875 | 7.00000 |
| July | | 5.51000 | 3.92375 | 1.96000 | 1.14625 | 1.87000 | 3.68875 | 6.89375 |
| August | | 5.43125 | 4.05500 | 1.99000 | 1.14313 | 1.79000 | 3.45250 | 6.83000 |
| September | | 5.37000 | 4.23063 | 2.19625 | 1.18000 | 1.71000 | 3.15250 | 6.76000 |
| October | | 5.38750 | 4.46625 | 2.31250 | 1.23000 | 1.60000 | 2.14625 | 6.72000 |
| November | | 5.36808 | 4.60063 | 2.62500 | 1.25875 | 1.46875 | 2.03000 | 6.64000 |
| December | | 5.37000 | 4.70000 | 2.92000 | 1.22000 | 1.38000 | 1.98125 | 6.20375 |

## One-Year LIBOR

    "One-Year LIBOR" is defined to be the rate for one-year U.S. dollar denominated deposits offered in the London interbank market as published in The Wall Street Journal, and most recently available as of the first business day of the month immediately preceding the month of the applicable Adjustment Date. In the event such Index is no longer available, the applicable servicer or the master servicer will select a substitute Index in accordance with the terms of the related mortgage note and in compliance with federal and state law.

    Listed below are historical values of certain average yields, which are related to One-Year LIBOR. The monthly averages shown are intended only to provide an historical summary of One-Year movements in One-Year LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to One-Year LIBOR as published by a different source for the same period.

### One-Year LIBOR

| Month | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|
| January | 5.43125% | 4.94000% | 3.46000% | 1.47625% | 1.45000% | 2.49125% | 5.17375% | 6.75000% |
| February | 5.23813 | 5.15000 | 3.37810 | 1.36750 | 1.38125 | 2.43000 | 4.88375 | 6.76375 |
| March | 5.32000 | 5.28750 | 3.84500 | 1.35125 | 1.28000 | 3.00250 | 4.66750 | 6.94375 |
| April | 5.29500 | 5.28563 | 3.68625 | 1.83000 | 1.28500 | 2.63375 | 4.44125 | 7.10125 |
| May | 5.39000 | 5.42625 | 3.78000 | 2.05750 | 1.21125 | 2.61125 | 4.24750 | 7.24750 |
| June | | 5.69313 | 3.88000 | 2.46250 | 1.19000 | 2.28625 | 4.18375 | 7.18000 |
| July | | 5.55938 | 4.16250 | 2.43375 | 1.26625 | 2.09000 | 3.82000 | 7.08000 |
| August | | 5.41000 | 4.24000 | 2.30000 | 1.43000 | 1.89625 | 3.56375 | 6.97000 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| September.............. | 5.29750 | 4.44000 | 2.48250 | 1.30000 | 1.72500 | 2.64250 | 6.80125 |
| October................ | 5.34125 | 4.72000 | 2.54625 | 1.48000 | 1.63625 | 2.27188 | 6.73000 |
| November............... | 5.24040 | 4.79000 | 2.96000 | 1.56250 | 1.72750 | 2.38625 | 6.55000 |
| December............... | 5.32938 | 4.83875 | 3.23500 | 1.45688 | 1.44938 | 2.44250 | 6.00000 |

**One-Year CMT**

"One-Year CMT" is defined to be the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board, published in Federal Reserve Statistical Release H.15(519) and most recently available as of the date 45 days before the applicable Adjustment Date. In the event such Index is no longer available, the applicable servicer or the master servicer will select a substitute Index in accordance with the terms of the related mortgage note and in compliance with federal and state law.

Listed below are historical values of certain average yields, which are related to One-Year CMT. The values shown are the average monthly yields on United States Treasury Securities adjusted for a constant maturity of one-year for the months indicated, published by the Federal Reserve Board. By contrast, One-Year CMT is

S-22

determined by reference to a weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, rather than such monthly average yields. The monthly averages shown are intended only to provide an historical summary of the movements in yields on United States Treasury Securities adjusted to a constant maturity of one year and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to One-Year CMT as published by a different source for the same period.

**One-Year CMT**

| Month | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|
| January................ | 5.09% | 4.45% | 2.86% | 1.24% | 1.36 | 2.16% | 4.81% | 6.12% |
| February............... | 5.05 | 4.68 | 3.03 | 1.24 | 1.30 | 2.23 | 4.68 | 6.22 |
| March.................. | 4.92 | 4.77 | 3.30 | 1.19 | 1.24 | 2.57 | 4.30 | 6.22 |
| April.................. | 4.90 | 4.90 | 3.32 | 1.43 | 1.27 | 2.48 | 3.98 | 6.15 |
| May.................... | 4.91 | 5.00 | 3.33 | 1.78 | 1.18 | 2.35 | 3.78 | 6.33 |
| June................... | | 5.16 | 3.36 | 2.12 | 1.18 | 2.20 | 3.58 | 6.17 |
| July................... | | 5.22 | 3.64 | 2.10 | 1.12 | 1.96 | 3.62 | 6.08 |
| August................. | | 5.08 | 3.87 | 2.02 | 1.31 | 1.76 | 3.47 | 6.18 |
| September.............. | | 4.97 | 3.85 | 2.12 | 1.24 | 1.72 | 2.82 | 6.13 |
| October................ | | 5.01 | 4.18 | 2.23 | 1.25 | 1.65 | 2.33 | 6.01 |
| November............... | | 5.01 | 4.33 | 2.50 | 1.34 | 1.49 | 2.38 | 6.09 |
| December............... | | 4.95 | 4.35 | 2.67 | 1.31 | 1.45 | 2.22 | 5.60 |

**Mortgage Loan Statistical Information**

Certain statistical characteristics of the initial mortgage loans to be deposited in the mortgage pool, as of the initial cut-off date unless otherwise indicated, will be set forth in the related term sheet.

**Prefunding and Conveyance of Subsequent Mortgage Loans**

On the closing date, funds may be deposited into a prefunding account established and maintained by the trust administrator on behalf of the certificateholders of one or more of the floating rate loan groups. The amount deposited in any prefunding account will be used to purchase additional mortgage loans to a certain floating rate loan group or floating rate loan groups, referred to as the "Subsequent mortgage loans." Any investment income earned from amounts in any prefunding account shall be paid to the depositor and will not be available for payments on the certificates. With respect to any prefunding account, during the period from the closing date until the earliest of (i) the date on which the amounts on deposit in such prefunding account have been reduced to zero, (ii) an event of default occurs under the pooling and servicing agreement or (iii) a date to be specified in the related term sheet, such period is referred to in this term sheet supplement as the "prefunding period," the depositor is expected to purchase subsequent mortgage loans from the seller, or other mortgage loan sellers, and sell such subsequent mortgage loans to the trust. The purchase price for each subsequent mortgage loan will equal the principal balance of such subsequent mortgage loan and will be paid from the related on deposit in the related prefunding account. Accordingly, the purchase of subsequent mortgage loans will decrease the related the mortgage loans such loan group or groups.

The characteristics of the mortgage loans in the trust will vary upon the acquisition of subsequent mortgage loans.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC  Document 1-1  Filed 01/04/12  Page 134 of 150

2/25/2010 6:54 PM

The obligation of the trust to purchase subsequent mortgage loans during a prefunding period, if applicable, will be subject requirements as set forth in the prospectus supplement.

## Underwriting Standards

The mortgage loans either have been or will be originated by the seller or purchased by the seller from various banks, savings and loan associations, mortgage bankers or other mortgage loan originators and have been or will be originated in accordance with the underwriting criteria described herein.

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As a part of the description of the mortgagor's financial condition, the mortgagor will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions, current payments and prior mortgage payments. In the case of investment properties and two- to four-unit dwellings, rental income from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all other payments on obligations equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full documentation," "alternative documentation," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative documentation," "reduced documentation," "stated income/stated asset" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative documentation" program requires information regarding the mortgagor's income, in the form of, for example, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full documentation" loan, however, alternative forms of standard verifications are used. Generally, under "full documentation" and "alternative documentation" programs at least one year of income verification of a mortgagor's stated income is undertaken by the originator, either no documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator, no verification of either a mortgagor's income or assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor's assets is undertaken by the originator. Under the "stated income/stated assets" program, the stated value of the assets income/no asset" program may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre established appraisal

S-23

procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre established appraisal procedure guidelines

S-24

established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

## DLJ Mortgage Capital Underwriting Standards

The sponsor acquires mortgage loans through its whole-loan flow acquisition channel from originators that the sponsor has determined met its qualified correspondent requirements. Such standards require that the sponsor (i) the following conditions be satisfied: (i) the related mortgage loans were qualified pursuant to a mortgage loan purchase agreement between the sponsor and the applicable loans from time to time, for sale to the sponsor, in accordance with underwriting guidelines designated by the sponsor ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such mortgage loans were in fact underwritten as described in the Designated Guidelines were, at the sponsor within 270 days after the related origination dates; (iii) sponsor on a consistent basis for use by originators in originating mortgage loans to be purchased by the sponsor and (iv) the sponsor employed, at the time such mortgage loans were underwritten, designated by the sponsor, certain quality assurance procedures designed to ensure that the applicable qualified correspondent from which it purchased the related mortgage loans properly applied the underwriting criteria designated by the sponsor.

## Underwriting Standards

The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac. primarily with respect to original principal balances, loan to value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower. Neither the depositor nor any affiliate, including the sponsor, has re underwritten any mortgage loan.

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, other than with respect to no income/no asset" documentation loans the mortgagor will have furnished information with respect to its assets, liabilities and income (except, with respect to "no income/no asset" and certain other property types. To the extent required documentation, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any mortgagor may have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and one to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor with respect to other sources. With property generally will have been considered for underwriting purposes.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property (such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses), generally, mortgage loan payments, generally, mortgage loan payments during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the loan to value ratio of the mortgage loan. The sponsor may also consider the amount of liquid assets available to the mortgagor after origination.

S-25

documentation," "reduced documentation," "alternative documentation" or "alternative" programs, the "alternative documentation," "stated income/stated assets" or "no income/no assets" and "no income/no asset" programs generally require either an alternative to the standard Fannie Mae/Freddie Mac-approved forms for verification of income/employment, assets and certain payment. Generally, an "alternative documentation" program requires less documentation and verification than do full documentation programs which generally require the mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs) and assets information regarding the mortgagor's "full documentation" loan, however, alternative forms of standard verification, as does a both "full documentation" and "alternative documentation" programs at least one year of verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is provided. Generally, under a "reduced documentation" program, either no loans having only one year of income verification and loans to mortgagor with an acceptable payment histories and credit scores but no information or verification of the mortgagor's income. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, such mortgagor's income and/or assets is not required to state his or her income or assets and therefore no verification of loans originated under the "no income/no asset" program. The underwriting for mortgage estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal, however, is based upon a market data analysis of recent sales of comparable properties and, deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

**Credit Suisse Financial Corporation Underwriting Standards**

Credit Suisse Financial Corporation, also referred to herein as an Originator, is a Delaware corporation. The Originator conducts its lending through wholesale loan production offices. The Originator operates more than two wholesale loan production offices located in three states and makes loans throughout all 50 states and the District of Columbia. The Originator has been originating mortgage loans since its 2003. The principal executive offices of the Originator are located at 302 Carnegie Center, 2nd Floor, Princeton, New Jersey 08540.

**Underwriting Standards**

The mortgage loans were originated or acquired by Credit Suisse Financial Corporation generally in accordance with the underwriting criteria described herein.

S-26

The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of the mortgage loans generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan to value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent, if at all, that reflect under its programs different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. In each application for a mortgage loan, the prospective borrower will have furnished information concerning description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history,

employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full documentation," "alternative documentation," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. Under an "alternative documentation," "reduced income/stated assets," "stated income/stated assets" and "no income/no asset" program generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain liabilities. Under a "full documentation" program requires information regarding the mortgagor's income (i.e., W-2 forms, tax returns or pay stubs) and assets (i.e., bank statements) as does a "full documentation" loan, however, alternative forms of verifications are used. Generally, under both "full documentation" and "alternative documentation" programs at least one year of income verification is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Under a "stated income/stated assets" program, originator although both income and assets are stated on the loan application and therefore "reasonableness" state this of her income. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income. Generally, under a "no income/no asset" program, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for mortgage loans originated under the "no income/no asset" program may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the estimated value of the mortgaged property in connection with a refinance of an existing mortgagor.

S-27

**STATIC POOL INFORMATION**

The depositor will make available any of the sponsor's material static pool information required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering, if any, located in the applicable series hyperlink at http://www.crefc.suisse.atm.static.pool.com. Access this web address on the internet and free of charge, the static pool information includes (i) information about the original characteristics of the securitized pool as of the cut off date for that pool and (ii) describing delinquency information about each prior securitized pool. For purposes of the delinquency loss and prepayment information, a mortgage loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the next following monthly due date. The determination as to whether a mortgage loan fails into this

category is made as of the close of business on the last business day of each month. For example, a mortgage loan due for December 1 at the close of business on January 31 would be described as 30 to 59 days delinquent in the February trust and static pool reporting.

The static pool information is not deemed to be a part of the accompanying base prospectus or any registration statement to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 or (b) information relating to assets of any trust fund established on or after July 1, 2006, which information relates to periods prior to January 1, 2006.

## AFFILIATES AND RELATED TRANSACTIONS

The sponsor, the depositor and the underwriter are affiliated entities and wholly owned subsidiaries of Credit Suisse Holdings (USA), Inc. Each of the cap counterparty, if applicable, and swap counterparty, if applicable is an affiliate of Credit Suisse Holding (USA), Inc. In addition, on October 4, 2005, Credit Suisse (USA), Inc., an affiliate of the sponsor, acquired all of the outstanding stock of SPS's parent from the prior shareholders. There is not currently any other relationship not during the past two years any material business relationship, arrangement or other understanding between any of the sponsor, the depositor, the underwriter or SPS that was entered into outside the the ordinary course of business of each such party or on terms other than would be obtained in an arm's length transaction with unaffiliated entities.

## THE CAP AND SWAP COUNTERPARTY

Each of the cap counterparty or swap counterparty with respect to any cap agreement or swap agreement will be Credit Suisse International ("CSi"). CSi was incorporated in England and Wales under the Companies Act 1985 on May 9, 1990 with registered no. 2500199 and was re-registered as unlimited under the name "Credit Suisse Financial Products" on July 6, 1990. Its registered office and principal place of business is at One Cabot Square, London E14 4QJ. CSi is an English bank and is regulated as a European Union credit institution by The Financial Services Authority ("FSA") under the Financial Services and Markets Act 2000. The FSA has issued a scope of permission notice authorizing CSi to carry out specified regulated investment activities. Effective as of March 27, 2000, Credit Suisse Financial Products was renamed "Credit Suisse First Boston International" and, effective as of January 16, 2006, was renamed "Credit Suisse International". These changes were renamings only.

CSi is an unlimited liability company and, as such, its shareholders have a joint, several and unlimited obligation to meet any insufficiency in the assets of CSi in the event of its liquidation. CSi's ordinary shares are owned, as to 56%, by Credit Suisse, as to 24%, by Credit Suisse (International) Holding AG and, as to 20%, by Credit Suisse Group. CSi commenced business on July 16, 1990. Its principal business is banking, including the trading of derivative products linked to interest rates, equities, foreign exchange, commodities and credit.

CSi has been assigned a senior unsecured debt rating of "AA- (stable outlook)" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., a senior debt rating of "Aa3 (stable outlook)" by Moody's Investors Service Inc. and a long-term rating of "AA- (stable outlook)" by Fitch Ratings.

CSi is an affiliate of the depositor, the seller, the underwriter and SPS.

S-28

## SERVICING OF MORTGAGE LOANS

### General

Wells Fargo will act as master servicer of all of the mortgage loans. The mortgage loans will initially be serviced by the entities listed in the prospectus supplement.

The master servicer will oversee and enforce the servicing by the servicers (other than the designated servicers) of the mortgage loans serviced by each of them in accordance with the servicing provisions of the pooling and servicing agreement.

If applicable, a modification oversight agent may be appointed pursuant to the pooling and and loan modifications, the modification oversight agent will have the authority to review short sales or modify a proposed short sale or loan modification (other than the designated servicers) to make, not make, modification oversight agent, such servicers do not need to obtain, in the absence of direction from the obligation to supervise or oversee the servicing activities of any servicer (other than with respect to the approval of short sale or loan modification as described above).

Each of SPS and Wells Fargo will be directly responsible for servicing the mortgage loans serviced by it under the terms of the pooling and servicing agreement.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 139 of 150

Under the pooling and servicing agreement, the servicers may contract with subservicers to perform, or cause any of their servicing duties. Regardless of the servicing arrangement, the servicers will remain liable for their servicing duties and obligations under the applicable Servicing Agreement. Additionally, any servicer, other than a designated servicer, may enter into special servicing agreements as more fully described in "*Servicing of Mortgage Loans—Special Servicing Agreements*" herein. None of the servicers or the special servicer will have any servicing obligations with respect to the mortgage loans not serviced by it.

Each servicer will make reasonable efforts to collect or cause to be collected all payments called for under the terms and provisions of the mortgage loans serviced by it and, to the extent those procedures are consistent with the applicable Servicing Agreement, will follow collection procedures as are followed for mortgage loans comparable to the mortgage loans in the trust in the local areas where each mortgaged property is located. Under the applicable Servicing Agreement, each servicer will establish and maintain, or cause to be established and maintained, one or more collection accounts into which deposits will be made on a daily basis of payments and collections on the mortgage loans serviced by it net of the related servicing compensation. Funds credited to a collection account may be invested for the benefit and at the risk of the related servicer in permitted investments as described in the applicable Servicing Agreement, that are scheduled to mature on or prior to the servicer remittance date in accordance with the provisions of the applicable Servicing Agreement. If permitted by the applicable Servicing Agreement, a collection account may be a commingled account with other similar accounts maintained by the related servicer.

Under the pooling and servicing agreement, the trust administrator will establish and maintain a certificate account. Each servicer will establish and maintain a collections account pursuant to the terms of the pooling and servicing agreement or applicable Servicing Agreement. Each month, on a date as specified in the pooling and servicing agreement, each servicer will withdraw from its collection account all amounts representing collections on the mortgage loans that are required to be distributed to certificateholders on the distribution date in that month and remit such amounts into which deposits will be made of the amounts remitted to the trust administrator by the servicers. Funds credited to a certificate account may be invested for the benefit and at the risk of the trust administrator in permitted investments, as described in the pooling and servicing agreement, that are scheduled to mature on or prior to the day immediately preceding the related distribution date in accordance with the provisions of the pooling and servicing agreement.

The pooling and servicing agreement prohibits the resignation of the master servicer, the special servicer, SPS and Wells Fargo, as servicer, except upon (a) appointment of a successor master servicer, special servicer or servicer (which may be with respect to all or a portion of the mortgage loans), as applicable, and receipt by the trustee and the trust administrator of a letter from each rating agency that the resignation and appointment will not result in a downgrading of the rating of

S-29

any of the certificates or (b) a determination that the master servicer's, such servicer's or such special servicer's duties thereunder are no longer permitted under applicable law. In addition, the entity specified in the pooling and servicing agreement or its transferee may request that (i) SPS or the master servicer, subject to certain conditions specified in the pooling and servicing agreement, resign and appoint a successor servicer or master servicer; provided, that such entity delivers to the trustee and trust administrator the letter from each rating agency described in the previous sentence and (ii) the special servicer resign and appoint a successor special servicer, provided, that such entity delivers to the trustee and trust administrator the letter from each rating agency described in the previous sentence. No resignation of the master servicer will be effective until a successor master servicer has assumed such master servicing obligations in the manner provided in the pooling and servicing agreement. No resignation of SPS or Wells Fargo (in its capacity as a servicer) will be effective until the master servicer or a successor servicer has assumed such servicing obligations in the pooling and servicing agreement. In the manner provided in the master servicer acts as successor servicer with respect to any mortgage loans, there will be a period of transition, not to exceed 90 days (except with respect to SPS serviced loans, such period of transition, not to exceed 60 days) before the servicing functions can be fully transferred to the master servicer. SPS acts as successor servicer with respect to any mortgage loans. If, during such period, however, that during such period, the master servicer will continue to be responsible for making advances and compensating interest payments with respect to such mortgage loans. In connection with the appointment of a successor servicer to SPS, Wells Fargo or the master servicer, the servicing provisions of the pooling and servicing agreement may be amended without the consent of the certificateholders, provided that the rating agencies confirm the rating of the certificates giving effect to the amendment.

### Servicing Compensation and Payment of Expenses

The expense fees for the mortgage loans are payable out of the interest payments on each mortgage loan. The expense fees will vary from mortgage loan to mortgage loan. The expense fees consist of the servicing fee, the excess servicing fee, any excess servicing fee described in the prospectus supplement, and any lender paid mortgage guaranty insurance premiums, if applicable. The net mortgage rate of a mortgage loan is equal to its current mortgage rate less the rate at which

expense fees accrue on that mortgage loan.

Each servicer or the master servicer is obligated to pay some ongoing expenses associated with the mortgage loans serviced or master serviced, respectively, by it and incurred by that servicer or the master servicer, as applicable, in connection with its responsibilities under the pooling and servicing agreement (and/or applicable servicing agreement) and those amounts will be paid by such servicer or the master servicer, as applicable, out of its servicing fee or master servicing fee, as applicable. The amount of the servicing fee for each servicer is subject to adjustment as described in this term sheet supplement under "—Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans." The related servicer will also be entitled to receive late payment fees, assumption fees and other similar charges, all reinvestment income earned on amounts on deposit in its collection account for the mortgage loans and in some cases, prepayment premiums. In addition, SPS will be entitled to the interest portion of a prepayment in full if such prepayment is received in the month that such prepayment is to be distributed to certificateholders and such interest represents interest accruals for that month. The trust administrator will be entitled to all reinvestment income earned on amounts on deposit in the certificate account. The trust administrator is obligated to pay to the master servicer and the trustee, the master servicing fee and trustee fee, respectively, out of the reinvestment income earned on amounts on deposit in the certificate account received by the trust administrator under the pooling and servicing agreement. See "Pooling and Servicing Agreement—The Trust Administrator" in this term sheet supplement.

**Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans**

When a principal prepayment in full is made on a mortgage loan, the mortgagor is charged interest only for the period from the due date of the immediately preceding monthly payment up to the date of that prepayment, instead of for a full month. Partial principal prepayments may result in a reduction in interest payable for the month during which the partial principal prepayment is made.

Compensating Interest Payments by the Master Servicer. The master servicer is obligated to remit compensating interest payments to the trust administrator to the extent that any servicer is required to do so under the pooling and servicing agreement, as applicable, but fails to do so.

Compensating Interest Payments by Wells Fargo. Wells Fargo, as servicer, is obligated to remit to the trust administrator on the eighteenth calendar day of each month (or if such calendar day is not a business day the following business day, with respect to each mortgage loan serviced by it, an amount equal to the lesser of:

- o  any shortfall for the previous month in interest collections resulting from the timing of principal prepayments in full on the mortgage loans serviced by it that are made from the fourteenth day of the calendar month preceding such distribution date to the last day of such month and partial principal prepayments made during the calendar month preceding such distribution date, in each case, with respect to mortgage loans directly serviced by Wells Fargo, and

- o  the servicing fee that Wells Fargo is entitled to receive from the trust on the related distribution date, equal to a certain percentage of the aggregate Stated Principal Balance of the mortgage loans serviced by it.

Compensating Interest Payments by SPS. SPS (or the master servicer, if SPS fails to do so) is obligated to remit to the trust seven calendar days before each distribution date, with respect to each mortgage loan serviced by it, an amount equal to the lesser of:

- o  any shortfall for the previous month in interest collections resulting from the timing of principal prepayments in full on the mortgage loans serviced by it that are made from the fifteenth day of the calendar month preceding such distribution date to the last day of such month and partial principal prepayments made during the calendar month preceding such distribution date, in each case, with respect to mortgage loans directly serviced by SPS, and

- o  the servicing fee that SPS is entitled to receive from the trust on the related distribution date, equal to a certain percentage of the aggregate Stated Principal Balance of the mortgage loans serviced by it.

**Advances from the Servicers and Master Servicer**

Subject to the limitations described below and only with respect to those mortgage loans serviced by it, each servicer (including the designated servicers) will be required to advance or to each distribution date, from its own funds or amounts received for the mortgage loans that are not required to be distributed on that distribution date, an amount equal to the aggregate of payments of principal of and interest on the mortgage loans, net of the servicing fees, that were due on the previous due date and which were delinquent on the determination date for that distribution date.

If the amount of advances received from a servicer (including the designated servicers) of a mortgage loan is less than the amount required to be advanced by such servicer under the pooling and servicing agreement, the master servicer will be required to make such advance prior to each distribution date, subject to the master servicer's reasonable determination as to recoverability.

Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates rather than to guarantee or insure against losses. Each servicer, or the master servicer, as applicable, is obligated to make advances for delinquent payments of principal of or interest on each mortgage loan to the extent that those advances are, in its reasonable judgment, recoverable from future payments and collections or insurance payments or proceeds of liquidation of the related mortgage loan. Subject to the foregoing, advances will be made through the liquidation of the related mortgaged property. If the related servicer determines on any determination date to make an advance, that advance will be included with the distribution to certificateholders on the related distribution date. Any failure by the master servicer to make an advance as required under the pooling and servicing agreement will constitute an event of default under the pooling and servicing agreement subject to a specified grace period. If the master servicer is terminated as a result of the occurrence of an event of default, the trustee will be obligated to make that advance, in accordance with the terms of the pooling and servicing agreement or the Designated Servicing Agreement, as applicable. For a discussion of other events of default under the pooling and servicing agreement and the rights of the trustee and trust administrator in the case of any event of default, see "The Agreements—Event of Default and Rights in the Case of Events of Default" in the prospectus.

S–31

Neither the master servicer nor the servicers will be required to advance shortfalls in interest payments on the mortgage loans resulting from the application of the Relief Act.

**Optional Purchase of Defaulted Loans; Specially Serviced Loans**

The special servicer may, at its option, purchase from the trust any mortgage loan that is delinquent 90 days or more. That purchase shall be at a price equal to 100% of the Stated Principal Balance of that mortgage loan plus accrued interest on the applicable mortgage loan at the mortgage rate from the date through which interest was last paid by the related mortgagor to the first day of the month in which that amount is to be distributed and any unreimbursed advances of servicers other than the special servicer and transferring costs.

In addition, the special servicer may, at its option, elect to act as servicer of any mortgage loan, other than any mortgage loan serviced by a designated servicer, that is delinquent 90 days or more. In that event the special servicer will be entitled to receive the servicing fee and other servicing compensation for each such mortgage loan. Upon the transfer of the servicing of any such delinquent mortgage loan, the prior servicer of that mortgage loan will have no servicing obligations with respect to that mortgage loan.

**Special Servicing Agreements**

The pooling and servicing agreement will permit any servicer to enter into a special servicing agreement with an unaffiliated subservicer or the most junior class of subordinate certificates then outstanding relating to a group. Under that agreement, that unaffiliated holder may instruct each such servicer to commence or delay foreclosure proceedings for delinquent mortgage loans being serviced by that servicer or delay at that holder's direction. It will be taken by that servicer only after that holder deposits a specified amount of cash with that servicer. That cash will be available for payment to related certificateholders if liquidation proceeds are less than they otherwise may have been had that servicer acted using its normal servicing procedures.

**Solicitation for Refinancing of Mortgage Loans**

The pooling and servicing agreement will permit the sponsor, SPS and other affiliates of the sponsor to implement programs designed to encourage refinancings of certain of the mortgage loans from time to time. These programs may include, without limitation, general solicitations by mail or otherwise, newsletters and other mailings to mortgagors, and using various incentives, including general or targeted solicitations, the offering of pre-approved applications, reduced origination fees or closing costs, or other financial incentives. Targeted solicitations may be based on a variety of factors, including the credit of the borrower or the location of the related mortgaged property. In addition, the sponsor, SPS or other affiliates of the sponsor may encourage assumptions of mortgage loans, including defaulted mortgage loans, under which creditworthy borrowers assume the outstanding indebtedness of the mortgage loans which may be removed from the mortgage pool. In connection with these programs the sponsor, SPS or other affiliates of the sponsor will have the right to waive any prepayment charges related to the applicable mortgage loan. As a result of these programs, with respect to the mortgage pool underlying any trust, the rate of principal prepayments of the mortgage loans in the mortgage pool may be higher than would otherwise be the case, and in some cases, the average credit or collateral quality of the mortgage loans remaining in the mortgage pool may decline.

## THE MASTER SERVICER AND THE TRUST ADMINISTRATOR

Wells Fargo Bank, National Association ("Wells Fargo Bank") will act as master servicer and trust administrator under the pooling and servicing agreement. Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company. A diversified financial services company, Wells Fargo & Company is a U.S. bank holding company, providing banking, insurance, investment, mortgage and consumer finance throughout the United States and internationally. Wells Fargo Bank provides retail and commercial banking services and corporate trust, securities lending, securities transfer, cash management, investment management and other financial and fiduciary services. The depositor, the sponsor, the seller and the servicers may maintain banking and other commercial relationships with Wells Fargo Bank and its affiliates. Wells Fargo Bank maintains principal corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951 (among other locations) and its office for certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

S-32

Wells Fargo Bank's assessment of compliance with applicable servicing criteria relating to its provision of master servicing, trustee, securities administration and paying agent services for the period ending December 31, 2006, furnished pursuant to Item 1122 of Regulation AB, discloses that it was not in compliance with the 1122(d)(3)(ii) servicing criteria during the reporting period. The assessment of compliance indicates that certain monthly investor or remittance reports included errors in the calculation and/or the reporting of delinquencies for the related pool assets, which metrics may or may not have been material, and that all such errors were the result of data processing errors and/or the mistaken interpretation of data provided by other participants in the servicing function. The assessment further states that all necessary adjustments to Wells Fargo Bank's data processing systems and/or interpretive clarifications have been made to correct those errors and to remedy related procedures.

Wells Fargo serves or may have served within the past two years as loan file custodian for various mortgage loans owned by the sponsor or an affiliate of the sponsor and anticipates that one or more of those mortgage loans may be included in the Trust. The terms of any custodial agreement under which those services are provided by Wells Fargo are customary for the mortgage-backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage loan files.

Wells Fargo Bank acts as master servicer pursuant to the pooling and servicing agreement. The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicers under the terms of their respective Servicing Agreements. In particular, the master servicer independently calculates monthly loan balances based on servicer data, compares its results to servicer loan-level reports and reconciles any discrepancies with the servicers. The master servicer also reviews the servicing of defaulted loans for compliance with the terms of the pooling and servicing agreement. In addition, upon the occurrence of certain servicer events of default under the terms of any Servicing Agreement, the master servicer may be required to enforce certain remedies on behalf of the Trust and at the direction of the trustee against such defaulting servicer. Wells Fargo has been engaged in the business of master servicing since June 30, 1995.

Under the terms of the pooling and servicing agreement, Wells Fargo Bank also is responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. As trust administrator, Wells Fargo is also responsible for the preparation and filing of all REMIC tax returns on behalf of the trust and the preparation of monthly reports on Form 10-D, current reports on Form 8-K and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the trust. Wells Fargo Bank has been engaged in the business of securities administration since June 30, 1995.

## THE SPONSOR AND THE SELLER

DLJ Mortgage Capital, Inc., a Delaware corporation ("DLJMC"), is referred to in the prospectus supplement as the "sponsor" and the "seller". DLJMC's executive offices are located at 11 Madison Avenue, New York, NY 10010. The sponsor is an affiliate of the depositor, the underwriter, the cap counterparty, if applicable, the cap counterparty, if applicable, and SPS.

The sponsor, together with its affiliates, is involved in mortgage-backed securitizations and other structured financing arrangements. The sponsor has been engaged in the securitization of assets since its inception in 1988. In connection with these activities, the sponsor uses special purpose entities, such as the depositor, primarily for (but not limited to) the securitization of residential mortgages and home equity loans.

In the normal course of its securitization program, the sponsor acquires mortgage loans from third party originators and through its affiliates. The sponsor or its affiliates structure securitization transactions in which the mortgage loans are sold to the depositor and the depositor issues the securities supported by the cash flows generated by the mortgage loans and

secured by the mortgage loans. The sponsor will make certain representations and warranties to the depositor and the trustee regarding the mortgage loans and if such representations and warranties are breached, the sponsor may be obligated to repurchase such mortgage loans from the trust. The sponsor (or directly from the trustee). To mitigate these risks, however, to the extent the mortgage loans being securitized have been originated by third parties, the sponsor will generally obtain appropriate representations and warranties from these third parties upon the acquisition of such mortgage loans.

S-33

The following table shows the composition of mortgage loans publicly securitized by the sponsor through the depositor and Credit Suisse First Boston Mortgage Acceptance Corp. for the periods indicated:

S-34

| Loan Type | 2003 | | 2004 | | 2005 | | 2006 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Sched Balance | Count | Sched Balance | Count | Sched Balance | Count | Sched Balance | Count | Sched Balance |
| AltA ARM | 12,949 | 3,613,982,397 | 31,611 | 7,798,385,125 | 25,293 | 6,831,096,734 | 6,416 | 2,280,172,993 | 76,269 | 20,523,637,248 |
| AltA Fixed | 17,402 | 4,093,249,308 | 7,117 | 1,902,965,819 | 24,087 | 5,330,498,566 | 34,740 | 8,478,642,982 | 83,346 | 19,505,176,675 |
| HELOC | | | | | 5,460 | 313,118,315 | 3,465 | 249,988,315 | 8,925 | 563,106,631 |
| Neg-Am ARM | | | | | 906 | 270,882,163 | | | 906 | 270,882,163 |
| Prime ARM | 15,114 | 5,625,217,619 | 16,316 | 5,252,996,734 | 14,610 | 5,015,172,488 | 3,255 | 1,848,703,933 | 49,295 | 17,742,090,774 |
| Prime Fixed | 12,261 | 5,699,018,590 | 4,752 | 2,444,016,643 | 8,991 | 4,822,306,801 | 6,113 | 3,440,119,634 | 32,117 | 16,405,461,668 |
| Prime Short Duration ARM | 1,573 | 535,070,678 | 2,487 | 772,412,569 | 1,747 | 664,251,179 | 64 | 36,156,350 | 5,871 | 2,007,892,776 |
| Seconds | 43,516 | 1,828,962,573 | 47,740 | 2,159,604,999 | 59,297 | 2,905,543,192 | 54,351 | 2,925,755,953 | 204,904 | 9,819,866,716 |
| Subprime | 40,443 | 5,773,420,790 | 54,761 | 8,595,781,396 | 72,966 | 10,881,936,213 | 43,884 | 7,749,759,566 | 212,054 | 33,000,897,964 |
| Grand Total | 143,258 | 27,168,921,954 | 164,784 | 29,325,790,730 | 213,357 | 36,734,805,651 | 152,288 | 27,009,121,726 | 673,687 | 119,839,012,615 |

S-35

### THE DEPOSITOR

Credit Suisse First Boston Mortgage Securities Corp., the depositor, was incorporated in the State of Delaware on December 31, 1985, as a wholly-owned subsidiary of First Boston Securities Corporation, the name of which was subsequently changed to Credit Suisse First Boston Securities Corporation, or CSFBSC. CSFBSC, the name of which was subsequently changed to Credit Suisse First Boston Management LLC and more recently to Credit Suisse Holdings (USA), Inc. The principal executive offices of the depositor are located at 11 Madison Avenue, New York, N.Y. 10010. Its telephone number is (212) 325-2000.

The depositor was organized, among other things, for the purposes of establishing trusts, selling beneficial interests in those trusts and acquiring and selling mortgage assets to those trusts. None of the depositor, its parent or any of the depositor's affiliates will guarantee or otherwise ensure the payment of or guarantee distributions on the certificates. The depositor will acquire the mortgage loans directly or through one or more affiliates.

After issuance of the certificates, the depositor will have no material obligations with respect to the certificates and mortgage loans, other than the (i) the right to appoint a successor trustee or trust administrator upon the resignation or removal of the trustee or trust administrator, as applicable, and (ii) the obligation to indemnify the underwriter against certain liabilities under the Securities Act of 1933, as amended.

### DESCRIPTION OF THE CERTIFICATES

## General

The trust will issue certificates pursuant to the pooling and servicing agreement. The pooling and servicing agreement will be filed with the Securities and Exchange Commission in a current report on Form 8-K following the issuance of the certificates. The certificates consist of certain publicly offered classes of certificates which are referred to collectively as the offered certificates, and one or more classes of certificates that are not publicly offered. The various classes of Class A Certificates are referred to collectively as the Class A Certificates. The Class AR Certificates and the Class AR-L Certificates are referred to, together as the Residual Certificates. The various classes of Class A Certificates and the Residual Certificates are referred to collectively as the Senior Certificates. In addition to the Senior Certificates, each series of certificates will include Class P Certificates various classes of subordinate certificates referred to as the Class C-B Certificates and the Class M Certificates. The Class C-B Certificates and the Class M Certificates are referred to collectively as the Subordinate Certificates. Various classes of Class A and Class M Certificates may also be referred to collectively as the LIBOR Certificates.

## Assets of the Trust

The certificates will evidence the entire beneficial ownership interest in the trust. The trust will consist of:

- o  the mortgage loans, together with their mortgage files, and together with all collections on them and their proceeds;

- o  any property acquired by foreclosure of the mortgage loans or by deed in lieu of foreclosure;

- o  the trustee's rights with respect to the mortgage loans under all insurance policies required to be maintained pursuant to the pooling and servicing agreement and their proceeds;

- o  the Collection Account, the Certificate Account, the prefunding account, the capitalized interest account and the assets that are deposited in each of them from time to time;

- o  any related Swap Agreement or Cap Agreement; and

- o  all proceeds of any of the foregoing.

Notwithstanding the foregoing, however, the trust specifically excludes all payments and other collections of principal and interest due on the mortgage loans on or before the cut-off date.

S-36

## Book-Entry Registration

Except as otherwise set forth in the prospectus supplement, the offered certificates, other than the Residual Certificates, will be book-entry certificates. The book-entry certificates will be issued in one or more certificates which equal the aggregate initial certificate principal balance or notional amount of each of those classes of certificates and which will be held by a nominee of DTC, and are referred to as the DTC registered certificates. Beneficial interests in the DTC registered certificates will be held indirectly by investors through the book-entry facilities of DTC in the United States, or Clearstream, Luxembourg or the Euroclear System, referred to as Euroclear, in Europe, if they are participants of these systems, or indirectly through organizations which are participants in these systems. Clearstream, Luxembourg and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream, Luxembourg's and Euroclear's names on the books of their respective depositaries which in turn will hold positions in customers securities accounts in the depositaries' names on the books of DTC. Citibank, N.A., referred to as Citibank, will act as depositary for Clearstream, Luxembourg and JPMorgan Chase Bank, N.A., referred to as JPMorgan, will act as depositary for Euroclear. Collectively these entities are referred to as the European depositaries.

The depositor has been informed by DTC that its nominee will be Cede & Co. Accordingly, Cede & Co. is expected to be the holder of record of the DTC registered certificates. No person acquiring a DTC registered certificate will be entitled to receive a physical certificate representing that certificate, a definitive certificate, except as described under "—Definitive Certificates" below.

Unless and until definitive certificates are issued, it is anticipated that the only "certificateholder" of the DTC registered certificates will be Cede & Co. as nominee of DTC. Beneficial owners of the DTC registered certificates will not be certificateholders, as that term is used in the pooling and servicing agreement. Beneficial owners are only permitted to exercise the rights of certificateholders indirectly through participants and DTC. Monthly and annual reports on the trust provided to Cede & Co., as nominee of DTC, may be made available to beneficial owners on request, in accordance with the rules, regulations and procedures creating and affecting DTC, and to participants to whose DTC accounts the DTC registered certificates of those beneficial owners are credited.

SEC Info - Adjustable Rate Mortgage Trust 2007-3 - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d1zj6l.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 145 of 150

2/25/2010 6:54 PM

For a description of the procedures applicable to the DTC registered certificates, see "Description of the Securities—Book-entry Registration" in the prospectus.

**Definitive Certificates**

Except as set forth in the prospectus supplement, definitive certificates will be issued to beneficial owners of DTC registered certificates, or their nominees, rather than to DTC, only if:

o   DTC or the depositor advises the trust administrator in writing that the depository is no longer willing qualified or able to discharge properly its responsibilities as nominee and depository for the DTC registered certificates and the depositor or the trust administrator is unable to locate a qualified successor;

o   the depositor, with the consent of the applicable participants, in writing, elects to terminate the book entry system through DTC; or

o   after the occurrence of an event of default, beneficial owners of any class of DTC registered certificates representing not less than 51% of the related aggregate certificate principal balance or notional amount advise the trust administrator and DTC through the participants in writing that the continuation of a book entry system through DTC, or a successor thereto, is no longer in the best interests of the beneficial owners and the applicable participants consent to the termination.

In the case of any of the events described in the immediately preceding paragraph, the trust administrator will be required to notify all beneficial owners of the occurrence of that event and the availability of definitive certificates. At the time of surrender by DTC of the global certificate representing the DTC registered certificates and proper instructions for re registration, the trust administrator will issue the definitive certificates. After that,

S-37

the trust administrator will recognize the holders of those definitive certificates as certificateholders under the pooling and servicing agreement.

According to DTC, the information above for DTC has been provided for informational purposes only and is not intended to serve as a representation, warranty or contract modification of any kind.

**Distributions**

Distributions on the certificates will be made by the trust administrator on the 25th day of each month, or if such day is not a business day, on the first business day thereafter, to the persons in whose names those certificates are registered on the close of business on the business day preceding that distribution date with respect to the LIBOR Certificates and any other class of certificates described in the prospectus supplement as long as the certificates remain in book-entry form. For certificates no longer held in book-entry form, payment on the last business day of the month preceding the distribution date and, with respect to all other classes of certificates, on the last business day of the month preceding the month of that distribution date (each such date, a "Record Date").

Distributions on each distribution date will be made by check mailed to the address of the person entitled to those distributions as it appears on the applicable certificate register. In the case of a certificateholder who holds 100% of a class of certificates or who holds certificates with an aggregate principal balance of $1,000,000 or more and who has so notified the trust administrator in writing in accordance with the pooling and servicing agreement, distributions on each distribution date will be made by wire transfer in immediately available funds to the account of that certificateholder at a bank or other depository institution having appropriate wire transfer facilities. The final distribution in retirement of the certificates will be made only on presentment and surrender of those certificates at the corporate trust office of the trust administrator.

**Determination of One-Month LIBOR**

With respect to the initial distribution date, One-Month LIBOR will equal the interbank offered rate for one-month United States dollar deposits in the London market as quoted on Telerate Page 3750 as of 11:00 A.M., London time, on the business day prior to the closing date. With respect to each distribution date other than the initial distribution date, One-Month LIBOR will equal the interbank offered rate for one-month United States dollar deposits in the London market as quoted on Telerate Page 3750 as of 11:00 A.M., London time, on the second LIBOR business day prior to the first day of the related Accrual Period. Telerate Page 3750 means the display designated as page 3750 on the Dow Jones Telerate Service or any other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks. If the rate does not appear on that page, or any other page that may replace that page on that service, or if the service is no longer offered, or any other service for displaying One-Month LIBOR or comparable rates as may be selected by the trust administrator after consultation with DLJ Mortgage Capital, the reference bank rate will be the reference bank rate. The reference bank rate will be determined on the basis of the rates at which deposits in U.S.

Dollars are offered by the reference banks, which shall be three major banks that are engaged in transactions in the London interbank market, selected by the trust administrator after consultation with the LIBOR certificates. The trust administrator will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations. If on the related date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by two or more major banks in New York City, selected by the trust administrator after consultation with DLJ Mortgage Capital, as of 11:00 A.M., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Class Principal Balance of the LIBOR Certificates. If no quotations can be obtained, the rate will be One-Month LIBOR for the prior distribution date.

Dollars are offered by the reference banks, which shall be three major banks that are engaged in transactions in the London interbank market, selected by the trust administrator after consultation prior to the immediately preceding distribution date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Class Principal Balance of the LIBOR Certificates. LIBOR business day means any day other than a Saturday or a Sunday or a day on which banking institutions in the State of New York or in the city of London, England are required or authorized by law to be closed.

**Prefunding Account**

On the closing date, the depositor may deposit funds, such funds referred to in this term sheet supplement as the "prefunding account deposit," into a segregated account maintained with the trust administrator, referred to in

S-38

this term sheet supplement as the prefunding account. The prefunding account deposit will be available for the purchase of subsequent mortgage loans for the floating rate loan group. The balances of any proposed initial mortgage loans removed from the floating rate loan group prior to the closing date. During the prefunding period, the amount on deposit in the prefunding account will be allocated for purchase of subsequent mortgage loans for the floating rate loan group from the depositor in accordance with the applicable provisions of the pooling and servicing agreement. Subsequent mortgage loans purchased by the trust and added to the trust during the prefunding period (a "subsequent transfer date"), must satisfy the criteria set forth in the pooling and servicing agreement. On the distribution date specified in the prospectus supplement, any remaining amounts in prefunding account will be applied to reduce the Class Principal Balance of certain classes of the related offered certificates as are entitled to payments of principal. Although it is intended that the principal amount of subsequent mortgage loans sold to the trust will require application of substantially all of the prefunding account deposit and to the extent not anticipated that there will be any material principal prepayments from amounts remaining on deposit in the prefunding account, no assurance can be given that such a distribution will not occur on the distribution date specified in the prospectus supplement. In any event, it is unlikely that the depositor will be able to deliver subsequent mortgage loans with aggregate principal balances exactly equal to the amount of any prefunding account deposit. Amounts on deposit in the prefunding account will be invested in permitted investments as defined in the pooling and servicing agreement. Such permitted investments are required to mature no later than the business day prior to a subsequent transfer date and, in any case, no later than the distribution date specified in the prospectus supplement. All interest and any other investment earnings on amounts on deposit in the prefunding account will be distributed to the depositor no later than the distribution date specified in the prospectus supplement. The prefunding account will not be included as an asset of any REMIC created pursuant to the pooling and servicing agreement.

**Capitalized Interest Account**

On the closing date and if required pursuant to the pooling and servicing agreement, the depositor will deposit cash into a capitalized interest account. The amounts on deposit in the capitalized interest account are specifically allocated to cover shortfalls in interest on each class of offered certificates related to the floating rate loan group specified in the prospectus supplement that may arise as a result of the utilization of the prefunding account for such loan group for the purchase by the trust of subsequent mortgage loans for such loan group. Any amounts remaining on deposit in the capitalized interest account (including any investment earnings) on the date and not needed for such purpose will be paid to the depositor and will not thereafter be available for payment to the certificateholders. Amounts on deposit in the capitalized interest account will be invested in permitted investments. All such permitted investments are required to mature no later than the business day prior to the date specified in the pooling and servicing agreement. The capitalized interest account will not be included as an asset of any REMIC created pursuant to the pooling and servicing agreement.

**The Senior-Subordinate Loan Groups**

As set forth in the term sheet in the term sheet supplement, subordinate certificates related to a pass-though group may relate to one or more loan groups with senior certificates. Each grouping of a senior certificate or certificates and related subordinate certificates with the same subordinate loan groups is called "Senior-Subordinate Loan Groups." Each series may have Senior-Subordinate Loan Groups which

will not be cross-collateralized with other Senior-Subordinate Loan Groups of the same series.

## Glossary of Terms--The Senior-Subordinate Loan Groups

The following terms are given the meanings shown below to help describe the cash flows on the Senior-Subordinate Loan Groups:

**Accrual Period**--For any distribution date and any class in a Senior-Subordinate Loan Group, the calendar month immediately preceding that distribution date.

**Aggregate Collateral Balance**--As of any date of determination, will be equal to the aggregate of the Aggregate Loan Group Balances for the Senior-Subordinate Loan Groups as of such date of determination.

**Aggregate Loan Group Balance**--For the Senior-Subordinate Loan Groups and any date of determination, the aggregate Stated Principal Balance of the mortgage loans in the related loan group as of such date of determination.

**Available Funds**--For any distribution date and each of the Senior-Subordinate Loan Groups, the sum of:

(a)  all scheduled installments of interest and principal due on the related due date and received prior to the related determination date on the related mortgage loans, together with any advances for the related mortgage loans;

(b)  (i) all Insurance Proceeds (to the extent not applied to restoration of the mortgaged property or released to the mortgagor in accordance with the applicable servicer's standard servicing procedures) and Liquidation Proceeds received during the calendar month preceding the month of that distribution date on the related mortgage loans, in each case net of unreimbursed expenses incurred in connection with a liquidation or foreclosure and unreimbursed advances, if any and (ii) all Recoveries, if any, for such distribution date;

(c)  all partial and full principal prepayments received during the applicable Prepayment Period on the related mortgage loans, exclusive of prepayment premiums and interest accruals received with any prepayments in full if such prepayment is received in the month that such prepayment is to be distributed to certificateholders and such interest represents interest accruals for that month;

(d)  amounts received for that distribution date in respect of the substitution of a related mortgage loan, the purchase of a related deleted mortgage loan, or a repurchase of a related mortgage loan by the seller or a purchase by the applicable servicer as of that distribution date;

(e)  any amounts payable as Compensating interest by the master servicer or the applicable servicer on that distribution date on the related mortgage loans; and

(f)  minus, in the case of clauses (a) through (e) above, (i) certain expense fees (including the excess servicing fees, accrued and unpaid servicing fees, unreimbursed advances and amounts to which the trustee, trust administrator, master servicer or the applicable servicer is entitled under the pooling and servicing agreement, in each case allocable to such loan group) and (ii) any lender paid mortgage guaranty insurance premiums, if applicable, in the related loan group.

With respect to any distribution date, the due date for substantially all of the mortgage loans is the first day of the month in which that distribution date occurs and the determination date (i) with respect to each servicer other than Wells Fargo, the 10th day of the month in which that distribution date occurs or, if that day is not a business day, the immediately succeeding business day and (ii) with respect to Wells Fargo, the business day immediately preceding the related remittance date.

**Class C-B Component Balance**--With respect to any date of determination and the Senior-Subordinate Loan Groups, the excess, if any, of (i) the Aggregate Loan Group Balance of such loan group as of such date, over (ii) the then-outstanding aggregate Class Principal Balance of the related senior certificates as of such date.

**Class C-B Percentage**--For any distribution date, the aggregate Class Principal Balance of the Class C-B Certificates immediately prior to that distribution date divided by the Aggregate Collateral Balance for that distribution date.

**Class Principal Balance**--For any class in a Senior-Subordinate Loan Group as of any date of determination, an amount equal to the initial class principal balance of that class, reduced by the

aggregate of the following amounts allocable to that class:

    o    All amounts previously distributed to holders of certificates of that class as payments of principal;

    o    The amount of Realized Losses allocated to that class; and

S-40

    o    In the case of the Class C-B Certificates, any amount allocated to a class of Class C-B Certificates in reduction of its Class Principal Balance if the aggregate Class Principal Balance of the Senior-Subordinate Loan Groups exceeds the Aggregate Collateral Balance on such date, as described below under "—*Allocation of Losses; Subordination of Class C-B Certificates*"

provided, however, that the Class Principal Balance of each class of certificates to which Realized Losses have been allocated (including any such class of certificates for which the Class Principal Balance has been reduced to zero) will be increased, up to the amount of related Recoveries for such distribution date, in order of seniority, up to the amount of Realized Losses previously allocated to reduce the Class Principal Balance of each such class of certificates.

    Compensating Interest—With respect to any distribution date, an amount to be paid by the related servicer as described above under "*Servicing of Mortgage Loans—Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans*" in this term sheet supplement.

    Credit Support Depletion Date—The first distribution date on which the aggregate Class Principal Balance of the Class C-B Certificates has been or will be reduced to zero.

    Cut-off Date Principal Balance—The aggregate Stated Principal Balance of the mortgage loans as of the cut-off date.

    Debt Service Reduction—With respect to any mortgage loan, a reduction in its scheduled monthly payment by a court of competent jurisdiction in a proceeding under the United States Bankruptcy Code, except a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

    Deficient Valuation—With respect to any mortgage loan, a valuation by a court of competent jurisdiction in a proceeding under the United States Bankruptcy Code in an amount less than the then outstanding indebtedness under the mortgage loan, or that results in a permanent forgiveness of principal.

    Expense Fee Rate—As to each mortgage loan, the sum of the related servicing fee rate, the trust administrator fee rate, if applicable, the special servicing fee rate, if applicable, and the rate at which the premium on a lender paid mortgage guaranty insurance policy is calculated, if applicable.

    Senior Principal Distribution Amount—For any distribution date the sum of:

    o    the related Senior Percentage of the Principal Payment Amount for the mortgage loans in the related mortgage group;

    o    the related Senior Prepayment Percentage of the Principal Prepayment Amount for the mortgage loans in the related mortgage group; and

    o    the Senior Liquidation Amount for the mortgage loans in the related mortgage group.

S-41

    Insurance Proceeds—Amounts paid pursuant to any insurance policy, with respect to a mortgage loan that have not been used to restore the related mortgaged property or released to the mortgagor in accordance with the terms of the pooling and servicing agreement, subject to the terms and conditions of the related mortgage note and mortgage.

    Liquidated Mortgage Loan—A mortgage loan for which the related servicer has determined that it has received all amounts that it expects to recover from or on account of the mortgage loan, whether from Insurance Proceeds, Liquidation Proceeds or otherwise.

    Liquidation Principal—The principal portion of Liquidation Proceeds received on a mortgage loan that became a Liquidated Mortgage Loan, but not in excess of the Stated Principal Balance of that mortgage loan, during the calendar month preceding the month of the distribution date.

    Liquidation Proceeds—Amounts, including Insurance Proceeds, received in connection with the

liquidation of a defaulted mortgage loan, whether through trustee's sale, foreclosure sale, or otherwise or amounts received in connection with any condemnation or partial release of a mortgaged property, other than Recoveries.

Net Interest Shortfall—For any distribution date and loan group, the sum of:

   o   the amount of interest which would otherwise have been received for a mortgage loan in that loan group during the prior calendar month that was the subject of a Relief Act Reduction, after the exhaustion of the respective amounts of coverage provided by the Class C-B Certificates for those types of losses; and

   o   any related Net Prepayment Interest Shortfalls.

Net Prepayment Interest Shortfall—For any distribution date and loan group, the amount by which the aggregate of Prepayment Interest Shortfalls for such loan group during the related Prepayment Period exceeds the available Compensating Interest for that period.

Prepayment Interest Shortfall—The amount by which interest paid by a borrower in connection with a prepayment of principal on a mortgage loan, net of the amount required to be paid as a servicing fee, is less than one month's interest at the related mortgage rate, net of the amount required to be paid as a servicing fee, on the Stated Principal Balance or the amount prepaid of that mortgage loan, as applicable. No Prepayment Interest Shortfall will be calculated for Principal Prepayments in full received on a mortgage loan serviced by Wells Fargo or SPS if such Principal Prepayment in full is distributed to certificateholders in the month of receipt.

Prepayment Period—For any distribution date and principal payment in full received on a mortgage loan, and with respect to each servicer as applicable, (1) the calendar month preceding that distribution date, (2) the period from the fourteenth day of the calendar month preceding the month preceding that distribution date (or in the case of the first distribution date, from the month (off Date) through the thirteenth day of the month in which that distribution date falls, (3) the period from the fifteenth day of the calendar month preceding the month in which that distribution date falls (or in the case of the first distribution date, from the cut-off date) through the fourteenth day of the month in which that distribution date falls or (4) such other period as described in the related servicing agreement. For any distribution date and all mortgage loans and any principal prepayment in part, the calendar month preceding that distribution date.

Principal Payment Amount—For any distribution date and each of the Senior-Subordinate loan Groups the sum of:

   o   scheduled principal payments on the mortgage loans in that loan group due on the due date related to that distribution date;

   o   the principal portion of repurchase proceeds received with respect to any mortgage loan in that loan group that was repurchased or was permitted or required by the pooling and servicing agreement during the applicable period preceding that distribution date; and

   o   any other unscheduled payments of principal that were received on the mortgage loans in that loan group during the preceding calendar month, other than that Principal Prepayments or Liquidation Principal.

Principal Prepayment Amount—For any distribution date and a loan group, the sum of (i) all applicable Principal Prepayments in full and in part in that loan group which were received during the loan group from the Prepayment Period preceding that distribution date and (ii) all Recoveries related to that loan group during the calendar month preceding the month of that distribution date.

Principal Prepayments—Any mortgage payment or other recovery of principal on a mortgage loan that is received in advance of its scheduled due date and is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Realized Loss—The amount determined by the related servicer and evidenced by an officers' certificate delivered to the trustee and trust administrator, in connection with any mortgage loan equal to:

   o   for any Liquidated Mortgage Loan, the excess of its Stated Principal Balance plus interest at a rate equal to the applicable net mortgage rate from the due date as to which interest was last paid up to the first due date after the liquidation over any net proceeds received in connection with the liquidation of all withdrawals permitted to be made by the servicer from the collection account for the mortgage loan;

SEC Info - Adjustable Rate Mortgage Trust - FWP - Adjustable Rate Mortgage Trust 20...

http://www.secinfo.com/d12j61.uph.htm#2q9w

Case 3:12-cv-00056-EMC   Document 1-1   Filed 01/04/12   Page 150 of 150

2/25/2010 6:54 PM

o   for any modified mortgage loan, the amount, if any, by which the principal balance of such Mortgage Loan has been reduced as a result of such modification;

o   for any mortgage loan that has become the subject of a Deficient Valuation, the excess of the Stated Principal Balance of the mortgage loan over the principal amount as reduced in connection with the proceedings resulting in the Deficient Valuation; or

o   for any mortgage loan that has become the subject of a Debt Service Reduction, the present value of all monthly Debt Service Reductions on the mortgage loan, assuming that the mortgagor pays each scheduled monthly payment on the applicable due date and that no principal prepayments are received on the mortgage loan, discounted monthly at the applicable mortgage rate.

Recovery--With respect to any Liquidated Mortgage Loan and distribution date, an amount received in respect of such Liquidated Mortgage Loan during the prior calendar month which has previously been allocated as a Realized Loss to a class or classes of certificates, net of reimbursable expenses.

Relief Act--The Servicemembers Civil Relief Act, as amended, and any similar state or local statute.

Relief Act Reduction--A reduction in the amount of the scheduled interest payment on a mortgage loan pursuant to the Relief Act.

Senior Liquidation Amount--For any distribution date and for any of the Senior-Subordinate Loan Groups, for each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of that distribution date, the lesser of (i) the related Senior Percentage of the Stated Principal Balance of that mortgage loan and (ii) the related Senior Prepayment Percentage of the Liquidation Principal with respect to that mortgage loan.

Senior Percentage--For any distribution date and loan group, the percentage equivalent of a fraction, the numerator of which is the aggregate Class Principal Balance of the classes of senior certificates related to such loan group immediately prior to that distribution date and the denominator of which is the Aggregate Loan Group Balance for such loan group as of the first day of the related Collection Period, subject to adjustment as described in the definition of the related month prior to that distribution date.

Senior Prepayment Percentage--With respect to the senior loans in each Senior-Subordinate Loan Group and any distribution date occurring during the seven years beginning on the first distribution date, 100%. Thereafter, the Senior Prepayment Percentage will, except as described below, be subject to gradual reduction as described in the following paragraph. This disproportionate allocation of unscheduled payments in respect of principal will have the effect of accelerating the amortization of the senior certificates while, in the absence of Realized Losses, increasing the interest in the aggregate Stated Principal Balance evidenced by the Class C-B Certificates relative to the respective interest of the Class C-B Certificates relative to the Class of the Senior-Subordinate Certificates is intended to preserve the availability of the subordination provided by the Class C-B Certificates.

The Senior Prepayment Percentage for each group and any distribution date occurring on or after the seventh anniversary of the first distribution date will be as follows:

S-43

o   for any distribution date in the first year thereafter, the related Senior Percentage plus 70% of the related Subordinate Percentage for that distribution date;

o   for any distribution date in the second year thereafter, the related Senior Percentage plus 60% of the related Subordinate Percentage for that distribution date;

o   for any distribution date in the third year thereafter, the related Senior Percentage plus 40% of the related Subordinate Percentage for that distribution date;

o   for any distribution date in the fourth year thereafter, the related Senior Percentage plus 20% of the related Subordinate Percentage for that distribution date; and

o   for any distribution date after the fourth year thereafter, the related Senior Percentage for that distribution date.

There are important exceptions to the calculations of the Senior Prepayment Percentage described in the above paragraph. On any distribution date, (i) if the Senior Percentage of any Senior Subordinate Loan Group exceeds its initial Senior Percentage, the Senior Prepayment Percentage for each group for that distribution date will equal 100%, or (ii) if on or before the distribution date three years from the closing date, the Class C-B Percentage for such distribution date is greater