than or equal to twice the Class C-B Percentage as of the closing date, then the Senior Prepayment Percentage for each group for such distribution date will equal the related Senior Percentage, plus 50% of the related Subordinate Percentage for that distribution date, and (iii) if after the distribution date three years from the closing date, the Class C-B Percentage for such distribution date is greater than or equal to twice the Class C-B Percentage as of the closing date, then the Senior Prepayment Percentage for each group for such distribution date will equal the related Senior Percentage.

Notwithstanding the foregoing, the Senior Prepayment Percentage for the related group will equal 100% for any distribution date as to which (i) the outstanding principal balance of the mortgage loans in the related group, delinquent 60 days or more (including all REO and loans in foreclosure) averaged over the preceding six month period, as a percentage of the related Class C-B Component Balance as of that distribution date is equal to or greater than 50% or (ii) cumulative Realized Losses for the mortgage loans in the related group exceed:

- for any distribution date prior to the third anniversary of the first distribution date, 20% of the related original Class C-B Component Balance;
- for any distribution date on or after the third anniversary but prior to the eighth anniversary of the first distribution date, 30% of the related original Class C-B Component Balance;
- for any distribution date on or after the eighth anniversary but prior to the ninth anniversary of the first distribution date, 35% of the related original Class C-B Component Balance;
- for any distribution date on or after the ninth anniversary but prior to the tenth anniversary of the first distribution date, 40% of the related original Class C-B Component Balance;
- for any distribution date on or after the tenth anniversary but prior to the eleventh anniversary of the first distribution date, 45% of the related original Class C-B Component Balance; and
- for any distribution date on or after the eleventh anniversary of the first distribution date, 50% of the related original Class C-B Component Balance.

If the Senior Prepayment Percentage for one group equals 100% due to the limitations set forth above, then the Senior Prepayment Percentage for the other groups will equal 100%.

If on any distribution date the allocation to the class of senior certificates then entitled to distributions of principal payments in full and partial principal prepayments and other amounts in the percentage required above would reduce the outstanding Class Principal Balance of that class below zero, the distribution to that class of



certificates of the Senior Prepayment Percentage of those amounts for that distribution date will be limited to the percentage necessary to reduce the related Class Principal Balance to zero.

Stated Principal Balance--As to any mortgage loan and any date of determination, the principal balance of that mortgage loan as of the cut-off date, after application of all scheduled principal payments due on or before the cut-off date, whether or not received, reduced by all amounts allocable to principal that have been distributed to certificateholders with respect to that mortgage loan on or before that date of determination, and as further reduced to the extent that any Realized Loss on that mortgage loan has been allocated to one or more classes of certificates on or before that date of determination.

Subordinate Liquidation Amount--For any distribution date and loan group, the excess, if any, of the aggregate Liquidation Principal for all mortgage loans related to that group that became Liquidated Mortgage Loans during the calendar month preceding the month of that distribution date, over the related Senior Liquidation Amount for that distribution date.

Subordinate Percentage--For any distribution date and the Senior-Subordinate Loan Groups, the excess of 100% over the related Senior Percentage for that date.

Subordinate Prepayment Percentage--For any distribution date and the Senior-Subordinate Loan Groups, the excess of 100% over the related Senior Prepayment Percentage for that distribution date; provided, however, that if the aggregate Class Principal Balance of the related senior certificates has been reduced to zero, then the Subordinate Prepayment Percentage for that loan group will equal 100%.

Subordinate Principal Distribution Amount--For any distribution date and the Senior-Subordinate Loan Groups, the sum of the following amounts calculated for each group:

- the related Subordinate Percentage of the related Principal Payment Amount;
- the related Subordinate Prepayment Percentage of the related Principal Prepayment Amount; and
- the related Subordinate Liquidation Amount;

less

- the amount of certain cross-collateralization payments as described under "--*Cross-Collateralization--The Senior-Subordinate Loan Groups*."

Subordination Level--On any distribution date for any class of Class C-B Certificates, the percentage obtained by dividing the sum of the Class Principal Balances of all classes of Class C-B Certificates which are subordinate in right of payment to that class by the Class Principal Balances of all classes in the Senior-Subordinate Loan Groups, in each case immediately prior to that distribution date.

**Priority of Distributions--The Senior-Subordinate Loan Groups**

Distributions will generally be made to the extent of the related Available Funds for the Senior-Subordinate Loan Groups in the order and priority as follows:

- first, to the senior certificates of the related group, accrued and unpaid interest as described in "--*Distributions of Interest--The Senior-Subordinate Loan Groups*" herein; and
- second, to the senior certificates of the related group, principal as described in "--*Distributions of Principal--The Senior-Subordinate Loan Groups*."

After giving effect to the distributions set forth in the previous paragraph, all such remaining Available Funds will be aggregated and the following distributions will be made in the priority set forth below, subject to any



payments required to be made to the Senior-Subordinate Certificates as described herein under "--*Cross Collateralization--the Senior-Subordinate Loan Groups*."

- first, to each class of Class C-B Certificates, interest and then principal, if applicable, in increasing order of alphanumerical class designation, with both interest and principal being paid to one class before any payments are made to the next class; and
- second, to the Class AR-L or Class AR Certificates, as appropriate, the remainder (which is expected to be zero) of all Available Funds.

Distributions of interest and principal to the Senior-Subordinate Certificates will be based on payments received or advanced for the mortgage loans in the related group except under the limited circumstances described under "--*Cross-Collateralization--The Senior-Subordinate Loan Groups*." Distributions of interest and principal to the Class C-B Certificates will be based on payments received or advanced for the Senior-Subordinate Loan Group mortgage loans.

**Distributions of Interest--The Senior-Subordinate Loan Groups**

The pass-through rates for the Senior-Subordinate Certificates are described in the term sheet to which this term sheet relates.

The pass-through rate on the Class C-B Certificates will equal, on any distribution date, the quotient expressed as a percentage, of (a) the sum obtained by adding each of the products obtained by multiplying the weighted average pass-through rates for each Senior-Subordinate Loan Group for that distribution date and the Class C-B Component Balance for each such Senior Subordinate Loan Group immediately prior to such distribution date, divided by (b) the aggregate of the Class C-B Component Balances for a Senior-Subordinate Loan Group immediately prior to such distribution date.

With respect to each class in the Senior-Subordinate Loan Groups and each distribution date, an amount of interest will accrue on each such class of certificates, generally equal to 1/12th of the applicable pass-through rate for that class multiplied by the related Class Principal Balance immediately prior to that distribution date. Interest to be distributed on the certificates on any distribution date will consist of accrued and unpaid interest as of the previous distribution dates and interest accrued during the preceding Accrual Period. Interest will accrue on each class in the Senior-Subordinate Loan Groups on the basis of a 360-day year consisting of twelve 30-day months.

The interest entitlement described above for each class of senior certificates in the Senior-Subordinate Loan Groups will be reduced by Net Interest Shortfalls experienced by the mortgage loans in the related group for that distribution date and the interest entitlement described above for the Class C-B Certificates will be reduced by Net Interest Shortfalls experienced by the Senior-Subordinate Loan Group mortgage loans for that distribution date. Net Interest Shortfalls on any distribution date will be allocated pro rata among all such classes of certificates related to such group, based on the amount of interest each of those classes of certificates would otherwise be entitled to receive on that distribution date from such group before taking into account any reduction in the amounts resulting from Net Interest Shortfalls. The amount a class of Class C-B Certificates would otherwise be entitled to receive from the mortgage loans in a loan group before taking into account any such reduction will be based on the amount of interest accruing at the applicable weighted average pass-through rate on that class's proportionate share, based on the Class Principal Balance, of the related Class C-B Component Balance for that distribution date.

**Distributions of Principal--<u>The Senior-Subordinate Loan Groups</u>**

**<u>General</u>**.

On each distribution date, certificateholders will be entitled to receive principal distributions from the funds available therefor to the extent and in the priority described in this term sheet supplement. See " --*Priority of Distributions--The Senior-Subordinate Loan Groups*" in this term sheet supplement. The Senior-Subordinate Certificates will receive principal collected from the Senior-Subordinate Loan Group mortgage loans, respectively, except under the limited circumstances described in "--*Cross-Collateralization--The Senior-Subordinate Loan Groups*." The Class C-B Certificates will receive principal collected from the Senior-Subordinate Loan Group mortgage loans.



---

Senior Principal Distribution Amount.

On each distribution date, an amount, up to the amount of the Senior Principal Distribution Amount for that distribution date, will be distributed as principal, to the following classes in the following order:

(i) first, to the Class AR and Class AR-L Certificates, pro rata, based on Class Principal Balances, until their respective Class Principal Balances have been reduced to zero; and

(ii) second, the Senior Principal Distribution Amount for that distribution date remaining after making the payments specified in clause (i) above, to the Class A Certificates, pro rata, based on their Class Principal Balances, until their respective Class Principal Balances have been reduced to zero.

Subordinate Principal Distribution Amount to the Class C-B Certificates.

On each distribution date, an amount, up to the amount of the Subordinate Principal Distribution Amount for that distribution date, will be distributed as principal, to the Class C-B Certificates, in accordance with the priorities set forth above in "--*Priorities of Distributions*" and to the extent of amounts available therefor. Each class of Class C-B Certificates will be entitled to receive (except on distribution dates on which the Subordination Level for any class of the Class C-B Certificates is less than the Subordination Level as of the closing date) its pro rata share, based on its respective Class Principal Balance, of the Subordinate Principal Distribution Amount. Distributions of principal of the Class C-B Certificates will be made on each distribution date sequentially in the order of their alphanumerical class designation, beginning with the Class C-B-1 Certificates, until each class of Class C-B Certificates has received its respective pro rata share of the Subordinate Principal Distribution Amount for that distribution date. See "--*Priority of Distributions--The Senior-Subordinate Loan Groups*" in this term sheet supplement.

For each class of Class C-B Certificates, if on any distribution date the related Subordination Level of that class is less than the related Subordination Level of such class as of the closing date, no distributions of principal prepayments in full and partial principal prepayments will be made to any class or classes junior to that class. The amount otherwise distributable to those classes will be allocated among the remaining classes of Class C-B Certificates, pro rata, based upon their respective Class Principal Balances.

**Allocation of Losses; Subordination of Class C-B Certificates**

Credit enhancement for the Senior-Subordinate Certificates includes the subordination of the Class C-B Certificates and the priority of application of Realized Losses. The Class C-B Certificates will be subordinate in right of payment of and provide credit support to the Senior-Subordinate Certificates to the extent described in this term sheet supplement. The support provided by the Class C-B Certificates is intended to enhance the likelihood of regular receipt by the Senior-Subordinate Certificates of the full amount of the monthly distributions of interest and

principal to which they are entitled and to afford the Senior-Subordinate Certificates protection against certain losses.

Any Realized Loss with respect to a Senior-Subordinate Loan Group mortgage loan will be allocated among the Senior-Subordinate Loan Groups as set forth in the term sheet to which this term sheet supplement relates.

On each distribution date, if the aggregate Class Principal Balance of all classes in the Senior-Subordinate Loan Groups exceeds the Aggregate Collateral Balance after giving effect to distributions of principal and the allocation of all losses to these certificates on that distribution date, that excess will be deemed a principal loss and will be allocated to the most junior class of Class C-B Certificates then outstanding.

Investors in the Senior-Subordinate Certificates should be aware that because the Class C-B Certificates represent interests in the Senior-Subordinate Loan Groups, the Class Principal Balances of the Class C-B Certificates could be reduced to zero as a result of a disproportionate amount of Realized Losses on the mortgage loans in any one of these groups. Therefore, notwithstanding that Realized Losses on the mortgage loans in each loan group may only be allocated to the related senior certificates, the allocation to the Class C-B Certificates of



---

Realized Losses on the mortgage loans in a loan group will increase the likelihood that losses may be allocated to the senior certificates unrelated to such loan group.

**Cross-Collateralization--<u>The Senior-Subordinate Loan Groups</u>**

Cross-Collateralization due to rapid prepayments.

On each distribution date prior to the Credit Support Depletion Date, but after the date on which any of the aggregate Class Principal Balance of the Senior-Subordinate Certificates has been reduced to zero, all principal on the mortgage loans relating to the group that has been paid in full, will be paid to the senior certificates of the other groups. Such amount will be allocated between the other groups, pro rata based on aggregate Class Principal Balance and paid to the senior certificates in such groups in the same priority as such certificates would receive other distributions of principal. However, principal will not be distributed as described above if on that distribution date (a) the Class C-B Percentage for that distribution date is greater than or equal to 200% of the Class C-B Percentage as of the closing date and (b) the average outstanding principal balance of the mortgage loans in each group delinquent 60 days or more over the last six months, as a percentage of the related Class C-B Component Balance, is less than 50%. If principal from one Group is distributed to the senior certificates of the other groups according to this paragraph, the Class C-B Certificates will not receive this principal amount.

Cross-Collateralization due to disproportionate realized losses in one group.

If on any distribution date the Class Principal Balance of any of the Senior-Subordinate Certificates is greater than the Aggregate Loan Group Balance of the related loan group (the *"Undercollateralized Group"*), then the following will occur:

- The Available Funds in the other groups that are not an Undercollateralized Group (each, an *"Overcollateralized Group"*) will be reduced, after distributions of interest to the senior certificates of each Overcollateralized Group, in an aggregate amount equal to one month's interest on the Principal Transfer Amount of each Undercollateralized Group at the weighted average pass-through rate applicable to the Undercollateralized Group or Groups and that amount will be added to the Available Funds of the applicable Undercollateralized Group; and

- The portion of the Available Funds in respect of principal on the mortgage loans in the Overcollateralized Group or Groups, after distributions of principal to the senior certificates of each Overcollateralized Group, will be distributed to the senior certificates of each Undercollateralized Group until the Class Principal Balance of the senior certificates of each Undercollateralized Group equals the Aggregate Loan Group Balance of the related group.

Consequently, the Class C-B Certificates will not receive any distributions of principal until the Undercollateralized Group or Groups are no longer undercollateralized.

On each Distribution Date, the *"Principal Transfer Amount"* for an Undercollateralized Group will equal the excess, if any, of the Class Principal Balance of the senior certificates related to such Undercollateralized Group over the Aggregate Loan Group Balance of such Undercollateralized Group.

For each distribution date and any group, the *"Overcollateralization Amount"* for such group is

the excess of (i) the Aggregate Loan Group Balance of such group over (ii) the aggregate Class Principal Balance of the Senior Certificates related to that group.

In the event more than one group is an Overcollateralized Group on any distribution date, reductions in the Available Funds of such groups to make payment to the Undercollateralized Group or Groups will be made pro rata based on the Overcollateralization Amount for each Overcollateralized Group. In the event more than one group is an Undercollateralized Group on any distribution date, payments made to such groups from the Available Funds of the Overcollateralized Group will be made pro rata based on the amount of payments required to be made to the Undercollateralized Groups.



---

All or a portion of the distributions to the Senior-Subordinate Certificates pursuant to the cross-collateralization provisions described above, may be made on the distribution date in the month following the month during which such transfer payment occurs (without any additional distribution of interest or earnings thereon with respect to such delay).

In the event that the weighted average of the pass-through rates of the senior certificates related to an Undercollateralized Group is greater than the weighted average of the pass-through rates of the senior certificates related to the Overcollateralized Group or Groups, the payment of interest to such senior certificates related to the Undercollateralized Group or Groups from the interest collected on the Overcollateralized Group or Groups may cause a shortfall in the amount of principal and interest otherwise distributable to the Class C-B Certificates. In addition, after the aggregate principal balance of the Class C-B Certificates has been reduced to zero, this may cause a shortfall of principal that would be allocated to the senior certificates.

**Glossary of Terms--The Floating Rate Loan Group Certificates**

The following terms are given the meanings shown below to help describe the cash flows on the Floating Rate Loan Group Certificates. Certain capitalized terms used to describe the Floating Rate Loan Group Certificates are defined under *"--Glossary of Terms--The Senior Subordinate Certificates."*

Accrual Period--For any class of Floating Rate Loan Group Certificates and any distribution date, the period commencing on the immediately preceding distribution date (or the closing date, in the case of the first Accrual Period) and ending on the day immediately preceding the related distribution date.

Aggregate Loan Group Balance--For the Floating Rate Loan Group and any date of determination, the aggregate of the Stated Principal Balance of the mortgage loans in the Floating Rate Loan Group as of the last day of the related Collection Period, plus the amount, if any, then on deposit in the prefunding account.

Basis Risk Shortfall--For any class of Floating Rate Loan Group Certificates, other than the Excess Cash Flow Certificates, and any distribution date, the sum of:

(1) the excess, if any, of the related Current Interest calculated on the basis of the least of (x) One-Month LIBOR plus the applicable certificate margin, (y) the Maximum Interest Rate and (z) 11.00%, over the related Current Interest for the applicable distribution date;

(2) any amount described in clause (1) remaining unpaid from prior distribution dates; and

(3) interest on the amount in clause (2) for the related Accrual Period calculated on the basis of the least of (x) One-Month LIBOR plus the applicable certificate margin, (y) the Maximum Interest Rate and (z) the amount set forth in the term sheet attached hereto.

Carryforward Interest--For any class of Floating Rate Loan Group Certificates and any distribution date, the sum of (1) the amount, if any, by which (x) the sum of (a) Current Interest for such class for the immediately preceding distribution date and (b) any unpaid Carryforward Interest for such class from previous distribution dates exceeds (y) the amount paid in respect of interest on such class on such immediately preceding distribution date, and (2) interest on such amount for the related Accrual Period at the applicable pass-through rate.

Class Principal Balance--For any class of Floating Rate Loan Group Certificates, as of any date of determination, an amount equal to the initial principal balance of that class, reduced by the aggregate of the following amounts allocable to that class:

- All amounts previously distributed to holders of certificates of that class as payments of principal; and
- Applied Loss Amounts (as defined below under *"--Credit Enhancement"*) previously allocated to that class;

provided, however, that the Floating Rate Loan Group Certificates will be increased in an aggregate amount equal to the related Recoveries received in respect of any distribution date, in order of seniority, up to the amount of the Deferred Amount for that class.

Collection Period--For any distribution date is the period from the second day of the month immediately preceding such distribution date to and including the first day of the month of that distribution date.

Compensating Interest--For each of the floating group mortgage loans and any distribution date, an amount to be paid by the master servicer or the servicer of that mortgage loan as described above under *"Servicing of Mortgage Loans--Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans"* in this term sheet supplement.

Credit Support Depletion Date--The first distribution date on which the aggregate Class Principal Balance of the Floating Rate Loan Group Subordinate Certificates has been or will be reduced to zero.

Current Interest--For any class of Floating Rate Loan Group Certificates and any distribution date, the amount of interest accruing at the applicable pass-through rate on the related Class Principal Balance during the related Accrual Period; provided, that as to each class of Floating Rate Loan Group Certificates, the Current Interest will be reduced by a pro rata portion of any Interest Shortfalls to the extent not covered by excess interest.

Cut-off Date Principal Balance--The aggregate Stated Principal Balance of the mortgage loans as of the Cut-off Date.

Deferred Amount--For any class of the Floating Rate Loan Group Senior Certificates and Floating Rate Loan Group Subordinate Certificates, and any distribution date, will equal the amount by which (x) the aggregate of the Applied Loss Amounts (as defined below under *"Credit Enhancement--The Floating Rate Loan Group Certificates"*) previously applied in reduction of the Class Principal Balance thereof exceeds (y) the sum of (a) the aggregate of amounts previously paid in reimbursement thereof and (b) any increases to the Class Principal Balance as a result of Recoveries.

Delinquency Rate--For any month will be, generally, the fraction, expressed as a percentage, the numerator of which is the aggregate outstanding Stated Principal Balance of all Floating Rate Loan Group mortgage loans 60 or more days delinquent (including all foreclosures and REO Properties) as of the close of business on the last day of such month, and the denominator of which is the Aggregate Loan Group Balance as of the close of business on the last day of such month, in each case after giving effect to any modification to the principal balance of any Mortgage Loan.

Expense Fee Rate--As to each mortgage loan, the sum of the related servicing fee rate, the excess servicing fee rate, if applicable, the special servicing fee rate, if applicable, and the rate at which the premium on a lender paid mortgage guaranty insurance policy is calculated, if applicable.

Floating Rate Loan Group Interest Remittance Amount--As set forth in the term sheet to which this term sheet supplement relates.

Floating Rate Loan Group Net Funds Cap-- As set forth in the term sheet to which this term sheet supplement relates.

Insurance Proceeds--Amounts paid pursuant to any insurance policy, with respect to a mortgage loan, that have not been used to restore the related mortgaged property or released to the mortgagor in accordance with the terms of the pooling and servicing agreement, subject to the terms and conditions of the related mortgage note and mortgage.

Interest Shortfall--For any distribution date is equal to the aggregate shortfall, if any, in collections of interest (adjusted to the related net mortgage rate) on the Floating Rate Loan Group mortgage loans resulting from (a) principal prepayments in full and in part received during the related Prepayment Period to the extent not covered by Compensating Interest and (b) interest payments on certain of the mortgage loans being limited pursuant to the provisions of the Relief Act.



Liquidated Mortgage Loan--A mortgage loan for which the related servicer has determined that it has received all amounts that it expects to recover from or on account of the mortgage loan, whether from Insurance Proceeds, Liquidation Proceeds or otherwise.

Liquidation Proceeds--Amounts, including Insurance Proceeds, received in connection with the liquidation of a defaulted mortgage loan, whether through trustee's sale, foreclosure sale, or otherwise or amounts received in connection with any condemnation or partial release of a mortgaged property, other than Recoveries.

Maximum Interest Rate--For any distribution date, an annual rate equal to the weighted average of the Rate Ceilings of the mortgage loans in the Floating Rate Loan Group, minus the weighted average expense fee rate of the mortgage loans in such Floating Rate Loan Group.

Monthly Excess Cashflow--For any distribution date, an amount equal to the sum of the Monthly Excess Interest and the Overcollateralization Release Amount, if any, for such date, plus any amounts applied pursuant to clauses I(vii) and II(vii) under "*Distributions of Principal-- The Floating Rate Loan Group Certificates*."

Net Cumulative Realized Loss Amount--For any distribution date, cumulative Realized Losses incurred on the mortgage loans from the Cut-off Date through the end of the prior calendar month less the amount of payments made to the Principal Remittance Amount from any related Cap Account on all prior distribution dates.

Net Mortgage Rate--With respect to any mortgage loan, the per annum rate equal to the mortgage rate minus the rate at which the expense fees accrue. The mortgage rate of a mortgage loan is the rate at which interest accrues at the time of determination on that mortgage loan in accordance with the terms of the related mortgage note.

Optimal Interest Remittance Amount--For any distribution date and loan group, will be equal to the excess of (i) the product of (1) (x) the weighted average Net Mortgage Rates of the mortgage loans in the related loan group as of the first day of the related Collection Period divided by (y) 12 and (2) the applicable Aggregate Loan Group Balance for the immediately preceding distribution date, over (ii) any expenses that reduce the Interest Remittance Amount for that loan group that did not arise as a result of a default or delinquency of the applicable mortgage loans or were not taken into account in computing the expense fee rate.

Overcollateralization Amount--For any distribution date will be equal to the amount, if any, by which (x) the Aggregate Loan Group Balance for such distribution date exceeds (y) the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates after giving effect to payments on such distribution date.

Overcollateralization Deficiency--For any distribution date will be equal to the amount, if any, by which (x) the Targeted Overcollateralization Amount for such distribution date exceeds (y) the Overcollateralization Amount for such distribution date, calculated for this purpose after giving effect to the reduction on such distribution date of the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates resulting from the payment of the Principal Payment Amount on such distribution date, but prior to allocation of any Applied Loss Amount on such distribution date.

Overcollateralization Release Amount--For any distribution date will be equal to the lesser of (x) the aggregate Principal Remittance Amount for the Floating Rate Loan Group for such distribution date and (y) the amount, if any, by which (1) the Overcollateralization Amount for such date, calculated for this purpose on the basis of the assumption that 100% of the aggregate Principal Remittance Amount for the Floating Rate Loan Group for such date is applied on such date in reduction of the aggregate of the Class Principal Balances of the Floating Rate Loan Group Certificates, exceeds (2) the Targeted Overcollateralization Amount for such date.

Payahead--Any scheduled payment intended by the related mortgagor to be applied in a Collection Period subsequent to the Collection Period in which such payment was received.

Principal Payment Amount--For any distribution date will be equal to the aggregate Principal Remittance Amount for the Floating Rate Loan Group for such date minus the Overcollateralization Release Amount, if any, for such date, plus, with respect to the distribution date in February 2006, the amount remaining, if any, on deposit in the prefunding account at the end of the prefunding period, exclusive of investment income thereon.



---

Principal Remittance Amount--For any distribution date and the Floating Rate Loan Group, will equal the sum of (1) all principal collected (other than Payaheads) or advanced in respect of scheduled payments on the mortgage loans in the Floating Rate Loan Group during the related Collection Period (less unreimbursed advances, servicing advances and other amounts due to a servicer, the master servicer, the trustee and the trust administrator with respect to the mortgage loans in the Floating Rate Loan Group, to the extent allocable to principal) and the principal portion of Payaheads previously received on the mortgage loans in the Floating Rate Loan Group and intended for application in the related Collection Period, (2) all principal prepayments received during the related Prepayment Period, (3) the outstanding Stated Principal Balance of each mortgage loan in the Floating Rate Loan Group that was repurchased by the seller or purchased by the special servicer during the period described in the pooling and servicing agreement relating to such distribution date, (4) the portion of any substitution amount paid with respect to any replaced mortgage loans in the Floating Rate Loan Group during the related Collection Period allocable to principal, (5) all Liquidation Proceeds (net of unreimbursed advances, servicing advances and other expenses, to the extent allocable to principal) and Recoveries, if any, collected with respect to the

mortgage loans in the Floating Rate Loan Group during the period described in the pooling and servicing agreement relating to such distribution date, to the extent allocable to principal, and (6) amounts withdrawn from any related the Cap Account to cover Net Cumulative Realized Loss Amounts on the floating group mortgage loans incurred during the related Collection Period.

Recovery--With respect to any Liquidated Mortgage Loan and distribution date, an amount received in respect of such Liquidated Mortgage Loan during the prior calendar month which has previously been allocated to a class or classes of certificates in accordance with the pooling and servicing agreement, net of reimbursable expenses.

Rolling Three Month Delinquency Rate--For any distribution date will be the fraction, expressed as a percentage, equal to the average of the Delinquency Rates for each of the three (or one and two, in the case of the first and second distribution dates) immediately preceding months.

Senior Enhancement Percentage--For any distribution date will be the fraction, expressed as a percentage, the numerator of which is the sum of the aggregate Class Principal Balance of the Floating Rate Loan Group Subordinate Certificates and the Overcollateralization Amount (which, for purposes of this definition only, shall not be less than zero), in each case after giving effect to payments on such distribution date (assuming no Trigger Event is in effect), and the denominator of which is the Aggregate Loan Group Balance for such distribution date.

Senior Principal Payment Amount--As set forth in the term sheet to which this term sheet supplement relates.

Stepdown Date--As set forth in the term sheet to which this term sheet supplement relates.

Trigger Event--As set forth in the term sheet to which this term sheet supplement relates (or the related prospectus supplement if not specified in such term sheet).

**Distributions of Interest--The Floating Rate Loan Group Certificates**

The per annum pass-through rates for the certificates are described in the term sheet to which this term sheet supplement relates.

The amount of interest payable on each distribution date in respect of each class of Floating Rate Loan Group Certificates, will equal the sum of (1) Current Interest for such class on such date and (2) any Carryforward Interest for such class and date. Interest will accrue on each class of Floating Rate Loan Group Certificates, on the basis of a 360-day year and the actual number of days elapsed in each Accrual Period.

With respect to each distribution date, to the extent that a Basis Risk Shortfall exists for any class of Floating Rate Loan Group Certificates, other than the Excess Cash Flow Certificates, such class will be entitled to the amount of such Basis Risk Shortfall. Such classes will be entitled to receive the amount of any Basis Risk Shortfall in accordance with the priority of payments described herein under *"--Credit Enhancement--The Floating Rate Loan Group Certificates--Overcollateralization,"* from amounts otherwise payable on the Excess Cash Flow Certificates on such distribution date, and from amounts paid under any Cap Agreement for a related class of certificates on deposit in any related Cap Account.



On each distribution date, the Floating Rate Loan Group Interest Remittance Amount for such date will be paid in the following order of priority:

(1) To any related Supplemental Interest Trust for payment to any swap counterparty, an amount equal to the amount set forth in the term sheet attached hereto.

(2) to the Floating Rate Loan Group Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for such Class and such distribution date;

(3) to the Floating Rate Loan Group Subordinate Certificates, in order of ascending numerical order Current Interest and any Carryforward Interest for such class and distribution date; and

(4) for application as part of Monthly Excess Cashflow for such distribution date, as described under *"--Credit Enhancement--The Floating Rate Loan Group Certificates --Overcollateralization"* below, any such Floating Rate Loan Group Interest Remittance Amount remaining after application pursuant to clauses (1) through (3) above (such amount, *"Monthly Excess Interest"*) for such distribution date.

**Distributions of Principal--The Floating Rate Loan Group Certificates**

Distributions of principal on the Floating Rate Loan Group Senior Certificates will be made primarily from the Principal Payment Amount, to the extent of available funds, as described below.

Distributions of principal on the Floating Rate Loan Group Subordinate Certificates will be made primarily from the Principal Payment Amount after distributions of principal have been made on the Floating Rate Loan Group Senior Certificates.

The Principal Payment Amount will be paid on each distribution date as follows:

I. On each distribution date (a) prior to the Stepdown Date or (b) with respect to which a Trigger Event is in effect, the Principal Payment Amount will be paid in the following order of priority:

(i) to the Floating Rate Loan Group Senior Certificates, pro rata, weighted based on the Class Principal Balances of such classes, until their respective Class Principal Balances have been reduced to zero;

(ii) to the Floating Rate Loan Group Subordinate Certificates, in ascending numerical order, until its Class Principal Balance has been reduced to zero; and

(iii) for application as part of Monthly Excess Cashflow for such distribution date, as described under *"--Credit Enhancement--The Floating Rate Loan Group Certificates--Overcollateralization"* below, any such Principal Payment Amount remaining after application pursuant to clauses (i) and (ii) above.

II. On each distribution date (a) on or after the Stepdown Date and (b) with respect to which a Trigger Event is not in effect, the Principal Payment Amount will be paid in the following order of priority:

(i) to the Floating Rate Loan Group Senior Certificates, the Senior Principal Payment Amount for such distribution date, pro rata, weighted based on the Class Principal Balances of such classes, until their respective Class Principal Balances have been reduced to zero;

(ii) to the Floating Rate Loan Group Subordinate Certificates, in ascending numerical order the Floating Rate Loan Group Subordinate Principal Payment Amount for such distribution date, until its Class Principal Balance has been reduced to zero; and

(iii) for application as part of Monthly Excess Cashflow for such distribution date, as described under *"--Credit Enhancement--The Floating Rate Loan Group Certificates--Overcollateralization"* below, any such Principal Payment Amount remaining after application pursuant to clauses (i) and (ii) above.



---

**Credit Enhancement--The Floating Rate Loan Group Certificates**

Credit enhancement for the Floating Rate Loan Group Certificates consists of the subordination of the Floating Rate Loan Group Subordinate Certificates, the priority of application of Realized Losses, overcollateralization and amounts available under any Swap Agreement for a related class of certificates to cover certain Net Cumulative Realized Loss Amounts on the Floating Rate Loan Group mortgage loans, in each case as described herein.

Subordination. The rights of holders of the Floating Rate Loan Group Subordinate Certificates to receive payments with respect to the Floating Rate Loan Group mortgage loans will be subordinated to such rights of holders of each class of Floating Rate Loan Group Certificates having a higher priority of payment, as described under *"--Distributions of Interest--The Floating Rate Loan Group Certificates"* and *"--Distributions of Principal--The Floating Rate Loan Group Certificates."* This subordination is intended to enhance the likelihood of regular receipt by holders of Floating Rate Loan Group Certificates having a higher priority of payment of the full amount of interest and principal distributable thereon, and to afford such certificateholders limited protection against Realized Losses incurred with respect to the Floating Rate Loan Group mortgage loans.

The limited protection afforded to holders of classes of certificates with a higher priority of payment by means of the subordination of certain classes of certificates having a lower priority of payment will be accomplished by the preferential right of holders of such classes of certificates with a higher priority of payment to receive distributions of interest or principal on any distribution date prior to classes with a lower priority of payment.

Application of Realized Losses. Realized Losses on the Floating Rate Loan Group mortgage loans will have the effect of reducing amounts payable in respect of the Excess Cash Flow Certificates (both through the application of Monthly Excess Interest to fund such deficiency and through a reduction in the Overcollateralization Amount for the related distribution date).

If on any distribution date, after giving effect to all Realized Losses incurred with respect to Floating Rate Loan Group mortgage loans during the Collection Period for such distribution date

and payments of principal on such distribution date, the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates exceeds the sum of the aggregate Stated Principal Balance of the Floating Rate Loan Group mortgage loans for such distribution date and the amounts on deposit in the prefunding account for such distribution date (such excess, an *"Applied Loss Amount"*), such amount will be allocated in reduction of the Class Principal Balance of first, the Floating Rate Loan Group Subordinate Certificates, in descending numerical order, until the Class Principal Balance thereof has been reduced to zero; and second, the Floating Rate Loan Group Senior Certificates (except the most senior Floating Rate Loan Group Senior Certificates, until the Class Principal Balance thereof has been reduced to zero. The Class Principal Balance of the most senior Floating Rate Loan Group Certificates will not be reduced by Applied Loss Amounts.

Holders of the Floating Rate Loan Group Senior Certificates (except the most senior Floating Rate Loan Group Senior Certificates) and Floating Rate Loan Group Subordinate Certificates will not receive any payments in respect of Applied Loss Amounts, except to the extent of available Monthly Excess Cashflow or amounts paid under any Swap Agreement for a related class of certificates as described below.

**The Cap Agreement.** If set forth in the term sheet related to this term sheet supplement, on or before the closing date, the trust administrator, acting on behalf of the trust, will enter into one or more separate interest rate cap agreements (each , a *"Cap Agreement"*) documented by a 1992 ISDA Master Agreement (Multicurrency-Cross Border), together with a Schedule, Confirmation and Credit Support Annex between the trustee, on behalf of the trust and Credit Suisse International (in such capacity, the *"cap counterparty"*), for the benefit of one or more classes of floating-rate certificates whereby, in consideration for a one time payment by the trust to the cap counterparty on the closing date, the cap counterparty will agree to make payments to the related class of floating rate certificates on each cap agreements payment date with respect to each related Cap Agreement. See the term sheet related to this term sheet supplement for more details regarding any Cap Agreement.

**The Swap Agreement.** If set forth in the term sheet related to this term sheet supplement, , a separate trust created under the pooling and servicing agreement (the *"Supplemental Interest Trust"*) will hold a swap agreement (the *"Swap Agreement"*) documented by a 1992 ISDA Master Agreement (Multicurrency-Cross Border), together with a Schedule, Confirmation and Credit Support Annex between the trustee, on behalf of the Supplemental



---

Interest Trust and Credit Suisse International (in such capacity, the *"swap counterparty"*), for the benefit of one or more classes of floating-rate certificates. See the term sheet related to this term sheet supplement for more details regarding any Swap Agreement.

**Overcollateralization.** The weighted average net mortgage rate of the Floating Rate Loan Group mortgage loans is generally expected to be higher than the weighted average of the pass-through rates of the Floating Rate Loan Group Certificates plus certain expenses of the trust, thus generating certain excess interest collections. Monthly Excess Interest will be applied in reduction of the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates. Such application of interest collections as payments of principal will cause the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates to amortize more rapidly than the Aggregate Loan Group Balance, thus creating and maintaining overcollateralization. However, Realized Losses on the Floating Rate Loan Group mortgage loans will reduce overcollateralization, and could result in an Overcollateralization Deficiency.

In addition, on and after the Stepdown Date, to the extent that a Trigger Event is not in effect and the Overcollateralization Amount exceeds the Targeted Overcollateralization Amount, a portion of each Principal Remittance Amount will not be applied in reduction of the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates, but will instead, be applied as described below.

On each distribution date, the Monthly Excess Cashflow will be distributed in the following order of priority:

(1) until the aggregate Class Principal Balance of the Floating Rate Loan Group Certificates equals the Aggregate Loan Group Balance for such distribution date minus the Targeted Overcollateralization Amount for such date:

(A) on each distribution date (x) prior to the Stepdown Date or (y) with respect to which a Trigger Event is in effect, to the extent of Monthly Excess Interest for such distribution date, to the Floating Rate Loan Group Certificates, in the following order of priority:

(a) to the Floating Rate Loan Group Senior Certificates, in ascending numerical order, pro rata, weighted based on the Class Principal Balances of such classes, until their respective Class Principal Balances have been reduced to zero; and

(b) to the Floating Rate Loan Group Subordinate Certificates, in ascending numerical order, until its Class Principal Balance has been reduced to zero;

(B) on each distribution date on or after the Stepdown Date and with respect to which a Trigger Event is not in effect, to fund any principal distributions required to be made on such distribution date set forth above in subclause II under "--*Distributions of Principal--The Floating Rate Loan Group Certificates*," after giving effect to the distribution of the Principal Payment Amount for such date, in accordance with the priorities set forth therein;

(2) to the Floating Rate Loan Group Senior Certificates (except the most senior Floating Rate Loan Group Senor Certificates), any Deferred Amount for such class;

(3) to the Floating Rate Loan Group Subordinate Certificates, in ascending numerical order, any Deferred Amount for such class;

(4) to the Floating Rate Loan Group Senior Certificates, pro rata based on amounts due, any Basis Risk Shortfall for such class;

(5) to the Floating Rate Loan Group Subordinate Certificates, in ascending numerical order, any Basis Risk Shortfall for such class;

(6) to the Excess Cash Flow Certificates, the amount distributable thereon pursuant to the pooling and servicing agreement; and



(7) to the Class AR-L or Class AR Certificates, any remaining amount, as appropriate. It is not anticipated that any amounts will be distributed to the Class AR-L or Class AR Certificates under this clause (7).

Distributions pursuant to subparagraphs (4) and (5) on any distribution date will be made after giving effect to any payments in respect of a related Cap Agreement to pay any related Basis Risk Shortfall. Distributions pursuant to subparagraphs (2) and (3) on any distribution date will be made after giving effect to any after giving effect to any payments in respect of a related a Cap Agreement on such date to pay Deferred Amounts.

**Additional Issuances of Certificates**

Upon the surrender of one or more classes of offered certificates to the trust, the trust will be permitted to issue one or more additional classes of certificates that will represent ownership interests in the surrendered certificates. A REMIC election will be made with respect to the surrendered certificates and the newly issued classes will constitute the regular interests in this REMIC. The Class AR Certificate will represent ownership of the residual interest in this REMIC. Any such issuance will be made pursuant to an amendment of the pooling and servicing agreement that will only require the consent of the holders of the offered certificates that are surrendered to the trust.

**POOLING AND SERVICING AGREEMENT**

**Assignment of Mortgage Loans**

Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan, including all principal and interest received on or with respect to such mortgage loans, exclusive of principal and interest due on or prior to the Cut off Date.
In connection with such transfer and assignment, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, a mortgage file for each mortgage loan which will consist of, among other things, the original promissory note, or mortgage note, and any modification or amendment thereto endorsed in blank without recourse (except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost), the original instrument creating a first lien on the related mortgaged property, or the mortgage, with evidence of recording indicated thereon, an assignment in recordable form of the mortgage, the title policy or a commitment to issue the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to such mortgage note and mortgage except for any such document not returned from the public recording office, which will be delivered to the trustee or its custodian as soon as the same is available to the depositor. Assignments of the mortgage loans to the trustee or its nominee will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, such recording is not required to protect the trustee's interest in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of

the depositor or the seller.

The trustee or its custodian will review each mortgage file within 90 days of the closing date, or promptly after receipt by the trustee or its custodian of any document permitted to be delivered after such date; and if any document in a mortgage file is found to be missing or defective in a material respect and the seller does not cure such defect within 90 days of notice thereof from the trustee or its custodian or within such longer period not to exceed 720 days after such date in the case of missing documents not returned from the public recording office, the seller will be obligated to repurchase the related mortgage loan from the trust. Rather than repurchase the mortgage loan as provided above, the seller may remove such mortgage loan (a deleted mortgage loan) from the trust and substitute in its place another mortgage loan (a replacement mortgage loan). However, any such substitution occurring more than 90 days after the closing date may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any REMIC or result in a prohibited transaction tax under the Code; provided, however, that such opinion will not be required if (1) the substitution occurs within two years of the closing date and (2) the substitution occurs with respect to mortgage loans that are *"defective"* under the Code and the seller delivers to the trustee and the trust administrator an officer's certificate to that effect. Any replacement mortgage loan generally will, or, if more than one replacement mortgage loan is being substituted for a mortgage loan, generally will have in the aggregate or on a weighted average basis, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement:



- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by the seller and held for distribution to the certificateholders on the related distribution date);
- have a current mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan, have a maximum mortgage rate and minimum mortgage rate not less than the respective rate for the deleted mortgage loan, have the same index as the deleted mortgage loan and a margin equal to or greater than the deleted mortgage loan;
- have an LTV ratio not higher than that of the deleted mortgage loan;
- have a remaining term to maturity not more than one year greater than or less than that of the deleted mortgage loan provided that the remaining term to maturity of any such mortgage loan shall be no greater than the last maturing mortgage loan in the trust immediately prior to any substitution; and
- comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of that mortgage, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some of the mortgage loans in the trust that are not already held through the MERS® System may, at the discretion of a servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loans and subsequent assignments of the mortgage were, or in the future may be, at the discretion of a servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

**Representations and Warranties Regarding the Mortgage Loans**

Under the pooling and servicing agreement, the trustee will receive representations and warranties made by DLJ Mortgage Capital. The mortgage loan representations and warranties will be made by DLJ Mortgage Capital as of the closing date or subsequent transfer date (or such earlier date, as specified in the subsequent transfer documents), as applicable. These representations and warranties include the following:

- each mortgage note and related mortgage is a legal and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy and other laws affecting the rights of creditors and general equitable principles;
- each mortgage loan at the time it was made complied in all material respects with applicable federal, state or local law, including, without limitation, predatory and abusive lending laws;
- none of the mortgage loans are classified as a *"high cost home," "covered," "high cost," "high risk home,"* or *"predatory"* loan under applicable state, federal or local law;
- the information set forth in the mortgage loan schedule is complete, true and correct in all

material respects as of the cut off date;

- no mortgaged property is subject to any material damage by waste, fire, earthquake, windstorm, flood or other casualty as of the closing date, and at origination of each mortgage loan there was, and there currently is, no proceeding pending for the total or partial condemnation of the related mortgaged property;
- each mortgage loan complies with all the terms, conditions and requirements of the originator's underwriting standards in effect at the time of origination;
- each mortgage loan had a CLTV ratio at origination of 100.00% or less; and
- each mortgage loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Internal Revenue Code.



---

In the event of a breach of any representation or warranty relating to a mortgage loan that materially and adversely affects the interests of the certificateholders in that mortgage loan, DLJ Mortgage Capital will be obligated to do one of the following:

- cure that breach,
- repurchase that mortgage loan at an amount equal to the sum of the unpaid principal balance of the mortgage loan on the date of repurchase, and accrued interest on that mortgage loan at the applicable mortgage rate from the date through which interest was last paid by the mortgagor to the date of repurchase, or
- substitute a replacement mortgage loan for that mortgage loan.

This substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that the substitution will not disqualify any REMIC, or result in a prohibited transaction under the Internal Revenue Code, provided, however, that an opinion of counsel will not be required if the depositor delivers an officer's certificate which states that the substitution is being made with respect to mortgage loans that are *"defective"* under the Internal Revenue Code. The depositor will make no representations or warranties for the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient documentation or that are otherwise defective. The sponsor is selling the mortgage loans without recourse and will have no obligations for the mortgage loans in its capacity as seller other than the cure, repurchase or substitution obligations described above. The obligations of each servicer, any modification oversight agent, any special servicer and the master servicer are limited to its contractual servicing obligations under the pooling and servicing agreement.

**Optional Termination; Terminating Auction Sale**

On any distribution date on or after which the aggregate Stated Principal Balance of the Senior-Subordinate Loan Group mortgage loans is less than or equal to the threshold described in the term sheet related to this term sheet supplement, the Terminating Entity (as defined below) will (subject to the terms of the pooling and servicing agreement) have the option to purchase the Senior-Subordinate Loan Group mortgage loans, all real property acquired in respect of any Senior-Subordinate Loan Group mortgage loan remaining in the trust, and any other related property remaining in the trust for a price equal to the greater of (a) the sum of (i) 100% of the aggregate outstanding Stated Principal Balance of the Senior-Subordinate Loan Group mortgage loans plus accrued interest thereon at the applicable mortgage rate to, but not including, the due date in the month of such distribution date, (ii) with respect to REO property related to the Senior-Subordinate Loan Group mortgage loans, the lesser of **(x)** the appraised value of such REO property and (y) the Stated Principal Balance for the mortgage loan related to such REO property and (iii) any unreimbursed advances, fees and other amounts payable to the master servicer, the servicers (other than the Terminating Entity), the trustee and the trust administrator related to the Senior-Subordinate Loan Group mortgage loans (with respect to the Senior-Subordinate Loan Group mortgage loans, the *"Terminating Par Value"*) and (b) the fair market value of all property of the trust related to the Senior-Subordinate Loan Group mortgage loans.

On any distribution date on or after which the aggregate Stated Principal Balance of the Floating Rate Loan Group mortgage loans is less than or equal to the threshold described in the term sheet related to this term sheet supplement, the Terminating Entity will (subject to the terms of the pooling and servicing agreement) have the option to purchase the Floating Rate Loan Group mortgage loans, all real property acquired in respect of any Floating Rate Loan Group mortgage loan remaining in the trust, and any other related property remaining in the trust for a price equal to the greater of (a) the sum of (i) 100% of the aggregate outstanding Stated Principal Balance of the Floating Rate Loan Group mortgage loans plus accrued interest thereon at the applicable mortgage rate to but not including, the due date in the month of such distribution date, (ii) with respect to REO property related to the Floating Rate Loan Group mortgage loans, the lesser of **(x)** the appraised value of such REO property and (y) the Stated Principal Balance for the mortgage loan related to such REO property and (iii) any unreimbursed advances and servicing fee and other amounts payable to the master

servicer, the servicers (other than the Terminating Entity), the trustee and the trust administrator related to the Floating Rate Loan Group mortgage loans (with respect to the Floating Rate Loan Group mortgage loans, the *"Terminating Par Value"*), and (b) the fair market value of all property of the trust related to the Floating Rate Loan Group mortgage loans.



---

The *"Terminating Entity"* will be (i) DLJ Mortgage Capital, Inc., if it is the owner of the servicing rights with respect to any related mortgage loan on such optional termination date, or (ii) if that is not the case, the special servicer or another servicer, as determined pursuant to the terms of the pooling and servicing agreement.

If either of such options is exercised, and the amount specified in clause (b) of the first or second immediately preceding paragraph exceeds the amount specified in clause (a) of the first or second immediately preceding paragraph, as applicable, the Class AR-L Certificates will be entitled to receive the amount of such excess. There can be no assurance that any of such options will be exercised, or that if any of such options are exercised, that there will be any excess amount available for distribution to the Class AR-L Certificates.

If specified in the term sheet related to this term sheet supplement, the option to purchase the Senior-Subordinate Loan Group mortgage loans and the other assets in the trust related to a Senior-Subordinate Loan Group as described above is not exercised and the aggregate Stated Principal Balance of the Senior-Subordinate Loan Group mortgage loans declines below the threshold described in the term sheet related to this term sheet supplement, the trust administrator will conduct an auction to sell the Senior-Subordinate Loan Group mortgage loans and the other assets in the trust related to a Senior-Subordinate Loan Group.

If specified in the term sheet related to this term sheet supplement, the option to purchase the Floating Rate Loan Group mortgage loans and the other assets in the trust related to Floating Rate Loan Group as described above is not exercised and the aggregate Stated Principal Balance of the Floating Rate Loan Group mortgage loans declines below the threshold described in the term sheet related to this term sheet supplement, the trust administrator will conduct an auction to sell the Floating Rate Loan Group mortgage loans and the other assets in the trust related to the Floating Rate Loan Group, provided, that if there are any NIM notes related to the Floating Rate Group outstanding, the trust administrator will not conduct such auction.

With respect to any auction, the trust administrator will solicit good faith bids for the related mortgage loans and the other related assets in the trust from at least three institutions that are regular purchasers and/or sellers in the secondary market of residential mortgage loans similar to the mortgage loans in the mortgage pool. The trust administrator will sell the related mortgage loans to the institution with the highest bid exceeding the related Terminating Par Value plus certain expenses set forth in the pooling and servicing agreement. If less than three bids are received or the highest bid received is less than the related Terminating Par Value plus such expenses, the trust administrator will not sell the related mortgage loans and the other related assets in the trust and, unless certain conditions specified in the pooling and servicing agreement are not satisfied, the trust administrator will continue conducting auctions every six months until the earlier of (a) the completion of a successful auction and (b) the exercise by the Terminating Entity of its purchase option with respect to the related mortgage loans.

If an auction is successfully completed with respect to either (a) the Senior-Subordinate Loan Group mortgage loans or (b) the Floating Rate Loan Group mortgage loans, and the highest bid is in excess of the related Terminating Par Value, the Class AR-L Certificates will be entitled to receive the amount of that excess. There can be no assurance that any auction will be successfully completed, or that if an auction is successfully completed, that there will be any excess amount available for distribution to the Class AR-L Certificates.

If either of such options is exercised or an auction is successfully conducted, the effect would be to cause an early retirement of the related certificates. Distributions on the certificates relating to any optional termination or auction sale will first be treated as a prepayment of mortgage loans and paid in accordance with the priorities and amounts set forth above under "*Description of the Certificates*." The proceeds from that distribution may not be sufficient to distribute the full amount to which each related class of certificates is entitled.

**Reports to Certificateholders**

The monthly statement to certificateholders prepared by the trust administrator will include the following information with respect to each distribution date:

- the Class Principal Balance of each class of certificates before giving effect to the distribution of principal and interest;
- the amount of the related distribution on each class of certificates allocable to interest;

- the amount of the related distribution on each class of certificates allocable to principal;
- the sum of the principal and interest payable to each class of certificates;
- any Realized Loss allocable to each class of certificates;
- any Carryforward Interest allocable to each class of certificates;
- the Class Principal Balance of each class of certificates after giving effect to the distribution of principal and interest;
- the pass through rate for each class of certificates;
- the applicable record dates, Interest Accrual Periods, determination date and distribution date;
- the Principal Payment Amount and Principal Remittance Amount;
- the total cash flows received and the general sources thereof;
- the amount of principal prepayments;
- the amount of principal as a result of repurchased mortgage loans;
- the aggregate amount of scheduled interest prior to reduction for fees;
- the amount of net recoveries on charged off mortgage loans;
- the amount of reimbursements of nonrecoverable advances previously made;
- the amount of Net Liquidation Proceeds;
- the amount of Insurance Proceeds;
- the number of mortgage loans as of the first and last day of the related Collection Period;
- the aggregate Stated Principal Balance of the mortgage loans as of the first and last day of the related Collection Period;
- the Expense Fee, with an identification of each payee and the general purpose of such fees;
- the amount of current advances (including the general purpose of such advances);
- the amount of outstanding advances;
- the number and aggregate Stated Principal Balance of mortgage loans delinquent (1) 31 to 60 days, (2) 61 to 90 days and (3) 91 days or more, including delinquent bankrupt mortgage loans but excluding mortgage loans in foreclosure and REO property;
- the number and aggregate Stated Principal Balance of mortgage loans that are currently in bankruptcy, but not delinquent;
- the number and aggregate Stated Principal Balance of mortgage loans that are in foreclosure;
- the Delinquency Rate, Rolling Three Month Delinquency Rate, the Senior Enhancement Percentage and whether a Trigger Event is in effect ;



- the number and aggregate principal amount of any REO properties as of the close of business on the determination date preceding such distribution date;
- current Realized Losses;
- cumulative net Realized Losses and whether a Cumulative Loss Event is occurring;
- the weighted average term to maturity of the mortgage loans as of the close of business on the last day of the calendar month preceding the related distribution date;
- the number of mortgage loans that have prepayment charges and for which prepayments were made during the related Collection Period, as applicable;
- the amount of any funds remaining in the Pre Funding Account as of such distribution date;

- the Net Funds Cap with respect to each Loan Group;
- amount, if any, on deposit in any Pre-Funding Account;
- the Monthly Excess Cashflow; and
- the Targeted Overcollateralization Amount, the Overcollateralization Amount, the amount, if any, by which the Targeted Overcollateralization Amount exceeds the Overcollateralization Amount and the Overcollateralization Release Amount.

For purposes of the information reported in the monthly statement to certificateholders prepared by the trustee, a mortgage loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the next following monthly due date. The determination as to whether a mortgage loan falls into this category is made as of the close of business on the last business day of each month. For example, a mortgage loan due for December 1 at the close of business on January 31 would be described as 30 to 59 days delinquent in the February trust and static pool reporting.

**Evidence as to Compliance**

Each of the servicers and the special servicer will deliver to the depositor and the trust administrator, on or about March 1st of each year, commencing with March 1, 2007, an officer's certificate stating that: (i) a review of that party's servicing activities during the preceding calendar year and of performance under the applicable Servicing Agreement has been made under the supervision of the officer, and (ii) to the best of the officer's knowledge, based on the review, such party has fulfilled all its obligations under the applicable Servicing Agreement in all material respects throughout the year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying the failure known to the officer and the nature and status of the failure.

In addition, on or prior to March 1st of each year, commencing with March 1, 2007, each of the servicers, the special servicer, the master servicer and the custodians will be required to deliver annually to the depositor and the trust administrator, an assessment of compliance with the minimum servicing criteria established in Item 1122(a) of Regulation AB (the *"AB Servicing Criteria"*) that are applicable to such party. The AB Servicing Criteria include specific criteria relating to the following areas: general servicing considerations, cash collection and administration, investor remittances and reporting, and pool asset administration. Such report will indicate that the AB Servicing Criteria were used to test compliance on a platform level basis and will set out any material instances of noncompliance.

Each entity delivering the assessment of compliance referred to in the previous paragraph also will deliver with its report on assessment of compliance, an attestation report from a firm of independent public accountants on the assessment of compliance with the AB Servicing Criteria.



---

Copies of the annual reports of assessment of compliance, attestation reports, and statements of compliance may be obtained by certificateholders without charge upon written request to the trust administrator. These items will be filed with the issuing entity's annual report on Form 10 K, to the extent required under Regulation AB.

**The Issuing Entity**

On the closing date, and until the termination of the trust, the applicable Adjustable Rate Mortgage Trust series will be a common law trust formed under the laws of the state of New York pursuant to the pooling and servicing agreement. The issuing entity will not have any liabilities as of the closing date. The fiscal year end of the issuing entity will be December 31 of each year. The assets of the issuing entity are described herein under "*Description of the Certificates--Assets of the Trust*."

The issuing entity will not have any employees, officers or directors. The trustee, the depositor, the master servicer, the servicers, the modification oversight agent, if applicable, and the trust administrator will act on behalf of the Issuing Entity, and may only perform those actions on behalf of the issuing entity that are specified in the pooling and servicing agreement. See "*Servicing of the Mortgage Loans*" in the prospectus supplement.

The trustee, on behalf of the issuing entity, is only permitted to take such actions as are specifically provided in the pooling and servicing agreement. Under the pooling and servicing agreement, the trustee on behalf of the issuing entity will not have the power to issue additional certificates representing interests in the issuing entity, borrow money on behalf of the issuing entity or make loans from the assets of the issuing entity to any person or entity, without the amendment of the pooling and servicing agreement by certificateholders and the other parties thereto as described under "*Description of the Certificates -- Amendment*" in the prospectus.

If the assets of the issuing entity are insufficient to pay the certificateholders all principal and interest owed, holders of certificates may not receive all of their expected payments of interest and principal and may suffer a loss. The issuing entity, as a common law trust, is not eligible to be a debtor in a bankruptcy proceeding. In the event of bankruptcy of the sponsor, the depositor or any originator, it is not anticipated that the assets of the issuing entity would become part of the bankruptcy estate or subject to the bankruptcy control of a third party.

**The Trustee**

**General**

U.S. Bank National Association (*"U.S. Bank"*) will act as trustee under the pooling and servicing agreement. A network of specialized U.S. Bancorp offices across the nation, inside and outside its 24-state footprint, provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, governments and institutions.

The trustee, U.S. Bank National Association, has its corporate trust offices at 60 Livingston Avenue, EP MN WS3D, St. Paul, Minnesota 55107. The trustee may resign at any time, in which event the depositor will be obligated to appoint a successor trustee. The depositor may also remove the trustee if the trustee ceases to be eligible to continue as such under the pooling and servicing agreement or if the trustee becomes insolvent. The trustee may also be removed at any time by the certificateholders evidencing not less than 50% of the voting rights evidenced by the certificates. In such circumstances, the depositor will also be obligated to appoint a successor trustee. Any resignation or removal of the trustee and appointment of a successor trustee will not become effective until acceptance of the appointment by the successor trustee.

The trustee, or any of its affiliates, in its individual or any other capacity, may become the owner or pledgee of certificates and may transact business with other interested parties with the same rights as it would have if it were not the trustee. The trustee will have the following material duties under the pooling and servicing agreement:

- directly or through a custodian, to hold the mortgage notes, mortgages and other legal documents in the mortgage files relating to all or some of the mortgage loans;



- directly or through a custodian, to review each mortgage file and deliver a certification to the effect that, except as noted in the certification, all required documents have been executed and received; and

- in the event of a default by the servicer under the pooling and servicing agreement that has not been remedied, either the trustee or holders of certificates evidencing at least 25% of the voting rights will have the right to terminate the master servicer. If the master servicer is terminated, or the master servicer resigns, the trustee will become the successor master servicer. However, if the trustee is unwilling or unable to act as successor master servicer, it may appoint, or petition a court to appoint, a successor master servicer.

The trustee may resign at any time, in which event the depositor will be obligated to appoint a successor trustee. The depositor may also remove the trustee if the trustee ceases to be eligible to continue as such under the pooling and servicing agreement or if the trustee becomes incapable of acting under the pooling and servicing agreement or insolvent. The trustee may also be removed at any time by the certificateholders evidencing not less than 50% of the voting rights evidenced by the certificates. In such circumstances, the depositor will also be obligated to appoint a successor trustee. Any resignation or removal of the trustee and appointment of a successor trustee will not become effective until acceptance of the appointment by the successor trustee. Any expenses associated with the resignation or removal of the trustee and the appointment of a successor will generally be paid by the trustee or the depositor.

The trustee, or any of its affiliates, in its individual or any other capacity, may become the owner or pledgee of certificates and may transact business with other interested parties with the same rights as it would have if it were not trustee.

The trustee will not be liable under the pooling and servicing agreement:

- expect for the performance of such duties and obligations as are specifically set forth in the pooling and servicing agreement;

- for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by the pooling and servicing agreement; or

- for any action taken or omitted by it in good faith in accordance with the direction of holders of certificates evidencing at least 50% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to such trustee, or relating to the exercise of any trust or power conferred upon such trustee under the pooling and servicing agreement.

In the absence of bad faith, the trustee may conclusively rely upon any certificates or opinions of counsel furnished to such trustee under the pooling and servicing agreement. Any such opinion of counsel will be full and complete authorization and protection in respect of any action taken or omitted to be taken by such trustee in good faith and in accordance with such opinion of counsel. The trustee will not be deemed to have knowledge or notice of any matter, including an event of default, unless actually known to it or unless it has received written notice thereof.

**Certain Matters Regarding the Servicers and the Master Servicer**

On and after the time a servicer receives a notice of termination or the resignation of a servicer, the master servicer shall be the successor to the related servicer, but only in its capacity as servicer, and not in any other capacity, and the transactions set forth or provided for in the pooling and servicing agreement and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the related servicer including the obligation to make Advances which have been or will be required to be made by the terms and provisions thereof. As compensation there for, the master servicer shall be entitled to all funds relating to the mortgage loans that the related servicer would have been entitled to charge to the related collection account, provided that the terminated servicer shall nonetheless be entitled to payment or reimbursement to the extent that such payment or reimbursement relates to the period prior to termination of the related servicer. Notwithstanding the foregoing, if the master servicer has become the successor to a servicer, the master servicer may, if it shall be unwilling to so act, or shall, if



it is prohibited by applicable law from making Advances, or if it is otherwise unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution, which is also a Fannie Mae or Freddie Mac approved seller/servicer for first and second lien loans in good standing, having a net worth of at least $10,000,000, as the successor to a servicer in the assumption of all or any part of the responsibilities, duties or liabilities of a servicer. Pending appointment of a successor to a servicer, the master servicer, unless the master servicer is prohibited by law from so acting, shall act in such capacity as described above. In connection with such appointment and assumption, the master servicer may make arrangements for the compensation of any successor out of payments on the related mortgage loans as it and the related successor agree; provided, however, that no such compensation will be in excess of the related servicing fee. The master servicer and the related successor will take such action, consistent with the pooling and servicing agreement, as shall be necessary to effectuate any such succession. Neither the master servicer, the trust administrator nor any other successor servicer will be deemed to be in default by reason of any failure to make, or any delay in making, any distribution pursuant to the pooling and servicing agreement or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities under the pooling and servicing agreement, in either case caused by the failure of the related servicer to deliver or provide, or any delay in delivering or providing, any cash, information, documents or records to it.

**The Trust Administrator**

The corporate trust office of the trust administrator for purposes of presentment of certificates for registration of transfer, exchange or final payment, is Wells Fargo Bank, N.A., 6th Avenue and Marquette, Minneapolis, Minnesota 55479, Attention: applicable CS ARMT series, and for all other purposes is located at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Client Manager, applicable CS ARMT series. The trust administrator may resign at any time, in which event the depositor will be obligated to appoint a successor trust administrator. The depositor may also remove the trust administrator if the trust administrator ceases to be eligible to continue as such under the pooling and servicing agreement or if the trust administrator becomes insolvent. The trust administrator may also be removed at any time by the trustee or by certificateholders evidencing not less than 50% of the voting rights evidenced by the certificates. In such circumstances, the depositor will also be obligated to appoint a successor trust administrator. Any resignation or removal of the trust administrator and appointment of a successor trust administrator will not become effective until acceptance of the appointment by the successor trust administrator.

The trust administrator, or any of its affiliates, in its individual or any other capacity, may become the owner or pledgee of certificates with the same rights as it would have if it were not the trust administrator.

The pooling and servicing agreement requires the trust administrator to maintain, at its own expense, an office or agency where certificates may be surrendered for registration of transfer or exchange and where notices and demands to or upon the trust administrator and the certificate registrar in respect of the certificates pursuant to the pooling and servicing agreement may be served.

The trust administrator will be required to notify certificateholders and the rating agencies of any event of default by the master servicer or servicer known to the trust administrator, and the appointment of any successor master servicer or servicer.

The trust administrator will also act as paying agent, certificate registrar and authenticating agent under the pooling and servicing agreement.

The trust administrator will also act as paying agent, certificate registrar and authenticating agent under the pooling and servicing agreement.

The trust administrator will make the reports of distributions to certificateholders (and, at its option, any additional files containing the same information in an alternative format) available each month to certificateholders and other interested parties via the trust administrator's website at http://www.ctslink.com. Information about and assistance in using the website can be obtained by calling the trust administrator's customer service desk at (866) 846-4526. Persons that are unable to use the above website are entitled to have a paper copy mailed to them via first class mail by calling the trust administrator at (866) 846-4526. The trust administrator shall have the right to change the way such reports are made available in order to make distributions more convenient and/or more accessible to the above parties and to the certificateholders. The trust administrator shall provide timely and adequate notification



to all above parties and to the certificateholders regarding any such change. In addition, the trust administrator will post on the above website, on a monthly basis, current loan level data reports about the mortgage loans in the trust fund. The format of these loan level data reports may be modified, or they may be discontinued, at any time.

The trust administrator shall be entitled to a portion of the net investment earnings on amounts on deposit in the certificate account maintained by the trust administrator.

**Restrictions on Transfer of the Class AR and Class AR-L Certificates**

The Class AR and Class AR-L Certificates will be subject to the restrictions on transfer described in the prospectus under *"Material Federal Income Tax Consequences--Taxation of Owners of REMIC Residual Certificates--Tax and Restrictions on Transfers of REMIC Residual Certificates to Specific Organizations."* The pooling and servicing agreement provides that the Class AR and Class AR-L Certificates, in addition to other classes of certificates, may not be acquired by a Plan or with assets of such a Plan unless certain conditions are met. See *"ERISA Considerations"* in this term sheet supplement. Each Class AR and Class AR-L Certificate will contain a legend describing the foregoing restrictions.

**Voting Rights**

All voting rights will be allocated among the holders of each class of certificates as set forth in the prospectus supplement.

**CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS**

**Factors Affecting Prepayments on the Mortgage Loans**

The yields to maturity of each class of the offered certificates and the aggregate amount of distributions on each class of the offered certificates will be affected by, among other things, the rate and timing of payments of principal on the related mortgage loans. The rate of principal payments on the mortgage loans will be affected by the amortization schedules of the mortgage loans and by the rate of principal prepayments thereon. For this purpose, the term *"prepayment"* includes prepayments and liquidations due to defaults or other dispositions of the mortgage loans or the mortgaged properties, including application of insurance proceeds or condemnation awards, the purchase of mortgage loans by the seller of those mortgage loans due to uncured breaches of representations and warranties, the purchase of delinquent mortgage loans by the special servicer or the purchase of the mortgage loans by the Terminating Entity under the circumstances described under *"Pooling and Servicing Agreement--Optional Termination; Terminating Auction Sale"* herein. No assurance can be given as to the rate or timing of principal payments or prepayments on any of the mortgage loans. Prepayments, liquidations and purchases of the mortgage loans will result in (a) principal distributions to certificateholders that would otherwise be distributed over the remaining terms of the mortgage loans and (b) the termination of ongoing interest distributions with respect to such mortgage loans to the certificateholders. See *"Yield, Prepayment and Maturity Considerations"* in the prospectus.

The rate of principal prepayments on mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of mortgage interest rates and the rate at which mortgagors default on their mortgages. All of the mortgage loans are adjustable-rate mortgage loans. As is the case with fixed-rate mortgage loans, in general, if prevailing interest rates fall

significantly below the mortgage rates on the mortgage loans, the adjustable-rate mortgage loans (and the applicable offered certificates) are likely to be subject to a higher incidence of prepayment than if prevailing rates remain at or above the mortgage rates on the mortgage loans. Conversely, if prevailing interest rates rise significantly above the mortgage rates on the mortgage loans, the mortgage loans (and the applicable offered certificates) are likely to be subject to a lower incidence of prepayment than if prevailing rates remain at or below the mortgage rates on the mortgage loans. Prepayments on the mortgage loans may differ as they approach their respective first Adjustment Dates. No assurance can be given as to the level of prepayment that the mortgage loans will experience.

Although the mortgage rates on the adjustable-rate mortgage loans are subject to adjustment, such mortgage rates may adjust less frequently than the pass-through rates on the certificates and adjust by reference to the applicable Index. With respect to the LIBOR Certificates, changes in One-Month LIBOR may not correlate with changes in the applicable Index and also may not correlate with prevailing interest rates. It is possible that an increased level of One-Month LIBOR could occur simultaneously with a lower level of prevailing interest rates



---

which would be expected to result in faster prepayments, thereby reducing the weighted average lives of the LIBOR Certificates. The mortgage rate applicable to substantially all of the mortgage loans and any Adjustment Date will be based on the applicable Index value most recently announced generally as of a date either 45 days prior to, or the first business day of the month immediately preceding the month of, such Adjustment Date. Thus, if the Index value with respect to an adjustable-rate mortgage loan rises, the lag in time before the corresponding mortgage rate increases, will, all other things being equal, slow the upward adjustment of the pass-through rate or rate cap, as applicable, on the related certificates. In addition, substantially all of the adjustable-rate mortgage loans have mortgage rates which will not adjust for a substantial period of time after origination. See "*Description of the Mortgage Pool*" in this term sheet supplement.

A portion of the initial mortgage loans may be subject to prepayment premiums during intervals ranging from three months to five years following origination, as described under "*Description of the Mortgage Pool--General*" herein. Such prepayment premiums may have the effect of reducing the amount or the likelihood of prepayment of such mortgage loans during such intervals.

The depositor makes no representation as to the expected rate of prepayments on the mortgage loans.

See "*Description of the Mortgage Pool*" and "*Description of the Certificates*" in this term sheet supplement and "*Yield, Prepayment and Maturity Considerations*" in the prospectus for additional information about the effect of the rate of prepayments on the yields on and maturity of the offered certificates.

Investors in the offered certificates are encouraged to consider the risk that rapid rates of prepayments on the mortgage loans, and therefore of principal distributions on the offered certificates, may coincide with periods of low prevailing interest rates. During such periods, the effective interest rates on securities in which an investor in the offered certificates may choose to reinvest amounts received as principal distributions on the offered certificates may be lower than the interest rate borne by such certificates. Conversely, slow rates of prepayments on the mortgage loans, and therefore of principal distributions on the offered certificates, may coincide with periods of high prevailing interest rates. During such periods, the amount of principal distributions available to an investor in the offered certificates for reinvestment at such high prevailing interest rates may be relatively low.

Substantially all of the mortgage loans will contain *"due-on-sale"* clauses. The enforcement of a due-on-sale clause will generally have the same effect as a prepayment on a mortgage loan. Some of the mortgage loans may be assumable by purchasers of the mortgaged property rather than prepaid by the related borrowers in connection with the sales of the those mortgage properties. Any such assumption will reduce the rate of prepayments of the mortgage loans and extend the weighted average life of the related offered certificates.

See *"Yield, Prepayment and Maturity Considerations"* in the prospectus.

**Mandatory Prepayment**

With respect to each class of offered certificates related to the Floating Rate Loan Group in the event that at the end of the prefunding period there are any remaining amounts on deposit in the prefunding account, the holders of those certificates then entitled to principal will receive an additional distribution allocable to principal in an amount equal to the amount remaining in such prefunding account. Although there can be no assurance, the depositor anticipates that there should be no material principal payment to the holders of the offered certificates due to a lack of subsequent mortgage loans.

lenders; and to quantify truth in lending violations when assessing damages. The OCC software is the benchmark for compliance with Regulation Z, and is used by Federal Reserve Bank examiners and regulators in other federal and state jurisdictions.

As my work evolved over the years, I encountered real-world problems for which no off-the-shelf loan amortization or accounting software could provide solutions. To fill this gap, I developed spreadsheet-based analytical tools using "Microsoft Excel" that would allow me to examine the exceptional amortization methods I encountered, and to track all primary and custodial mortgage loan accounts simultaneously. In order to accomplish this, I had to learn the mathematical capabilities of "Microsoft Excel" and become proficient at using the financial functions embedded in the program.

Recently, I came upon a loan type that could not be computed with a Hewlett Packard calculator, Microsoft Excel or T-Value. To understand how this particular loan functioned, I had to study college textbooks on the Mathematics of Finance. This exercise proved challenging because the more recent textbooks did not contain sufficient algebraic equations to solve the problem. Finally, I found the answer in a book having a copyright date of 1929, which clearly illustrates how, as our confidence in technology grows, we are losing first generation knowledge. I see this as a very dangerous trend, and one that will undoubtedly lead to a great deal of lender liability in the future if not corrected.

**REGULATIONS:** Adding to the complexity of home mortgage financing is the extensive body of consumer law, which often supplants contractual rights and remedies contained in the loan agreement. Regulatory oversight is needed to promote level competition within the industry on the one hand, and to ensure fairness for consumers throughout the lending relationship on the other.

Competency in the field of residential mortgage finance requires a firm grasp of both the spirit and letter of the federal Truth in Lending Act; of Regulation Z which implements the purpose of the Act; and the Official Staff Commentary, which interprets the regulations. Additionally, since virtually all mortgages provide for the collection of escrow funds, knowledge of the Real Estate Settlement Procedures Act, and its corollary, Regulation X, is also necessary. Furthermore, RESPA addresses mortgage servicing transfer procedures and billing complaints. Both are common occurrences, which prompt consumers to reach out for professional assistance.

## QUALIFICATIONS

**Formal Education, Professional Development, Self-Study**

### Merrimack College

*North Andover, Massachusetts*

- Bachelor of Arts in American Studies with a Minor in Biology

I graduated in 1970 with honors from Merrimack College, North Andover, Massachusetts earning a Baccalaureate in American Studies supported by a solid background in math and science. I entered college in the Fall of 1966 having had the equivalent of five years of high school math. Courses included Fundamentals of Mathematics, Algebra I and II, Geometry I and II, Calculus I and II, and Trigonometry I and II. The first five of eight college semesters adhered to the strict curriculum required of Biology majors, and were heavily concentrated in science and math. Coursework included: two semesters of General Biology and General Chemistry with labs, Principles of Mathematics I and II; two semesters of Morphogenesis and Organic Chemistry with labs, Principles of Mathematics III and IV; Cellular Biochemistry, Advanced Botany and General Physics all with labs; and Structure of Invertebrates with lab.

### Real Estate & Finance

**American Real Estate Academy**

- Salespersons Qualifying Course, October 1986

- Real Estate Brokers Course, January 1988
- Licensing Renewal Course, August 2002
- 1031 Exchange, April 2007
- Residential Rental Agency, April 2007
- Foreclosures Estate Sales And Auctions, April, 2007
- Residential Mortgage Loan Market & Credit Today, April 2007
- Seller Agency, April 2007
- Buyer Agency, April 2007

**Commonwealth of Massachusetts**

- Registered Real Estate Salesperson, December 1986
- Registered Real Estate Broker, February 1988

**Massachusetts Association of Realtors**

*Earned Graduate, Realtor's Institute Designation (G.R.I.)*

- Graduate Realtor's Institute I, February 1987
- Graduate Realtor's Institute II, April 1987
- Graduate Realtor's Institute III, September 1988
- HP-12C Calculator, October 1988
- Financing Concepts, November 1988

**Commercial-Investment Real Estate Council**

- CI 100: Marketing Techniques for Leasing and Selling Commercial Property, September 1988

**National Counsel of Exchangors**

*Earned Designation of Certified Exchange Consultant from The Academy of Real Estate, High Honors*

- Gold card Qualifying Course - Wally Walker, January 1989
- Trade Secrets of Exchanging - Warren G. Harding, July 1989

**Miscellaneous Real Estate Courses**

- Nothing Down - Robert Allen, November 1986
- Boot Camp - Tom Hopkins, January 1987
- Sales Training - Tom Hopkins, April 1987
- The Art of Real Estate Counseling - Charles Chatham, August 1988
- Tom Peters' Excellence 1991, April 1991

**Real Estate Finance**

- Complete Course on Discounted Mortgages - Carl Abe, April 1988
- International Financing - Robert Findling, October 1988
- Mortgage Buying Workshop - Mike Meeker, March 1990 and May 1990
- Roth IRA Wealthbuilding - Dyches Boddiford & Peter Fortunato, March 2001
- Private Lending - Dyches Boddiford, May 2001

**Real Estate Acquisition**

- Option Fundamentals - Jack Miller, June 2001
- Corporation & LLC Combo Class – Jack Miller, May 2002

## Mortgage Auditing

**Consumer Loan Advocates**

- ARM AID-Mortgage Auditing Workshop, September 1991

**Self-Study**

- Understanding The Time Value of Money, Jack V. Michaels
- Mathematics of Finance, Cissell, Cissell & Flaspohler
- Handbook of Financial Mathematics, Justin H. Moore
- The Cost of Credit, National Consumer Law Center

## Legal

### Massachusetts Bar Association

- Foreclosure Defense Training, September 1992
- Massachusetts Mortgage Foreclosures, June 1997

### Practising Law Institute

- Consumer Financial Services Litigation, April 2001

### O. Max Gardner III

- Bankruptcy Boot Camp, September 2006
- Co-Taught Speaking On Securitization Boot Camp, February 2007
- Guest Speaker at a Veteran's Boot Camp, December 2009

## Regulations & Compliance

### Massachusetts Bankers Association

- Bank Compliance Academy, November 1998

### CUNA Mutual Group

- Truth In Lending School, July 1999

### BankersOnline

- Truth In Lending – How To Audit Open-End Credit, December 2005
- How To Comply With The Rescission Rules, June 2006

### Self-Study

- Truth In Lending Act, Regulation Z, Official Staff Commentary
- Real Estate Settlement Procedures Act, Regulation X
- Alternative Mortgage Transaction Parity Act
- Home Ownership Equity Protection Act
- Federal Trade Commission Act – Unfair and Deceptive Acts and Practices
- Truth-in-Lending Manual - Ralph C. Clontz, Jr.
- Truth in Lending - National Consumer Law Center
- Repossessions & Foreclosures - National Consumer Law Center
- Unfair and Deceptive Acts and Practices - National Consumer Law Center
- Mortgage and Consumer Loan Disclosure Handbook - Kenneth F. Hall
- Residential Mortgage Lending: State Regulation Manual - Negroni & Pfaff

## Technology

### COMP USA Computer Training

- Microsoft® Windows 95®, December 1996
- Microsoft® Excel Introduction 7.0, December 1996
- Microsoft® Excel 7.0 Tools & Techniques, December 1996
- Quicken 5.0 for Windows – Introduction, December 1996
- Microsoft® Introduction to Access 2.0, March 1997
- Microsoft® Access 7.0 – Level I, March 1997

## Association of Certified Fraud Examiners

### Associate Member

### Candidate for CFE Certification

- Building Your Fraud Examination Practice, June 2005
- Communicating the Results of Your Fraud Examination, June 2005

## MORTGAGE AUDITING AS A PROFESSION

**Self-Initiated Study & Life Experience**

### Mortgage Auditing

Consumer-based mortgage loan auditing is a new field. It originated in the early 1990's when Consumer Loan Advocates of Chicago, Illinois began exposing the high percentage of errors and overcharges made by lenders when adjusting variable rate mortgage loans. Within a short period, a number of entrepreneurs emerged to provide consumers with mortgage auditing services. I was among the earliest of these, and began doing business as THE MORTGAGE COUNSELOR in the fall of 1991.

While other companies focused on adjustable rate mortgages and escrow accounts, I targeted disclosure violations and negative amortization loans, especially as these affected consumers who obtained financing from subsidiaries of The Dime Savings Bank of New York, FSB in the late 1980's. Pressed to the challenge, I was able to crack the code on Dime's "Impact Loan" and explain to consumers, attorneys and authorities, the basis for legal action against the institution. My findings instigated and facilitated investigations of Dime by the Attorneys General of Massachusetts, New Hampshire and Connecticut.

To the best of my knowledge, presently, there are no college or university level courses that teach the consumer-based objectives I have defined for my work. Consequently, I had to devise a curriculum of self-study that supplements my professional education and supports my purpose.

### Real Estate Finance

The foundation for my knowledge of real estate was acquired initially through courses taken at the American Academy of Real Estate in 1986-87 which were required to obtain licensing as a real estate salesperson and broker in the Commonwealth of Massachusetts. Thereafter between 1987-88, I attended and completed the Graduate REALTOR® Institute, which is a nationally accredited professional development program designed and approved by the National Association of REALTORS® and taught by local chapters.

In order to earn the GRI designation, I completed instruction in real estate finance (and other subjects) at three progressive levels of difficulty. The curriculum covered: financial structures for the purchase and sale of real estate; the mortgage application process; qualifying the borrower; standards of approval used by the secondary mortgage market and private mortgage insurance providers; instructions in the use of the financial calculator; basic and advanced real estate finance; risk reduction, taxation, investment, technology, contract law, and real estate valuation.

### Mortgage Finance

The key to solving problems in real estate rests, largely, on mitigating the inevitable financial challenges of ownership. My interest in providing solutions for investor-clients led me to study real estate exchanging, and consequently, to the study of "paper" — that is the financing of equity, used to facilitate liquidity in an otherwise long-term investment medium.

Through various courses given by the Commercial-Investment Real Estate Council, the National Council of Exchangors, the New England Real Estate Exchangors, the Academy of Real Estate, and experts who teach techniques for creating and marketing private mortgages, I learned the fundamentals of the time value of money, the compounding and discounting of cash flows, net present and future values, and other sophisticated financing techniques used in commercial banking and in the esoteric world of real estate exchanging.

With respect to coursework developed to teach about the primary and secondary mortgage markets, I completed Consumer Loan Advocates' course on auditing adjustable rate mortgages in 1991, and more recently attended the Massachusetts Bankers Association Annual Compliance Academy.

I have undertaken independent study in connection with my casework to learn about lending industry standards as promulgated by institutions such as the Department of Housing and Urban Development, the

Federal Deposit Insurance Corporation, the Federal National Mortgage Corporation, and the American Bankers Association. Research topics include: loan origination and application procedures; qualifying ratios for debt-to-income and loan-to-value; underwriting guidelines; loan program disclosure obligations; external and internal documentation of a loan; loan administration policies; quality control review process; duties of customer service representatives; escrow operations; default servicing; loss mitigation techniques; document preparation; and record retention requirements.

## Technology

I have an ongoing commitment to investing in technology and to improving my technical skills, both of which are reflected in my work product. I have taken courses in the Microsoft products I use daily, and have devoted hours of self-study to the use of "T-Value" and "APRWIN" for which no official instruction is offered. I subscribe to "The National Mortgage News" and to "Mortgage Technology" to stay current with changes in technology that are transforming the mortgage lending industry.

## Regulations

One way in which I distinguish myself from other mortgage auditing companies is that I provide consumers, and their attorneys, with guidance as to whether the errors and omissions I detect constitute violations of the mortgage contract and/or consumer protection statutes.

The laws that I am particularly concerned with and have studied over the years are: the federal Truth in Lending Act, Regulation Z, the Official Staff Commentary on Regulation Z, the Real Estate Settlement Procedures Act, Regulation X, the Homeownership Equity Protection Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Federal Trade Commission Act, the FTC policy statements on unfair and deceptive acts, The Garn St. Germain Act, and the Alternative Mortgage Transaction Parity Act.

I have received formal instruction on how to detect Truth in Lending violations taught by Kathleen Keest formerly of the National Consumer Law Center at a Foreclosure Defense seminar held by the Massachusetts Bar Association. I completed a course on credit through the Bank Compliance Academy, conducted by the Kirchman Corporation for the Massachusetts Bankers Association and attended CUNA Mutual Group's Truth in Lending School. Subsequently, I contacted the Kirchman Corporation to check an APR reimbursement calculation and to discuss a truth-in-lending violation I had detected. The compliance officer I spoke with told me I was correct and that I had a Ph.D. in truth-in-lending. When asked what courses they had upcoming, he told me they were too elementary for me.

# ADVOCACY

### Pro bono Services, Publications, Testimony

Between 1991 through 1996, I dedicated approximately 5,000 hours of unpaid time to uncovering the means by which The Dime Savings Bank of New York, through its mortgage subsidiaries, perpetrated its mortgage lending scheme upon consumers up and down the eastern seaboard, from Florida to New Hampshire.

My specific and self-initiated activities included developing mortgage loan auditing procedures to track the highly complex interplay between principal, interest and deferred interest in Dime's negative amortization "Impact Loan;" working with consumers and their attorneys to create foreclosure defense strategies; participating in both open and closed meetings with the staff of U.S. Congressmen Studds and Kennedy, and with U.S. Senators Kerry and Kennedy; consulting on three occasions with Massachusetts Attorney General's investigative staff; informing the New Hampshire Attorney General's senior deputy that Dime had violated the state's simple interest statute by making compound interest first mortgage loans; working with investigative reporter Jeff Cole of WFSB in Hartford to alert Connecticut consumers, and to inform the Attorney General and Banking Commissioner of that state; and establishing a grass roots consumer organization in Massachusetts and New Hampshire known as the Dime Borrowers Association.

I published two reports during 1992 to assist Massachusetts authorities in understanding Dime's scheme, and to facilitate their investigations. Authorities in New Hampshire and Connecticut requested these reports, and copies were circulated to over 100 public policy makers, attorneys and consumers in six states. In early April 1994, I prepared a report called the "Official Commentary of the Dime Borrowers Association," which pointed out the defects of a settlement agreement negotiated between Dime and the Massachusetts Attorney General. Subsequently, similar agreements were announced in New Hampshire and Connecticut. The Official Commentary provided the Dime Borrowers Association with strategic bargaining positions that allowed them to conduct their own negotiations directly with Dime's CEO, Richard Parsons. As a result the DBA received a $150,000.00 grant from Dime as well as added relief that surpassed the settlement agreements made by the aforementioned Attorneys General.

In October 1997, I prepared a report at the request of the Massachusetts Office of Consumer Affairs & Business Regulation titled "Truth In Lending Violations in Massachusetts". I compiled this preliminary report after analyzing the mortgage loan documents of about twenty consumers who had filed complaints against the mortgage lending practices of Ford Consumer Finance and Associates Financial Services. In early December 1997, on the heels of that effort, I offered a report to a federal Judge in Massachusetts who had before him a request to certify a class for purposes of accepting a settlement agreement in a case against Ford Consumer Finance Company, Inc. My analysis revealed that if the Judge approved the agreement, consumers would receive no meaningful relief, they would forfeit valuable truth-in-lending rights, the element causing the overcharge would not be expunged, and Ford Consumer Finance would net $52 million in profits that would likely escalate to $160 million before all was said and done.

I have given public testimony on several occasions: in November 1991 at hearings called by Attorney General Scott Harshbarger in which he promulgated regulations to license mortgage lenders and brokers in Massachusetts; in April 1993 to Dime Stockholders at their Annual Meeting in New York City; and in September 1997 before the Massachusetts Office of Consumer Affairs & Business Regulation, which sought expert testimony concerning abuses in mortgage lending practices in Massachusetts.

Recent trends in residential mortgage market, such as the exponential rise in sub-prime lending and home equity loans that exceed the value of the collateral, are of great concern to me. Together these have bred boldness among lenders who target equity rich real estate by making unaffordable, high interest loans that are "designed to fail." Innovations in *credit scoring* appear to be driving worthy borrowers into the sub-prime marketplace, which for those entrenched in debt, is nearly inescapable. Another, more subtle change is the use of US Rule and Exact Days interest loans which are not affirmatively disclosed to consumers. Many of these loan types are unfathomable because of deviations from normal amortization, and because there are few if any software programs to track them. These trends suggest that the vast majority of consumers are losing ground in the battle to accumulate and retain wealth through the great American Dream of home ownership.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

# ADJUSTABLE RATE NOTE

**(Libor Six-Month Index (As Published in The Wall Street Journal)—Rate Caps)**
**(Interest Only ARM)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

July 11, 2007 Gilbert, ARIZONA

115 15th Avenue
San Mateo, CALIFORNIA 94402
(Property Address)

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $1,350,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation.** I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.375%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make my monthly payments on the 1st day of each month beginning on **September 1, 2007**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**Fisher Financial Group, Inc., dba, NationsChoice Mortgage**
**3303 East Baseline Road, #7-118**
**Gilbert , ARIZONA 85234**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $6,046.88. This amount may change.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the **1st day of August, 2012**, and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

*106*

*MIN:* 100274686777116040 *Loan Number:* NCM11604

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate I am required to pay at the first Change Date will not be greater than **11.375%** or less than **4.000%** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) (**2.000%**) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **11.375%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is knows as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,

*MIN:* 100274686777116040

*Loan Number:* NCM11604

Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

(Seal)
Marshall E. Mikels -Borrower

(Seal)
-Borrower

*(Sign Original Only)*

Pay to the order of

Without Recourse this 11th day of July, 2007

By: ______________________

Its: Chad Fisher, President
Fisher Financial Group, Inc.
dba NationsChoice Mortgage
ISAOA

RECORDING REQUESTED BY
TICOR TITLE
TUSTIN-ORANGE CO. BRANCH

17

2007-108403
11:06am 07/18/07 DT Fee: 46.00
Count of pages 14
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*20070108403AR*

WHEN RECORDED, MAIL TO:
SMI-CSFB
3910 Kirby Drive, Suite 300
Houston, TEXAS 77098
ATTENTION: SMI-CSFB Laniece
Lamell/Trailing Doc Dept

This Instrument was prepared by:
Fisher Financial Group, Inc., dba,
NationsChoice Mortgage
3303 East Baseline Road, #7-118
Gilbert, ARIZONA 85234
480-461-1111

Assessor's Identification Number: 034-294-150
Loan Number: NCM11604
Order Number: 896276-12

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

# DEED OF TRUST

14P

MIN: 100274686777116040

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated July 11, 2007, together with all Riders to this document.

**(B) "Borrower"** is Marshall E. Mikels a married man as his sole and seperate property. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is Fisher Financial Group, Inc., dba, NationsChoice Mortgage. Lender is An Arizona Corporation, organized and existing under the laws of Arizona.
Lender's address is 3303 East Baseline Road, #7-118, Gilbert, ARIZONA 85234.

**(D) "Trustee"** is Ticor Title
Trustee's address is 18302 Irvine Blvd. Suite 100, Tustin, ORANGE County, CALIFORNIA 92780.

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated July 11, 2007. The Note states that Borrower owes Lender ONE MILLION THREE HUNDRED FIFTY-THOUSAND and no/100 Dollars (U.S. $1,350,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2037.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider
[ ] Balloon Rider [ ] Planned Unit Development Rider [ ] VA Rider
[ ] 1-4 Family Rider [ ] Biweekly Payment Rider
[ ] Other (Specify) -

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of San Mateo:

**legal description attached hereto and made a part hereof**

Parcel Identification Number: **034-294-150**

which currently has the address of **115 15th Avenue**
**San Mateo, CALIFORNIA 94402** ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower

shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more



Borrower(s) Initials ________

than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to

the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments

from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



Borrower(s) Initials M. M.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date**



Borrower(s) Initials AM, NM

specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________ _______________________

[signature] (Seal)
Marshall E. Mikels -Borrower

_______________________ (Seal)
-Borrower

State of CALIFORNIA
County of San Mateo } ss.

On July 11th 2007 before me, Fredy P. Estrada Notary Public

a notary public, personally appeared Marshall E. Mikels, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

FREDY P. ESTRADA
COMM. # 1699688
NOTARY PUBLIC-CALIFORNIA
SAN MATEO COUNTY
MY COMM. EXP. OCT. 21, 2010

(Seal) Signature [signature]

*MIN:* 100274686777116040 *Loan Number:* NCM11604

# ADJUSTABLE RATE RIDER

**(Libor Six-Month Index (As Published in The Wall Street Journal)—Rate Caps)**
**(Interest Only ARM)**

THIS ADJUSTABLE RATE RIDER is made this 11th day of July, 2007, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed or Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation, ("Lender") of the same date and covering the property described in the Security Instrument and located at:

115 15th Avenue
San Mateo, CALIFORNIA 94402
(Property Address)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of 5.375%. The Note also provides for changes in the interest rate and the monthly payments, as follows:

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make my monthly payments on the 1st day of each month beginning on September 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

Fisher Financial Group, Inc., dba, NationsChoice Mortgage
3303 East Baseline Road, #7-118
Gilbert , ARIZONA 85234

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $6,046.88. This amount may change.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**



Borrower(s) Initials M.M.

MIN: 100274686777116040 Loan Number: NCM11604

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of August, 2012, and on that day every SIXth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR percentage point(s) (4.000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate I am required to pay at the first Change Date will not be greater than 11.375% or less than 4.000% Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) (2.000%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 11.375%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

*MIN:* 100274686777116040 *Loan Number:* NCM11604

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____________________ (Seal)
Marshall E. Mikels -Borrower

_____________________ (Seal)
-Borrower

# INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE RIDER

**LOAN NUMBER:** **NCM11604**

**PROPERTY ADDRESS:** **115 15th Avenue**
**San Mateo, CA 94402**

**THIS ADDENDUM** is made this **11th** day of **July, 2007** and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as the Addendum executed by the undersigned and payable to

**Fisher Financial Group, Inc., dba, NationsChoice Mortgage, An Arizona Corporation**
(the Lender).

**THIS ADDENDUM** supersedes Sections 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C) Calculations of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **FOUR** percentage point(s) (**4.000%**) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the **FIRST TEN (10) YEARS** after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal prepayments.

Dated: July 11, 2007

(Seal)
Marshall E. Mikels -Borrower

(Seal)
-Borrower

**MIKELS TITLE DOCUMENTS FROM**
**SAN MATEO COUNTY RECORDER**
**EXHIBIT 3**

**Recording Date: 2/8/2010**

**Document Number:** 2010-013796

| Seq No | Title Code | Description | Title Details | Title Maps | Grantors/Grantees |
|---|---|---|---|---|---|
| 1 | ST | SUBSTITUTION OF TRUSTEE | | | View Grantors/Grantees |

http://www.smcare.org/apps/LandDocs/gg.asp

| Seq No | Grantors | Continuation |
|---|---|---|
| 1 | MIKELS MARSHALL E | |

| Seq No | Grantees | Continuation |
|---|---|---|
| 1 | NATIONAL DEFAULT SERVICING CORP | |

http://www.smcare.org/apps/LandDocs/result.asp

| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |
| 19. | 2007-109963 | MIKELS MARSHALL E TR | Grantee | DEED | 7/20/2007 | View Details |

| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |
| 19. | 2007-109963 | MIKELS MARSHALL E TR | Grantee | DEED | 7/20/2007 | View Details |
| 20. | 2007-114112 | MIKELS MARSHALL E TR | Grantee | RECONVEYANCE | 7/30/2007 | View Details |
| 21. | 2007-130720 | MIKELS MARSHALL E TR | Grantor | DEED | 8/30/2007 | View Details |
| 22. | 2007-131270 | MIKELS MARSHALL E TR | Grantee | DEED | 8/31/2007 | View Details |

Back

**Recording Date: 2/8/2010**

**Document Number:** **2010-013797**

| Seq No | Title Code | Description | Title Details | Title Maps | Grantors/Grantees |
|---|---|---|---|---|---|
| 1 | NT | NOTICE OF TRUSTEE'S SALE | | | View Grantors/Grantees |



| Seq No | Grantors | Continuation |
|---|---|---|
| 1 | MIKELS MARSHALL E | |

| Seq No | Grantees | Continuation |
|---|---|---|
| 1 | ENTRY NOT REQUIRED | |



| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |
| 19. | 2007-109963 | MIKELS MARSHALL E TR | Grantee | DEED | 7/20/2007 | View Details |
| 20. | 2007-114112 | MIKELS MARSHALL E TR | Grantee | RECONVEYANCE | 7/30/2007 | View Details |
| 21. | 2007-130720 | MIKELS MARSHALL E TR | Grantor | DEED | 8/30/2007 | View Details |
| 22. | 2007-131270 | MIKELS MARSHALL E TR | Grantee | DEED | 8/31/2007 | View Details |

**Recording Date: 7/19/2007**

**Document Number:** 2007-109201

| Seq No | Title Code | Description | Title Details | Title Maps | Grantors/Grantees |
|---|---|---|---|---|---|
| 1 | DT | DEED OF TRUST | | | View Grantors/Grantees |

http://www.smcare.org/apps/LandDo

| Seq No | Grantors | Continuation |
|---|---|---|
| 1 | MIKELS MARSHALL E | |

| Seq No | Grantees | Continuation |
|---|---|---|
| 1 | MORTGAGE ELECTRONIC REGIS SYS | |
| 2 | INTERESTDIRECT INC | |

http://www.smcare.org/apps/LandDocs/

| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

**Recording Date: 8/17/2010**

**Document Number:** 2010-091521

| Seq No | Title Code | Description | Title Details | Title Maps | Grantors/Grantees |
|---|---|---|---|---|---|
| 1 | TD | TRUSTEE'S DEED | View Details | | View Grantors/Grantees |

http://www.smcare.org/apps/LandDocs/gg.asp

| Seq No | Grantors | Continuation |
|---|---|---|
| 1 | NATIONAL DEFAULT SERVICING CORP | |
| 2 | MIKELS MARSHALL E | |

| Seq No | Grantees | Continuation |
|---|---|---|
| 1 | U S BANK NATIONAL ASSN | |
| 2 | US BANK NATIONAL ASSN | |

http://www.smcare.org/apps/LandDocs/result.asp

| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |
| 19. | 2007-109963 | MIKELS MARSHALL E TR | Grantee | DEED | 7/20/2007 | View Details |
| 20. | 2007-114112 | MIKELS MARSHALL E TR | Grantee | RECONVEYANCE | [illegible] | View Details |

**Recording Date: 2/8/2010**

**Document Number:** 2010-013795

| Seq No | Title Code | Description | Title Details | Title Maps | Grantors/Grantees |
|---|---|---|---|---|---|
| 1 | AT | ASSIGNMENT OF DEED OF TRUST | | | View Grantors/Grantees |

http://www.smcare.org/apps/LandDocs/gg.asp

| Seq No | Grantors | Continuation |
|---|---|---|
| 1 | MIKELS MARSHALL E | |
| 2 | MORTGAGE ELECTRONIC REGIS SYS | |
| 3 | FISHER FINANCIAL GRP INC | |

| Seq No | Grantees | Continuation |
|---|---|---|
| 1 | US BANK NATIONAL ASSN TR | |

http://www.smcare.org/apps/LandDocs/result.asp

| No | Document Number | Name | Grantor/Grantee | Document Description | Recording Date | View Details |
|---|---|---|---|---|---|---|
| 1. | 2009-166518 | MIKELS MARSHALL | Grantor | FINANCING STATEMENT -- U.C.C.1 | 12/23/2009 | View Details |
| 2. | 2007-108401 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 3. | 2007-108402 | MIKELS MARSHALL E | Grantee | DEED | 7/18/2007 | View Details |
| 4. | 2007-108403 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/18/2007 | View Details |
| 5. | 2007-109201 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 7/19/2007 | View Details |
| 6. | 2007-109963 | MIKELS MARSHALL E | Grantor | DEED | 7/20/2007 | View Details |
| 7. | 2007-124791 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 8/20/2007 | View Details |
| 8. | 2007-124791 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 8/20/2007 | View Details |
| 9. | 2007-130720 | MIKELS MARSHALL E | Grantee | DEED | 8/30/2007 | View Details |
| 10. | 2007-130721 | MIKELS MARSHALL E | Grantor | DEED OF TRUST | 8/30/2007 | View Details |
| 11. | 2007-131270 | MIKELS MARSHALL E | Grantor | DEED | 8/31/2007 | View Details |
| 12. | 2007-148448 | MIKELS MARSHALL E | Grantee | RECONVEYANCE | 10/11/2007 | View Details |
| 13. | 2009-146379 | MIKELS MARSHALL E | Grantor | NOTICE OF DEFAULT | 11/6/2009 | View Details |
| 14. | 2010-013795 | MIKELS MARSHALL E | Grantor | ASSIGNMENT OF DEED OF TRUST | 2/8/2010 | View Details |
| 15. | 2010-013796 | MIKELS MARSHALL E | Grantor | SUBSTITUTION OF TRUSTEE | 2/8/2010 | View Details |
| 16. | 2010-013797 | MIKELS MARSHALL E | Grantor | NOTICE OF TRUSTEE'S SALE | 2/8/2010 | View Details |
| 17. | 2010-091521 | MIKELS MARSHALL E | Grantor | TRUSTEE'S DEED | 8/17/2010 | View Details |
| 18. | 2007-108402 | MIKELS MARSHALL E TR | Grantor | DEED | 7/18/2007 | View Details |

**REQUEST FOR SUBSTITUTION AND MIKELS REQUEST FOR DISMISSAL**

**EXHIBIT 3**

MC-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Timothy Y. Fong, SBN 255221<br>3333 Bowers Avenue, STE 130<br>Santa Clara, CA 95054<br>TELEPHONE NO.: 408-627-7810 FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Marshall Mikels | ENDORSED FILED<br>SAN MATEO COUNTY<br>MAR 1 0 2010<br>Clerk of the Superior Court<br>By J. Obaob<br>DEPUTY CLERK |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo<br>STREET ADDRESS: 400 County Center<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Redwood City, 94063<br>BRANCH NAME: | |
| CASE NAME:<br>SEE ATTACHMENT A | |
| **SUBSTITUTION OF ATTORNEY—CIVIL**<br>**(Without Court Order)** | CASE NUMBER:<br>CIV492452 |

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name)*: MARSHALL MIKELS makes the following substitution:

1. **Former legal representative** ☐ Party represented self ☑ Attorney *(name)*: TIMOTHY Y. FONG
2. **New legal representative** ☑ Party is representing self* ☐ Attorney
   a. Name: MARSHALL MIKELS b. State Bar No. *(if applicable)*:
   c. Address *(number, street, city, ZIP, and law firm name, if applicable)*:
   207 Shasta Avenue, Mt. Shasta, CA 96067
   d. Telephone No. *(include area code)*: 530-918-4162
3. The party making this substitution is a ☑ plaintiff ☐ defendant ☐ petitioner ☐ respondent ☐ other *(specify)*:

***NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

- Guardian
- Conservator
- Trustee
- Personal Representative
- Probate fiduciary
- Corporation
- Guardian ad litem
- Unincorporated association

**If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.**

**NOTICE TO PARTIES WITHOUT ATTORNEYS**

**A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.**

4. *I consent to this substitution.*
Date:
MARSHALL MIKELS Without Prejudice UCC 1-207 ▶ [signature]
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY)

5. ☑ I consent to this substitution.
Date:
TIMOTHY Y. FONG ▶ [signature]
(TYPE OR PRINT NAME) (SIGNATURE OF FORMER ATTORNEY)

6. ☐ I consent to this substitution.
Date:
▶
(TYPE OR PRINT NAME) (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)

MC-050

| CASE NAME: | CASE NUMBER: |
|---|---|
| —SEE ATTACHMENT A | CIV492452 |

**PROOF OF SERVICE BY MAIL**
**Substitution of Attorney—Civil**

**Instructions:** *After having all parties served by mail with the Substitution of Attorney—Civil, have the person who mailed the document complete this Proof of Service by Mail. An unsigned copy of the Proof of Service by Mail should be completed and served with the document. Give the Substitution of Attorney—Civil and the completed Proof of Service by Mail to the clerk for filing. If you are representing yourself, someone else must mail these papers and sign the Proof of Service by Mail.*

1. I am over the age of 18 and not a party to this cause. I am a resident of or employed in the county where the mailing occurred. My residence or business address is *(specify)*:

2. I served the Substitution of Attorney—Civil by enclosing a true copy in a sealed envelope addressed to each person whose name and address is shown below and depositing the envelope in the United States mail with the postage fully prepaid.

   (1) Date of mailing: (2) Place of mailing *(city and state)*:

3. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(TYPE OR PRINT NAME) (SIGNATURE)

**NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED**

4. a. Name of person served:
   b. Address *(number, street, city, and ZIP)*:

   c. Name of person served:
   d. Address *(number, street, city, and ZIP)*:

   e. Name of person served:
   f. Address *(number, street, city, and ZIP)*:

   g. Name of person served:
   h. Address *(number, street, city, and ZIP)*:

   i. Name of person served:
   j. Address *(number, street, city, and ZIP)*:

☑ List of names and addresses continued in attachment.

## ATTACHMENT A

U.S. Bank, National Association, 45202-3923 as Trustee on behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates Series 2007-3, and Trustee and or Agent for Beneficiaries known or unknown; Fisher Financial Group, Inc., dba, NationsChoice Mortgage, an Arizona Corporation qualified to do business in California; Mortgage Electronic Registration Systems, Inc., a Virginia Corporation ("MERS"); Select Portfolio Servicing Inc. ("SPS"), a Utah Corporation qualified to do business in California; National Default Servicing Center, Inc. an Arizona Corporation qualified to do business in California ("NDSC").

**ATTACHMENT B**

No parties have been served this substitution. This is because none of the parties have yet been served with a summons and complaint. Plaintiff Mr. Mikels will serve the instant substitution of attorney form on the defendants when he serves them with the summons and complaint.

**CIV-110**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Marshall E. Mikels
Mailing Address: 207 Shasta Avenue
Mount Shasta, CA 96067

TELEPHONE NO.: 650-349-7762 FAX NO. *(Optional)*:
E-MAIL ADDRESS *(Optional)*: biocorp@nctv.com
ATTORNEY FOR *(Name)*: No attorney Self

FOR COURT USE ONLY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Mateo
STREET ADDRESS: 400 County Center,
MAILING ADDRESS: Civil Division
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern

PLAINTIFF/PETITIONER: MARSHALL MIKELS
DEFENDANT/RESPONDENT: SEE ATTACHMENT A

**REQUEST FOR DISMISSAL**

CASE NUMBER: CIV 492452

☐ **Personal Injury, Property Damage, or Wrongful Death**
☐ **Motor Vehicle** ☐ **Other**
☐ **Family Law** ☐ **Eminent Domain**
☑ **Other *(specify)*:** Fraud Accounting

**- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) ☐ With prejudice (2) ☑ Without prejudice
   b. (1) ☑ Complaint (2) ☐ Petition
   (3) ☐ Cross-complaint filed by *(name)*: on *(date)*:
   (4) ☐ Cross-complaint filed by *(name)*: on *(date)*:
   (5) ☑ Entire action of all parties and all causes of action
   (6) ☐ Other *(specify)*:*

2. *(Complete in all cases except family law cases.)*
   ☐ Court fees and costs were waived for a party in this case. *(This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed).*

Date: March 10, 2010

Marshall Mikels Without Prejudice UCC1-20 ▶ [signature]

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☑ PARTY WITHOUT ATTORNEY) (SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
☑ Plaintiff/Petitioner ☐ Defendant/Respondent
☐ Cross–Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
   Date: March 10, 2010

Marshall Mikels Without Prejudice UCC1-207 ▶ [signature]

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☑ PARTY WITHOUT ATTORNEY) (SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
☑ Plaintiff/Petitioner ☐ Defendant/Respondent
☐ Cross–Complainant

*(To be completed by clerk)*

4. ☐ Dismissal entered as requested on *(date)*:
5 ☐ Dismissal entered on *(date)*: as to only *(name)*:
6. ☐ Dismissal **not entered** as requested for the following reasons *(specify)*:

7. a. ☐ Attorney or party without attorney notified on *(date)*:
   b. ☐ Attorney or party without attorney not notified. Filing party failed to provide
   ☐ a copy to be conformed ☐ means to return conformed copy

Date: Clerk, by ______________________, Deputy

CIV-110

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Marshall E. Mikels
Mailing Address: 207 Shasta Avenue
Mount Shasta, CA 96067

TELEPHONE NO.: 650-349-7762 FAX NO. (Optional):
E-MAIL ADDRESS (Optional): blocorp@netv.com
ATTORNEY FOR (Name): No attorney Self

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center.
MAILING ADDRESS: Civil Division
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern

FOR COURT USE ONLY

**ENDORSED FILED**
**SAN MATEO COUNTY**

APR 1 6 2010

Clerk of the Superior Court
By R. Huerta
DEPUTY CLERK

File by Fax

PLAINTIFF/PETITIONER: MARSHALL MIKELS

DEFENDANT/RESPONDENT: SEE ATTACHMENT A

**REQUEST FOR DISMISSAL**

CASE NUMBER: CIV 492452

☐ Personal Injury, Property Damage, or Wrongful Death
☐ Motor Vehicle ☐ Other
☐ Family Law ☐ Eminent Domain
☑ Other (specify): Fraud Accounting

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
a. (1) ☐ With prejudice (2) ☑ Without prejudice
b. (1) ☑ Complaint (2) ☐ Petition
(3) ☐ Cross-complaint filed by (name): on (date):
(4) ☐ Cross-complaint filed by (name): on (date):
(5) ☑ Entire action of all parties and all causes of action
(6) ☐ Other (specify):*

2. (Complete in all cases except family law cases.)
☐ Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed).

Date: March 10, 2010

Marshall Mikels Without Prejudice UCC1-207
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☑ PARTY WITHOUT ATTORNEY)

(SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
☑ Plaintiff/Petitioner ☐ Defendant/Respondent
☐ Cross-Complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
Date: March 10, 2010

Marshall Mikels Without Prejudice UCC1-207
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☑ PARTY WITHOUT ATTORNEY)

(SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
☑ Plaintiff/Petitioner ☐ Defendant/Respondent
☐ Cross-Complainant

(To be completed by clerk)
4. ☒ Dismissal entered as requested on (date): APR 1 6 2010
5. ☐ Dismissal entered on (date): as to only (name):
6. ☐ Dismissal not entered as requested for the following reasons (specify):

7. a. ☐ Attorney or party without attorney notified on (date):
b. ☐ Attorney or party without attorney not notified. Filing party failed to provide
☐ a copy to be conformed ☐ means to return conformed copy

Date: APR 1 6 2010 JOHN C. FITTON Clerk, by R. HUERTA, Deputy

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. July 1, 2009]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

04/16/2010 14:02 6505571875 GOTCHA SUBPOENA SERV PAGE 02/04

**Mr. Mikels Complaint for Fraud Against All Parties in Connection with the Alleged Loan SMSC Case No. CIV492452**

**EXHIBIT 3-A**

PLD-PI-001

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
TIMOTHY Y. FONG SBN 255221
3333 Bowers Ave., STE 130
Santa Clara, CA 95054

TELEPHONE NO: 408-627-7582 FAX NO. (Optional):
E-MAIL ADDRESS (Optional): tyfong919@gmail.com
ATTORNEY FOR (Name): MARSHALL MIKELS

FOR COURT USE ONLY

(ENDORSED)
FILED
SAN MATEO COUNTY

MAR 1 - 2010

Clerk of the Superior Court
By G. Lacey
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF: MARSHALL MIKELS

DEFENDANT: SEE ATTACHMENT A

[✔] DOES 1 TO 100

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**

[ ] **AMENDED *(Number)*:**

**Type *(check all that apply)*:**

[ ] **MOTOR VEHICLE** [✔] **OTHER *(specify)*:** Fraud, Accounting
[ ] **Property Damage** [ ] **Wrongful Death**
[ ] **Personal Injury** [ ] **Other Damages *(specify)*:**

**Jurisdiction *(check all that apply)*:**

[ ] **ACTION IS A LIMITED CIVIL CASE**
**Amount demanded** [ ] **does not exceed $10,000**
[ ] **exceeds $10,000, but does not exceed $25,000**
[✔] **ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)**
[ ] **ACTION IS RECLASSIFIED by this amended complaint**
[ ] **from limited to unlimited**
[ ] **from unlimited to limited**

CASE NUMBER:
CIV 492452

1. **Plaintiff** *(name or names)*: MARSHALL MIKELS
alleges causes of action against **defendant** *(name or names)*:
SEE ATTACHMENT A
2. This pleading, including attachments and exhibits, consists of the following number of pages:
3. Each plaintiff named above is a competent adult
   a. [ ] **except** plaintiff *(name)*:
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe)*:
      (3) [ ] a public entity *(describe)*:
      (4) [ ] a minor [ ] an adult
         (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) [ ] other *(specify)*:
      (5) [ ] other *(specify)*:
   b. [ ] **except** plaintiff *(name)*:
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe)*:
      (3) [ ] a public entity *(describe)*:
      (4) [ ] a minor [ ] an adult
         (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) [ ] other *(specify)*:
      (5) [ ] other *(specify)*:

[ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3.





American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001

| SHORT TITLE: MIKELS v. U.S. BANK | CASE NUMBER: |
|---|---|

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
   a. ☐ Motor Vehicle
   b. ☐ General Negligence
   c. ☐ Intentional Tort
   d. ☐ Products Liability
   e. ☐ Premises Liability
   f. ☑ Other *(specify):*
   Fraud, Accounting.

11. Plaintiff has suffered
   a. ☐ wage loss
   b. ☐ loss of use of property
   c. ☐ hospital and medical expenses
   d. ☐ general damage
   e. ☐ property damage
   f. ☐ loss of earning capacity
   g. ☑ other damage *(specify):*
   Unjust enrichment by defendants amount unknown.$796,042 in investment portfolio losses and unnecessary broker commissions. Interest payments made on the loan of $78,000. The loan fee that was charged as a separate loan of $20,500.

12. ☐ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a. ☐ listed in Attachment 12.
   b. ☐ as follows:

13. The relief sought in this complaint is within the jurisdiction of this court.

14. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. (1) ☑ compensatory damages
   (2) ☐ punitive damages
   The amount of damages is *(in cases for personal injury or wrongful death, you must check (1)):*
   (1) ☑ according to proof
   (2) ☐ in the amount of: $

15. ☑ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers):*
   FR-2, FR-5, FIR-7

Date: March 1, 2010

Timothy Y. Fong — /S
(TYPE OR PRINT NAME) (SIGNATURE OF PLAINTIFF OR ATTORNEY)

**VERIFICATION**

I, Marshall Mikels, am the plaintiff in the above-entitled action. I have read the foregoing complaint and know its contents. The same is true of my own knowledge, except as to those matters that are alleged in the complaint on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 02-30-2010

Signature: [signature]
Marshall Mikels, Plaintiff

**ATTACHMENT A**

U.S. Bank, National Association, 45202-3923 as Trustee on behalf of the Holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates Series 2007-3, and Trustee and or Agent for Beneficiaries known or unknown; Fisher Financial Group, Inc., dba, NationsChoice Mortgage, an Arizona Corporation qualified to do business in California; Mortgage Electronic Registration Systems, Inc., a Virginia Corporation ("MERS"); Select Portfolio Servicing Inc. ("SPS"), a Utah Corporation qualified to do business in California; National Default Servicing Center, Inc. an Arizona Corporation qualified to do business in California ("NDSC").

**Attachment 5**

National Default Servicing Corporation, a corporation.

PLD-C-001(3)

| SHORT TITLE: MIKELS v. U.S. BANK | CASE NUMBER: |
|---|---|

# CAUSE OF ACTION—Fraud

______________ (number)

ATTACHMENT TO [✔] Complaint [ ] Cross-Complaint

(*Use a separate cause of action form for each cause of action.*)

FR- 1. Plaintiff (*name*): MARSHALL MIKELS

alleges that defendant *(name)*: FISHER FINANCIAL GROUP, INC.

on or about (*date*): 12 June 2007 defrauded plaintiff as follows:

FR-2. [✔] **Intentional or Negligent Misrepresentation**

a. Defendant made representations of material fact [✔] as stated in Attachment FR-2.a [ ] as follows:

b. These representations were in fact false. The truth was [✔] as stated in Attachment FR-2.b [ ] as follows:

c. When defendant made the representations,

[✔] defendant knew they were false, **or**

[ ] defendant had no reasonable ground for believing the representations were true.

d. Defendant made the representations with the intent to defraud and induce plaintiff to act as described in item FIR-5. At the time plaintiff acted, plaintiff did not know the representations were false and believed they were true. Plaintiff acted in justifiable reliance upon the truth of the representations.

FR-3. [ ] **Concealment**

a. Defendant concealed or suppressed material facts [ ] as stated in Attachment FR-3.a [ ] as follows:

b. Defendant concealed or suppressed material facts

[ ] defendant was bound to disclose.

[ ] by telling plaintiff other facts to mislead plaintiff and prevent plaintiff from discovering the concealed or suppressed facts.

c. Defendant concealed or suppressed these facts with the intent to defraud and induce plaintiff to act as described in item IFIR-5. At the time plaintiff acted, plaintiff was unaware of the concealed or suppressed facts and would not have taken the action if plaintiff had known the facts.

**Page** ______



American LegalNet, Inc.
www.FormsWorkflow.com

PLD-C-001(3)

| SHORT TITLE: MIKELS v. U.S. BANK | CASE NUMBER: |
|---|---|

## CAUSE OF ACTION—Fraud

__________________
(number)

FR-4. ☐ **Promise Without Intent to Perform**

a. Defendant made a promise about a material matter without any intention of performing it ☐ as stated in Attachment FR-4.a ☐ as follows:

b. Defendant's promise without any intention of performance was made with the intent to defraud and induce plaintiff to rely upon it and to act as described in item FR-5. At the time plaintiff acted, plaintiff was unaware of defendant's intention not to perform the promise. Plaintiff acted in justifiable reliance upon the promise.

FR-5. In justifiable reliance upon defendant's conduct, plaintiff was induced to act ☑ as stated in Attachment FR-5 ☐ as follows:

FR-6. Because of plaintiff's reliance upon defendant's conduct, plaintiff has been damaged ☑ as stated in Attachment FR- 6 ☐ as follows:

FIR - 7. Other:
SEE ATTACHMENT FIR-7

Page ________

**ATTACHMENT FR-2.a**

In early June of 2007, between the 4th and the 12th, Erick Brass, Senior Loan Officer at Defendant Fisher Financial, Inc., dba NationsChoice Mortgage ("NationsChoice") approached Mr. Mikels. Brass informed Mr. Mikels that "[i]f I were you I would pull every dollar possible out of your home and invest it in the stock market with some investments that will earn more than the interest payments you would be making and you're sure to make double or triple what your loan is costing you." Mr. Mikels did not investigate the statements on his own because Brass represented himself as very knowledgeable in the loan business and also in the investment world. Brass guaranteed Mr. Mikels that he knew what he was talking about, and that Mr. Mikels could rely on him for expert advice. The property in question ("Property") is described in the Legal Description attached as Exhibit A, and incorporated here by reference.

Brass told Mr. Mikels that he had to move fast because interest rates would go up soon. Mr. Mikels was concerned that if he waited too long, interest rates would go up. He was not suspicious of Brass, because Brass sounded very professional and sure of himself. Brass also represented himself as a long time industry veteran who knew what he was talking about. Based on Brass' comments, Mr. Mikels was led to believe that he would be making a big mistake if he did not take advantage of the opportunity.

Mr. Mikels did make some inquiries to Brass regarding the nature of the proposed loan. Specifically, Mr. Mikels had some concerns

regarding the adjustable rate note. This is because the interest rate on the loan would reset to a higher rate at the end of five years. He communicated these concerns to Brass. In response, Brass said "I wouldn't be concerned about any adjustment of the loan payment in five years because we rewrite these loans all the time, guaranteed, so don't be worried." Mr. Mikels was not suspicious of Brass because he had been in the business a long time with NationsChoice, and Brass represented that they could rewrite the loan to keep the payments low.

Mr. Mikels did not further investigate Brass claims for the reasons given previously,and also because Brass represented himself as able to rewrite the loan. Brass stated that he had been at NationsChoice since the company started, that he was in charge of rewriting loans and could guarantee a rewrite of the loan to keep the payments low. Mr. Mikels felt pressure to act fast before the rates change.

Mr. Mikels believed that NationsChoice was interested in receiving regular loan payments from him. This is because Brass told Mr. Mikels that his credit score was high, and he should have no problem obtaining the loan and making the necessary payments required by the lender. Mr. Mikels believed Bass and did not investigate them because of the reasons stated previously. Furthermore, Mr. Mikels assumed that an organization that extended a loan would naturally want to be paid back on the loan.

**FR-2.b**

The truth is that Mr. Mikels was not able to make double or triple the cost of his loan in the stock market.

The truth is that NationsChoice was not able to refinance Mr. Mikels loan.

The truth is that NationsChoice sold Mr. Mikels alleged loan to investors in a securitized Loan Trust. The expert analysis of the Loan Trust is contained in Exhibit B, the McDonnell Analysis, and incorporated here by reference. The investors in the Loan Trust did not intend to ever collect payments from the putative loans, including Mr. Mikels transaction. With a default rate of approximately 44%, it is likely that the Loan Trust was put together not to develop a stream of payments, but to generate a profit for the defendants via failure of the trust.

**ATTACHMENT FR-5**

In reliance on the statements of Brass, Mr. Mikels executed an Adjustable Rate Note ("Note") on July 11, 2007. A copy of the Note is attached as Exhibit C and incorporated here by reference. The Note was in the amount of $1,350,000. The lender was Defendant Fisher Financial Group.

To secure payment of the principal sum and interest as provided in the note and as part of the same transaction, Mr. Mikels, as trustor, executed and delivered to defendant Mortgage Electronic Registration System ("MERS"), as alleged nominee for unnamed beneficiaries, a Deed of Trust ("Deed") dated July 11, 2007 by the terms of which plaintiff, as trustor, conveyed to Ticor Title, as trustee, real property described in Exhibit A, which is incorporated here by reference. On July 18, 2007, the Deed was recorded at the San Mateo County Assessor-County Clerk-Recorder's office. A copy of the Deed is attached as Exhibit D and incorporated here by reference.

After receiving the funds from the loan, and relying on the advice of Brass, Mr. Mikels invested the money in the stock market. Shortly thereafter the market declined, and Mr. Mikels attempted to protect his position by investing in precious metals.

**ATTACHMENT FR-6**

As a result of signing the Note and investing the funds from Fisher Financial, Mr. Mikels lost $633,711 in the investment markets, and paid $162,331 commissions charged by various investment brokers. Mr. Mikels also suffered damages via the interest payments on the loan, in the amount of $78,000. He also lost the loan fee of $20,500, which was charged as a separate loan.

Since Mr. Mikels lost money in the investment markets, he did not make any money in the way that Brass represented. As a result of losing the money, Mr. Mikels was unable to make his payments on the Note, which led to a foreclosure action on his home.

On November 6, 2009, defendant National Default Servicing Corporation ("NDSC"), caused to be recorded a Notice of Default against Mr. Mikels in regard to the subject property. A copy of the Notice of Default is attached as Exhibit E and incorporated by reference.

It is unclear in what capacity NDSC recorded the Notice of Default. In the body of the Notice, NDSC refers to itself as either "the original Trustee, the duly appointed substituted trustee, or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 7/13/2007..."

The signature line of the Notice of Default claims that NDSC was acting on behalf of Select Portfolio Servicing , FKA Fairbanks Capital Corporation as Beneficiary.

On or about February 8, 2010, NDSC caused to be recorded a Notice of Trustee Sale. A copy of the Notice of Trustee Sale is attached as Exhibit F, and incorporated by reference. The sale is scheduled for March 2, 2010 at 1:00 p.m.

Furthermore, Defendants as whole took an unknown amount of profit on the origination, sale and servicing of the loan described in the Note. (See Exhibit B, McDonnell Analysis) This amount can only be determined via an accounting.

**ATTACHMENT FIR-7**

Mr. Mikels asserts that the Note and Deed of Trust are void because of fraud in the inception of the contract. The contract he entered into by signing the Note, was not the one he anticipated.

This is because Mr. Mikels anticipated, based on representations by NationsChoice, that his lender would rewrite his loan to keep the payments affordable. Furthermore, Mr. Mikels also anticipated that his lender would have an interest in continuing to receive a stream of payments from him on the Note. As evidenced by the McDonnell Analysis, it is highly likely that the Loan Trust in which Mr. Mikels loan was securitized was not designed to produce a stream of payments from borrowers. Rather it is likely that the Loan Trust was designed by defendants to fail.

**INDEX OF EXHIBITS**


| | |
|---|---|
| Exhibit A | Legal Description of Property |
| Exhibit B | McDonnell Analysis |
| Exhibit C | Adjustable Rate Note |
| Exhibit D | Deed of Trust |
| Exhibit E | Notice of Default |
| Exhibit F | Notice of Trustee's Sale |

# NOTICE OF CANCELATION OF LOAN
# &
# AUTOMATIC VOIDING OF THE DEED OF TRUST

Notice to Agent is Notice to Principal
Notice to Principal is Notice to Agent

**Notice date:** March 29, 2010

**From: Borrower**
Marshall E. Mikels
*Service by and respond to:*
c/o JAN SCHRIEBERL, A Notary Public located at:
7172 Regional Street
Suite 440
Dublin, CA 94568

**To:** Mr. Jan Estep, President and Chief Financial Officer
c/o U.S. Bank, National Association, 425 Walnut Street, Cincinnati, OH 45202-3923
Certified Mail #7009 3410 0002 1099 9785

R.K. Arnold, President and Chief Executive Officer
Mortgage Electronic Registration Systems Inc. "MERS", P.O. Box 2026, Flint, MI 48501-2026
Delivered by Certified Mail #7009 3410 0002 1099 9778

Chad Fisher President, Financial Group, Inc., dba, Nations Choice Mortgage, Lender is An Arizona Corporation, 3393 East Baseline Road, #7-118, Gilbert, ARIZONA 85234
Certified Mail #7009 3410 0002 1099 9792

Olivia A. Todd, National Default Servicing Corporation, (NDSC)
7720 N. 16th Street, Suite 300, Phoenix, Arizona 85020
Delivered by Certified Mail #7009 3410 0002 1099 9815 Express Mail
Delivered by Jan Schieberl, Notary Public Certified Mail #7009 3410 0002 1099 9822 Express

Benny Chang & Lucy McCord,
Title Company, 2550 N. Red Hill Avenue, Santa Ana, CA 92705
Certified Mail #7009 3410 0002 1099 9839

CEO Timothy O'Brien
Select Portfolio Servicing Inc. (SPS) Loan Servicer
3815 South West Temple, Salt Lake City, UT 84115
Certified Mail #7009 3410 0002 1099 9846 Express Mail
Delivered by Jan Schieberl, Notary Public Certified Mail #7009 3410 0002 1099 9853 Express

Re: **Lender on the Deed of Trust:** Fisher Financial Group, Inc., dba, Nations Choice Mortgage, Lender is An Arizona Corporation, located at 3393 East Baseline Road, #7-118, Gilbert, ARIZONA 85234

**Servicer: Select Portfolio Servicing Inc. (SPS) Loan Number 0010982387**
**Deed of Trust Dated:** 7/13/2007
**Deed of Trust Record:** # 2007108403
**Record Date:** JULY 18, 2007 in the County of San Mateo in the State of CALIFORNIA
**Subject property:** 115 15TH AVENUE; SAN MATEO, CA 94402
**Deed of Trust Grantor/Trustor** Marshall E. Mikels
**Beneficiary on the Deed of Trust:** "MERS" Mortgage Electronic Registration Systems, Inc.
**Property Owner:** Marshall E. Mikels, Trustee of the MCM TRUST
**Loan:** SPS Loan number 0010982387,
**Loan Amount in Dispute**: $1,350,000 principal on original Note, plus $119,446.55 in interest and other charges claimed on the VOID monthly loan statement from SPS dated 03/17/2010. And, $78,000 in interest payments made by the Borrower and any other payments that have been made by the Borrower to Lender.
**Void Trustee's Sale:** NDSC conducted and scheduled an unlawful and fraudulent Trustee's Sale on March 2, 2010, and thereafter cancelled it without notice and scheduled another fraudulent and illegal sale without notice for April 1, 2010, is hereby **VOIDED by this Notice.**

**NOTICE OF CANCELATTION OF LOAN is hereby made by the undersigned to the above referenced Lender(s), Assign(s), Successor(s) Beneficiary(s), Trustee(s), Agent(s), Entities and any other Parties with interest, (herein after referred to as "Lender")** as provided for in (Reg. Z §§ 226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15 U.S.C. § 1635(b).and other applicable law contained in the Federal Truth in Lending Act (TILA) including all other applicable law.

**SERVICE OF THIS NOTICE is done in accordance with the above Law** by Certified Mail numbers referenced above with Return Receipt of proof of delivery to the above referenced Lender, Entities and Individuals and is proof of notification according to the Official Staff Commentary, 226.2(a)(22)-2 as authorizing service. In addition, this Notice was served on National default Servicing Corporation by fax message sent to (602) 264-6209 by a Notary Public and verified sent electronically on the date indicated below. And, service was done by delivery to National Default Service Corporation by U.S. Express Mail Certified number referenced above and Return Receipt by Jan Schieberl, Notary Public with a Certificate of Service.

**CERTIFIED MAILING AND PROOF OF FAX DELIVERY** of this NOTICE is done prior to the foreclosure sale scheduled for April 1, 2010 by NDSC as indicated by the fax delivery and mailing dates indicated below and within the three (3) year time period for Borrower's right to cancel as referenced herein.

**WHEREAS, the above referenced law provides the Borrower the absolute right to cancel** the above referenced Loan and to automatically VOID the mortgage/lien/security interest/Deed of Trust on the Subject Property located at 115 15th Avenue, San Mateo, California as referenced above. Upon serving the notice of rescission, the TILA statute and Regulation Z state that by operation of the law, the security interest automatically becomes void and the debtor is relieved of any obligation to pay any finance or other

charge (15 U.S.C. § 1635(b), Reg. Z §§ 226.15(d)(1), 226.23(d)(1)). (In re Moore, 117 B.R. 135 (Bankr. E.D. Pa. 1990) (security interest eliminated upon effective rescission, reducing creditor to status of unsecured creditor). Thus, since the security interest is automatically voided per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

**WHEREAS, Regulation Z requires that the voiding be absolute and not subject to judicial modification** and is covered by a ***Rule of law*** of the Federal Truth-in-Lending Act which empowers the debtor/Borrower to exercise their right in writing by notifying creditors of the cancellation by mail to rescind the mortgage loan transactions per (Reg. Z §§226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15 U.S.C. § 1635(b). The statute and regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void. (15 U.S.C. § 1635(b); Reg. Z §§ 226.15(d)(1), 226.23(d)(1)). As noted by the Official Staff Commentary, the creditor's interest in the property is "automatically negated regardless of its status and whether or not it was recorded or perfected." (Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1.).Thus, since the security interest is **automatically voided** per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

**WHEREAS, the cancelation period** in § 226.15 right of rescission (3) states ***"****If the required notice and material disclosures are not delivered, the right to rescind shall expire three years after the occurrence giving rise to the right of rescission".*

**WHEREAS, the cancelation period in § 226.15 right of rescission notice and material disclosures were not delivered to the Borrower** including but not limited to: 1. In the "NOTICE OF RIGHT TO CANCEL" or other documents delivered to the Borrower there was no delivery of the material fact and disclosure that the right of rescission period extended beyond a three day period **to three (3) year period** after the occurrence giving rise to the rescission in the case where material disclosures are not delivered. 2. In the "NOTICE OF RIGHT TO CANCEL" or other documents there was no delivery of the material fact and disclosure of the Federal Truth in Lending Act (TILA) referenced above or any other applicable law to fully inform the Borrower of their rights, including no content, text, citing or information source for TILA to inform the borrower of the three (3) year recession period or any other part of the law that affected the borrower. 3. There was no delivery by the Lender of the material fact and disclosure of the right to cancel delivered to the Beneficiaries in the trust the property was held in. 4. "THE NOTICE OF RIGHT TO CANCEL" delivered to the Borrower was devoid of the part of the law that provided for a three (3) year rescission period and therefore was concealed from the Borrower and mislead the Borrower to believe that the law only provided for a three (3) day recession period. Therefore, there was no delivery of the material fact and disclosure that the right of rescission period extended beyond a three (3) day period to a three (3) year period. The Right to Cancel are not limited to 1 through 4 above and include other factors that would extend the right to cancel to there (3) years from the time of the discovery of any material non-disclosure. The discovery of fraud in the origination of this Loan, the fraud in connection with the securitization and default insurance and the fraud in the chain of title and forged documents

to claim the authority to foreclose are all instances of material concealment that upon discovery would trigger the three (3) year period and Right to Cancel.

**WHEREAS,** Borrower was vaguely informed of an option to cancel the loan in mid March, 2010 by Marie McDonnell, a loan forensic examiner who performed the forensic audit of the above referenced Loan. However, both McDonnell and the Borrower believed that a foreclosure sale had occurred on March 2, 2010 and therefore the option to cancel the loan was not available. NDSC had not informed the borrower that the trustee's sale had been cancelled. Only after learning on March 24, 2010 that NDSC had rescheduled another trustee's sale on April 1, 2010, and after the Borrower did law research on the internet on March 27, 2010 was Borrower fully informed of the three (3) year rescission provision of the TILA law and of his right to cancel the loan and automatically void the security instrument/Deed of Trust.

**WHEREAS,** the law referenced herein state that the Lender, Assign(s) or authorized Agent(s) are required to cancel documents creating the security interest and file a Release or Termination Statements in the public record. (Official Staff Commentary §§ 226.15(d)(2)-3, 226.23(d)(2)-3.). Regulation Z makes it clear that, if the Debtor has the extended right and chooses to exercise it, the security interest and obligation to pay charges are automatically voided. (Cf. Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704-05 (9th Cir.1986) (courts do not have equitable discretion to alter substantive provisions of TILA, so cases on equitable modification are irrelevant). Also, it is clear from the statutory language that the court's modification authority extends only to the procedures specified by section 1625(b). The voiding of the security interest is not a procedure, in the sense of a step to be followed or an action to be taken. Thus, since the security interest is automatically voided per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

**WHEREAS, there are penalties for non-compliance,** the statute makes no distinction between the right to rescind in three days or extended in three years and neither case law nor statute give courts equitable discretion to alter TILA's substantive provisions. Since the rescission process was intended to be self-enforcing, failure to comply with the rescission obligations subjects the above referenced Lender(s) to liability. Non-compliance is a violation of the act which gives rise to a claim for actual and statutory damages under 15 USC 1640. Borrower has the option of enforcing the rescission right in federal district, state or bankruptcy court (See S. Rep. No. 368, 96th Cong. 2 Sess. 28 at 32 reprinted in 1980 U.S.C.A.N. 236, 268 ("The bill also makes explicit that a consumer may institute suit under section 130 [15 U.S.C., 1640] to enforce the right of rescission and recover costs and attorney fees in a successful action").

**WHEREAS, Lender must payback all money collected from Borrower plus damages.** TIL rescission does not only cancel a security interest in the property but it also cancels any liability for the Debtor to pay finance and other charges, including accrued interest, points, broker fees, closing costs and that the lender must refund to Borrower all finance charges, fees and other payments made by borrower. In addition, the Lender is liable to borrower for all damages borrower sustained as a result of any fraud or other illegal act committed by Lender(s).

**THEREFORE, based on the above law and facts the undersigned hereby RESCINDS AND CANCELS THE LOAN AND SECURITY INSTRUMENT/DEED OF TRUST referenced above, effective with the mailing and fax transmission of this NOTICE to the above referenced Lender(s). Therefore, the Lender(s) are obligated under the above referenced law to do the following:**

**Step one of the recession process,** the Lender(s) is obligated to acknowledge the Borrower's rescinding of the Loan transaction. As the bare bones nature of the FRB model notice demonstrates, it is not necessary to explain why the borrower is canceling. The FRB Model Notice simply says: "I WISH TO CANCEL," followed by a signature and date line (Arnold v. W.D.L. Invs., Inc., 703 F.2d 848, 850 (5th cir. 1983) (clear intention of TILA and Reg. Z is to make sure that the creditor gets notice of the Borrower's intention to rescind).

The statute and Regulation Z states that if creditor disputes the Borrower's right to rescind, it should file a declaratory judgment action within the twenty days after receiving the rescission notice, before its deadline to return the Borrower's money or property and record the termination of its security interest (15 USC 1625(b)). Once the Lender(s) receives this Notice, the statute and Regulation Z mandate 3 steps to be followed.

**Step two of the recession process,** upon Borrower's rescinding of the Loan transaction, the Lender(s) must return any money, including that which may have been passed on to a third party, such as a broker or an appraiser and to take any action necessary to reflect the termination of the security interest within 20 calendar days of receiving the rescission Notice. The Lender(s)'s other task is to take any necessary or appropriate action to reflect the fact that the security interest was automatically terminated by the rescission within 20 days of the Lender(s)'s receipt of this rescission Notice (15 USC 1635(b); Reg. Z-226.15(d)(2),226.23(d)(2).

**Step three of the recession process,** the Borrower's tender obligation is based on an accounting and return of all money paid by borrower to the Lender(s) and satisfactory ways in which to meet this obligation. The termination of the security interest is required **before** tendering and step 1 and 2 have to be respected and performed by the Lender(s).

**Conclusion**, I, Marshall E. Mikels am requesting an itemized statement of my payment record from the above referenced Lender(s) to facilitate a conclusion and final settlement of this Loan rescission and the obligations of Lender(s) and Borrower there under. Courts have held that the rescission effectively voids the security interest, rendering the debt, if any, unsecured (See Exhibit #6). (See in re Perkins, 106 B.R. 863, 874 (Bankr. E.D.Pa. 1989); In re Brown, 134 B.R. 134 (Bankr. E.D.Pa. 1991); In re Moore, 117 B.R. 135 (Bankr.E.D. Pa. 1990)).

Once the court finds a violation such as not responding to the TILA rescission letter, no matter how technical, it has no discretion with respect to liability (in re Wright, supra. At 708; In re Porter v. Mid-Penn Consumer Discount Co., 961 F,2d 1066, 1078 (3d. Cir. 1992); Smith v. Fidelity Consumer Discount Co., Supra. At 898. Any misgivings

creditors may have about the technical nature of the requirements should be addressed to Congress or the Federal Reserve Board, not the courts.

If the Lender(s) have not cancelled the security interest and returned all monies paid by the undersigned Borrower within the 20 days of receipt of this Notice of rescission dated March 29, 2010, the Lender(s) named above are responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

The Lender(s) referenced above are to take any necessary or appropriate action to reflect the fact that the security interest was automatically terminated by the rescission (15 USC 1635(b); Reg. Z-226.15(d)(2),226.23(d)(2). This requires canceling documents creating the security interest and filing release or termination statements in the public record of FREE and CLEAR TITLE to Mr. Marshall E. Mikels.

**Existing claims,** this Notice of Cancelation of Loan does not relinquish, void, or cancel any previous agreement, claim, default, judgment, lien, or public recording that presently exists or may exist as a result of any previous claim by Borrower against Lender(s) and any agreement, judgment or lien against Lender(s) and obligation arising there from is preserved and remains in force and my be a separate claim subject to other jurisdiction. Note: the term Borrower as used herein shall mean alleged Borrower and Lender(s) as alleged Lender(s) in light of any existing or previous controversy, default or judgment as to whether an actual loan was made and received.

IN WITNESS WHEREOF I hereunto set my hand and seal on this 29TH day of March 2010 and hereby certify all the statements made above are true, correct and complete to the best of my knowledge and belief..

Date: 03-29-2010 Signed: Marshall E. Mikels
Marshall Edward Mikels

Date: 03-29-2010 Signed: Marshall E. Mikels
Marshall Edward Mikels/Trustee MCM TRUST

**JURAT**

WENDE REY KNIGHT
COMM. #1775773
Notary Public-California
SISKIYOU COUNTY
My Comm. Exp. Oct 25, 2011

STATE OF CALIFORNIA )
) ss:
COUNTY OF SISKIYOU )

Subscribed and sworn to (or affirmed) before me on this 29th day of March,

2010, by Marshall E. Mikels, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Wende R. Knight
(seal) Signature
**Wende Knight NOTARY PUBLIC**

**PROOF OF DELIVERY**

I, Wende Rey Knight, a PUBLIC NOTARY in the State of California, County of Siskiyou, notarized the above document entitled NOTICE OF CANCELATION OF LOAN, dated March 29, 2010 and signed by Marshall E. Mikels, herby certify that I delivered pages one (1) through seven (7) of the above referenced NOTICE by fax message to the telephone numbers listed below on March 29, 2010:

National Default Servicing Corporation's fax telephone number (602) 264-6209

Select Portfolio Servicing Inc. (SPS) Loan Servicer's fax telephone number (801) 594-6476

Lender, Financial Group, Inc., dba, Nations Choice Mortgage 480-654-4398

IN WITNESS WHEREOF I hereunto set my hand and seal on this 29TH day of March 2010 and hereby certify all the statements made above are true, correct and complete to the best of my knowledge and belief.

Date: 3-29-2010 Signed: Wende Rey Knight

Wende Rey Knight, Notary Public

**Sources of Law in Truth in Lending Cases,** these include TILA itself, the Federal Reserve Board's Regulation Z which implements the Act, the Official Staff Commentary on Regulation Z, and case law. Except where Congress has explicitly relieved lenders of liability for noncompliance, it is a strict liability statute. (Truth-In-Lending, 5th Edition, National Consumer Law Center, 1.4.2.3.2, page 11)

***"NOTICE OF CANCELATION OF LOAN & AUTOMATIC VOIDING OF THE DEED OF TRUST"***
**dated March 29 2010 & Proof of Delivery**

**EXHIBIT 4 & 4-A**

# DUE PRESENTMENT
# AND NOTARY CERTIFICATE OF SERVICE

NOTICE TO AGENT IS NOTICE TO PRINCIPAL

**From:** Marshall E. Mikels
c/o JAN SCHIEBERL, Notary Public
7172 Regional Street, Suite 440
Dublin, CA 94568

**To:** Olivia A. Todd, National Default Servicing Corporation, (NDSC)
7720 N. 16th Street, Suite 300, Phoenix, Arizona 85020
Delivered by Certified Mail #7009 3410 0002 1099 9815 Express Mail
Delivered by Jan Schieberl, Notary Public ~~Certified Mail #7009 3410 0002 1099 9822 Express~~
UPS Overnight A373 565 179 0

CEO Timothy O'Brien
Select Portfolio Servicing Inc. (SPS) Loan Servicer
3815 South West Temple, Salt Lake City, UT 84115
Certified Mail #7009 3410 0002 1099 9846 Express Mail
Delivered by Jan Schieberl, Notary Public ~~Certified Mail #7009 3410 0002 1099 9853 Express~~
UPS overnight A373 565 112 9

**Re:** **NOTICE OF CANCELATION OF LOAN AND AUTOMATIC VOIDING OF DEED OF TRUST**
**Dated March 29, 2010, by Marshall E. Mikels**
**SPS loan number 0010982387; APN: 034-294-150-7**
**Original Loan Number NCM11604, and Lender**
**Fisher Financial Group Inc. dba Nations Choice Mort.**
**Property address: : 115 15TH AVENUE; SAN MATEO, CA 94402**
**Deed of Trust Record: # 2007108403– Record Date JULY 18, 2007,**
**in the County of SAN MATEO in the State of CALIFORNIA**

**Service:** USPS EXPRESS MAIL AND Certified Mail #s listed above. Return Receipt Requested.

Pursuant to the US UCC and California's UCC Articles and Sections §§ 3-501, 3-502, 3-503, 3-504, 3-505, 1-307 and California Government Code § 8205(a)(1) concerning Duties of a Notary Public, at the request of Marshall E. Mikels, due presentment is hereby made of:

1. X_ Due Presentment and Notary Certificate of Service issued by notary public JAN SCHIEBERL
2. X_ Copy of NOTICE OF CANCELATION OF LOAN AND AUTOMATIC VOIDING OF DEED OF TRUST Dated March 29, 2010, by Marshall E. Mikels

It is hereby certified that on or about March 6, 2010 Jan Schieberl, Notary Public, Served by USPS EXPRESS MAIL and Certified/ Return Receipt Requested Nos. **listed above** by placing same in a postpaid envelope properly addressed to Recipient at said address and depositing same at an official depository under the exclusive face and custody of the U.S. Postal Service within the State of California.

Failure to fulfill each of the requests within the respective deadlines will be certified for evidentiary purposes.

Thank you kindly for your attention.

WITNESS my hand and official seal.

BY: JAN SCHIEBERL, Notary Public — 3/30/10 DATE

**Void where prohibited by law**

My commission expires: July 13, 2010

[**Note:** Notary Public JAN SCHIEBERL is not an attorney licensed to practice law in the state of California and has not given legal advice or accepted fees for legal advice; provided no assistance in the preparation of the above referenced documents, and has no interest in any issue referenced therein. JAN SCHIEBERL is NOT a party to this action and is ONLY acting in an authorized capacity as liaison to communications between the parties.]

## Acknowledgement

State of California

County of ALAMEDA

On MAR 30 2010, before me, **Sunil Dhir, Notary Public**, personally appeared **Jan Schieberl** who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**Sunil Dhir, Notary Public**

SUNIL DHIR
COMM. # 1855792
NOTARY PUBLIC • CALIFORNIA
ALAMEDA COUNTY
MY COMM. EXP. JULY 24, 2013

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com
FLINT MI 48501-2026
OFFICIAL USE

| | |
|---|---|
| Postage | $ $4.90 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $10.00 |

Postmark Here: MOUNT SHASTA CA 96067, 02 MAR 2 2010, USPS

Sent To: R.K. Arnold, President and CEO
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: Mortgage Electronic Registration Systems Inc. "MERS", P.O. Box 2026, Flint, MI 48501-2026

PS Form 3800, August 2006 See Reverse for Instructions

7009 3410 0002 1099 9778

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com
SANTA ANA CA 927
OFFICIAL USE

| | |
|---|---|
| Postage | $ $4.90 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | |

Postmark Here: MOUNT SHASTA, 96067, 02 MAR 2 2010, USPS

Sent To: Benny Chang & Lucy McC
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: Title Company, 2550 N. R Avenue, Santa Ana, CA 92

PS Form 3800, August 2006 See Reverse for Ins

7009 3410 0002 1099 9839

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com
SALT LAKE CITY UT 84115
OFFICIAL USE

| | |
|---|---|
| Postage | $ $4.90 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $10.00 |

Postmark Here: MOUNT SHASTA CA 96067, 02 MAR 2 2010, USPS

Sent To: CEO Timothy O'Brien
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: Select Portfolio Servicing Inc. (SF 3815 South West Temple, Salt La City, UT 84115

PS Form 3800, August 2006 See Reverse for Instructions

7009 3410 0002 1099 9846

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provi
For delivery information visit our website at www.usps.com
GILBERT AZ 85234
OFFICIAL USE

| | |
|---|---|
| Postage | $ $4.90 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | |

Postmark Here: MOUNT SHASTA, 96067, MAR 2 2010, USPS

Sent To: Chad Fisher President, Fishe
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: Financial Group, Inc., dba, N 3393 East Baseline Road, #7- Gilbert, ARIZONA 85234

PS Form 3800, August 2006 See Reverse for Ins

7009 3410 0002 1099 9792

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com
PHOENIX AZ 85020
OFFICIAL USE

| | |
|---|---|
| Postage | $ $4.90 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | |

Postmark Here: MOUNT SHASTA CA 96067, MAR 2 2010, USPS

Sent To: Olivia A. Todd, National Default
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: Servicing Corporation, (NDSC) 7720 N. 16th Street, Suite 300, Phoenix, Arizona 85020

7009 3410 0002 1099 9815

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provi
For delivery information visit our website at www.usps.com
OFFICIAL USE
CINCINNATI OH 45202-3923

| | |
|---|---|
| Postage | $ |
| Certified Fee | $4.90 |
| Return Receipt Fee (Endorsement Required) | $2.80 |
| Restricted Delivery Fee (Endorsement Required) | $2.30 |
| Total Postage & Fees | $0.00 |

Postmark Here: MOUNT SHASTA, 96067, MAR 2 2010, USPS

Sent To: Mr. Jan Estep, President and
Street, Apt. No.; or PO Box No. / City, State, ZIP+4: U.S. Bank, National Associat 425 Walnut Street, Cincinnati 45202-3923

PS Form 3800, August 2006

7009 3410 0002 1099 9785

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Benny Chang & Lucy McCord, Title Company, 2550 N. Red Hill Avenue, Santa Ana, CA 92705**

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) C. Date of Delivery 3/31/1

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7009 3410 0002 1099 9839

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Mr. Jan Estep, President and CFO U.S. Bank, National Association, 425 Walnut Street, Cincinnati, OH 45202-3923**

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X Norman Leibreich CTA ☐ Agent ☐ Addressee

B. Received by (Printed Name) C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

APR 0 2 2010

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service 7009 3410 0002 1099 9785

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**R.K. Arnold, President and CEO Mortgage Electronic Registration Systems Inc. "MERS", P.O. Box 2026, Flint, MI 48501-2026**

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature ☐ Agent ☐ Addressee

B. Received by (Printed Name) Blaine K. Grant

C. Date of Delivery APR 0 2 2010

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7009 3410 0002 1099 9778

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Chad Fisher President, Fisher Financial Group, Inc., dba, NCM, 3393 East Baseline Road, #7-118, Gilbert, ARIZONA 85234**

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X Glenda Guess ☐ Agent ☐ Addressee

B. Received by (Printed Name) Glenda Guess

C. Date of Delivery 4/5/10

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7009 3410 0002 1099 9792

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**CEO Timothy O'Brien**
**Select Portfolio Servicing Inc. (SF**
**3815 South West Temple, Salt La**
**City, UT 84115**

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X Darger ☐ Agent ☐ Addressee

B. Received by (Printed Name) DARGER

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

MAR 31 2010

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)* 7009 3410 0002 1099 9846

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Olivia A. Todd, National Default**
**Servicing Corporation, (NDSC)**
**7720 N. 16th Street, Suite 300,**
**Phoenix, Arizona 85020**

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name) J. CARDY

C. Date of Delivery 3/31/10

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)* 7009 3410 0002 1099 9815

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

# TRANSMISSION VERIFICATION REPORT

TIME : 03/29/2010 16:27
NAME :
FAX : 5309261830
TEL : 5309262520
SER.# : BROH7J686551

| | |
|---|---|
| DATE,TIME | 03/29 16:25 |
| FAX NO./NAME | 18015946476 |
| DURATION | 00:01:46 |
| PAGE(S) | 07 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

TRANSMISSION VERIFICATION REPORT

TIME : 03/29/2010 16:23
NAME :
FAX : 5309261830
TEL : 5309262520
SER.# : BROH7J686551

| | |
|---|---|
| DATE,TIME | 03/29 16:21 |
| FAX NO./NAME | 16022646209 |
| DURATION | 00:01:42 |
| PAGE(S) | 07 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

| | |
|---|---|
| **Tracking Number:** | 1Z6F90640153113535 |
| **Service:** | NEXT DAY AIR |
| **Shipped/Billed On:** | 03/29/2010 |
| **Delivered On:** | 03/30/2010 9:48 A.M. |
| **Delivered To:** | 7172 REGIONAL ST<br>DUBLIN, CA, US 94568 |
| **Signed By:** | DHIR |
| **Location:** | RECEIVER |

Thank you for giving us this opportunity to serve you.

Sincerely,

UPS

Tracking results provided by UPS: 03/30/2010 5:36 P.M. ET

**LOAN RECISSION LAW SUPPORT**
**EXHIBIT 4-1**

SHERROD BROWN
OHIO

COMMITTEES:
AGRICULTURE, NUTRITION, AND FORESTRY
BANKING, HOUSING, AND URBAN AFFAIRS
HEALTH, EDUCATION, LABOR, AND PENSIONS
VETERANS' AFFAIRS
SELECT COMMITTEE ON ETHICS

# United States Senate

WASHINGTON, DC 20510

January 3, 2011

Jennifer J. Johnson
Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551

*Re: FRB Docket No. R-1390*

Dear Members of the Board of Governors:

We write today as members of the Senate Committee on Banking, Housing, and Urban Affairs, to express our concerns regarding proposed changes to Regulation Z implementing the Truth in Lending Act (TILA) that would erode important borrower protections that have been in place since TILA was enacted 42 years ago.

The extended right of rescission has been an important home-saving legal tool protecting borrowers against predatory loans. A borrower has traditionally had the right to rescind a loan agreement that does not comply with TILA's disclosure requirements within three years of the agreement. The statute and its implementing regulations have long been interpreted to require a creditor to cancel its security interest after receiving notice from a homeowner.[1] The agreement is then rescinded.

The Board's proposed rule would reverse the traditional understanding of TILA's right of rescission by requiring a homeowner to pay off the entire mortgage amount before a creditor is required to cancel its security interest in the home.[2] Requiring a borrower to repay the entire mortgage would render this important borrower right inaccessible to all but the wealthiest homeowners.

The Board has said that it "believes this adjustment would facilitate compliance with TILA."[3] We disagree. The existing order of events creates a balance between the consumer and the lender. The Board's proposal would tilt the balance in favor of creditors who have failed to comply with TILA's disclosure requirements.

In this time of record foreclosures and reports of systemic problems with the operations of the largest mortgage servicers, the proposed revisions are unfortunate and unnecessary. The mortgage market needs greater oversight and accountability to restore borrower confidence lost in the mortgage crisis. The proposed rules would undermine this goal. We urge the Board to reconsider its proposed revisions to Regulation Z.

---

[1] *See Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992); *see also id.*, at 1141-42 (describing the rescission procedures under Regulation Z).
[2] *See* 75 Fed. Reg. 58539, 58694 (2010).
[3] *Id.*, at 58548; *see also id.*, at 58629.

PRINTED ON RECYCLED PAPER

**Exhibit 4-1**

Thank you for considering our views on this important matter.

Sincerely,

Sherrod Brown
United States Senator

Christopher Dodd
United States Senator

Jack Reed
United States Senator

Daniel Akaka
United States Senator

Jeff Merkley
United States Senator

Tim Johnson
United States Senator

**Exhibit 4-1**

**LOAN RECISSION LAW SUPPORT**
**EXHIBIT 4-B**

**STATE ATTORNEYS GENERAL**
**A Communication From the Chief Legal Officers**
**Of the Following States**
**Ohio * Illinois**

December 23, 2010

*By Electronic Submission*
Jennifer J. Johnson
Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, DC 20551

Re: Comments to Notice of Proposed Rulemaking, R-1390
Regulation Z – Truth In Lending Act

Dear Secretary Johnson,

As the primary state law enforcement officials charged with protecting consumers from unfair and deceptive acts and practices in mortgage lending, we are writing in response to the Federal Reserve's proposed amendments to Reg. Z, as set forth in the Notice of Proposed Rulemaking of September 24, 2010. This comment is submitted on behalf of the attorneys general of Ohio and Illinois.

These comments address only the proposed changes with respect to the extended right of rescission in 12 CFR §226.15 and §226.23. The proposed amendments to §226.15 and §226.23 would amend Reg. Z to condition the voiding of the creditor's security interest upon the consumer's tender of the amount *demanded* by the creditor. Proposed §226.15(d)(2) and §226.23(d)(2). This change would effectively nullify rescission as a tool for middle and low-income homeowners fighting foreclosure and predatory lending, and would remove the leverage of rescission as deterrence for unlawful creditor conduct. Accordingly, we respectfully request that the Federal Reserve withdraw its proposed rule amendments to 12 CFR §226.15 and §226.23.

The Truth In Lending Act ("TILA") was enacted in 1968 "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. §1601(a). TILA is a remedial statute that must be liberally construed in favor of the borrower in order to effectuate the purpose of the statute -- to avoid the uninformed use of credit. *See, e.g., Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 800 (6th Cir. 1996), *cert. denied*, 520 U.S. 1252, 117 S. Ct. 2411, 138 L. Ed. 2d 177 (1997); *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989); *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983). TILA is enforced through a "private attorneys general"

**Exhibit 4 B**

scheme, whereby consumers may recover fixed statutory penalties and in some cases may rescind their credit transactions, if the required disclosures are not made correctly. 15 U.S.C. §1640(a), §1635; *See also, Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 411, 118 S. Ct. 1408, 140 L. Ed. 2d 566 (1998); *Jones v. The TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040 (6th Cir. 1984); *Bizier v. Globe Financial Services, Inc.*, 654 F.2d 1, 3 (1st Cir. 1981); *McGowan v. King, Inc.*, 569 F.2d 845, 849 (5th Cir. 1978). The private cause of action and strict liability for violations are intended to deter illegalities which would otherwise rarely be uncovered or punished. *Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475 (5th Cir. 1995).

Rescission under TILA, as currently in effect, calls for a sequential set of events that must be followed unless the court orders otherwise. 15 U.S.C. §1635(b) provides the following process when the consumer rescinds a transaction:

> [Step 1] - [T]he obligor is not liable for any finance or other charge, and any security interest given by the obligor *** becomes void upon such a rescission.
>
> [Step 2] - Within twenty (20) days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money or down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.
>
> [Step 3] - If the creditor has delivered any money or property on the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligation under this section, the obligor shall tender the money or property to the creditor, except that if return of the property in kind would be impracticable or inequitable the obligor shall tender its reasonable value ***
>
> The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

*See also*, 12 CFR §226.15(d) and 12 §CFR 226.23(d).

The TILA sequential process alters the common law process of rescission, forcing the creditor to terminate its security interest and return all monies paid on the loan before the consumer's duty to return the net proceeds of the loan is engaged. This alteration, placing the burden on the creditor, is "an important enforcement tool, insuring creditor compliance with the TILA disclosure requirements." *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992).

The state Attorneys General were among the first to warn and take action against unfair and deceptive acts and practices in the residential mortgage lending markets, both prime and subprime. Together, the states brought multi-state consumer fraud actions resulting in large-dollar settlements against major lenders such as Famco, Household, Ameriquest and Countrywide. These actions also resulted in injunctive relief that prohibited the

**Exhibit 4**

lenders from engaging in unfair and deceptive acts and practices going forward and required them to implement reforms introducing more fairness and increased transparency to their lending practices. In October of this year, all 50 state Attorneys General formed a multistate to investigate whether individual mortgage servicers and banks have submitted false documents in support of foreclosures and other potential issues regarding servicing irregularities, fraud or abuses.

The state Attorneys General have been on the frontlines of foreclosure prevention and have witnessed first-hand the effectiveness of rescission as a consumer tool against foreclosure as well as an important tool to enforce the disclosure requirements of TILA. The Federal Reserve's proposed regulations would not only make rescission a less useful tool for most consumers, but the regulations also would actively discourage and heavily burden consumers from exercising their rights, wholly undermining the private attorneys general goal of the Act.

TILA is designed to protect consumers who are not on an equal footing with lenders, either in bargaining for credit terms or in knowledge of credit provisions. The proposed amendments to Reg. Z, conditioning the voiding of the creditor's security interest upon the consumer's tender, would be a large step backward from this purpose. In a time of unprecedented numbers of foreclosures, it is unthinkable that the Federal Reserve would weaken a critical provision of TILA and thus harm consumers.

The States strongly oppose the proposed regulations as outlined above and urge the Board to withdraw the rule. Please feel free to contact us if we can be of help in any way.

Sincerely,

Richard Cordray
Attorney General of Ohio

Lisa Madigan
Attorney General of Illinois

**Exhibit 4**

# 12 CFR, FDIC Law, 6500, 226.15 and Regulation Z
# 226.15 Right of Loan Recession

# EXHIBIT 5

Reg. 24688, June 9, 1989, effective June 7, 1989, but compliance is optional until November 7, 1989]

**§ 226.15 Right of rescission.**

(a) *Consumer's right to rescind.* (1)(i) Except as provided in paragraph (a)(1)(ii) of this section, in a credit plan in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind: each credit extension made under the plan; the plan when the plan is opened; a security interest when added or increased to secure an existing plan; and the increase when a credit limit on the plan is increased.

(ii) As provided in § 125(e) of the act, the consumer does not have the right to rescind each credit extension made under the plan if such extension is made in accordance with a previously established credit limit for the plan.

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. Notice is considered given when mailed, or when filed for telegraphic transmission, or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[36] whichever occurs last. **If the required notice and material disclosures are not delivered, the right to rescind shall expire three years after the occurrence giving rise to the right of rescission,** or upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with § 125(f) of the act.

(4) When more than one consumer has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) *Notice of right to rescind.* In any transaction or occurrence subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act). The notice shall identify the transaction or occurrence and clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind, as described in paragraph (a)(1) of this section.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires.

(c) *Delay of creditor's performance.* Unless a consumer waives the right to rescind under paragraph (e) of this section, no money shall be disbursed other than in escrow, no services shall be performed, and no materials delivered until after the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded. A creditor does not violate this section if a third party with no knowledge of the event activating the rescission right does not delay in providing materials or services, as long as the debt incurred for those materials or services is not secured by the property subject to rescission.

**(d) *Effects of rescission.* (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge.**

**(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.**

**(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section.** When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. **If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.**

(4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

(e) *Consumer's waiver of right to rescind.* (1) The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in paragraph (e)(2) of this section.

(2) The need of the consumer to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1993, pursuant to 42 U.S.C. 5170, to be a major disaster area because of severe storms and flooding in the Midwest.[36a] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

**Mr. Mikels' Alleged Loan Securitization Flow Chart**

**EXHIBIT 6**

# EXHIBIT "J"

## Securitization Flow Chart

# MIKELS SECURITIZATION FLOW CHART

Adjustable Rate Mortgage Trust 2007-3




Truth In Lending Audit & Recovery Services, LLC

Copyright 2010

WRIGHT, FINLAY & ZAK, LLP
Donna L. La Porte, Esq., SBN 93428
Madeleine K. Lee, Esq., SBN 258520
Nichole L. Glowin, Esq., SBN 262932
David A. Wood, Esq., SBN 272406
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel: (949) 477-5050; Fax: (949) 608-9142

Attorneys for Plaintiff,
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

FILED
SAN MATEO COUNTY
FEB 0 3 2011
Clerk of the Superior Court
By [signature]
DEPUTY CLERK

FAXED

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3,

Plaintiff,

vs.

MARSHALL E. MIKELS and DOES 1-10 inclusive,

Defendants.

Case No.: CLJ 203241

**ORDER FOR SERVICE OF SUMMONS BY POSTING**

**[C.C.P. §§ 415.10-415.50]**

**ORDER**

**IT IS ORDERED** that a copy of the Summons and Complaint be posted at 115 15TH AVENUE, SAN MATEO, California 94402, and mailed to Defendants, MARSHALL E.

MIKELS and tenants, subtenants, named claimants, and other occupants of the premises by certified mail to their last known address at 115 15TH AVENUE, SAN MATEO, California 94402 in the County of SAN MATEO, State of California, and proof of service be made in accordance with law.

Dated: FEB 0 2 2011

Denied see attachment.

JUDGE OF THE SUPERIOR COURT

# JUDGE BUCHWALD

## APPLICATION FOR POSTING ORDER

## FOR SIGNATURE

## RETURN TO UNLAWFUL DETAINER DESK REBECCA HUERTA

2/2/11

Application DENIED.
Reasonable Diligence to serve
by other means is
not established.
Gerald J. Buchwald, Judge

WRIGHT, FINLAY & ZAK, LLP
Donna L. La Porte, Esq., SBN 93428
Madeleine K. Lee, Esq., SBN 258520
Nichole L. Glowin, Esq., SBN 262932
David A. Wood, Esq., SBN 272406
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel: (949) 477-5050; Fax: (949) 608-9142

FILED
SAN MATEO COUNTY
FEB 03 2011
Clerk of the Superior Court
By [signature] DEPUTY CLERK

Attorneys for Plaintiff,
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

FAXED

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3,

Plaintiff,

vs.

MARSHALL E. MIKELS and DOES 1-10 inclusive,

Defendants.

Case No.: CLJ 203244

**APPLICATION FOR ORDER FOR SERVICE OF SUMMONS BY POSTING WITH DECLARATION OF DAVID A. WOOD IN SUPPORT THEREOF**

[C.C.P. §§ 415.10-415.50]

I, DAVID A. WOOD, declare:

1. I am an attorney at law, duly admitted to appear before all of the courts of the State of California. I am the attorney for the Plaintiff in this action which is an action for

Unlawful Detainer by which Plaintiff seeks possession of the property located at 115 15TH AVENUE, SAN MATEO, CALIFORNIA, 94402.

2. Defendants, MARSHALL E. MIKELS and tenants, subtenants, named claimants, and other occupants of the premises under CCP §§ 415.45 cannot, with reasonable diligence, be served in any manner specified in CCP §§ 415.10-415.50 other than posting. Efforts have been continuously made by a registered process server without success, as is shown by the Declaration of Due Diligence attached hereto and incorporated herein by reference. The Defendant's business address is unknown.

3. A cause of action exists against the Defendants and occupants for possession of the property located at 115 15TH AVENUE, SAN MATEO, CALIFORNIA, 94402.

**WHEREFORE,** Plaintiff prays for an Order of this Court to have the Summons on the Defendants and occupants and Complaint be posted at 115 15TH AVENUE, SAN MATEO, CALIFORNIA, 94402, and that Plaintiff be directed to mail by certified mail a copy of the Summons and Complaint to the Defendants and occupants at their last known address which is 115 15TH AVENUE, SAN MATEO, CALIFORNIA, 94402 in the County of SAN MATEO, State of California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed at Newport Beach, California.

Dated: 9-1-11

David A. Wood, Esq.
Attorney for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | | | | FOR COURT USE ONLY |
|---|---|---|---|---|
| Donna L. La Porte, Esq., SBN 93428<br>Madeleine K. Lee, Esq., SBN 258520<br>Nichole L. Glowin, Esq., SBN 262932<br>David A. Wood, Esq., SBN 272406<br>**WRIGHT, FINLAY & ZAK, LLP**<br>4665 MacArthur Court, Suite 280<br>Newport Beach, CA 92660<br>Telephone: (949) 477-5050 Fax: (949) 477-9200<br>*Attorney(s) for:* Plaintiff<br>*Ref:* | | | | |
| Superior Court of California, County of SAN MATEO, SOUTHERN BRANCH | | | | |
| U.S. BANK N.A. VS MIKELS | | | | |
| *DECLARATION OF DUE DILIGENCE* | *DATE:* | *TIME:* | *DEPT.:* | *CASE NUMBER:*<br>CLJ203244 |

I ALBERTO REYES on the dates herein mentioned, over the age of 18 years and not a party to the action.
I received copies of Summons-Unlawful Detainer-Eviction; Verified Complaint for Unlawful Detainer and Damages; Prejudgment Claim of Right to Possession; Civil Case Cover Sheet.
On 1/24/11, and that after due and diligent effort, I have been unable to effect personal service on the within named party.
Dates and times of attempts with reported detail is listed below:

*PARTY SERVED:*
ALL OTHER OCCUPANTS

*ADDRESS DATES AND TIMES ATTEMPTED*
115 15TH AVENUE
SAN MATEO, CALIFORNIA 94402

| | | |
|---|---|---|
| 1/24/11 | 9:20 PM | LIGHT GREY, TWO STORY BUILDING WITH DARK GREY TRIM, NO GARAGE, BOTTOM OF WALL HAS STONES, ON LEFT SIDE IS A TALL NARROW FENCE, DOOR WITH LOCK, ON THE RIGHT SIDE IS A WALKWAY WITH PLANTS AND POTS, NO TRESSPASSING SIGN BY DEFENDANT, SMALL YARD, 8' BY 15' YARD, MAIL IN BOX, POSTING THAT WE PREVIOUSLY DID IS GONE, NO CARS IN DRIVEWAY, NO ANSWER |
| 1/25/11 | 7:17 AM | LIGHTS BY LOBBY ON, MAILBOX IS STILL FULL, NO ANSWER |
| 1/26/11 | 4:00 PM | LIGHT BY LOBBY STILL ON, MAILBOX IS EITHER EMPTY OR THE MAIL WAS PUSHED INSIDE BOX, PLANTS AND POTS HAVE BEEN REMOVED, NO ANSWER |
| 1/27/11 | 7:20 AM | LIGHT BY LOBBY STILL ON, NO ANSWER |

*I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

*Date:* January 28, 2011

*Signature:* ______
ALBERTO REYES/1160/SAN FRANCISCO

**Superior Court of California**
**County of San Mateo**
**Civil Department**
**400 County Center**
**Redwood City, California 94063-1655**
**www.sanmateocourt.org**

**IN THE MATTER OF: U.S. BANK VS MARSHALL E MIKELS,ET AL** **Case: CLJ203244**

ALL OCCUPANTS
115 15TH AVENUE
SAN MATEO, CA 94402

## Notice of Filing an Unlawful Detainer (Eviction) Complaint

On 01/21/2011 an unlawful detainer (eviction) complaint was filed against: **MARSHALL E MIKELS residing at 115 15TH AVENUE, SAN MATEO, CA 94402**

Pursuant to Section 1161.2(a) of the Code of Civil Procedure, access to the court file will be restricted during the first 60 days after the date the complaint was filed except to a party, an attorney for one of the parties, or any other person who either:

(1) provides to the clerk the names of at least one plaintiff and one defendant in the action and the address, including any applicable apartment, unit or space number of the subject premises, or
(2) provides to the clerk the name of one of the parties in the action or the case number and can establish through proper identification that he or she lives at the subject premises.

Access to the court index, register of actions, or other records is not permitted during the first 60 days after the complaint is filed, except pursuant to an ex parte order upon a showing of good cause why access is necessary (Code of Civil Procedure Section 1161.2(c).)

The following organizations may provide you with legal advise regarding this action:

| | |
|---|---|
| San Mateo County Bar Association | 650-298-4030 |
| Legal Aid Society of San Mateo County | 650-558-0915 or 800-381-8898 |
| Bay Area Legal Aid | 650-358-0745 or 800 551-5554 |
| Stanford Community Law Clinic | 650-475-0560 |
| La Raza Centro Legal | 415-575-3500 |

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that I am not a party to this cause; that I served the foregoing Notice of Filing an Unlawful Detainer (Eviction) Complaint by placing a copy of the above Notice in separate sealed envelopes addressed respectively to the persons and addresses as shown in the foregoing Notice of Filing an Unlawful Detainer (Eviction) Complaint, and by placing the envelope for collection and mailing on the date indicated below at Redwood City, California, following standard court practices. On the same day that correspondence is placed for collection and mailing, fully pre-paid postage is affixed thereon, and is deposited in the United States mail at Redwood City, California, in the ordinary course of business.

DATED: 01/24/11

John C. Fitton, Court Executive Officer/Clerk
By: Rebecca Huerta
Deputy Clerk

FILE COPY

SUM-130

# SUMMONS
## (CITACION JUDICIAL)
## UNLAWFUL DETAINER—EVICTION
## (RETENCIÓN ILÍCITA DE UN INMUEBLE—DESALOJO)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
SAN MATEO COUNTY
JAN 2 1 2011
Clerk of the Superior Court
By DEPUTY CLERK

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
MARSHALL E. MIKELS, and DOES 1-10 inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3...**SEE ATTACHMENT

You have 5 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. (To calculate the five days, count Saturday and Sunday, but do not count other court holidays. If the last day falls on a Saturday, Sunday, or a court holiday then you have the next court day to file a written response.) A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*Tiene 5 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. (Para calcular los cinco días, cuente los sábados y los domingos pero no los otros días feriados de la corte. Si el último día cae en sábado o domingo, o en un día en que la corte esté cerrada, tiene hasta el próximo día de corte para presentar una respuesta por escrito). Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

CASE NUMBER: (Número del caso): CLJ 203244

1. The name and address of the court is: *(El nombre y dirección de la corte es):*
Superior Court, County of San Mateo
400 County Center
Redwood City, CA 94063
Southern Branch

2. The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David A. Wood, Esq., SBN 272406 949-477-5050
WRIGHT, FINLAY & ZAK, LLP 949-477-9200
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660

3. *(Must be answered in all cases)* An unlawful detainer assistant (Bus. & Prof. Code, §§ 6400-6415) [ ] did not [ ] did for compensation give advice or assistance with this form. *(If plaintiff has received any help or advice for pay from an unlawful detainer assistant, complete item 6 on the next page.)*

Date: *(Fecha)* JAN 2 1 2011 JOHN C. FITTON Clerk, by *(Secretario)* ________, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

4. **NOTICE TO THE PERSON SERVED:** You are served
 a. [ ] as an individual defendant.
 b. [ ] as the person sued under the fictitious name of *(specify)*:
 c. [ ] as an occupant
 d. [ ] on behalf of *(specify)*:
 under: [ ] CCP 416.10 (corporation) [ ] CCP 416.60 (minor)
 [ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
 [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
 [ ] CCP 415.46 (occupant) [ ] other *(specify)*:

5. [ ] by personal delivery on *(date)*:



Form Adopted for Mandatory Use
Judicial Council of California
SUM-130 [Rev. July 1, 2009]

**SUMMONS—UNLAWFUL DETAINER—EVICTION**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 415.456, 1167

FAXED

SUM-130

| PLAINTIFF (Name): U.S. BANK, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT (Name): MARSHALL E. MIKELS, and DOES 1-10 inclusive | |

6. **Unlawful detainer assistant** *(complete if plaintiff has received any help or advise for pay from an unlawful detainer assistant)*:
   a. Assistant's name:
   b. Telephone no.:
   c. Street address, city, and zip:

   d. County of registration:
   e. Registration no.:
   f. Registration expires on *(date)*:

SUM-200(A)

| SHORT TITLE: U.S. BANK, et al. v. MARSHALL E. MIKELS, and DOES 1-10 inclusive | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

- This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
- If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[X] Plaintiff [ ] Defendant [ ] Cross-Complainant [ ] Cross-Defendant

...ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

FILED
SAN MATEO COUNTY
JAN 2 1 2011
Clerk of the Superior Court
By DEPUTY CLERK

FAXED

WRIGHT, FINLAY & ZAK, LLP
Donna L. La Porte, Esq., SBN 93428
Madeleine K. Lee, Esq., SBN 258520
Nichole L. Glowin, Esq., SBN 262932
David A. Wood, Esq., SBN 272406
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel: (949) 477-5050; Fax: (949) 608-9142

Attorney for Plaintiff,
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

CLJ 203244

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3,<br><br>Plaintiff,<br>vs.<br><br>MARSHALL E. MIKELS, and DOES 1-10 inclusive,<br><br>Defendants. | ) | Case No.: CLJ 20324…<br><br>**VERIFIED COMPLAINT FOR UNLAWFUL DETAINER AND DAMAGES. "ACTION BASED ON CODE OF CIVIL PROCEDURES SECTION 1161a"**<br>**[UNDER $10,000.00]** |

Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3 ("Plaintiff"), alleges:

1. Plaintiff is, and was at all times mentioned herein, a corporation authorized to do business and doing business within the State of California.

2. Plaintiff is informed and believes and thereon alleges that Defendants MARSHALL E. MIKELS and DOES 1-10, inclusive ("Defendants") are individuals, who reside at or are otherwise in possession of the property commonly known as 115 15TH AVENUE, SAN MATEO, CALIFORNIA 94402, together with detached garage and separate structures, if any ("Property"), which Property is located within this judicial district.

3. Plaintiff seeks to recover possession of the Property by this action.

4. The true names or capacities, whether individual, corporate, associate or otherwise of Defendants named herein as DOES 1-10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names, and Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.

5. On August 6, 2010, a foreclosure sale was held and Plaintiff took title to the Property at the foreclosure sale and received an executed Trustee's Deed Upon Sale, which was recorded in the Official Records in the office of the County Recorder of SAN MATEO County, CALIFORNIA. A true and correct copy of the Trustee's Deed Upon Sale is attached hereto as Exhibit "1" and is incorporated herein by reference.

6. After Plaintiff acquired title to the Property, Plaintiff caused to be duly served on Defendants a written notice requiring them to quit and deliver up possession of the Property to Plaintiff within the time period set forth in such notice ("Notice to Quit"), a true and correct copy of which is attached hereto as Exhibit "2" and incorporated by reference. Proofs of service of the Notice to Quit on the Defendants are attached collectively hereto as Exhibit "3".

7. As of the date hereof, the time to deliver up possession of the Property as set forth in the Notice to Quit has expired, but Defendants have failed and refused to deliver up possession of the property.

8. Defendants continue in possession of said Property without Plaintiff's permission or consent.

9. The reasonable value of the use and occupancy of the Property is $50.00 per day, and damages have accrued to Plaintiff at that rate since August 6, 2010, and will continue to accrue at that rate so long as Defendants remain in possession of the Property.

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows:

1. Restitution and possession of the Property to Plaintiff;
2. For an Order directing Defendants to quit and deliver up possession of the Property to Plaintiff;
3. Damages at the rate of $50.00 per day commencing on August 6, 2010 and continues each day that Defendants continue in possession of the Property up to date of judgment herein:
4. For an order terminating the lease, if any, under which Defendants occupy the premises;
5. Costs of suit herein; and
6. Such other and further relief as the court deems just and proper.

Respectfully Submitted,

WRIGHT, FINLAY & ZAK, LLP

Dated: January 19, 2011

By: ______________________

David A. Wood, Esq.
Attorney for Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3

## VERIFICATION

STATE OF CALIFORNIA )
)
COUNTY OF ORANGE )

I, David A. Wood, declare:

I am an attorney at law duly admitted and licensed to practice before all courts of this State and I have my professional office at 4665 MacArthur Court, Suite 280, Newport Beach, County of Orange, California 92660. I make this Verification as the Plaintiff is absent from the County of Orange, California.

I have read the foregoing Complaint and know its contents.

I am informed and believe and on that ground allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Verification is executed at Newport Beach, California on January 19, 2011.

DAVID A. WOOD

THIS IS TO CERTIFY THAT THIS IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL RECORDED IN THE OFFICE OF THE COUNTY

RECORDING FEE: $21.00

RECORDED ON: August 17, 2010

AS DOCUMENT NO: 10-91521

BY: s/ Benny Chang

LSI TITLE COMPANY (CA)

RECORDING REQUESTED BY :

WHEN RECORDED MAIL TO :
U.S. Bank National Association
3815 S.W. Temple
Salt Lake City, UT 84115
FORWARD TAX STATEMENTS TO:
U.S. Bank National Association
3815 S.W. Temple
Salt Lake City, UT 84115

APN: 034-294-150-7

| | | |
|---|---|---|
| NDSC File No. | : | 09-21321-SP-CA |
| Loan No. | : | 0010982387 |
| Title Order No. | : | 090778864 |

# TRUSTEE'S DEED UPON SALE

Transfer Tax :
The Grantee herein WAS the Beneficiary
The amount of the unpaid debt was$1,496,571.49
The amount paid by the Grantee was $1,496,571.49
The property is in the city of SAN MATEO, County of SAN MATEO, State of CA.

National Default Servicing Corporation, an Arizona Corporation, as the duly appointed Trustee (or successor Trustee or Substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without any covenant or warranty to :

U.S. Bank National Association, as trustee, on behalf of the holders of the Adjustable Rate Mortgage Trust 2007-3 Adjustable Rate Mortgage Backed Pass Through Certificates, Series 2007-3

herein called Grantee, the following described real property situated in SAN MATEO County :

LOT 4, BLOCK J, AS SHOWN ON THAT CERTAIN MAP ENTITLED, MAP OF SUBDIVISION NO. 3 AND RESUBDIVISION OF BLOCK G AND H OF SUBDIVISION NO. 2 HAYWARD PARK, SAN MATEO COUNTY, CALIFORNIA, IN THE CITY OF SAN MATEO, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON OCTOBER 21, 1907, IN BOOK 5 OF MAPS AT PAGES 36, OFFICIAL RECORDS.

This conveyance is made pursuant to the powers conferred upon Trustee by said Deed of Trust executed MARSHALL E. MIKELS, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY , as Trustor, recorded on 07/18/07, Instrument No. 2007-108403 Official Records in the Office of the County Recorder of SAN MATEO County, CA.

All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.

EXHIBIT "I"

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on 08/06/10 Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, which amount was $1,496,571.49.

Dated : 8/12/10

National Default Servicing Corporation, an Arizona Corporation

By: ____________________

Jamie Gorsuch, Trustee Sales Officer

STATE OF ARIZONA
COUNTY OF MARICOPA

On 8.12, 2010, before me, ***Pamela Cardy***, a Notary Public for said State, personally appeared ***Jamie Gorsuch*** who personally known to me (or who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing is true and correct.

Pamela Cardy
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
JUNE 8, 2011

**WITNESS** MY HAND AND OFFICIAL SEAL

Pamela Cardy

**Notice to Any Renters Living At**

**115 15TH AVENUE**
**SAN MATEO, CALIFORNIA, 94402**

The attached notice means that your home was recently sold in foreclosure and the new owner plans to evict you. You should talk to a lawyer NOW to see what your rights are. You may receive court papers in a few days. If your name is on the papers it may hurt your credit if you do not respond and simply move out.

Also, if you do not respond within five days of receiving the papers, even if you are not named in the papers, you will likely lose any rights you may have. In some cases, you can respond without hurting your credit. You should ask a lawyer about it.

You may have the right to stay in your home for 90 days or longer, regardless of any deadlines stated on any attached papers. In some cases and in some cities with a "just cause for eviction law," you may not have to move at all. But you must take the proper legal steps in order to protect your rights.

**How to Get Legal Help**

If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

EXHIBIT "2"

# NOTICE TO QUIT

TO: **MARSHALL E. MIKELS**
**AND ALL OCCUPANT(S), TENANTS, OR SUBTENANTS IN POSSESSION**
of the premises located at:

**115 15TH AVENUE**
**SAN MATEO, CALIFORNIA, 94402**

NOTICE IS HEREBY GIVEN that the property located at **115 15TH AVENUE, SAN MATEO, CALIFORNIA, 94402** was duly sold to **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES** 2007-3, in accordance with Section 2924 of the Civil Code of the State of California, on August 6, 2010, under the power of sale contained in a Deed of Trust recorded in the official records of SAN MATEO County, California. Title under the sale has been duly perfected.

NOTICE IS FURTHER GIVEN THAT:

1. Within **three (3) days** after service on you of this Notice, if you are the original owner or a successor owner of the Property; **or**,

2. Within **ninety (90)** days after service on you of this Notice, in the event you are in possession of the property as a **bona fide** tenant or a bona fide subtenant :

You are **required** to vacate and surrender possession of the Property, or the portion in which you reside, to the undersigned, who can be reached at (949) 797-1311 from 9:00 a.m. to 5:00 p.m. on all business days, unless you provide evidence to the undersigned law firm that you are a bona fide tenant or bona fide subtenant pursuant to Section 702(a)(2)(A) of the federal "Protecting Tenants at Foreclosure Act of 2009" ("PTFA") or are protected by Section 703 of the PTFA. Please see Page 2 Addendum of this Notice for instructions on how to deliver this evidence;

Please notify this office immediately if you are active military duty or have come out of active duty within the last nine (9) months.

If within the applicable period as set forth above, EITHER if you fail to surrender possession of the Property OR if you fail to provide evidence you are a bona fide tenant or bona fide subtenant pursuant to Section 702(a)(2)(A) of the PTFA or are protected by Section 703 of the PTFA, (name on TDUS) will commence eviction proceedings against you to recover possession of the Property and for damages caused by your unlawful detention of the Property. **<u>For additional information and/or contact information, please see attached Page 3 Addendum.</u>** PARA ASISTENCIA EN ESPANOL LLAME AL (949) 797-1311.

EXHIBIT 2

This Notice is given pursuant to the provisions of the PTFA and Code of Civil Procedure §§ 1161, 1161a and 1161b.

DATED: January 14, 2011

WRIGHT, FINLAY & ZAK, LLP
**U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ADJUSTABLE RATE MORTGAGE TRUST 2007-3 ADJUSTABLE RATE MORTGAGE BACKED PASS THROUGH CERTIFICATES, SERIES 2007-3.**

By: ______________________

Madeleine K. Lee, Esq., SBN 258520
Nichole L. Glowin, Esq., SBN 262932
David A. Wood, Esq., SBN 272406
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Telephone: (949) 797-1311
Fax: (949) 608-9142

EXHIBIT "2"

PAGE 3
ADDENDUM

TENANT INFORMATION

**IF YOU ARE A TENANT of the prior owner, please provide the following documents:**

- A copy of your lease
- A return phone number and the best time to reach you
- The receipt for the last six (6) payments made to the landlord for the residence
- Utility bills
- Names and ages of all occupants

**by mail, fax, or in person to:**

**Wright, Finlay & Zak, LLP**
**Unlawful Detainer Department**
**4665 MacArthur Court, Suite 280**
**Newport Beach, CA 92660**

**Fax: (949) 608-9142**

**For any questions, please call (949) 797-1311**

PARA ASISTENCIA EN ESPANOL LLAME AL (949) 797-1311

EXHIBIT 2

WRIGHT, FINLAY & ZAK, LLP
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660

# PROOF OF SERVICE

**I, the undersigned declare that I served the Notice (s) below indicated:**

☒ NOTICE TO ANY RENTERS LIVING AT
☒ 30/90 DAY NOTICE TO QUIT
☐ W-9 FORM
☐ STIPULATION FOR VACATION OF PREMISES DISPOSITION OF PERSONAL PROPERTY, AND FOR JUDGEMENT OF POSSESSION
☐ 3/60 DAY NOTICE TO QUIT
☒ ADDENDUM TENANT INFORMATION
☐ LETTER DATED
☐ CHANGE OF OWNERSHIP AND INFORMATION
☐ NOTICE OF ENTRY

**The above described Notice(s) were served on the following named parties in the manner set forth below:**

NAME: MARSHALL E. MIKELS
ADDRESS: 115 15TH AVENUE, SAN MATEO, CALIFORNIA 94402

☐ 1. PERSONAL SERVICE — By delivering a copy of the Notice (s) on at to at the address above.

☒ 2. CONSTRUCTIVE SERVICE — After due and diligent effort, by service of said Notice (s) as authorized by C.C.P. Section 1162 (2,3) on each of the above named parties in the manner set forth below:

☐A. By leaving a copy for each of the above named parties on at , with , a competent member of the household at the usual place of resident of each of the above named parties; and thereafter mailing a copy to each of the above named parties by depositing said copies in the United States mail on in a sealed envelope, with postage fully prepaid, addressed to each of the above named parties at their place of residence.

☒B. By posting a copy for each of the above named parties on January 14, 2011 at 8:20 PM in a conspicuous place on the property; and thereafter mailing a copy to each said party by depositing said copies in the United States mail, in a sealed envelope with postage fully prepaid, addressed to each said party at their place where the property is situated on January 14, 2011.

At the time of service, I was at least 18 years of age. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2011
NAME: ALBERTO REYES
C/O NATIONWIDE LEGAL, INC.
820 N. Parton Street, 2ND Floor
Santa Ana, California 92701
(714) 558-2400
The fee for service was: $
Registration Number: 1160
County: SAN FRANCISCO
Ref.: 9091599

[signature]

EXHIBIT "3"

WRIGHT, FINLAY & ZAK, LLP
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660

## PROOF OF SERVICE

I, the undersigned declare that I served the Notice (s) below indicated:

☒ NOTICE TO ANY RENTERS LIVING AT
☒ 30/90 DAY NOTICE TO QUIT
☐ W-9 FORM
☐ STIPULATION FOR VACATION OF PREMISES, DISPOSITION OF PERSONAL PROPERTY, AND FOR JUDGEMENT OF POSSESSION

☐ 3/60 DAY NOTICE TO QUIT
☒ ADDENDUM TENANT INFORMATION
☐ LETTER DATED
☐ CHANGE OF OWNERSHIP AND INFORMATION
☐ NOTICE OF ENTRY

The above described Notice(s) were served on the following named parties in the manner set forth below:

NAME:ALL OCCUPANT(S), TENANTS OR SUBTENANTS IN POSSESSION
ADDRESS:115 15TH AVENUE, SAN MATEO, CALIFORNIA 94402

☐ 1. PERSONAL SERVICE — By delivering a copy of the Notice (s) on at to at the address above.

☒ 2. CONSTRUCTIVE SERVICE — After due and diligent effort, by service of said Notice (s) as authorized by C.C.P. Section 1162 (2,3) on each of the above named parties in the manner set forth below:

☐ A. By leaving a copy for each of the above named parties on at , with , a competent member of the household at the usual place of resident of each of the above named parties; and thereafter mailing a copy to each of the above named parties by depositing said copies in the United States mail on in a sealed envelope, with postage fully prepaid, addressed to each of the above named parties at their place of residence.

☒ B. By posting a copy for each of the above named parties on January 14, 2011 at 8:20 PM in a conspicuous place on the property; and thereafter mailing a copy to each said party by depositing said copies in the United States mail, in a sealed envelope with postage fully prepaid, addressed to each said party at their place where the property is situated on January 14, 2011.

At the time of service, I was at least 18 years of age. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2011
NAME:ALBERTO REYES
C/O NATIONWIDE LEGAL, INC.
820 N. Parton Street, 2ND Floor
Santa Ana, California 92701
(714) 558-2400
The fee for service was:$
Registration Number: 1160
County: SAN FRANCISCO
Ref.: 9091598A

EXHIBIT 5

FAXED

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David A. Wood, Esq., SBN 272406
WRIGHT, FINLAY & ZAK, LLP
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
TELEPHONE NO.: 949-477-5050 FAX NO.: 949-477-9200
ATTORNEY FOR (Name): U.S. BANK, et al.

FOR COURT USE ONLY

RECEIVED
JAN 21 2011
CLERK OF THE SUPERIOR COURT SAN MATEO COUNTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch

CASE NAME: U.S. BANK, et al. v. MARSHALL E. MIKELS, and DOES 1-10 inclusive

# CIVIL CASE COVER SHEET

[ ] Unlimited (Amount demanded exceeds $25,000)
[X] Limited (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: CLJ 203244
JUDGE:
DEPT:

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[X] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (*check all that apply*): a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (*specify*): 1
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: January 19, 2011
David A. Wood, Esq., SBN 272406
(TYPE OR PRINT NAME)
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)—Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case—Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief from Late Claim
  - Other Civil Petition

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

| | |
|---|---|
| BANK ONE, N.A., | Case No. 03-047448-CZ |
| Plaintiff, | Hon. E.. Sosnick |
| v. | AFFIDAVIT OF WALKER F. TODD, EXPERT WITNESS FOR DEFENDANTS |
| HARSHAVARDHAN DAVE and PRATIMA DAVE, jointly and severally, | |
| Defendants. | |

| | |
|---|---|
| Harshavardhan Dave and Pratima H. Dave<br>C/o 5128 Echo Road<br>Bloomfield Hills, MI 48302<br>Defendants, *in propria persona* | Michael C. Hammer (P41705)<br>Ryan O. Lawlor (P64693)<br>Dickinson Wright PLLC<br>Attorneys for Bank One, N.A.<br>500 Woodward Avenue, Suite 4000<br>Detroit, Michigan 48226<br>(313) 223-3500 |

Now comes the Affiant, Walker F. Todd, a citizen of the United States and the State of Ohio over the age of 21 years, and declares as follows, under penalty of perjury:

1. That I am familiar with the Promissory Note and Disbursement Request and Authorization, dated November 23, 1999, together sometimes referred to in other documents filed by Defendants in this case as the "alleged agreement" between Defendants and Plaintiff but called the "Note" in this Affidavit. If called as a witness, I would testify as stated herein. I make this Affidavit based on my own personal knowledge of the legal, economic, and historical principles stated herein, except that I have relied entirely on documents provided to me, including the Note, regarding certain facts at issue in this case of which I previously had no direct and personal knowledge. I am making this affidavit based on my experience and expertise as an attorney, economist, research writer, and teacher. I am competent to make the following statements.

**PROFESSIONAL BACKGROUND QUALIFICATIONS**

2. My qualifications as an expert witness in monetary and banking instruments are as follows. For 20 years, I worked as an attorney and legal officer for the legal departments of the Federal Reserve Banks of New York and Cleveland. Among other things, I was assigned responsibility for questions involving both novel and routine notes, bonds, bankers' acceptances, securities, and other financial instruments in connection with my work for the Reserve Banks' discount windows and parts of the open market trading desk function in New York. In addition, for nine years, I worked as an economic research officer at the Federal Reserve Bank of Cleveland. I became one of the Federal Reserve System's recognized experts on the legal history of central banking and the pledging of notes, bonds, and other financial instruments at the discount window to enable the Federal Reserve to make advances of credit that became or could become money. I also have read extensively treatises on the legal and financial history of money and banking and have published several articles covering all of the subjects just mentioned. I have served as an expert witness in several trials involving banking practices and monetary instruments. A summary biographical sketch and resume including further details of my work experience, readings, publications, and education will be tendered to Defendants and may be made available to the Court and to Plaintiff's counsel upon request.

**GENERALLY ACCEPTED ACCOUNTING PRINCIPLES**

3. Banks are required to adhere to Generally Accepted Accounting Principles (GAAP). GAAP follows an accounting convention that lies at the heart of the double-entry bookkeeping system called the Matching Principle. This principle works as follows: When a bank accepts bullion, coin, currency, checks, drafts, promissory notes, or any other similar instruments (hereinafter "instruments") from customers and deposits or records the instruments as assets, it must record offsetting liabilities that match the assets that it accepted from customers. The liabilities represent the amounts that the bank owes the customers, funds accepted from customers. **In a fractional reserve banking system like the United States banking system, most of the funds advanced to borrowers (assets of the banks) <u>are created by the banks themselves</u> and are not merely transferred from one set of depositors to another set of borrowers.**

**RELEVANCE OF SUBTLE DISTINCTIONS ABOUT TYPES OF MONEY**

4. From my study of historical and economic writings on the subject, I conclude that a common misconception about the nature of money unfortunately has been perpetuated in the U.S. monetary and banking systems, especially since the 1930s. In classical economic theory, once economic exchange has moved beyond the barter stage, there are two types of money: money of *exchange* and money of *account*. For nearly 300 years in both Europe and the United States, confusion about the distinctiveness of these two concepts has led to persistent attempts to treat money of account as the equivalent of money of exchange. In reality, especially in a fractional reserve banking system, a comparatively small amount of money of exchange (e.g., gold, silver, and official currency notes) may support a vastly larger quantity of

business transactions denominated in money of account. The sum of these transactions is the sum of credit extensions in the economy. **With the exception of customary stores of value like gold and silver, the monetary base of the economy largely consists of credit instruments.** **Against this background, I conclude that the Note, despite some language about "lawful money" explained below, clearly contemplates both disbursement of funds and eventual repayment or settlement in money of account (that is, money of exchange would be welcome but is not required to repay or settle the Note).** The factual basis of this conclusion is the reference in the Disbursement Request and Authorization to repayment of $95,905.16 to Michigan National Bank from the proceeds of the Note. That was an exchange of the credit of Bank One (Plaintiff) for credit apparently and previously extended to Defendants by Michigan National Bank. Also, there is no reason to believe that Plaintiff would refuse a substitution of the credit of another bank or banker as complete payment of the Defendants' repayment obligation under the Note. This is a case about exchanges of money of account (credit), not about exchanges of money of exchange (lawful money or even legal tender).

5. Ironically, the Note explicitly refers to repayment in "lawful money of the United States of America" (*see* "Promise to Pay" clause). Traditionally and legally, Congress defines the phrase "lawful money" for the United States. **Lawful money was the form of money of exchange that the federal government (or any state) could be required by statute to receive in payment of taxes or other debts.** Traditionally, as defined by Congress, lawful money only included gold, silver, and currency notes redeemable for gold or silver on demand. In a banking law context, lawful money was only those forms of money of exchange (the forms just mentioned, plus U.S. bonds and notes redeemable for gold) that constituted the reserves of a national bank prior to 1913

(date of creation of the Federal Reserve Banks). *See,* Lawful Money, *Webster's New International Dictionary* (2d ed. 1950). **In light of these facts, I conclude that Plaintiff and Defendants exchanged reciprocal credits involving money of account and not money of exchange; no lawful money was or probably ever would be disbursed by either side in the covered transactions.** This conclusion also is consistent with the bookkeeping entries that underlie the loan account in dispute in the present case. Moreover, it is puzzling why Plaintiff would retain the archaic language, "lawful money of the United States of America," in its otherwise modern-seeming Note. It is possible that this language is merely a legacy from the pre-1933 era. Modern credit agreements might include repayment language such as, "The repayment obligation under this agreement shall continue until payment is received *in fully and finally collected funds*," which avoids the entire question of "In what form of money **or credit** is the repayment obligation due?"

6. *Legal tender*, a related concept but one that is economically inferior to *lawful money* because it allows payment in instruments that cannot be redeemed for gold or silver on demand, has been the form of money of exchange commonly used in the United States since 1933, when domestic private gold transactions were suspended (until 1974).. Basically, legal tender is whatever the government says that it is. The most common form of legal tender today is Federal Reserve notes, which by law cannot be redeemed for gold since 1934 or, since 1964, for silver. *See,* 31 U.S.C. Sections 5103, 5118 (b), and 5119 (a).

Note: I question the statement that fed reserve notes cannot be redeemed for silver since 1964. It was Johnson who declared on 15 March 1967 that after 15 June 1967 that Fed Res Notes would not be exchanged for silver and the practice did stop on 15 June

1967 – not 1964. I believe this to be error in the text of the author's affidavit.

7. *Legal tender under the Uniform Commercial Code (U.C.C.)*, Section 1-201 (24) (Official Comment), is a concept that sometimes surfaces in cases of this nature. The referenced Official Comment notes that the definition of ***money*** is not limited to ***legal tender*** under the U.C.C. *Money* is defined in Section 1-201 (24) as "a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more nations." The relevant Official Comment states that "The test adopted is that of sanction of government, whether by authorization before issue or adoption afterward, which recognizes the circulating medium as a part of the official currency of that government. The narrow view that money is limited to legal tender is rejected." Thus, I conclude that the U.C.C. tends to validate the classical theoretical view of money.

**HOW BANKS BEGAN TO LEND THEIR OWN CREDIT INSTEAD OF REAL MONEY**

8. In my opinion, the best sources of information on the origins and use of credit as money are in Alfred Marshall, MONEY, CREDIT & COMMERCE 249-251 (1929) and Charles P. Kindleberger, A FINANCIAL HISTORY OF WESTERN EUROPE 50-53 (1984). A synthesis of these sources, as applied to the facts of the present case, is as follows: As commercial banks and discount houses (private bankers) became established in parts of Europe (especially Great Britain) and North America, by the mid-nineteenth century they commonly made loans to borrowers by extending their own credit to the borrowers or, at the borrowers' direction, to third parties. The typical form of such extensions of credit was drafts or bills of exchange drawn upon themselves (claims on the credit of the drawees) instead of disbursements of bullion,

coin, or other forms of money. In transactions with third parties, these drafts and bills came to serve most of the ordinary functions of money. The third parties had to determine for themselves whether such "credit money" had value and, if so, how much. The Federal Reserve Act of 1913 was drafted with this model of the commercial economy in mind and provided at least two mechanisms (the discount window and the open-market trading desk) by which certain types of bankers' credits could be exchanged for Federal Reserve credits, which in turn could be withdrawn in lawful money. Credit at the Federal Reserve eventually became the principal form of monetary reserves of the commercial banking system, especially after the suspension of domestic transactions in gold in 1933. Thus, credit money is not alien to the current official monetary system; it is just rarely used as a device for the creation of Federal Reserve credit that, in turn, in the form of either Federal Reserve notes or banks' deposits at Federal Reserve Banks, functions as money in the current monetary system. In fact, a means by which the Federal Reserve expands the money supply, loosely defined, is to set banks' reserve requirements (currently, usually ten percent of demand liabilities) at levels that would encourage banks to extend new credit to borrowers on their own books that third parties would have to present to the same banks for redemption, thus leading to an expansion of bank-created credit money. In the modern economy, many non-bank providers of credit also extend book credit to their customers without previously setting aside an equivalent amount of monetary reserves (credit card line of credit access checks issued by non-banks are a good example of this type of credit), which also causes an expansion of the aggregate quantity of credit money. The discussion of money taken from Federal Reserve and other modern sources in paragraphs 11 et seq. is consistent with the account of the origins of the use of bank credit as money in this paragraph.

**ADVANCES OF BANK CREDIT AS THE EQUIVALENT OF MONEY**

9. Plaintiff apparently asserts that the Defendants signed a promise to pay, such as a note(s) or credit application (collectively, the "Note"), in exchange for the Plaintiff's advance of funds, credit, or some type of money to or on behalf of Defendant. However, the bookkeeping entries required by application of GAAP and the Federal Reserve's own writings should trigger close scrutiny of Plaintiff's apparent assertions that it lent its funds, credit, or money to or on behalf of Defendants, thereby causing them to owe the Plaintiff $400,000. According to the bookkeeping entries shown or otherwise described to me and application of GAAP, the Defendants allegedly were to tender some form of *money* ("lawful money of the United States of America" is the type of money explicitly called for in the Note), securities or other capital equivalent to money, funds, credit, or something else of value in exchange (money of exchange, loosely defined), collectively referred to herein as "money," to repay what the Plaintiff claims was the *money* lent to the Defendants. **It is not an unreasonable argument to state that Plaintiff apparently changed the economic substance of the transaction from that contemplated in the credit application form, agreement, note(s), or other similar instrument(s) that the Defendants executed, thereby changing the costs and risks to the Defendants.** At most, the Plaintiff extended its own *credit* (money of account), but the Defendants were required to repay in *money* (money of exchange, and *lawful money* at that), **which creates at least the inference of inequality of obligations** on the two sides of the transaction (*money*, including *lawful money*, is to be exchanged for *bank credit*).

**MODERN AUTHORITIES ON MONEY**

11. To understand what occurred between Plaintiff and Defendants concerning the alleged loan of *money* or, more accurately, *credit*, it is helpful to review a modern Federal Reserve description of a bank's lending process. *See*, David H. Friedman, MONEY AND BANKING (4th ed. 1984)(apparently already introduced into this case): "The commercial bank lending process is similar to that of a thrift in that the receipt of cash from depositors increases both its assets and its deposit liabilities, which enables it to make additional loans and investments. . . . When a commercial bank makes a business loan, it accepts as an asset the borrower's debt obligation (the promise to repay) and creates a liability on its books in the form of a demand deposit in the amount of the loan." (Consumer loans are funded similarly.) Therefore, the bank's original bookkeeping entry should show an increase in the amount of the asset credited on the asset side of its books and a corresponding increase equal to the value of the asset on the liability side of its books. **This would show that the bank received the customer's signed promise to repay as an *asset*, thus *monetizing* the customer's signature and creating on its books a liability in the form of a demand deposit or other demand liability of the bank.** The bank then usually would hold this demand deposit in a transaction account on behalf of the customer. Instead of the bank lending its *money* or other assets to the customer, as the customer reasonably might believe from the face of the Note, the bank *created* funds for the customer's transaction account without the customer's permission, authorization, or knowledge and delivered the *credit* on its own books representing those funds to the customer, meanwhile alleging that the bank lent the customer *money*. If Plaintiff's response to this line of argument is to the effect that it acknowledges that it lent credit or issued credit instead of money, one might refer to Thomas P. Fitch, BARRON'S

BUSINESS GUIDE DICTIONARY OF BANKING TERMS, "Credit banking," 3. "Bookkeeping entry representing a deposit of funds into an account." But Plaintiff's loan agreement apparently avoids claiming that the bank actually lent the Defendants *money*. They apparently state in the agreement that the Defendants are obligated to repay Plaintiff principal and interest for the "Valuable consideration (money) the bank gave the customer (borrower)." The loan agreement and Note apparently still delete any reference to the bank's receipt of actual cash value from the Defendants and exchange of that receipt for actual cash value that the Plaintiff banker returned.

12. **According to the Federal Reserve Bank of New York, money is anything that has value that banks and people accept as money; money does not have to be issued by the government.** For example, David H. Friedman, I BET YOU THOUGHT. . . . 9, Federal Reserve Bank of New York (4th ed. 1984)(apparently already introduced into this case), explains that banks create new money by depositing IOUs, promissory notes, offset by bank liabilities called checking account balances. Page 5 says, "Money doesn't have to be intrinsically valuable, be issued by government, or be in any special form. . . ."

13. The publication, Anne Marie L. Gonczy, MODERN MONEY MECHANICS 7-33, Federal Reserve Bank of Chicago (rev. ed. June 1992)(apparently already introduced into this case), contains standard bookkeeping entries demonstrating that *money* ordinarily is recorded as a bank *asset*, while a bank *liability* is evidence of *money* that a bank owes. The bookkeeping entries tend to prove that banks accept cash, checks, drafts, and promissory notes/credit agreements (assets) as *money* deposited to create credit or checkbook money that are bank *liabilities*, which shows that, absent any right of setoff, banks owe *money* to persons who deposit *money*.. **Cash (money of**

**exchange) is money, and credit or promissory notes (money of account) become money when banks deposit promissory notes with the intent of treating them like deposits of cash.** *See*, 12 U.S.C. Section 1813 (*l*)(1) (definition of "deposit" under Federal Deposit Insurance Act). The Plaintiff acts in the capacity of a lending or banking institution, and the newly issued credit or money is similar or equivalent to a promissory note, which may be treated as a deposit of money when received by the lending bank.. Federal Reserve Bank of Dallas publication MONEY AND BANKING, page 11, **explains that when banks grant loans, they create new money.** The new money is created because a new "loan becomes a deposit, just like a paycheck does." **MODERN MONEY MECHANICS, page 6, says,** "What they [banks] do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts." **The next sentence on the same page explains that the banks' assets and liabilities increase by the amount of the loans.**

## COMMENTARY AND SUMMARY OF ARGUMENT

14. Plaintiff apparently accepted the Defendants' Note and credit application (money of account) in exchange for its own credit (also money of account) and deposited that credit into an account with the Defendants' names on the account, as well as apparently issuing its own credit for $95,905.16 to Michigan National Bank for the account of the Defendants. One reasonably might argue that the Plaintiff recorded the Note or credit application as a loan (money of account) from the Defendants to the Plaintiff and that the Plaintiff then became the borrower of an equivalent amount of money of account from the Defendants.

15. **<u>The Plaintiff in fact never lent any of its own pre-existing money, credit, or assets as consideration to purchase the Note or credit agreement from the Defendants.</u>** (Robertson Notes: I add that when the bank does the forgoing, then in that event, there is an utter ***<u>failure of consideration</u>*** for the "loan contract".) When the Plaintiff deposited the Defendants' $400,000 of newly issued credit into an account, the Plaintiff created from $360,000 to $400,000 of new money (the nominal principal amount less up to ten percent or $40,000 of reserves that the Federal Reserve would require against a demand deposit of this size). The Plaintiff received $400,000 of credit or money of account from the Defendants as an asset. GAAP ordinarily would require that the Plaintiff record a liability account, crediting the Defendants' deposit account, showing that the Plaintiff owes $400,000 of money to the Defendants, just as if the Defendants were to deposit cash or a payroll check into their account.

16. The following appears to be a disputed fact in this case about which I have insufficient information on which to form a conclusion: I infer that it is alleged that Plaintiff refused to lend the Defendants Plaintiff's own money or assets and recorded a $400,000 loan from the Defendants to the Plaintiff, which arguably was a $400,000 deposit of money of account by the Defendants, and then when the Plaintiff repaid the Defendants by paying its own credit (money of account) in the amount of $400,000 to third-party sellers of goods and services for the account of Defendants, the Defendants were repaid their loan to Plaintiff, and the transaction was complete.

17. I do not have sufficient knowledge of the facts in this case to form a conclusion on the following disputed points: None of the following material facts are disclosed in the credit application or Note or were advertised by Plaintiff to prove that the

Defendants are the true lenders and the Plaintiff is the true borrower. **The Plaintiff is trying to use the credit application form or the Note to persuade and deceive the Defendants into believing that the opposite occurred and that the Defendants were the borrower and not the lender.** The following point is undisputed: The Defendants' loan of their credit to Plaintiff, when issued and paid from their deposit or credit account at Plaintiff, became money in the Federal Reserve System (subject to a reduction of up to ten percent for reserve requirements) as the newly issued credit was paid pursuant to written orders, including checks and wire transfers, to sellers of goods and services for the account of Defendants.

## CONCLUSION

18. Based on the foregoing, Plaintiff is using the Defendant's Note for its own purposes, and it remains to be proven whether Plaintiff has incurred any financial loss or actual damages (I do not have sufficient information to form a conclusion on this point). In any case, the inclusion of the "lawful money" language in the repayment clause of the Note is confusing at best and in fact may be misleading in the context described above.

Note is confusing at best and in fact may be misleading in the context described above.

AFFIRMATION

19. I hereby affirm that I prepared and have read this Affidavit and that I believe the foregoing statements in this Affidavit to be true. I hereby further affirm that the basis of these beliefs is either my own direct knowledge of the legal principles and historical facts involved and with respect to which I hold myself out as an expert or statements made or documents provided to me by third parties whose veracity I reasonably assumed.

Further the Affiant sayeth naught.

At Chagrin Falls, Ohio

December 5, 2003

Walker F. Todd

WALKER F. TODD (Ohio bar no. 0064539)
Expert witness for the Defendants
Walker F. Todd, Attorney at Law
1164 Sheerbrook Drive
Chagrin Falls, Ohio 44022
(440) 338-1169, fax (440) 338-1537
e-mail: westodd@adelphia.net

NOTARY'S VERIFICATION

At Chagrin Falls, Ohio
December 5, 2003

On this day personally came before me the above-named Affiant, who proved his identity to me to my satisfaction, and he acknowledged his signature on this Affidavit in my presence and stated that he did so with full understanding that he was subject to the penalties of perjury.

L G Lechman

Notary Public of the State of Ohio

L. A. LECHMAN, Notary Public
State of Ohio, Geauga County
My Commission Expires Sept. 6, 2005

636

14